1   Robert S. Green (State Bar No. 136183)
    James Robert Noblin (State Bar No. 114442)
2   **GREEN & NOBLIN, P.C.**
    2200 Larkspur Landing Circle, Suite 101
3   Larkspur, CA  94939
    Telephone:  (415) 477-6700
4   Facsimile:  (415) 477-6710
    Email:  gnecf@classcounsel.com
5
    Lynda Grant
6   **THEGRANTLAWFIRM, PLLC**
    521 Fifth Avenue, 17th Floor
7   New York, NY 10175
    Telephone:  212-1292-4441
8   Facsimile:  212-292-4442
9   Email:  lgrant@grantfirm.com

10  *Attorneys for Plaintiff*

11

12                  **UNITED STATES DISTRICT COURT**

13          **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

14

15  JEFFREY BERK, on behalf of himself        Case No.:
    and all others similarly situated,
16                                            **CLASS ACTION COMPLAINT**
                    Plaintiff,
17
    vs.
18                                            JURY TRIAL DEMAND

19  COINBASE, INC., a Delaware
    Corporation d/b/a Global Digital Asset
20  Exchange ("GDAX"), Brian Armstrong
    and David Farmer,
21
                    Defendants.
22

23

24

25

26

27

28

Plaintiff, Jeffrey Berk ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned counsel, alleges in this complaint, the following based upon his knowledge with respect to his own acts, and upon the investigation of his counsel, which include public statements made by defendant Coinbase, Inc.  ("Coinbase" or the "Company"), Brian Armstrong ("Armstrong"), its founder and chief executive officer, and David Farmer ("Farmer"), its director of communications, a review and analysis of media reports, interviews, social media and other information concerning the Company and its actions with regard to the cryptocurrency Bitcoin Cash ("Bitcoin Cash" or "BCH").

## INTRODUCTION

1.      This is a class action on behalf of all Coinbase customers who placed purchase, sale or trade orders with Coinbase or the GDAX in connection with Coinbase's launch of BCH during the period of December 19, 2017 through and including December 21, 2017 (the "Class Period") and who suffered monetary loss as a result of Defendants' wrongdoing (the "Class"). Excluded from the Class are Defendants, any entity owned or controlled by them, and any officer, director, employee or agent of any of the Defendants, and any heirs, assigns, or family members of any individual defendant.

2.      Bitcoin ("Bitcoin" or "BTC")  is a digital currency that was created as a response to the 2008 financial crisis and is the first decentralized digital currency that works without a bank or central authority, but rather on a peer to peer basis.

3.      It is powered by its users who use cryptography to control its creation. The Bitcoin protocol and software are published openly, and all Bitcoin transactions are kept on a ledger visible to all users in a "blockchain".  A blockchain is a continually growing chain of blocks of cryptographically secured records of transactions.  Blocks are created when the distributed computers complete the work of cryptographically securing the information.

4.      Global actors that do the work of storing and securing the data do so for the chance to obtain cryptocurrency when new chains are formed and are only added to the block chain when there is consensus.  As a general rule, decisions about the blockchain, and any changes in the software are essentially controlled by a group of miners and developers.

CLASS ACTION COMPLAINT

00106104.000.docx

5.      With the increase in exposure of cryptocurrencies, and Bitcoin in particular, to the public, and the concomitant increase in the number of transactions being performed, in early 2017, these miners and developers determined that Bitcoin would experience what is known as a hard fork, or a split, resulting in a second blockchain and a new currency that was called Bitcoin Cash, in order to increase the speed of (number of) transactions that could be performed.  At some point in about July 2017, these miners and developers determined that the hard fork would occur on about August 1, 2017.

6.      Coinbase is one of the most popular and accessible exchanges for the purchase, sale and use of Bitcoins, with more customers than Charles Schwab.  By opening a Coinbase account, a person can obtain Bitcoins, and either buy and sell them or use them as currency with retailers and other businesses who accept Bitcoin as payments.  Coinbase maintains a digital currency exchange known as the GDAX, which caters primarily to institutional and professional currency traders.

7.      Coinbase customers can set up what is known as a wallet, in which they keep their Bitcoins for later use or for investment.

8.      As one of the largest exchanges for the purchase and sale of Bitcoin, (and effectively a monopoly), the issue of whether Coinbase will maintain a market and support a cryptocurrency is essential to people who want to buy or sell the currencies.

