1    Robert S. Green (State Bar No. 136183)
     James Robert Noblin (State Bar No. 114442)
2    **GREEN & NOBLIN, P.C.**
     2200 Larkspur Landing Circle, Suite 101
3    Larkspur, CA  94939
     Telephone:  (415) 477-6700
4    Facsimile:  (415) 477-6710
     Email:  gnecf@classcounsel.com
5
     Lynda Grant
6    **THEGRANTLAWFIRM, PLLC**
     521 Fifth Avenue, 17th Floor
7    New York, NY 10175
     Telephone:  212-1292-4441
8    Facsimile:  212-292-4442
9    Email:  lgrant@grantfirm.com

10   *Attorneys for Plaintiff*

11

12                    **UNITED STATES DISTRICT COURT**

13            **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

14

15   JEFFREY BERK, on behalf of himself      | Case No.:  3:18-cv-01364-VC
16   and all others similarly situated,
                                             | **PLAINTIFF'S OPPOSITION TO**
17                    Plaintiff,             | **DEFENDANTS' MOTION TO COMPEL**
                                             | **INDIVIDUAL ARBITRATION AND TO**
18   vs.                                     | **STAY**

19   COINBASE, INC., a Delaware              | Date:        August 9, 2018
20   Corporation d/b/a Global Digital Asset  | Time:        10:00 a.m.
     Exchange ("GDAX"), Brian Armstrong      | Judge:       Hon. Vince Chhabria
21   and David Farmer,

22                    Defendants.            | Courtroom:  4 - 17th Floor

23                                           | Date Filed:  March 1, 2018

24                                           | Trial Date:  None set

25

26

27

28

---

PLAINTIFF'S OPPOSITION TO MOTION TO COMPEL INDIVIDUAL ARBITRATION AND TO STAY
CASE NO. 3:18-cv-01364-VC

## <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION AND RELEVANT FACTS ....................................................................1

II.   ARGUMENT ..............................................................................................................6

      A.    This Court has Jurisdiction to Determine the Enforceability of the Arbitration
            Agreement ........................................................................................................6

      B.    This Dispute Does not Fall within the Narrow Scope of the Arbitration
            Agreement ........................................................................................................8

      C.    The Arbitration Agreement is Unconscionable and Should Be Stricken .............12

      D.    The Claims Against Armstrong and Farmer are not Subject to Arbitration.........13

      E.    No Claims Should be Stayed ...........................................................................15

III.  CONCLUSION ..........................................................................................................15

PLAINTIFF'S OPPOSITION TO MOTION TO COMPEL INDIVIDUAL ARBITRATION AND TO STAY
CASE NO. 3:18-cv-01364-VC

00107825.000.docx

1

## <u>TABLE OF AUTHORITIES</u>

2

**Federal Cases**

3
*Accord Tompkins v. 23andMe, Inc.*
    2014 U.S. Dist. LEXIS 88068 (N.D. Cal. June 25, 2014)................7
4

*Amisil Holdings Ltd. v. Clarium Capital Mgmt. LLC*
5
    622 F. Supp. 2d 825 (N.D. Cal. 2007).................14, 15

6
*Anderson v. Pitney Bowes, Inc.*
    2005 U.S. Dist. LEXIS. 37662 (N.D. Cal. May 4, 2005)................15
7

8
*Baysand Inc. v. Toshiba Corp.*
    2015 U.S. Dist. LEXIS 157442 (N.D. Cal. Nov. 19, 2015)................10

9
*Bermudez v. PrimeLending*
    2012 U.S. Dist. LEXIS 197023 (C.D. Cal. Aug. 14, 2012) ................13
10

11
*Boston Telecomms. Grp., Inc. v. Deloitte Touche Tohmatsu*
    249 Fed. App'x 534 (9th Cir. 2007)................14

12
*Brennan v. Opus Bank*
    796 F.3d 1126 (9th Cir. 2015) ................6
13

14
*Britton v. Co-op Banking Group*
    4 F.3d 742 (9th Cir. 1993)................14

15
*Bynum v. Maplebear Inc.*
    160 F. Supp. 3d 527 (E.D.N.Y. 2016)................13
16

17
*Cape Flattery Ltd. v. Titan Mar.LLC*
    647 F.3d 914 (9th Cir. 2011)................6, 8, 9

18
*CFTC v. McDonnell*
    287 F. Supp. 3d 213 (E.D.N.Y. 2018)................11
19

20
*Chastain v. Union Sec. Life Ins. Co.*
    502 F. Supp. 2d 1072 (C.D. Cal. 2007)................14

21
*Cordas v. Uber Tech., Inc.*
    228 F. Supp. 3d 985 (N.D. Cal. 2017)................7
22

23
*First Options of Chicago, Inc. v. Kaplan*
    514 U.S. 938 (1995)................6, 7

24
*Ingalls v. Spotify USA, Inc.*
    2016 U.S. Dist. LEXIS 157384 (N.D. Cal. Nov. 14, 2016)................7
25

26
*Kramer v. Toyota Motor Corp.*
    705 F.3d 1122 (9th Cir. 2013)................11

27
*Leidel v. Coinbase, Inc.*
    2018 U.S. App. LEXIS 10464 (11th Cir. Apr. 23, 2018)................9, 10
28

PLAINTIFF'S OPPOSITION TO MOTION TO COMPEL INDIVIDUAL ARBITRATION AND TO STAY
CASE NO. 3:18-cv-01364-VC

00107825.000.docx

*Letizia v Prudential Bache Secur., Inc.*
  802 F.2d 1185 (9th Cir. 1986) ..............................................................................14

*Levi Strauss & Co. v. Aqua Dynamics Sys.*
  2016 U.S. Dist. LEXIS 46738 (N.D. Cal. April 6, 2016) ...............................6, 7

*McLellan v. Fitbit, Inc.*
  2017 U.S. Dist. LEXIS 168370 (N.D. Cal. Oct. 11, 2017) ....................................7

*Mediterranean Enterprises, Inc. v. Ssangyong Corp.*
  708 F.2d 1458 (9th Cir. 1983) .............................................................................8, 9

*Moses H. Cone Memorial Hosp. v. Mercury Const. Corp.*
  460 U.S. 1 (1983) ................................................................................................15

*Nagrampa v. MaiCoupons*
  469 F.3d 1257 (9th Cir. 2006) ..............................................................................12

*Oracle Am., Inc. v. Myriad Grp. A.G.*
  724 F.3d 1069 (9th Cir. 2013) ................................................................................6

*Qualcomm Inc. v. Nokia Corp.*
  466 F. 3d 1366 (Fed. Cir. 2006) ...........................................................................10