9.      In response to a disclosure that Bitcoin would experience a "hard fork," which would create a new cryptocurrency called BCH, Coinbase initially announced that it was unprepared to and thus would not support the new currency.  In mid to late July 2017, it further told customers that if they intended to participate in the new currency, they should withdraw their Bitcoins from Coinbase, resulting in a deluge of withdrawals.

10.      On about August 6, 2017, Coinbase abruptly changed course, and announced that it would allow current Coinbase customers at the time of the hard fork to withdraw their BCH but not until January 2018, but that it still would not support the currency.

11.     On December 19, 2017, a month after tipping off its own employees as to when it would commence fully supporting BCH, Coinbase suddenly announced that it was opening up its books to the buying and selling of BCH within minutes after its announcements.

12.     Unsurprisingly, those who had been tipped off, immediately swamped Coinbase and the GDAX with buy and sell orders, thinning the liquidity but obtaining BCH at fair  prices. The market effect was to unfairly drive up the price of BCH for non-insider traders once BCH came on line on the Coinbase exchange.

13.     The remaining Coinbase customers, however, were not so lucky.  Within minutes, but after its insiders were able to sell their shares, Coinbase stopped the trading in BCH, and cancelled the outstanding orders of other customers, claiming that there was no more liquidity in the issue.  They opened BCH for purchase, sale and trading the next day, and again within minutes, closed the books and cancelled all the outstanding order while insiders and those who had prior knowledge of Coinbase's confidential information, were able to buy, sell and trade.

14.     When Coinbase's customers' trades were finally executed, it was only after the insiders had driven up the price of BCH, and thus the remaining Bitcoin customers only received their BCH at artificially inflated prices that had been manipulated well beyond the fair market value of BCH at that time.

15.     Rumors of insider trading, given the one month tip off that Coinbase gave to its employees, immediately started circulating.  Although the Company, through its chief executive officer, Armstrong publicly announced that the Company had an insider trading policy, and that it was undertaking an internal investigation of the insider trading allegation, to date, neither Armstrong nor the Company has disclosed the result of its purported investigation.

16.     Plaintiff brings this action on behalf of all Coinbase customers who were harmed by the Company's changing statements in connection with its launch of BCH, and who were damaged by Defendants' negligence in the handling of the launch.

CLASS ACTION COMPLAINT

**Jurisdiction and Venue**

17.     This action is brought under diversity jurisdiction under the Class Action Fairness Act, 28 U.S.C. §1332(d), in that the named Plaintiff is a citizen of a state different from the Defendants, and the aggregate amount in controversy for all Class members exceeds $5,000,000, exclusive of interest and costs.

18.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Substantial acts in furtherance of the alleged conduct have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information and the manipulation of the Company's stock, occurred in substantial part in this Judicial District, as did the acts of negligence.

**Parties**

19.     Plaintiff is a citizen of Arizona.  On December 19, 2017, at 5 p.m. PST, Plaintiff attempted to purchase BCH within five minutes of Coinbase announcing that it was going to support BCH.  Plaintiff's orders were not executed until 1:06 p.m. December 20, at which time, Plaintiff learned that his order was executed and that he had purchased BCH at the inflated price of $4,200.98 per BCH.  Plaintiff's order was executed at prices 100% greater than the price at the time that he submitted his buy order.

20.     Coinbase maintains its principal place of business in San Francisco, California and is incorporated in Delaware. It is one of the most powerful digital currency exchanges in the world, buying and selling Bitcoin, BCH, Litecoin, and Ethereum.

21.     It does so through a secure platform, in which customers can buy, sell, transfer or store their digital current in electronic wallets.  Although Coinbase maintains a digital currency exchange known as the GDAX, for the most part, it services professional traders and institutions, leaving Coinbase to act and the main broker and underwriter for retail customers wishing to purchase digital currencies.

22.     Coinbase is presently co-partnering with merchants such as Overstock.com, Dish Network, Dell, PayPal and Expedia, and has obtained investments from the New York Stock

-4-

1    Exchange, among others.  It is licensed in most states and operates in about 190 countries.  It is

2    considered one of the most influential blockchain companies in the world.