*Regents of the Univ. of Cal. v. Japan Sci. & Tech. Agency*
  2014 U.S. Dist. LEXIS 199896 (C.D. Cal. Oct. 16, 2014) ....................................2

*Swift v. Zynga Game Network, Inc.*
  805 F. Supp. 2d 904 (N.D. Cal. 2010) ..................................................................14

*Tompkins v. 23andMe, Inc.*
  2014 U.S. Dist. LEXIS 88068 (N.D. Cal. June 25, 2014).....................................12

*Tracer Research Corp. v. Nat'l. Envtl. Servs. Co.*
  42 F.3d 1292 (9th Cir. 1994) ..............................................................................8, 9

*United Steelworkers v. Warrior & Guild Navigation Co.*
  363 U.S. 574 (1960) ..............................................................................................8

*Vargas v. Delivery Outsourcing, LLC*
  2016 U.S. LEXIS 32634 (N.D. Cal. Mar. 14, 2016) ..............................................7

*Zelkind v. Flywheel Networks, Inc.*
  2015 U.S. Dist. LEXIS 141367 (N.D. Cal. Oct. 16, 2015) ....................................7

*Ziglar v. Express Messenger Sys.*
  2017 U.S. Dist. LEXIS 220460 (D. Ariz. Aug. 31, 2017) .....................................2

**State Cases**

*Ajamian v. CantorCo2e, L.P.*
  203 Cal. App. 4th 771 (2012)..................................................................................7

*Armendariz v. Foundation Health Psychcare Services, Inc.*
  24 Cal. 4th 83  (2000)...........................................................................................12

-iii-

00107825.000.docx

*Baker v. Osborne Dev. Corp.*
    159 Cal. App. 4th 884 (2008) ............................................................................7

*Dream Theater, Inc. v. Dream Theater*
    124 Cal. App. 4th 547 (2004) .............................................................................8

*Dryer v. Los Angeles Rams*
    40 Cal. 3d 406 (1985) .....................................................................................14

*E Fund Capital Partners v. Pless*
    150 Cal. App. 4th 1311 (2007) ....................................................................8, 11

*Frances T. v. Village Green Owners Assn.*
    412 Cal. 3d 490 (1986) ...................................................................................14

*Greenspan v. LADT, LLC*
    185 Cal. App. 4th 1413 (2010) ...........................................................................8

*Jackson v. Shakespeare Found., Inc.*
    108 So. 3d 587 (Fla. 2013) ................................................................................9

*Parada v. Superior Court*
    176 Cal. App. 4th 1554 (2009) ...........................................................................7

*Rice v. Downs*
    248 Cal. App. 4th  175 (2016) ......................................................................8, 11

*Rodgriguez v. Am. Techs., Inc.*
    136 Cal. App. 4th 1110 (2006) ...........................................................................8

*Waller v. Trust Ins. Exchange, Inc.*
    11 Cal. 4th 1 (1995) ..........................................................................................8

**Federal Statutes**

9 U.S.C. § 3 ..............................................................................................................15

Fed. Rule of Civil Procedure, Rule 56 .......................................................................1

PLAINTIFF'S OPPOSITION TO MOTION TO COMPEL INDIVIDUAL ARBITRATION AND TO STAY
CASE NO. 3:18-cv-01364-VC

1

## I. INTRODUCTION AND RELEVANT FACTS

2      Plaintiff Jeffery Berk ("Plaintiff") submits this Memorandum of Points and Authorities

3   in opposition to Defendants' Motion to Compel Individual Arbitration and to Stay ("Motion to

4   Compel").[1]  This action arises from the manipulation of the market for the cryptocurrency

5   bitcoin cash ("BCH") by Coinbase, Inc., among others, in relation to its undeniably disastrous

6   launch on the Coinbase exchange (the "Launch").   Contrary to Coinbase's assertions that all of

7   its alleged wrongdoing (and that of its two executives, Armstrong and Farmer), falls within the

8   arbitration agreement ("Arbitration Agreement") contained in its User Agreement ("User

9   Agreement")—it not and is not subject to arbitration.[2]

10  This Action asserts the following:

11      (1)   That prior to Coinbase's ill-advised Launch of BCH, both Armstrong and Farmer

12            made misrepresentations and omissions regarding whether and when Coinbase

13            would support BCH, misleading customers and investors;

14      (2)   That Coinbase and Armstrong then tipped their employees as to when Coinbase

15            was going to launch BCH over a month before the Launch and any public

16            announcement of the Launch date, and then failed to enforce rules preventing

17            their employees or other insiders from misappropriating that confidential

18            information to engage in extensive pre-launch trading on other exchanges, only a

19            few days before the Launch, resulting in the run up and artificial inflation of the

20            price of BCH just days before the Launch was publicly announced, *See* Roedell

21            Dec., Ex A[3], Comp.¶63-64;

22

---

23  [1] Plaintiff concurrently submits the Declaration of Robert Green (the "Green Declaration", or
    "Green Dec., at Ex. __"), and the exhibits thereto, which include the Declaration of Jeffrey Berk
24  (the "Berk Declaration"), and the Declaration of Matthew Roedell (the "Roedell Declaration",
    "Roedell Dec., Ex. __", and the exhibits thereto.
25  [2] At this juncture, Plaintiff concedes that he clicked a box at the inception of his service with
    Coinbase that hyperlinked to the User Agreement and Privacy Agreement. *See* Motion to
26  Compel at 2-4.  He does not concede that he agreed to the American Arbitration Association
    ("AAA") Rules, which were "hyperlinked to the Arbitration Agreement and pages away from
27  the click button, and the delegation clause that was nested within the 40 page AAA Rules.
    [3]On a motion to compel arbitration, a court may consider matters outside the pleadings, and the
28  motion is treated like one for summary judgment under Fed. Rule of Civ. Pro., 56. *Regents of*

-1-

00107825.000.docx

(3)     That the launch of BCH was disastrous due to this pre-announcement trading, which led to the price of BCH skyrocketing in a matter of minutes, from about $3,500 to about $9,500 per BCH, *See* Roedell Dec., Ex. C, Comp. ¶53, leading to the halt sales of BCH at these inflated prices, but Coinbase's continued recognition of purchases at artificially inflated prices, generating fees;

(4)     That Coinbase halted and cancelled trading, after two minutes[4]; leaving Coinbase customers with the inability to get their money or coins out of Coinbase; and

(5)     That BCH opened the next day at about $3,500, almost $6,000 less per BCH than the run up the day before due in part to trading by insiders. Roedell Dec., Ex. B.