3        23.    Armstrong is one of the founders and the chief executive officer of Coinbase, and

4    one of its primary spokespersons.  Armstrong works from the Coinbase headquarters in San

5    Francisco, California.  During the Class Period, Armstrong made repeated statements in relation

6    to the Company's launch of BCH.

7        24.    Farmer is Coinbase's Director of Communications.  Farmer works from the

8    Coinbase headquarters in San Francisco.  During the Class Period, Farmer made statements in

9    relation to the Company's mission to support other currencies, and about the launch of BCH.

10    **Factual Background**

11    **BCH is Created through a Hard Fork**

12        25.    Bitcoin is one of the first digital currencies to gain widespread acceptance and

13    use.  As Bitcoin increased in popularity, and the number of transactions increased, a

14    disagreement arose among key miners and Bitcoin developers about how to proceed with

15    Bitcoin, and how to upgrade the network to accommodate more transactions.

16        26.    After a meeting in Hong Kong, about 80% of Bitcoin miners and developers

17    agreed to split the chain to create a new form of Bitcoin called Bitcoin Cash or BCH through the

18    hard fork process.

19        27.    A hard fork occurs when a cryptocurrency splits into two, and the

20    cryptocurrency's existing code is changed, resulting in both an old version and a new version of

21    the currency.  The hard fork is created through a new ledger with a different set of code

22    requiring all nodes or computers to make a change in their software.

23        28.    On about August 1, 2017, Bitcoin experienced a hard fork, and BCH was

24    launched through a change in the Bitcoin protocol. At the time, anyone who held a Bitcoin was

25    supposed to receive the equivalent numbers of BCHs.

26        29.    At the time of the BCH launch, many exchanges supported BCH, including

27    Bitfinex and Kraken, and BCH futures were trading at $475 on the VIABTC.

28

CLASS ACTION COMPLAINT

00106104.000.docx

1    **Coinbase First Announced that it would not Support BCH**

2           30.     Although many of Coinbase's customers were due to receive BCH in their on-

3    line wallets maintained by Coinbase, Coinbase initially refused to support BCH or to distribute

4    BCH to customers' online wallets, thus effectively holding its customers' BCH hostage.  (Those

5    that held their Bitcoin off line or in hard drives did obtain their BCH.)

6           31.     Coinbase, and Armstrong on behalf of Coinbase, proceeded to make a number of

7    statements as to when and whether Coinbase could and would support BCH.

8           32.     On July 19, 2017, in a FAQ on its website, Coinbase stated that it did not plan to

9    support BCH at the time of the hard fork, and that customers would not be able to withdraw any

10   "version of any Bitcoin from Coinbase."  It further stated that "we have no plans to support

11   additional blockchains at this time," despite the fact that Coinbase had announced its intention

12   that customers benefit to the extent possible from hard forks.

13          33.     Coinbase reiterated its position on July 27, 2017, when it announced:

14          In the event of two separate blockchains after August 1, 2017 we will only
            support one version.  We have no plans to support the Bitcoin Cash fork.  We
15          have made this decision because it is hard to predict how long the alternative
            version of bitcoin will survive and if Bitcoin Cash will have future market value.
16
17          34.     On July 28, 2017, Coinbase publicly tweeted that:

18          Coinbase does not intend to interact with the Bitcoin Cash Blockchain, or to
            access bitcoin cash (BCC) [later to become BCH].  In order to safely and securely
19          access bitcoin cash, Coinbase would need to undertake a process of designing and
            testing significant changes to our systems—including hot and cold storage.  This
20          is one of the core reasons customers will not be able to withdraw bitcoin cash
            after the fork on August 1st 2017. If this decision were to change in the future and
21          we were to access bitcoin cash, we would distribute to customers bitcoin cash
            (BCC) associated with bitcoin (BTC) balances at the time of the fork on August 1,
22          2017.  Coinbase would not keep the bitcoin cash associated with customer bitcoin
            (BTC) balances for ourselves.
23
24          35.     On July 29, 2017, Coinbase stated in a tweet that it was "seeing a high backlog in

25   bitcoin withdrawals due to significant congestion on the bitcoin network" and that it was taking

26   "us longer than normal to process bitcoin withdrawals" of those customers seeking to withdraw

27   their Bitcoins before the fork.