Given the unprecedented run up of the price of BCH before the launch, Armstrong himself publicly admitted that there might have been insider trading, and that Coinbase was commencing an investigation, but then did nothing thereafter.  Comp.¶¶63-67.  Rather, than take action consistent with their own rules, however, Defendants then falsely eradicated the artificial price spike that they had created on December 19th, in an effort to sweep the entire manipulation scheme, and their own negligence under the proverbial rug, but locked in massive losses for customers.  *See* Roedell Dec., Ex. B.  They also changed the priority rules governing the GDAX, the exchange run by Coinbase, and the "back room" for its Coinbase retail customers, in mid stream from requiring priority trading to eliminating that provision. Green Decl., Ex. A.

The reasoning for this is obvious--to save Coinbase's own skin in this effective run on the Company.  As a currency dealer and exchange[5], with the onslaught of sales due to the price run up, Coinbase would have had to pay out exorbitant amounts of money to make these purchases at the highly inflated prices.  With an avalanche of purchases at inflated prices from outside investors, it is likely that it would have had to sell far more BTH than it had.  To avoid

---

*the Univ. of Cal. v. Japan Sci. & Tech. Agency*, 2014 U.S. Dist. LEXIS 199896, *6, n. 24 (C.D. Cal. Oct. 16, 2014).  The Court should view all evidence in favor of the non-moving party to determine whether a valid arbitration agreement exists.  *Ziglar v. Express Messenger Sys.*, 2017 U.S. Dist. LEXIS 220460, *6 (D. Ariz. Aug. 31, 2017).

[4] Significantly, Coinbase continued to record purchases of BCH, after terminating all sales for lack of liquidity leaving Class members with no exit, and for many, stuck with overpriced, and artificially inflated BCH and the conversion of their property by Coinbase. Comp., ¶¶58-62.

[5] Coinbase has recently sought registration as a broker and has purchased several broker dealers.  *See* Green Dec., Ex. B.  There is little question that the GDAX is an exchange.  Comp.¶6.

PLAINTIFF'S OPPOSITION TO MOTION TO COMPEL INDIVIDUAL ARBITRATION AND TO STAY CASE NO. 3:18-cv-01364-VC

1   this run, it allowed two minutes of trading, enabling dumping at inflated prices by its own

2   insiders, and then shut down selling (but still took purchase orders and then filled them at

3   inflated prices, and ignored limit orders) until it completely shut down trading.[6]  It then opened

4   for trading the next day but at prices of about $3,000 less than the inflated price to which BCH

5   has been run the prior day to be consistent with other exchanges.  In the meantime, it filled

6   purchase orders at the artificially inflated prices, earning fees.[7]

7        This is not a simple case of a "conversion" issue that falls neatly within the limited scope

8   of Coinbase's User Agreement, and thus under the "narrow" scope of the arbitration clause, as

9   Defendants contend.[8]  It is a manipulation of the Launch and market for BCH.  Neither

10   deceptive practices, manipulation or even the negligence alleged here are claims "arising under"

11   the narrow scope of the Arbitration Agreement. However, it is scheme that at a minimum

12   violates California's Unfair Competition Law ("UCL") and resulted from intentional conduct or,

13   alternatively, negligence, and may be violative of the Commodities Exchange Act.[9]  In short, it

14   is an Action rightfully belonging in this Court.[10]

15        It is up to this Court to decide the "gateway issues" of whether there is an agreement to

16   arbitrate, and the scope of that agreement ---not an arbitrator.  Defendants argue that the

17   incorporation of the AAA Rules constitute a clear and unmistakable intent by the parties that

18   these gateway issues be determined in arbitration.  But the Ninth Circuit has explicitly left open

19

---

[6] Although Defendants argue that Class members could have cancelled their trades, that is not correct.  First, the cancellation button did not work. S*ee* Roedell Declaration.  Second, Class members had every expectation that their orders would be filled at the market price quoted to them and therefore had insufficient information to cancel their purchases.  *See* Berk Declaration.
[7] Notably, Coinbase also engages in proprietary trading on GDAX.  Whether it traded during the Launch is an issue to be determined during discovery.  *See* GDAX Rules at 3.4.
[8] The Arbitration Clause here falls into what courts deem the "narrow" scope:  it provides that only disputes with Coinbase "arising under this Agreement" or the User Agreement are subject to arbitration.  *See* Point II, *infra.*
[9] BCH and all cryptocurrencies are commodities regulated by the CFTC.
[10] The User Agreement, moreover, specifically acknowledges that customers will bringing tort claims in Section 8.3, entitled Limitation of Liability, and does not provide that such claims be arbitrated.  *See* Declaration of Jesse Pollack in Support of Motion to Compel Individual Arbitration and to Stay ("Pollack Dec.") Ex. 4 at p.12.  Further, Defendants admit in the Motion to Dismiss, that the issue of the scope of their duties under negligence claims is one to be decided by a court—not an arbitrator.  *See Motion to Dismiss* at 9 (citing *Melton v. Boustred*, 198 Cal. App. 4th 521, 531 (2010) for the proposition that "[t]he existence of a duty is a question of law for the court.").

PLAINTIFF'S OPPOSITION TO MOTION TO COMPEL INDIVIDUAL ARBITRATION AND TO STAY
CASE NO. 3:18-cv-01364-VC

00107825.000.docx

the issue of whether such an incorporation applies in the current circumstance—a consumer

contract of adhesion where there has been no opportunity for negotiation or to opt out, and

where the customer is not a sophisticated business person.  More importantly, the Arbitration

Agreement specifically reserves those issues for the Court, in direct contravention to the AAA

Rules and thus to the delegation to the arbitrator of its right to determine its own jurisdiction.

The Arbitration Agreement states that, "[i]f a court decides that any provision of this section 7.2

is invalid or unenforceable, that provision shall be severed and the other parts of this section 7.2

shall still apply."   The court must determine in the first instance, the enforceability of the

Arbitration Agreement.  The "delegation provision" or the reference to the AAA rules conflicts

with the Arbitration Agreement making any delegation ambiguous at best.  It therefore must be

construed against Coinbase—the drafter.  It is certainly not clear and unmistakable.[11]

The delegation agreement was never agreed to.  The User Agreement was merely

hyperlinked.  Defts. Br. at 2-4. The User Agreement is 30 pages long. *See* Pollack Dec., Ex. 4.

At page 10, the User Agreement, in a section regarding Customer Disputes that was not

referenced at the "click" stage[12], is yet another hyperlink to the AAA Rules, which are over 44

pages. At page 17 of those rules is one paragraph regarding the delegation. It is difficult to

believe that a consumer by clicking a button at the opening page has formed consent to a

provision that is nested over 30 pages and two hyperlinks away from the opening account page.