28

36.     By July 30, 2017, Coinbase had been so inundated with requests for withdrawals, that it was operating with significant delays, and unable to timely process the requests.

37.     Customers who kept their Bitcoins on hard drives or off line, were able to access the equivalent amount of BCH.  But Coinbase customers who kept their Bitcoins in their on-line wallets at Coinbase did not receive their distributions, with Coinbase initially keeping the Bitcoin Cash.

38.     Although customers' BCH was associated with their Bitcoins, they were unable to withdraw their Bitcoins, or access and trade or sell their BCH.  In the meantime, the price of BCH rose to over $400 per BCH.

39.     Given the length of time that it takes for customers to move from one exchange to another, moreover, it was impossible for Coinbase customers to quickly move their BTC from Coinbase to another exchange that was supporting BCH, so that they could access  their BCH and could commence trading them.

40.     In essence, Coinbase held their property captive forcing them to lose millions in value, and causing at least one cryptocurrency expert, Professor Tim Wu, to publicly state that Coinbase could be held liable under common law property principles.

**Coinbase Announces That It Will Not Support BCH until 2018**

41.     In apparent response to customer outrage over its actions in connection with the issuance of BCH, on August 3, 2017, Farmer, in a blog entitled, "Update on Bitcoin Cash" stated that one of the "points" Coinbase wanted to make clear was the it "operate[s] by the general principle that our customers should benefit to the greatest extent possible from hard forks or other unexpected events," but misleadingly reiterated Coinbase's position that it would not support BCH.

42.     In that blog, Farmer stated that, "Over the last several days, we've examined all of the relevant issues and have decided to work on adding support for bitcoin cash for Coinbase customers.  We made this decision based on factors such as the security of the network, customer demand, trading volumes, and regulatory considerations."

CLASS ACTION COMPLAINT

43.     However, Farmer then announced that Coinbase would not start to support BCH until January 1, 2018, "assuming no additional risks emerge during that time" and that once supported, customers will be able to withdraw bitcoin cash."  Farmer further stated that until that time, BCH would remain "safely stored on Coinbase."

44.     Notably, while it was keeping customers' Bitcoin Cash in reserve and announcing that it would continue to do so until January 2018, Coinbase was able to raise $100 million in Series D funding from a group of private equity and venture capital investors, including Spark Capital, Greylock Partners, Battery Ventures, Section 32, and Draper Associates on August 10, 2017.

45.     Although Coinbase indicated that it wouldnot have the capacity to support BCH until January 2018, about this time it announced that it would support another hard fork of Bitcoin then slated for November 2017 (Segwit2x), and in a blog noted that its customers would have access to that new currency immediately, undercutting its claims about its ability to support an alternative currency.

46.     In fact, in a Coinbase FAQ the morning of December 19th, Coinbase stated that "for now, Coinbase plans on supporting bitcoin cash withdrawals.  If this changes, we will notify all customers with an update e-mail", and further stated that Coinbase would not support BCH withdrawals until January 1, 2018.  Customers would not even be able to view the BCH balance associated with their accounts at that time, however.

47.     Coinbase further stated that it was "currently designing, building, testing and auditing our systems, to enable you to withdraw your bitcoin cash balance."  At the time that it made these announcements, Coinbase had already told its employees that it intended to launch the currency in mid-December but failed to disclose this material information to Coinbase customers.

48.     In the meantime, this failure to disclose such material information provided Coinbase insiders and investors with time to prepare their strategy for Coinbase's BCH launch.

**Coinbase Suddenly Announces its Support for Bitcoin Cash**

49.     In conflict with its prior announcements, including that it would only distribute Bitcoin Cash to customers at the time of the fork and then only for withdrawal purposes, on December 19, 2017, Coinbase, without prior notice suddenly announced that it was opening access to Bitcoin cash that day for trading.

50.     In a tweet, and without any other notice, Coinbase stated, "Buy, sell and receive Bitcoin Cash on Coinbase," and cited to its blog implying that it now had the capacity to handle the launch.

51.     On its blog, Coinbase effectively admitted that its failure to support Bitcoin Cash was contrary to its prior public statements and its purported mission statement that it operated "by the principle that our customers should benefit to the greatest extent possible form forks or other network events" and that doing so was essential to its "mission to make Coinbase the most trusted, safe, and easy-to-use digital currency exchange."