In any event, the Arbitration Agreement suffers from both procedural and substantive

unconscionability under California law, and cannot be enforced.  This case involves a consumer

contract of adhesion that was offered on a take it or leave it basis.  There was no negotiation and

---

[11] In the Motion to Dismiss at note 1 and pages 14-15, Defendants ask that even if there is no delegation of the arbitration issues, the class action allegations be stricken from the Complaint. Defendants have not made a motion to strike, nor do they provide any reason why such provisions should be stricken.  Moreover, courts in this jurisdiction have held that striking class action provisions at the early stages of a litigation are premature. *See, e.g., In re Nexus 6P Products Liability Litig.*, 2018 U.S. Dist. LEXIS 35739 (N.D. Cal. Mar. 5, 2018).  *Eshagh v. Terminix Int'l Co., L.P.*, 588 Fed. Appx. 703 (9th Cir. 2014), cited by Defendants at page 15, merely allows that where court compels arbitration, the class allegation should be stricken.  It does not concern the issue of striking class actions where the court retains jurisdiction to determine arbitrability and may well find that the claims are not arbitrable.  In that case, the Court must assuredly should not strike the class action allegations.

[12] Nowhere at the "click" stage does it indicate that the customer is both agreeing to arbitration, a class action waiver, and delegation of the issue of arbitrability to the arbitrator.

PLAINTIFF'S OPPOSITION TO MOTION TO COMPEL INDIVIDUAL ARBITRATION AND TO STAY CASE NO. 3:18-cv-01364-VC

00107825.000.docx

1   no ability to opt out to use the site.[13]  Those facts alone give rise to a degree of procedural

2   unconscionability.  And the scale is tipped in favor of striking it given the substantive

3   unconscionability of a fee shifting provision that imposes upon any customer the attorneys' fee

4   and expenses incurred by Coinbase in any proceeding to enforce the Arbitration Agreement

5   against any non-prevailing party.  Any customer filing a court action, who is then subject to a

6   successful motion to compel and subsequently loses the arbitration, may be liable for arbitration

7   fees, and for hundreds of thousands of dollars in legal fees incurred by the defendants in

8   compelling arbitration.  Such a provision, despite being nominally bi-lateral, was intended to

9   have an *in terrorem* effect, and to discourage any customer from challenging the Arbitration

10  Agreement.  This fee shifting provision conflicts with other provisions of the Arbitration

11  Agreement that specifically state that in an arbitration, the parties shall be liable for their own

12  costs and attorneys' fees.   This fee shifting provision, makes the Arbitration Agreement

13  sufficiently riddled with unconscionable provisions and should not be enforced.[14]  It imposes

14  fees on a customer in excess of those allowable in arbitration.[15]

15          Neither of the Individual Defendants are signatories to the Arbitration Agreement and do

16  not have standing to make this motion.  They are alleged to have made negligent

17  misrepresentations concerning Coinbase's launch of BCH, and to have acted negligently during

18  the Launch. There is a separate basis for their liability arising under state law, that is imposed

19  upon them apart from their agency with Coinbase.  As non-signatories sued under state law, the

20  claims against them do not fall within the narrow scope of the Arbitration Agreement.  The

21  claims against the individuals must remain in this Court, even if the Court determines to compel

22  arbitration of the Coinbase claims.  No stay should be issued if those claims remain here.

23

24

25  [13] Defendants argue that other sites were supporting BCH. However, those sites were not nearly
    as large as Coinbase, and did not offer the liquidity available on Coinbase.  Comp.¶6, 8.
26  [14] Alternatively, the Court can strike the fee shifting provision from the Arbitration Agreement
    and not enforce it if the Action is then sent to arbitration, and Plaintiff loses.
27  [15] The Arbitration Agreement provides that the Company will reimburse the customer for costs
    beyond those he would have incurred in a court proceeding in arbitration.  *See* Arbitration.
28  Agreement, Section 7.2.

-5-

## II.    ARGUMENT

### A.    This Court has Jurisdiction to Determine the Enforceability of the Arbitration Agreement

There is a strong and long-standing presumption that courts, not arbitrators, determine the threshold questions of arbitrability. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, *924 (1995)("*First Options*"); *Oracle Am., Inc. v. Myriad Grp. A.G.*, 724 F.3d 1069, 1072 (9th Cir. 2013)("*Oracle*").  Thus, a provision delegating those questions to an arbitrator is enforceable only if it "clear and unmistakable".  *Brennan v. Opus Bank*, 796 F.3d 1126 (9th Cir. 2015)("*Brennan*").  In making that determination, courts are to exercise caution, and should require a higher showing of intent. *Id.*, citing *First Options*, 514 U.S. at 44.  Unless there is clear and unmistakable evidence that the parties agreed to arbitrate abitrability, the usual presumption that exists in favor of arbitration is replaced by a presumption against it.  *Cape Flattery Ltd. v. Titan Mar., LLC*, 647 F.3d 914, *13-14 (9th Cir. 2011)("*Cape Flattery*"). In deciding whether the parties have agreed to arbitrate, courts should apply ordinary state law principles that govern the formation of contracts.  *Levi Strauss & Co.  v. Aqua Dynamics Sys.*, 2016 U.S. Dist. LEXIS 46738, *20 (N.D. Cal. April 6, 2016)("*Levi Strauss*"); *First Options*, 514 U.S. at 944.

Defendants argue that incorporation of the AAA Rules into the User Agreement constitutes clear and unmistakable evidence that the parties agreed to delegate the "gateway" questions of arbitrability to an arbitrator.  First, the Arbitration Agreement does not unmistakably delegate such issues to the arbitrator.  In fact, the opposite is true.  It leaves issues of enforceability and the validity of the Arbitration Agreement in the jurisdiction of the Court.

As stated above, the severability provision, found in the Arbitration Agreement, specifically states, "[i]f a court decides that any provision of this section 7.2 is invalid or unenforceable, that provision shall be severed and the other parts of this section 7.2 shall still apply."  Section 7.2 is the Arbitration Agreement.  Reference to the AAA Rules cannot be viewed in a vacuum, as Defendants would have this Court do. *Levi Strauss*, 2016 U.S. Dist. LEXIS at *21-22.  Rather, the arbitration agreement must be viewed holistically.  *Id.*  Where an arbitration agreement contains a reference to AAA Rules and a severability provision, courts

-6-

1    have found that the agreement fails to evince a clear delegation of arbitrability.  *Levi Strauss,*

2    2016 U.S. Dist. LEXIS at \*23-24; *Vargas v. Delivery Outsourcing, LLC*, 2016 U.S. LEXIS

3    32634, \*17-18 (N.D. Cal. Mar. 14, 2016)("Vargas"); *Parada v. Superior Court*, 176 Cal. App.