52.     It further stated that "Sends and receives" were available immediately, and that buys and sells would be available to all customers once there was sufficient liquidity on GDAX, within a few hours.

53.     Within minutes of this announcement, BCH experienced a significant run up of its price, although almost all Coinbase customers were not aware of this sudden support for the currency.

54.     In fact, many Coinbase customers noted on various blogs and sites, such as Reddit, they were not aware that Coinbase was trading BCH, until they actually saw the BCH being bought and sold along with BTC.

55.     Given the immediate, suspicious run up of BCH, when most Coinbase customers were unaware that it was trading, Coinbase felt compelled to address what was evident—that the run up was caused by insider trading by those who had been tipped by the Company as to when it was going to commence support for BCH.

56.     In its blog, Coinbase announced that it maintains a "strict trading policy and internal guideline for employees" who had been prohibited from trading in Bitcoin Cash for

1  several weeks.  However, Coinbase did not address, nor it disclose, the fact that insider trading

2  had taken place and that its employees had been tipped at least a month before that Coinbase

3  intended to commence support for BCH in December.

4  **The Offering of Bitcoin Cash is a Disaster**

5      57.     Most Coinbase customers were not informed about Coinbase's decision to

6  support buying and selling of BCH until after the GDAX and Coinbase had opened trading, and

7  the price of BCH had spiked.

8      58.     Although Coinbase employees and potentially others knew for over a month that

9  Coinbase was going to launch BCH, it was not until December 19, 2017, that Coinbase made

10  the sudden announcement that it would support BCH trading on three new books:  BCH-USD,

11  BCH-EUR, and BCH-BTC, but then in post only mode, which would allow for orders to be

12  placed but not filled, thus presumably establishing liquidity.

13      59.     Less than an hour later, Coinbase announced that it was going to enable full

14  trading of the BCH-USD book in five minutes, at 5:20 pm PST, and opened the books three

15  minutes later.

16      60.     Two minutes and 40 seconds later, the book was opened and over 4,443 orders

17  were placed with 3,461 orders matched, equal to $15.5 million of trading and the price of BCH

18  jumped 200% to over $8,499.  Liquidity was quickly thinned by these traders who were

19  prepared to trade at its sudden opening, leaving the rest of Coinbase's customers out of luck.

20  Two minutes after BCH commenced trading on the GDAX, Coinbase placed restrictions on

21  trading, preventing orders from being filled.

22      61.     By 6:30 pm  PST, Coinbase announced that the BCH-USD, BCH-EUR, and

23  BCH-BTC books would move to "cancel-only" mode, due to thinning liquidity (and Coinbase's

24  apparent intent to support its price for those insiders who had purchased) and that all open

25  orders essentially for any other Coinbase customers seeking to trade that day, would be cleared

26  so that any Coinbase customer who did not know or was unable to trade at Coinbase's sudden

27  open (and who were not aware that it was going to commence trading BCH on December 19th),

28  lost any opportunity to buy at a fair price, rather an artificially manipulated price.

-10-

CLASS ACTION COMPLAINT

62.     At 8:56 a.m. PST, on December 20, 2017, Coinbase announced its intention to open the BCH-USD, BCH-EUR, and BCH-BTC books in 'post-only' mode, and at 1:00 p.m. PST opened the book but then canceled the BCH-EUR and BCH-BTC books and moved them to cancel only mode, and failed to open them for the remainder of the year.

**Coinbase Does Not Deny Insider Trading Claims and Admits Employees were Tipped**

63.     Rumors that the run up in the price of BCH immediately prior to Coinbase's sudden decision to fully launch BCH on December 19 were caused by insider trading started circulating immediately.

64.     In response, Armstrong implicitly admitted that the allegations had some traction, stating, "Given the price increase in the hours leading up to the announcement [that the Company would support BCH], we will be conducting an investigation into this matter, and that if the Company found evidence of wrongdoing, he would "not hesitate to terminate the employee immediately and take appropriate legal action."

65.     Armstrong further announced that the Company maintains a policy prohibiting employees from buying and selling BCH and that at that point, he was not aware of any wrongdoing.

66.     Defendants' public statements were  disseminated by way of the internet, which culminated purchases, sales and trade orders on the Coinbase website, which is maintained and run from its headquarters in San Francisco, California.