4    4th 1554, 1565-66 (2009); *Baker v. Osborne Dev. Corp.*, 159 Cal. App. 4th 884, 891 (2008);

5    *Ajamian v. CantorCo2e, L.P.*, 203 Cal. App. 4th 771, 792 (2012).   In those instances, ambiguity

6    is resolved in favor of court adjudication.  *Vargas*, 2016 U.S. Dist. LEXIS at \*16-17, citing

7    *First Options*, 514 U.S. at 944-45.   Thus, there is no question here that the Court is to determine

8    the "gateway" issues.[16]

9           The Ninth Circuit has not explicitly held that incorporation of the AAA Rules in

10   consumer agreements involving unsophisticated parties constitutes clear and unmistakable

11   evidence of delegation.  Defendants argue that the weight of authority since the Ninth Circuit's

12   rulings in *Brennan* and *Oracle*, support such an outcome.  Both *Brennan* and *Oracle* limited

13   their holdings to their facts—which did not involve unsophisticated consumers.  Even after

14   *Brennan* and *Oracle*, some courts in this jurisdiction have found that mere incorporation of the

15   AAA Rules into a consumer contract of adhesion is insufficient to demonstrate a clear and

16   unmistakable intent to delegate.  *See Ingalls v. Spotify USA, Inc.*, 2016 U.S. Dist. LEXIS 157384

17   (N.D. Cal. Nov. 14, 2016) and the cases cited therein.  *Accord Tompkins v. 23andMe, Inc.*, 2014

18   U.S. Dist. LEXIS 88068, \*41 (N.D. Cal. June 25, 2014)(noting that the holding in *Oracle* was

19   limited, and for good reason).

20          None of the cases cited by Defendants involve the situation here, where the arbitration

21   clause contains a severability clause leaving the issue of its enforceability and validity to the

22   court.  *See, e.g., McLellan v. Fitbit, Inc.*, 2017 U.S. Dist. LEXIS 168370, \*12-13  (N.D. Cal.

23   Oct. 11, 2017)(severability clause contained in general terms pertaining to entire terms of

24   service, not just to arbitration agreement); *Cordas v. Uber Tech., Inc.*, 228 F. Supp. 3d 985, 992

25   (N.D. Cal. 2017)(no discussion about severability agreement); *Zelkind v. Flywheel Networks,*

26   *Inc.*, 2015 U.S. Dist. LEXIS 141367, \*8-11 (N.D. Cal. Oct. 16, 2015)(no discussion of

27

28

---

[16] Notably, the Defendants' counsel lost this very issue under similar circumstances in an earlier case.  *See Cobarruviaz v. Maplebear, Inc.*, 143 F. Supp. 3d 930 (N.D. Cal. 2015).

PLAINTIFF'S OPPOSITION TO MOTION TO COMPEL INDIVIDUAL ARBITRATION AND TO STAY
CASE NO. 3:18-cv-01364-VC

1  severability clause); *Rodriguez v. Am. Techs., Inc.*, 136 Cal. App. 4th 1110, 1123 (2006)(no

2  discussion of severability clause); *Dream Theater, Inc. v. Dream Theater*, 124 Cal. App. 4th 547,

3  557 (2004)(same); *Greenspan v. LADT, LLC*, 185 Cal. App. 4th 1413, 1442 (2010)(same).

**B.    This Dispute Does not Fall within the Narrow Scope of the Arbitration Agreement**

6          Arbitration is a matter of contract, and a party "cannot be required to submit to

7  arbitration any dispute which he has not agreed to submit."  *Tracer Research Corp. v. Nat'l.*

8  *Envtl. Servs. Co.*, 42 F.3d 1292, 1294 (9th Cir. 1994)("*Tracer*"); citing *United Steelworkers v.*

9  *Warrior & Guild Navigation Co.*, 363 U.S. 574, 582 (1960); *Henson v. United States Dist. Of N.*

10  *Cal.*, 869 F.3d 1052, 1059 (9th Cir. 2017).  State law holds the same.  *See E Fund Capital*

11  *Partners v. Pless*, 150 Cal. App. 4th 1311, 1320-21 (2007) and cases cited therein ("[t]here is no

12  public policy requiring persons to arbitrate disputes that have not agreed to arbitrate.").

13  Statutory rules of construction apply in determining the scope of the arbitration provision, and

14  the clear provisions of the contract are given their ordinary meaning.  *Waller v. Trust Ins.*

15  *Exchange, Inc.*, 11 Cal. 4th 1 (1995).

16          In determining whether a particular dispute falls within the purview of an arbitration

17  agreement, courts consider whether the language of the arbitration provision is "broad" or

18  "narrow".   An arbitration provision that covers claims "arising under" *and* "relating to" the

19  agreement are considered broad in scope and cover not only contract claims but tort claims

20  arising from the contract.  *Tracer*, 42 F. 3d at *1295, *Mediterranean Enterprises, Inc. v.*

21  *Ssangyong Corp.*, 708 F.2d 1458, *1463-64 (9th Cir. 1983)("*Mediterranean*").

22          Provisions that are limited to disputes "arising under" an agreement, as here, however,

23  have been held to be "narrow" and cover solely those claims that relate to the interpretation and

24  performance of the contract itself.  *Tracer*, 42 F.3d at *1295; *Mediterranean,* 708 F.2d at *1464.

25  *See also Cape Flattery,* 647 F. 3d at *921 (reaffirming the holdings of *Tracer* and

26  *Mediterranean* that the term "arising under" relates to contract interpretation and performance);

27  *Rice v. Downs*, 248 Cal. App. 4th  175, 187, 190 (2016)("*Rice*") (noting that tort claims are only

28  included in broadly worded provisions).  Any argument that the cause of action would not exist

-8-

"but for" the agreement is insufficient to establish that it falls within the confines of a narrow

arbitration agreement).  *Cape Flattery*, 647 F.3d at 922.

Coinbase undeniably has a "narrow" arbitration agreement, which provides that only

disputes "arising under" the User Agreement or contract claims, are arbitrable.  That means that

only *disputes with Coinbase* involving "the interpretation and performance of the contract itself"

are covered by the arbitration clause.  *See Tracer*, at *1295, citing *Mediterranean*, at *1464.