67.     To date, the Company has not publicly denied that in fact insider trading occurred or the results of the purported internal investigation.

68.     Rather, in a January 9, 2018 GDAX blog, Adam White ("White"), the Company's general manger, in an article entitled, "Bitcoin Cash Launch Retrospective", admitted that employees were notified of Coinbase's decision to support BCH trading on November 13, 2017, over a month before Coinbase's customers, so that the employees had a month to craft the trading strategies to employ the moment that Coinbase enabled CTH trading. White then reiterated that employees were barred from sharing this confidential information and

CLASS ACTION COMPLAINT

00106104.000.docx

from buying and selling without stating whether in fact insider trading had taken place or whether the purported "internal investigation" had yielded any results.

69.     The GDAX, however, did amend its rules on January 16, 2018, to require order minimums.

## CLASS ACTION ALLEGATIONS

70.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf the Class defined in paragraph 1, above.

71.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Coinbase had over 11 million customers, and approximately $11 billion (USD) of BCH was traded on December 20, 2017.

72.     While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, customers may be determined through Coinbase's documents.

73.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct.

74.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class litigation.

75.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

     (a)     Whether the conduct of Coinbase in connection of the launch of BCH was unfair conduct under the California Unfair Competition Law;

     (b)     Whether statements made by Defendants to Coinbase customers during the Class Period omitted and/or misrepresented material facts about the timing and ability of Coinbase to support BCH and disclosure of its plans to launch BCH to its employees and other insiders; and

     (c)     Whether Coinbase was negligent in its handling of the launch of BCH, including failing to properly oversee its employees and others who were tipped.

76.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the monetary losses suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

77.     The claims asserted herein are a matter of public policy, and do not arise out of the Plaintiff's or any other customer contract.

78.     Customers of Coinbase are not asked and therefore do not have to agree to the Customer Agreement, which contains an arbitration clause, a class action waiver provision and a limitation on damages.  In opening an account, a customer merely has to provide identifying information and bank, wire transfer or credit card information in order to start purchasing currency or trading, without clicking, agreeing or opting in or out of those provisions. Nowhere on the Coinbase website does it require actual approval or a meeting of minds with respect to the terms of the customer agreement, and in particular, the arbitration clause, the class action waiver and the limitation on damages.

79.     In fact, it is only by going through the website, and a multitude of links that a customer can obtain the Customer Agreement, which contains the arbitration provision, the class action waiver and the limitation of liability.

80.     Further, even if the arbitration and attendant provisions are enforceable and this matter arise under the Customer Agreement, Section 7.2 of the Customer Agreement or the arbitration/class action provision requires the Company to attempt to resolve any dispute informally as a condition precedent to the requirement to arbitrate.

81.     However, Coinbase is unprepared to and therefore does not provide sufficient customer support such that this condition precedent can be satisfied, thereby precluding the Company from enforcing the arbitration and class action waiver clause at Section 7.2 of the Customer Agreement.

CLASS ACTION COMPLAINT

82.     Plaintiff made several attempts by email to obtain redress from Coinbase which went unanswered.

83.     Certain of the claims asserted herein, including claims against Armstrong and Farmer, do not invoke any provisions of the Customer Agreement, as those persons are not parties to the Customer Agreement.

84.     Additionally, certain sections of the Customer Agreement are ambiguous and inconsistent and therefore cannot be enforced.  Section 8.3 purports to limit Coinbase's liability in a section entitled, "Limitation of Liability; No Warranty", but Section 7.2 states that should an action proceed to arbitration, "[t]he arbitrator may award any relief that a court of competent jurisdiction could award."

## COUNTS

## Count I:  Violation of California's Unfair Competition Law ("UCL")(Cal. Bus. & Prof. Code 17200, *et seq.*)

85.     Plaintiff incorporates all of the above allegations as if fully set forth herein.

86.     California's Unfair Competition Law ("UCL") prohibits and makes actionable any unfair business practice.  Defendant Coinbase's conduct, all of which emanated from California, constitutes unfair business practices.   Defendant's conduct allowed Coinbase's agents, employees and others, who were aware that Coinbase was going to support BCH in December 2017, to purchase BCH from other exchanges, and devise their strategy to either purchase or sell their BCH through Coinbase and on the GDAX, once Coinbase announced that it was going to support BCH.