Tort claims and claims that arise under an independent statute or state common law, such as

those asserted here unequivocally do not fall within that category.  *Leidel v. Coinbase, Inc.*, 2018

U.S. App. LEXIS 10464, *11-12 (11th Cir. Apr. 23, 2018)("*Leidel*")(discussing Coinbase's

arbitration agreement, under Florida law, and finding that its narrow scope only covers claims

that have a direct relationship to the agreement.  Also noting that to some extent Florida and

California law are the same).[17]

In fact, that was one of issues in *Leidel*, a decision in which the Eleventh Circuit refused

to order arbitration of tort claims including breach of fiduciary duty and negligence.  In *Leidel*,

both a receiver of Crypsty, Inc. ("Crypsty"), and the named plaintiff, Leidel, as a representative

of a class of customers of Cryptsty, sued Coinbase for its failure to monitor the illegal activity of

Crypsty and its principal, who had agreements with Coinbase and had used Coinbase to clear

their trades.  In holding that the claims brought by Leidel and class members were not subject to

the arbitration provision, the Eleventh Circuit explained that given the narrow scope of the

arbitration provision, Coinbase was required to show that Leidel's claims had "direct

relationship to [the User Agreement] terms and provisions."  *Id*. at *11-12.   The court held that

Coinbase's duties arose out of the regulatory scheme under which it operated, as a money

transmitter, rather than the agreement, and denied Coinbase's motion to compel arbitration.  *Id*.

---

[17] The Eleventh Circuit further explained that even a broad arbitration agreement would not necessarily cover claims merely because the parties in issue have a contractual relationship.  *Id*. at *8-9.  Rather, there must be a significant relationship between the claim and the contract, such that the "claims present circumstances in which the resolution of the disputed issue requires either reference to, or construction of, a portion of the contract."  *Id*. citing *Jackson v. Shakespeare Found., Inc.*, 108 So. 3d 587, 593 (Fla. 2013).

00107825.000.docx

1    at *11. Significantly, Leidel did not assert claims under any money transmission act, but rather

2    that Coinbase had breached a fiduciary duty owed to class members and had acted negligently.[18]

3          The claims here assert a manipulation scheme consisting of: insider trading and tipping,

4    a failure to monitor employees, misleading statements concerning Coinbase's launch of BCH,

5    and sales of BCH at manipulated prices for fees, and the termination of trading—all of which

6    are brought under a state statutory cause of action governing Coinbase's operations—

7    California's Unfair Competition Law.    That law prohibits unfair business practices.

8          Alternatively, the Complaint alleges negligence in Coinbase's handling of the Launch.

9    These are state law claims that do not have a direct relationship to the User Agreement.[19]

10          Defendants do not address any of these issues.  Rather, they make the broad brushed

11    argument that Plaintiff's claims "revolve" around Coinbase's Conversion services.  Defts. Br. at

12    12.  This broad reading is insufficient to bring Plaintiff's state law claims into the narrow scope

13    of the Arbitration Agreement nor do they derive from an interpretation or performance of the

14    Agreement.  Coinbase's conversion services cannot possibly include illegal conduct including

15    the sale of a cryptocurrency, here BCH, at artificial and manipulated prices, caused by its own

16    employees, and the effective conversion of customer's monies or BCH until the following day,

17    when the price of BCH plummeted to about $3,500 per coin.[20]  It does give Coinbase the right

18    

19    [18] Leidel was not a signatory to the arbitration agreement.  *Id*. at *6-7.

19-20    [19] Should the Court find the delegation valid, it should then find that the assertion of arbitrability
is "wholly groundless".  *See, e.g., Qualcomm Inc. v. Nokia Corp.*, 466 F. 3d 1366, 1371 (Fed.
20-21    Cir. 2006)("*Qualcomm*"); *Baysand Inc. v. Toshiba Corp.*, 2015 U.S. Dist. LEXIS 157442, *7
(N.D. Cal. Nov. 19, 2015). In undertaking that analysis, the Court must look at the "arbitration
21-22    clause and the precise issues that the moving party asserts are subject to arbitration" to
determine whether the assertion of arbitrability is "wholly groundless".  *Qualcomm*, at *1374.
22-23    As the above asserts, the claims here do not fall within the arbitration clause's purview, even
under the "wholly groundless" standard.

23    [20] In the accompanying Motion to Dismiss, Defendants argue that no insider trading took place
because Coinbase's employees did not trade until Coinbase announced the Launch.  Motion to
24    Dismiss at 6-7.  That is not the issue nor is that accurate.  As Roedell Dec., Ex. A demonstrates,
there was a run up of the price and trading of BCH several days before the Launch and early
25    during the Launch, that was clearly due to Coinbase insiders purchasing BCH on other
exchanges, in order to dump their cheaply purchased BCH for artificial prices on Coinbase.
26    Comp. at ¶12, 14, 48, 55-56, 58, 64-65.  After effectively pumping up the price pre-Launch,
they dumped their shares at the Launch at the same time that the unsuspecting investing public
27    tried to either purchase for a lower prices or sell their shares. *Id*. These employees misappropriated
Coinbase's non public information, which they obtained through their confidential relationship
28    with Coinbase.  Coinbase then executed the trades at artificially manipulated prices, for which it

-10-

PLAINTIFF'S OPPOSITION TO MOTION TO COMPEL INDIVIDUAL ARBITRATION AND TO STAY
CASE NO. 3:18-cv-01364-VC

1    to manipulate the market for a currency and to convert the coins or monies of its customers in

2    order to avoid a run.  These claims arise out of duties created by law—not the contract, and

3    Plaintiff does not rely upon the contract to plead his claims.  The Ninth Circuit held that claims

4    brought under the UCL based upon deceptive acts and practices, that do not rely upon a contract

5    containing an arbitration clause, are not arbitrable.  *Kramer v. Toyota Motor Corp.*, 705 F.3d

6    1122, 1130 (9th Cir. 2013).  This illegal conduct does not even relate peripherally to the

7    agreement at issue.  *Cape Flattery*, at 917 (claims that touch only peripherally to an agreement

8    are not arbitrable under a narrow provision).[21]

9         Moreover, the Complaint seeks restitution and disgorgement of Coinbase's profits  under

10   the UCL, that it obtained by engaging in manipulation and deceptive acts and practices—not

11   damages under the Agreement.  *See Rice*, at 193-194 (denying arbitration, in part because

12   remedies sought were based upon state law claims, and not the contract).

13        Defendants further effectively argue that Plaintiff's negligence claim would not exist but

14   for the Agreement and that Defendants' duties only arise because of the Agreement.  That is not

15   true.  Defendants' duties arise because they were acting as a currency broker and exchange—not

16   because of the Agreement.  This is not an issue of what duties Coinbase owed to its customers

17   under the Agreement.  It is a matter of what duties Coinbase owed under state law. In any event,

18   but for causation is not sufficient to support arbitration.  *E Fund Capital Partners*, at 1327-28.