87.     Coinbase's acts and practices constitute "unfair" business acts and practices, in that the harm caused by Coinbase's wrongful conduct outweighs any utility of such conduct, and such conduct (i) offends public policy, (ii) is immoral, unscrupulous, unethical, oppressive, deceitful and offensive, or (iii) has caused and will continue to cause substantial injury to consumers such as Plaintiffs and the Class.

CLASS ACTION COMPLAINT

88.     As a direct, proximate and foreseeable result of Defendant Coinbase's unfair business practices, Plaintiff and Class members sustained ascertainable losses, in that they received less BCH than they would have obtained at the time that they placed their trades.

89.     Plaintiff and Class members are entitled to and do seek an order of restitution and disgorgement requiring Coinbase to restore to them the additional benefits and monies that Defendant Coinbase received in connection with Class Members' purchase, sales and trades of BCH.

90.     Plaintiffs are entitled to recover their attorneys' fees and costs under California Code of Civil Procedure, Section 1021.5.

**Count II-Negligence and Negligent Misrepresentation against Coinbase, Armstrong and Farmer**

91.     Plaintiff repeats the allegations above as if fully set forth herein.  Plaintiff explicitly disclaims any allegations of fraud.

92.     Coinbase, Armstrong and Farmer owed Plaintiff and Class Members a duty of reasonable care, which they breached.   By operating an exchange through which customers, and particularly retail customers, could buy, sell and trade currency, Defendants owed the highest duties of reasonable care to Coinbase's customers.

93.     Defendants were negligent in performing these duties, and in particular, in failing to prevent their employees and other insiders from engaging in insider trading.

94.     Defendants were further negligent and failed to use reasonable due care in ensuring that Coinbase could successfully launch BCH, and that its systems could properly handle the number of transactions that would occur once it suddenly launched BCH.

95.     Defendants made the representations alleged above without reasonable grounds for believing them to be true and with the intent that Coinbase customers would rely on their statements.

96.     Plaintiff and Class Members were ignorant of the truth and justifiably relied on the statements made by Defendants.

CLASS ACTION COMPLAINT

00106104.000.docx

1    97.    There is a strong public interest in Defendants' proper and non-negligent

2    performance of their duties.

3    98.    Because Defendants breached their legal duties, Plaintiff and Class members

4    suffered the damage described herein.

5    99.    The damages suffered by Plaintiff and Class members were all general and

6    special damages arising from the natural and foreseeable consequences of Defendants'

7    wrongdoing and were proximately caused by Defendants' acts.

8                                    **PRAYER FOR RELIEF**

9    WHEREFORE, Plaintiff, on behalf of himself and all other Class members similarly

10   situated, prays for relief and judgment as follows:

11   (a)    Determining that this is a proper class action pursuant to Rule 23(a) and (b)(3) of

12   the Federal Rules of Civil Procedure;

13   (b)    Awarding compensatory damage and restitution in favor of Plaintiff and the other

14   Class members against Defendants, jointly and severally, for all damages sustained as a result of

15   Defendants' wrongdoing, in an amount to be determined at trial, including interest thereon;

16   (c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in

17   this action, including a reasonable allowance of fees for Plaintiff's attorneys and experts; and

18   (d)    Awarding Plaintiff and the other Class members such other and further relief as

19   the Court may deem just and proper.

20                                   **JURY TRIAL DEMAND**

21   Plaintiff demands a jury trial on all issues so triable.

22   DATED:  March 1, 2018                **GREEN & NOBLIN, P.C.**

23

24                                        By:  ___/s/ Robert S. Green_____
                                                  Robert S. Green

25
                                          James Robert Noblin
26                                        2200 Larkspur Landing Circle, Suite 101
                                          Larkspur, CA  94939
27                                        Telephone:  (415) 477-6700
                                          Facsimile:  (415) 477-6710
28                                        Email:  gnecf@classcounsel.com

Lynda Grant
**THEGRANTLAWFIRM, PLLC**
521 Fifth Avenue, 17th Floor
New York, NY 10175
Telephone:  212-1292-4441
Facsimile:  212-292-4442
Email:  lgrant@grantfirm.com

*Attorneys for Plaintiff*

CLASS ACTION COMPLAINT

00106104.000.docx