19

20

21

---

22   obtained fees, while shutting down sales, so that it did not have to pay out to the investing
     public at artificially high prices.  In short, Coinbase manipulated the trading market for BCH

23   during the Launch for its own benefit, taking advantage of the insider trading of its employees.
     That not only states a claim under the UCL, as discussed in the accompanying Opp. to Motion

24   to Dismiss, but could state a claim under the Commodities Exchange Act ("CEA").  *See, e.g.,
     CFTC v. McDonnell,* 287 F. Supp. 3d 213, 217 (E.D.N.Y. 2018)("*McDonnell*")(in which Judge

25   Jack Weinstein upheld the CFTC's jurisdiction over virtual currencies, noting that bitcoin was a
     commodity, and issuing an injunction in an action arising from violations of the CEA in a

26   virtual currency manipulation scheme).  *Accord* S. Sullivan, Columbia Business Review, *Insider
     Trading in Cryptocurrency:  Exploring New Territory for the CFTC*, dated April 3, 2018, found

27   at https://cblr.columbia.edu/insider-trading-in-cryptocurrency-exploring-new-territory-for-the-
     cftc/.  At the very least, Coinbase was negligent in the way that it handled the Launch.

     [21] The GDAX Rules prohibit market manipulation by customers but say nothing about Coinbase

28   or its employees. Section 2, *et seq.*

PLAINTIFF'S OPPOSITION TO MOTION TO COMPEL INDIVIDUAL ARBITRATION AND TO STAY
CASE NO. 3:18-cv-01364-VC

C.     **The Arbitration Agreement is Unconscionable and Should Be Stricken**

The Arbitration Agreement is unconscionable under California law and should be stricken.[22]   To demonstrate unconscionability, California requires a showing of procedural and substantive unconscionability.  *Tompkins v. 23andMe, Inc.*, 2014 U.S. Dist. LEXIS 88068, *51-52 (N.D. Cal. June 25, 2014)("*Tompkins*") citing *Armendariz v. Foundation Health Psychcare Services, Inc.,* 24 Cal. 4th 83  (2000)("*Armendariz*").   In determining whether an agreement is unconscionable, a court examines both prongs and determines whether, overall, the arbitration provision is unconscionable.  *Tompkins* at *52.  Unconscionability is determined on a sliding scale, and where procedural unconscionability is slight, strong evidence of substantive unconscionability will tip that scale.  *Nagrampa v. MaiCoupons*, 469 F.3d 1257, 1281 (9th Cir. 2006).[23]  As discussed in *Tompkins*, the unconscionability analysis begins with whether the contract is one of adhesion, as is the instant agreement.  If a contract is adhesive; that is, imposed by the party of superior bargaining powers, without the possibility of negotiation and on a take or leave it basis, the next question is whether it presents some degree of oppression due to the unequal bargaining power of the parties.  *Id*. at 54; *Armendariz*, at 99.  Oppression arises from unequal bargaining power which results in no real negotiation.  *Tompkins*, at *54.

There is no question that the Arbitration Agreement here is one of adhesion and oppression was extant.  Neither Plaintiff nor any other Class member had an opportunity to negotiate it or to opt out. Moreover, no other exchanges had close to the liquidity that Coinbase has, as the largest cryptocurrency exchange in the world.  Comp.¶6-8.  In fact, those Class members who received BCH in the August 1, 2017 fork were especially oppressed since Coinbase refused to distribute their coins until the date of the launch—December 19, 2017—preventing them from withdrawing their BCH and selling them on another exchange—an issue that was never raised in any agreement.  It was unrealistic for most retail investors to use

---

[22] Recent cases have held that the unconscionability defense has not been overruled by the Supreme Court's decision in *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011).  *See, e. g., Bermudez v. PrimeLending*, 2012 U.S. Dist. LEXIS 197023, *18-19 (C.D. Cal. Aug. 14, 2012).

[23] Further, the sophistication of the parties alone cannot defeat a claim of unconscionability. *Nagrampa*, at 1283.  Defendants speculate but have no facts regarding Plaintiff's sophistication.

-12-

1   another exchange for the BCH launch.  The Arbitration Agreement was procedurally

2   unconscionable and Coinbase customers seeking to sell their BCH, were stuck.[24]

3          The Arbitration Agreement is substantively unconscionable in that it contains a fee

4   shifting provision allowing fees in any action or proceeding to enforce "this agreement".

5   Specifically, the provision, which is found in Section 7.2, the Arbitration Agreement, states,

6   "[t]he prevailing party in any action or proceedings to enforce this agreement shall be entitled to

7   costs and attorneys' fees."  Any Class member who seeks to challenge any portion of the

8   Arbitration Agreement or its enforcement, as here, and is compelled to arbitration and loses,

9   may be forced to pay the costs of arbitration and the costs of his efforts to repel the Arbitration

10  Agreement.  Customers with legitimate challenges to unconscionable provisions in arbitration

11  agreements would be discouraged from challenging them and penalized when they did, even if

12  successful.  This provision clearly exposes the customer to far greater risk and has the intended

13  effect of chilling a customer's right to challenge the unconscionability of the arbitration in court.

14  In California, such fee shifting provisions have been held to be unconscionable.  *See, e.g.*,

15  *Bermudez v. PrimeLending*, 2012 U.S. Dist. LEXIS 197023, *26-27 (C.D. Cal. Aug. 14, 2012)

16  (holding that even a bi-lateral fee shifting provision is unconscionable under California law,

17  where it conflicts with statutes); *Bynum v. Maplebear Inc.*, 160 F. Supp. 3d 527, *537 (E.D.N.Y.

18  2016)(apply California law and holding that fee shifting in an arbitration agreement is

19  unconscionable under California).  Although the foregoing cases arose in the employment

20  context, they apply here given the substantive unconscionability of the fee shifting provision.[25]

21          **D.      The Claims Against Armstrong and Farmer are not Subject to**
22                  **Arbitration**

23          The claims against the Individual Defendants, Armstrong and Farmer are not subject to

24  arbitration as they not signatories to any arbitration agreement.   In determining whether an

25  arbitration clause applies to a non-signatory, the federal policy favoring arbitration falls away

---

26  [24] Once the Launch began, and Coinbase closed down the exchange, all potential sellers were
     unable to obtain their coins or their money and were essentially stuck. Comp.¶57-62.

27  [25] At a minimum, the Court should sever and strike the provision.  Under the provision, fees do
     not accrue until the entire action is completed and lost on the merits. *In re Cellphone*
28   *Termination Fee Cases*, 2014 Cal. App. Unpub. LEXIS. 4459 (Cal. Ct. App. June 24, 2014).

PLAINTIFF'S OPPOSITION TO MOTION TO COMPEL INDIVIDUAL ARBITRATION AND TO STAY
CASE NO. 3:18-cv-01364-VC

00107825.000.docx

1   and the liberal federal policy regarding the scope of arbitrable issues is inapposite.  *Chastain v.*

2   *Union Sec. Life Ins. Co.*, 502 F. Supp. 2d 1072, *1075 (C.D. Cal. 2007).   In that instance, the

3   burden is on the non-signatories to satisfy a two pronged standard: (1) whether the wrongful acts

4   for which they are sued relate to their behavior as agents of the signatory to the arbitration

5   agreement; *and* (2) whether their acts arise out of the agreement containing the arbitration

6   agreement.  *Swift v. Zynga Game Network, Inc.*, 805 F. Supp. 2d 904, 916 (N.D. Cal.

7   2010)(citing *Letizia v Prudential Bache Secur., Inc.*, 802 F.2d 1185 (9th Cir. 1986)("*Letizia*")

8   and *Britton v. Co-op Banking Group*, 4 F.3d 742 (9th Cir. 1993)(acts of agents that do not arise

9   from a contract containing an arbitration provision, are not arbitrable).  *See also  Amisil*

10   *Holdings Ltd. v. Clarium Capital Mgmt. LLC*, 622 F. Supp. 2d 825, 835 (N.D. Cal. 2007).

11          Defendants argue only one prong of the test, that Armstrong and Farmer, were acting as

12   Coinbase's agents, and thus they can compel arbitration, based upon the *Letizia* case.  *Letizia* is

13   distinguishable.  It involved the arbitrability of claims against two account managers for

14   plaintiff's account in an action against Prudential Bach, under a customer arbitration agreement.

15   The account managers were undeniably acting solely as agents for the brokerage firm.  Further,

16   the customer agreement specifically provided for "arbitration of *any dispute arising out of or*

17   *relating* to Letizia's account."  *Letizia*  at 1186 (emphasis added).  Thus, the court, applying

18   ordinary contract and agency principles, held those claims could be arbitrated.[26]

19          That is not the situation here. The claims against Armstrong and Farmer are for their

20   negligence and negligent misrepresentation.  They are individually liable for their acts, not as

21   agents of Coinbase.  *Frances T. v. Village Green Owners Assn.*, 412 Cal. 3d 490, 507-508

22   (1986)(officers held personally liable for their tortious conduct).

23          Second, even if Armstrong and Farmer were acting as agents or employees of Coinbase,

24   they have failed to show that their wrongful conduct implicates the terms of the User

---

25   [26] *Dryer v. Los Angeles Rams*, 40 Cal. 3d 406, 418 (1985), upon which Defendants also rely, is
26   equally inapposite. In that case, a player sued his former football team and four owners,
    operators and managers, admitting that they had all breached the player's contract.  Given that
27   characterization, the court found that arbitration provision in the contract applied to the non-
    signatory defendants.  Similarly inapposite is *Boston Telecomms. Grp., Inc. v. Deloitte Touche*
28   *Tohmatsu*, 249 Fed. App'x 534, 539 (9th Cir. 2007)(extending arbitration agreement to non-
    signatory CEO where he was alleged to have been acting as an agent under an agreement).

-14-

1    Agreement.   Their wrongdoing constitutes independent acts of negligence and unfair business

2    practices unrelated to any provision or interpretation of the User Agreement, and potential

3    manipulation under the CEA.   Moreover, the Arbitration Agreement applies solely to disputes

4    arising under the User Agreement with Coinbase, and says nothing about arbitrating officer's

5    misleading statements or their tipping of employees in advance of a launch.  *See Amisil,* 622 F.

6    Supp. 2d at *834 (discussing a narrow arbitration provision, such as the instant one, and

7    reasoning that it would be difficult to find that claims against a non-signatory "arise under" an

8    agreement to which he is not a party).  Armstrong and Farmer have not satisfied the burden

9    enabling non-signatories to compel arbitration.

10              **E.      No Claims Should be Stayed**

11              Given that Armstrong's and Farmer's misconduct does not implicate the User

12   Agreement (and thus the Arbitration Agreement), there is no basis to stay the claim against

13   them, even if the Court orders arbitration of the Coinbase claims. Defendants argue that the

14   Court must stay all the claims because they fall within the Arbitration Agreement, citing 9

15   U.S.C. §3 and *Anderson v. Pitney Bowes, Inc.*, 2005 U.S. Dist. LEXIS. 37662 (N.D. Cal. May 4,

16   2005)( where claims clearly falling within the pertinent arbitration agreement were stayed).

17   Plaintiff believes that no stay is warranted, based upon the above arguments.  If the Court finds

18   that the claims against Coinbase are arbitrable but the claims against Armstrong and Farmer, are

19   not, it is within the Court's discretion whether to stay the non arbitrable claims.  *Moses H. Cone*

20   *Memorial Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 21 n. 23 (1983)(indicating that staying

21   litigation among the non-arbitrating parties "may be advisable" but the "decision is left to the

22   district court . . . as a matter of discretion to control its dockets.").  Given the importance of

23   regulating cryptocurrency exchanges, public policy and the need to ensure that virtual currency

24   exchanges operate in a fair manner, Plaintiffs believe that the Court should exercise its

25   discretion to deny any stay of the non-arbitrable claims.

26   **III.   CONCLUSION**

27              Based upon the foregoing, Plaintiff respectfully requests that the Court deny Defendants'

28   Motion to Compel and Stay in all respects.

PLAINTIFF'S OPPOSITION TO MOTION TO COMPEL INDIVIDUAL ARBITRATION AND TO STAY
CASE NO. 3:18-cv-01364-VC

1

2 DATED:  June 27, 2018                **GREEN & NOBLIN, P.C.**

3

4                                      By:    /s/ Robert S. Green
                                             Robert S. Green

5

6 James Robert Noblin
   2200 Larkspur Landing Circle, Suite 101

7 Larkspur, CA  94939
   Telephone:  (415) 477-6700

8 Facsimile:  (415) 477-6710
   Email:  gnecf@classcounsel.com

9

10 Lynda Grant
    **THEGRANTLAWFIRM, PLLC**

11 521 Fifth Avenue, 17th Floor
    New York, NY 10175

12 Telephone:  212-1292-4441
    Facsimile:  212-292-4442

13 Email:  lgrant@grantfirm.com

14                                     *Attorneys for Plaintiff*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S OPPOSITION TO MOTION TO COMPEL INDIVIDUAL ARBITRATION AND TO STAY
CASE NO. 3:18-cv-01364-VC