Robert S. Green (State Bar No. 136183)
James Robert Noblin (State Bar No. 114442)
**GREEN & NOBLIN, P.C.**
2200 Larkspur Landing Circle, Suite 101
Larkspur, CA  94939
Telephone:  (415) 477-6700
Facsimile:  (415) 477-6710
Email:  gnecf@classcounsel.com

Lynda J.  Grant
**THEGRANTLAWFIRM, PLLC**
521 Fifth Avenue, 17th Floor
New York, NY 10175
Telephone:  (212) 292-4441
Facsimile:  (212) 292-4442
Email:  lgrant@grantfirm.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEFFREY BERK, on behalf of himself and all others similarly situated, | Case No.:  3:18-cv-01364-VC |
| Plaintiff, | **AMENDED CLASS ACTION COMPLAINT** |
| vs. | |
| COINBASE, INC., a Delaware Corporation d/b/a Global Digital Asset Exchange ("GDAX"), BRIAN ARMSTRONG, and DAVID FARMER, | **JURY TRIAL DEMAND** |
| Defendants. | |

Plaintiff, Jeffrey Berk ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned counsel, alleges in this complaint, the following based upon his knowledge with respect to his own acts, and upon the investigation of his counsel, which include public statements made by defendant Coinbase, Inc. ("Coinbase" or the "Company"), Brian Armstrong ("Armstrong"), its founder and chief executive officer, and David Farmer ("Farmer", with Coinbase and Armstrong, "Defendants"), its director of communications, a review and analysis of media reports, interviews, social media and other information concerning the Company and its actions with regard to the cryptocurrency Bitcoin Cash ("Bitcoin Cash" or "BCH").

## **INTRODUCTION**

1.     This is a class action on behalf of all Coinbase customers who placed purchase, sale or trade orders with Coinbase or the GDAX in connection with Coinbase's launch of BCH during the period of December 19, 2017 through and including December 21, 2017 (the "Class Period") and who suffered monetary loss as a result of Defendants' wrongdoing (the "Class"). Excluded from the Class are Defendants, any entity owned or controlled by them, and any officer, director, employee or agent of any of the Defendants, and any heirs, assigns, or family members of any individual defendant.

2.     Coinbase is one of the largest and most accessible exchanges for the trading, buying and selling of cryptocurrency.  At this point, it has more retail customers than Charles Schwab, approximately 20 million, and reaches into over 30 countries.

3.     Coinbase is the major "on ramp" for individual investors to get involved in cryptocurrency.  It is one of the only, if not the only, cryptocurrency exchange to take fiat currency (typical government issued currency) for cryptocurrency through credit cards and bank accounts throughout the world.

4.     Coinbase, and its executives made representations through blogs and other means, touting the safety of Coinbase, and its mission to have to the most secure and "compliant" digital currency exchange in the world.

coinbase—amended

1     5.     Armstrong has made repeated statements that "compliance is key to digital

2    currency's success", and in one particular blog, stated that Coinbase "spent many years and

3    millions of dollars working to become the best in the industry at compliance."

4    https://blog.coinbase.com/building-the-bridge-why-compliance-is-key-to-digital-currencys-

5    success-7bfdd88a084c.   It presently bills itself as "the easiest and most trusted place to buy and

6    sell crypto." https://blog.coinbase.com.

7     6.     Coinbase touts its relationship with regulators, and that it is a licensed entity,

8    including holding a "Bitlicense" with the New York Department of Finance.

9    https://blog.coinbase.com/coinbase-obtains-the-bitlicense-f1c3e35c4d75.

10     7.     It has also announced that it maintains a policy against insider trading by its

11    employees and contractors.   https://blog.coinbase.com/our-employee-trading-policy-at-

12    coinbase-1d4e860b7837.

13     8.     These statements gave the investing public the clear impression that Coinbase

14    complied with all relevant laws, that its trading was free from manipulation and that it could

15    control and monitor any insider trading.

16     9.     Nevertheless, the Coinbase launch of bitcoin cash (the "Launch"), an offshoot of

17    BTC, that occurred during the Class Period, was a disaster and in direct violation of multiple

18    laws including the Commodity Exchange Act ("CEA"), and California's Unfair Competition

19    Law ("UCL"), Cal. Bus. & Prof. Code §17200, *et seq*., and involved insider trading engendered

20    by Coinbase's failure to monitor obvious insider trading even a month before the Launch.

21     10.    As further described below, for months Armstrong and Farmer tweeted or

22    blogged that Coinbase would not support BCH until it was satisfied that there was little risk in

23    doing so.  They further stated that in any event, Coinbase would only support *withdrawals* and

24    then by January 1, 2018.  Nonetheless, on December 19, 2017, with little prior public notice to

25    its millions of users, Coinbase announced that it was launching or supporting all buying, selling

26    and trading in BCH within two minutes of the Launch.

27     11.    Within minutes of the opening of BCH on the GDAX and Coinbase to public

28    trading, the price of BCH skyrocketed to over $16,000, and then traded around $9,500.   At the

coinbase—amended

same time, BCH was trading on other exchanges in a range from around $2,500 to $4,000.  For example, the range for BCH on EXX.com on that day was a low of $2457 and a high of $4024; on Huobi.pro BCH was traded for a low of $1990 and a high of $2410 and on Binance BCH traded from a low of $2604 to a high of $5389.

12.     Coinbase insiders were able to sell into this manipulated market at prices far above the prices in other exchanges that reflected unmanipulated supply and demand for the currency.  Coinbase then stopped open trading, as quickly as it had started it, after about two minutes and then shut down selling and filled buy orders at artificially inflated prices thus providing purchasers with far less BCH than they should have received and trapping purchasers who were disabled from selling.

13.     During this entire time, Coinbase was sitting on massive reserves of BCH over which it had complete control.  To the extent that customers maintained online wallets with Coinbase, Coinbase retained control over the BCH until the day of the Launch.

14.     In the face of the price run up, Armstrong stated that it looked like there had been insider trading—presumably in direct conflict with the Company's policies, and that the Company was undertaking an internal investigation.  Yet, no results of this internal investigation were ever announced.

15.     In fact, Coinbase stated in its Bitcoin Cash Launch Retrospective published around January 9, 2018, that it notified its employees on Monday, November 13th that it would fully support BCH trading.  On November 13th, and over the two weekend days prior (November 11 and 12), BCH experienced the greatest spike in volume and price that occurred during the entire life span of the currency since its issuance on July 23, 2017, as indicated in the following chart:

AMENDED CLASS ACTION COMPLAINT

coinbase—amended

1
2
3
4
5
6
7
8
9
10
11
12



13   16.   The next great spike in volume and price was on the December 19th , the day on

14   which Coinbase opened trading and the couple of days prior (even though Coinbase was still

15   stating publicly as late as the morning of the 19th that it was not yet supporting trading in BCH),

16   unequivocally demonstrating insider trading, as shown in the following chart:

17
18
19
20
21
22
23
24
25
26
27
28



AMENDED CLASS ACTION COMPLAINT

coinbase—amended

17.     Notably, although it knew that it was going to fully Launch BCH in mid December,  Coinbase did not revise its false "roadmap" of supported digital currencies that appears in the Supported Digital Currencies section of its website, which noted that only withdrawals of BCH were projected, and said absolutely nothing about a full Launch in mid-December.

18.     Nonetheless, Coinbase and Armstrong, among others, used the Launch to manipulate the price of BCH and took advantage of it by filling buy orders from investors at hyperinflated prices and cancelled sales that would have caused it to sell out its own reserve of BCH.

19.     Thereafter, Coinbase and Armstrong tried to sweep the entire manipulation scheme under the table by eliminating the price spike from the price history of BCH, as shown on their website which shows the high price for BCH on December 19, 2017 at $2926.88 and the high on December 20, 2017 as $3421.45, as demonstrated in the chart below.  Coinbase also changed its own trading rules for the GDAX, as further discussed below.



AMENDED CLASS ACTION COMPLAINT

coinbase—amended

20.     The Launch and the events leading up to it constitute manipulation and unfair business practices.  Coinbase, Armstrong and Farmer are sued for violations of the CEA, and for their negligent misrepresentations or negligence. Coinbase is also sued for violating California's Unfair Competition Law.

## Jurisdiction and Venue

21.     This action is brought under diversity jurisdiction under the Class Action Fairness Act, 28 U.S.C. §1332(d), in that the named Plaintiff is a citizen of a state different from the Defendants, and the aggregate amount in controversy for all Class members exceeds $5,000,000, exclusive of interest and costs.  It is also brought under 28 U.S.C. §1331 (2012)(federal question jurisdiction) for violations of the CEA.

22.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b), as Coinbase resides in this judicial district, and all Defendants are residents of the State of California.  Substantial acts in furtherance of the alleged conduct have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information and the manipulation of the market for BCH, occurred in substantial part in this Judicial District.

## Parties

23.     Plaintiff is a citizen of Arizona.  On December 19, 2017, within about a minute of BCH going live on Coinbase, Plaintiff attempted to purchase BCH.  Plaintiff placed a purchase order for BCH at a time when Coinbase indicated that BCH was trading at about $2000 per coin.

24.     Generally when a purchaser places orders, Coinbase provides the purchaser with a window of 15 to 20 seconds to accept the stated price. If the customer does not accept the price within that window, Coinbase rejects the purchase and tells the purchaser that the price is no longer available.

25.     That is not what occurred here.  Instead, Plaintiff placed his order at the price of about $2000 BCH-the false and manipulated price that was represented by Coinbase, which was

AMENDED CLASS ACTION COMPLAINT

presenting false statements to the market about the price at which Coinbase was executing trades.

26.     The following day, December 20, 2018, at about 3:07 p.m., Plaintiff received notification from Coinbase that his order executed at the inflated price of $4200.98 per BCH. Plaintiff's order was executed at prices 100% greater than the price represented by Coinbase at the time that he submitted his order.

27.     Coinbase maintains its principal place of business in San Francisco, California and is incorporated in Delaware. It is one of the most powerful digital currency exchanges in the world, buying and selling Bitcoin, BCH, Litecoin, and Ethereum.

28.     It does so through a secure platform, in which customers can buy, sell, transfer or store their digital current in electronic wallets.  Coinbase maintains a digital currency exchange known as the GDAX, which acts as the backroom for Coinbase and provides Coinbase with the prices at which it executes buys, sells and trades.  Certain traders may also directly trade on GDAX.

29.     Coinbase is presently co-partnering with merchants such as Overstock.com, Dish Network, Dell, PayPal and Expedia, and has obtained investments from the New York Stock Exchange, among others, as well as private equity firms.  It is considered one of the most influential blockchain companies in the world.

30.     Armstrong is one of the founders and the chief executive officer of Coinbase, and one of its primary spokespersons.  Armstrong works from the Coinbase headquarters in San Francisco, California.  During the Class Period, Armstrong made repeated statements in relation to the Company's Launch of BCH.

31.     Farmer is Coinbase's Director of Communications.  Farmer works from the Coinbase headquarters in San Francisco.  During the Class Period, Farmer made statements in relation to the Company's Launch of BCH.

coinbase--amended

**Factual Background**

**Cyptocurrency**

32.   BTC   is a digital currency that was created as a response to the 2008 financial crisis and is the first decentralized digital currency that works without a bank or central authority, but rather on a peer to peer basis.

33.   It is powered by its users who use cryptography to control its creation. The Bitcoin protocol and software are published openly, and all Bitcoin transactions are kept on a ledger visible to all users in a "blockchain".  A blockchain is a continually growing chain of blocks of cryptographically secured records of transactions.  Blocks are created when the distributed computers complete the work of cryptographically securing the information.

34.   Global actors that do the work of storing and securing the data do so for the chance to obtain cryptocurrency when new chains are formed and are only added to the block chain when there is consensus.  As a general rule, decisions about the blockchain, and any changes in the software are essentially controlled by a group of miners and developers.

35.   Coinbase is one of the most popular and accessible exchanges for the purchase, sale and use of cryptocurrency and the only exchange which allows the purchase and sale of digital currency with any fiat currency.

36.   Coinbase customers can set up what is known as a wallet, in which they keep their Bitcoins or other digital currency for later use or for investment.

37.   As one of the largest exchanges for the purchase and sale of Bitcoin and other digital currencies, the issue of whether Coinbase will maintain a market and support a cryptocurrency is essential to people who want to buy or sell the currencies.

**BCH is Created Through a Hard Fork**

38.   Bitcoin is one of the first digital currencies to gain widespread acceptance and use.  As Bitcoin increased in popularity, and the number of transactions increased, a disagreement arose among key miners and Bitcoin developers about how to proceed with Bitcoin, and how to upgrade the network to accommodate more transactions.

AMENDED CLASS ACTION COMPLAINT

coinbase—amended

39.     After a meeting in Hong Kong, about 80% of Bitcoin miners and developers agreed to split the chain to create a new form of Bitcoin called Bitcoin Cash or BCH through the hard fork process.

40.     A hard fork occurs when a cryptocurrency splits into two, and the cryptocurrency's existing code is changed, resulting in both an old version and a new version of the currency.  The hard fork is created through a new ledger with a different set of code requiring all nodes or computers to make a change in their software.

41.     On about August 1, 2017, Bitcoin experienced a hard fork, and BCH was created through a change in the Bitcoin protocol. At the time, anyone who held a Bitcoin was supposed to receive the equivalent numbers of BCHs.

**Coinbase Unequivocally States that It will Not Support BCH**

42.     Although many of Coinbase's customers were due to receive BCH in their on-line wallets maintained by Coinbase, Coinbase initially refused to support BCH or to distribute BCH to customers' online wallets, thus effectively holding its customers' BCH hostage.  (Those that held their Bitcoin off line or in hard drives did obtain their BCH.)

43.     Coinbase, Armstrong, and Farmer proceeded to make a number of statements as to when and whether Coinbase could and would support BCH.

44.     On July 19, 2017, in a FAQ on its website, Coinbase stated that it did not plan to support BCH at the time of the hard fork, and that customers would not be able to withdraw any "version of any Bitcoin from Coinbase."  It further stated that "we have no plans to support additional blockchains at this time," despite the fact that Coinbase had announced its intention that customers benefit to the extent possible from hard forks.

45.     This was reiterated in a tweet by Adam White, Coinbase's Vice President and General Manager, who stated in a blog on July 19, 2017, that should a fork occur, "GDAX will not support the new blockchain or its associated coin."

46.     Coinbase reiterated its position on July 27, 2017, when it announced:

In the event of two separate blockchains after August 1, 2017 we will only support one version.  We have no plans to support the Bitcoin Cash fork.  We have made

AMENDED CLASS ACTION COMPLAINT

coinbase—amended

this decision because it is hard to predict how long the alternative version of bitcoin will survive and if Bitcoin Cash will have future market value.

47.    In a blog on the same date discussing Coinbase's determination not to support BCH, Farmer stated, "[o]ur policy is to support only one version of a digital currency.  In order to determine which fork to support we look at factors such as size of the network, market value and customer demand.  We make this decision carefully because safely supporting a new digital currency requires significant work for many teams."

48.    On July 28, 2017, Coinbase publicly tweeted that:

Coinbase does not intend to interact with the Bitcoin Cash Blockchain, or to access bitcoin cash (BCC) [later to become BCH].  In order to safely and securely access bitcoin cash, Coinbase would need to undertake a process of designing and testing significant changes to our systems—including hot and cold storage.  This is one of the core reasons customers will not be able to withdraw bitcoin cash after the fork on August 1st 2017. If this decision were to change in the future and we were to access bitcoin cash, we would distribute to customers bitcoin cash (BCC) associated with bitcoin (BTC) balances at the time of the fork on August 1, 2017. Coinbase would not keep the bitcoin cash associated with customer bitcoin (BTC) balances for ourselves.

49.    The clear implications of these numerous tweets and blogs, was that Coinbase was not going to expend the time and expenses necessary to support BCH.

50.    Customers who kept their Bitcoins on hard drives or off line, were able to access the equivalent amount of BCH.  But Coinbase customers who kept their Bitcoins in their on-line wallets at Coinbase did not receive their distributions, with Coinbase initially keeping the BCH.

51.    Although customers' BCH was associated with their Bitcoins, they were unable to withdraw their Bitcoins, or access and trade or sell their BCH.  In the meantime, the price of BCH rose to over $400 per BCH.

52.    Given the length of time that it takes for customers to move from one exchange to another, moreover, it was impossible for Coinbase customers to quickly move their BTC from Coinbase to another exchange that was supporting BCH, so that they could access  their BCH and could commence trading it.

53.     In essence, Coinbase held their property captive forcing them to lose millions in value, and causing at least one cryptocurrency expert, Professor Tim Wu, to publicly state that Coinbase could be held liable under common law property principles.

**After a Customer Uproar, Coinbase Announces That it Will Support BCH Withdrawals by January 2018**

54.     In apparent response to customer outrage over its actions in connection with the issuance of BCH, on August 3, 2017, Farmer, issued a blog entitled, "Update on Bitcoin Cash".

55.     In that blog, Farmer stated that "[a]dding new digital assets to GDAX . . .  must be approached with caution," and noted that Coinbase's "top priority is always the safety of customer funds."

56.     He further stated that "we spend extensive time designing, building, testing and auditing our systems to ensure that the digital assets we support remain safe and secure."  As Farmer explained, "[w]e may not always be first in adding an asset, but if we do, you can be *sure that we have invested significant time and care in supporting that digital asset securely. We believe this is the best approach for us to maintain customer trust and ensure a fair and orderly market.*" (emphasis added).

57.     Farmer then went on to state that:

> Over the last several days, we've examined all of the relevant issues and have decided to work on adding support for bitcoin cash for all GDAX customers.  We made this decision based upon factors such as the security of the network, customer demand, trading volumes, and regulatory considerations.

58.     Farmer then clarified that Coinbase planned "to have support for bitcoin cash by January 1, 2018", but that by support he meant only that customers would be able to withdraw their BCH—not to trade it.  He further stated that such support would be forthcoming only if no "additional risks emerge[d] during that time."

59.     Farmer's statements, made only to quell the customer uprising, clearly indicated to the investing public: (1) that Coinbase would only support BCH when it was sure that it could maintain a "fair and orderly" market; (2) that BCH would not be in more than withdrawal mode

coinbase—amended

by January 1, 2018; and (3) that such support would occur only if no additional risks occurred—all of which were untrue.

60.     Notably, while it was keeping customers' BCH in reserve and announcing that it would continue to do so until January 2018, Coinbase was able to raise $100 million in Series D funding from a group of private equity and venture capital investors, including Spark Capital, Greylock Partners, Battery Ventures, Section 32, and Draper Associates on August 10, 2017.

**Coinbase Determines that It will Launch BCH and Insiders Start to Trade**

61.     Although Coinbase maintains that it formally notified its employees on November 13, 2017 that it would begin supporting BCH, trading in the currency spiked in volume and price over the two day weekend prior to the 13th and continued on that day.

62.     Although there was purportedly a policy in place at Coinbase that prohibited insider trading, this spike in trading in BCH indicated to Coinbase and Armstrong, at least, that there was insider trading based upon this information.  *See* Bitcoin Cash Chart in Paragraph 15.

63.     Nonetheless, Coinbase took no steps to secure this proprietary information or root out the source of this trading and manipulation, other than apparently telling its employees not to trade.

64.     Moreover, despite the fact that Coinbase knew that statements made by Farmer and the Company regarding BCH were false, and that in fact, it was going to fully support trading in mid December, neither Coinbase, Farmer nor Armstrong did anything to inform their customers or the investing public about this change of plans, or to correct the Company's and Farmer's earlier statements.

65.     Further, the Company took no steps to correct its now false and inaccurate "roadmap" or that section of its website concerning which currencies it would support and the degree of support.

66.     As demonstrated in the screen shot below of Coinbase's website on December 13, 2017, a full month after it had made the decision to fully launch BCH, its website shows that support for "Buy", "Sell", and "Deposit" are not planned and that that support of the currency

coinbase—amended

for withdrawals only is "projected".   https://medium.com/@MishaGuttentag/5-important-
unanswered-questions-after-gdax-coinbases-bch-retrospective-37e573a9a8f1.

## Supported Digital Currencies

Coinbase and GDAX provide varying levels of support for different Digital Currencies.

Availability for buying, selling, depositing, and withdrawing supported Digital Currencies varies by Digital Currency. Fees and availability also depend on your country, and payment method.

The following table lists all supported Digital Currencies on Coinbase and GDAX:

| | Coinbase | | | | GDAX | | | |
|---|---|---|---|---|---|---|---|---|
| | Buy | Sell | Deposit | Withdraw | Buy | Sell | Deposit | Withdraw |
| Bitcoin (BTC) | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Litecoin (LTC) | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Ethereum (ETH) | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Ethereum Classic (ETC) | ✗ | ✗ | ✗ | ✗* | ✗ | ✗ | ✗ | ✗ |
| Bitcoin Cash (BCH) | ✗ | ✗ | ✗ | Projected | ✗ | ✗ | ✗ | Projected |
| Bitcoin2x (B2X) | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected |

Digital Currencies or other tokens that are not listed on this page are not supported by Coinbase. Coinbase is unable to process any transaction made using an unsupported Digital Currency. For more information, please refer to our User

67.     Neither Coinbase, nor it spokesmen, Armstrong or Farmer, said anything publicly that indicated that Coinbase had been testing its systems and was building functionality to buy, sell or trade BCH, and did not update this "roadmap" until the day that it commenced the Launch.

68.     By failing to timely inform customers of the Launch, Defendants ensured that customers would not have enough time to place orders, so that Coinbase's order books for BCH would be "fair and orderly" as represented previously by Farmer.

69.     By failing to take any steps to prevent insider trading and price manipulation, they further ensured that the price of BCH would be inflated at the time of the Launch.

70.     This in fact did start a run up of the price.  As the referenced chart shows, days before the actual Launch, insiders commenced cheaply purchasing BCH on other exchanges, running up the price of the stock.  *See* Bitcoin Cash Chart in Paragraph 16.

71.     Although this should have been apparent to Defendants, they did nothing to stop this run up or the insider trading that contributed to the run up.

**Coinbase Continues to Disseminate False Statements on the Day of the Launch**

72.     Even the morning of the Launch, December 19th, Coinbase continued to disseminate false and misleading statements regarding its support of BCH.

73.     In a Coinbase FAQ the morning of December 19th, Coinbase again stated that it was only supporting withdrawals: "for now, Coinbase plans on supporting bitcoin cash withdrawals.  If this changes, we will notify all customers with an update e-mail", and further stated that Coinbase would not support BCH withdrawals until January 1, 2018.

74.     It again stated that it was "*currently* designing, building, testing and auditing our systems, to enable you to *withdraw* your bitcoin cash balance," (emphasis added) at a time when it presumably had achieved full functionality.

**Coinbase Suddenly Proceeds with the BCH Launch Which is a Disaster**

75.     Suddenly, at about 4 p.m. Pacific Time on December 19th, without prior notice, Coinbase indicated that it was opening access to Bitcoin cash that day for buying, selling and trading, in post-only mode.

76.     Then, at 5:15 p.m. Pacific Time, Coinbase stated that trading would begin at 5:20. At this time, Coinbase knew the orders on its post-only book were primarily purchase orders that would drive the price sharply higher.

AMENDED CLASS ACTION COMPLAINT

coinbase—amended

1    77.    In a tweet, Coinbase stated, "Buy, sell and receive Bitcoin Cash on Coinbase,"

2    and cited to its blog implying that it now had the capacity to handle the Launch.

3    78.    On its blog, Coinbase stated that its failure to support BCH was contrary to its

4    prior public statements and its purported mission statement that it operated "by the principle that

5    our customers should benefit to the greatest extent possible from forks or other network events"

6    and that doing so was essential to its "mission to make Coinbase the most trusted, safe, and

7    easy-to-use digital currency exchange."

8    79.    It further stated that "Sends and receives" were available immediately, and that

9    buys and sells would be available to all customers once there was sufficient liquidity on GDAX,

10   within a few hours.

11   80.    Within minutes of this announcement, given the lack of prior notice, and pressure

12   from insider traders who had continued to run up and then dump BCH at inflated prices, the

13   price of BCH skyrocketed to over $16,000 per coin, and then to about $9,500 per coin—

14   thousands of dollars more than it was selling on any other exchange.

15   81.    Two minutes and 40 seconds later, the book was closed, trading was suddenly

16   stopped and over 4,443 orders were placed with 3,461 orders matched, equal to $15.5 million of

17   trading.

18   82.    Unsurprisingly, given the lack of notice enabling an orderly opening, liquidity

19   quickly thinned by insiders who were prepared to trade at its sudden opening, leaving the rest of

20   Coinbase's customers out of luck. After two minutes, Coinbase halted and cancelled trading,

21   leaving it customers and Class members with the inability to get out their money or their coins,

22   or to sell the coins that Coinbase had effectively caused them to purchase at highly inflated

23   prices.

24   83.    By 6:30 pm  PST, Coinbase announced that the BCH-USD, BCH-EUR, and

25   BCH-BTC books would move to "cancel-only" mode, due to thinning liquidity and that all open

26   orders essentially for any other Coinbase customers seeking to trade that day, would be cleared

27   so that any Coinbase customer who did not know or was unable to trade at Coinbase's sudden

28

AMENDED CLASS ACTION COMPLAINT

coinbase—amended

open (and who were not aware that it was going to commence trading BCH on December 19th), lost any opportunity to buy at a fair price, rather an artificially manipulated price.

84.   Moreover, despite being in cancel only mode, the cancel button for the most part was also disabled.

85.   Despite the fact that the price of BCH was clearly highly inflated through insider trading, Coinbase nonetheless continued to fill purchase orders at highly inflated prices.

**Coinbase Initially Admits to Insider Trading but then Hides the Evidence**

86.   Given the unprecedented run up of the price of BCH before the Launch, Armstrong himself finally publicly admitted that there might have been insider trading, and that Coinbase was commencing an investigation, but then did nothing thereafter.

87.   Rather, Defendants then falsely eradicated the artificial price spike that they had created on December 19th, from BCH's trading history as found on their website, in an effort to sweep the entire manipulation scheme, and their own negligence, among other things, under the proverbial rug, but locked in massive losses for customers.

88.   Moreover, on December 21, two days later, they changed the GDAX rules to justify their conduct.

89.   Prior to December 21, 2017, Section 3.3 of the GDAX rule provided only that, "[a]ll traders have equal access to the GDAX API and Web Interface.  Coinbase does not provide prioritized access to any trader."  Section 3.11 of the GDAX Rules stated that GDAX does not use artificial market integrity measures such as 'circuit breakers' or trading halts.

90.   However, on December 21, 2017, Coinbase suddenly changed these rules adding the following clause to Section 3.3, "GDAX Market Operations has the authority to take any action deemed appropriate to preserve market integrity. Such actions include, but are not limited to, the halting of trading, modifying risk-mitigation parameters, restricting Trader access to GDAX or any other actions deemed to be in the best interests of the Exchange."

91.    In other words, Coinbase effectively changed the rules to provide its insiders with priority access to trading, while allowing it to halt trading of other customers because insiders had run up the price of BCH—in direct contravention to its priority and trading rules.

92.     Significantly, the same week that Coinbase suddenly decided to launch BCH, the Chicago Mercantile Exchange ("CME") launched its Bitcoin Futures contracts, such that any institutional investors who were short BTC, which crashed with the rise of BCH, were further aided.

93.     The CFTC has issued a subpoena to Coinbase and other cryptocurrency exchanges and is investigating whether they have engaged in market manipulation and violations of the CEA.

## CLASS ACTION ALLEGATIONS

94.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(2) and (b)(3) on behalf the Class defined in paragraph 1, above.

95.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Coinbase had over 20 million customers, and approximately $11 billion (USD) of BCH was traded on December 20, 2017.

96.     While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, customers may be determined through Coinbase's documents.

97.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct.

98.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class litigation.

99.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     Whether Defendant  Coinbase's conduct in connection of the Launch of BCH was unfair conduct under the California Unfair Competition Law, whether Defendants' conduct was manipulative under the CEA, whether Coinbase was negligent, and whether Armstrong and Farmer made negligent misrepresentations;

-17-

(b)  Whether statements made by Armstrong and Farmer to Coinbase customers during the Class Period omitted and/or misrepresented material facts including but not limited to the timing and ability of Coinbase to support BCH and disclosure of its plans to launch BCH; and

(c)  Whether Coinbase was negligent in its handling of the Launch of BCH, including failing to properly oversee its employees and others who were tipped and proceeding with the Launch when it was unprepared to do.

100.  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the monetary losses suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

101.  The claims asserted herein are a matter of public policy, and do not arise out of the Plaintiff's or any other customer contract.

102.  Further, even if the arbitration and attendant provisions are enforceable and this matter arises under the Customer Agreement, Section 7.2 of the Customer Agreement or the arbitration/class action provision requires the Company to attempt to resolve any dispute informally as a condition precedent to the requirement to arbitrate.

103.  However, Coinbase is unprepared to and therefore does not provide sufficient customer support such that this condition precedent can be satisfied, thereby precluding the Company from enforcing the arbitration and class action waiver clause at Section 7.2 of the Customer Agreement.

104.  Plaintiff made several attempts by email to obtain redress from Coinbase which went unanswered.

105.  Certain of the claims asserted herein, including claims against Armstrong and Farmer, do not invoke any provisions of the User or Arbitration Agreement, as they are not parties to those  Agreements.

coinbase—amended

1   **The Arbitration Agreement is not Enforceable**

2         106.    The Arbitration Agreement found in the User Agreement is not enforceable.

3         107.    First, the Arbitration Agreement specifically states that, "[i]f a court decides that

4   any provision of this section 7.2 is invalid or unenforceable, that provision shall be severed and

5   the other parts of this section 7.2 shall still apply."

6         108.    Thus, the Court must determine in the first instance, the enforceability of the

7   Arbitration Agreement.

8         109.    Second, the "delegation provision" or the reference to the AAA rules conflicts

9   with the Arbitration Agreement making any delegation ambiguous at best.

10        110.    The delegation agreement was never agreed to and was merely part of the AAA

11  Rules that were hyperlinked to the User Agreement that was also hyperlinked.

12        111.    The User Agreement is 30 pages long.  At page 10, the User Agreement, in a

13  section regarding Customer Disputes that was not referenced at the "click" stage, is yet another

14  hyperlink to the AAA Rules, which are over 44 pages. At page 17 of those rules is one

15  paragraph regarding the delegation. A consumer merely by clicking a button at the opening page

16  has not formed consent to a provision that is nested over 30 pages and two hyperlinks away

17  from the opening account page.

18        112.    Further, this Arbitration Agreement constitutes a consumer contract of adhesion

19  and is thus procedurally unconscionable.

20        113.    Moreover, it contains an unconscionable fee shifting provision making it

21  unenforceable.

22  **COUNTS**

23  **Count I:  Violation of California's Unfair Competition Law (Cal. Bus. & Prof. Code**

24  **17200, *et seq.*) Against Coinbase**

25        114.    Plaintiff incorporates all of the above allegations as if fully set forth herein.

26        115.    California's Unfair Competition Law prohibits and makes actionable any unfair

27  and deceptive business practice.  Defendant Coinbase's conduct, all of which emanated from

28  California, constitutes unfair business practices, in that its conduct not only violated its own

internal policies, such as the prohibition of insider trading, but violated the CEA, in that its actions resulted in the manipulation of the market for BCH.   Coinbase then tried to hide these violations by changing the price history of BCH on its website, and changing the GDAX rules to justify their conduct.

116.    Coinbase made false and misleading statements and deceptive statements to the market regarding when Coinbase would support BCH, the degree to which Coinbase would support BCH, and whether the Coinbase was ready from a technical standpoint to support a full Launch of BCH.  It also made false and misleading statements regarding Coinbase's compliance with regulatory authorities and its ability to have an orderly and fair market.

117.    Coinbase allowed its agents, employees and others, who were tipped a month in advance of the Launch date, to purchase BCH from other exchanges, thereby running up the price of BCH both about the time that they first told insiders about the Launch, on or about November 12 and 13th  and the weekend before, and then several days before the actual Launch.

118.    Coinbase's acts and practices constitute "unfair" business acts and practices, in that the harm caused by their wrongful conduct outweighs any utility of such conduct, and such conduct (i) offends public policy, (ii) is immoral, unscrupulous, unethical, oppressive, deceitful and offensive, or (iii) has caused and will continue to cause substantial injury to consumers such as Plaintiff and the Class.  It constitutes a violation of the CEA, and is market manipulation.

119.    As a direct, proximate and foreseeable result of Defendants' unfair and deceptive business practices, Plaintiff and Class members sustained losses, and Coinbase benefitted by selling BCH at inflated prices, obtaining both fees and compensation thereby.

120.    Plaintiff and Class members are entitled to and do seek an order of restitution and disgorgement.

121.    Plaintiff is entitled to recover his attorneys' fees and costs under California Code of Civil Procedure, Section 1021.5.

## Count II-Negligence against Coinbase

122.    Plaintiff repeats the allegations above as if fully set forth herein.  Plaintiff explicitly disclaims any allegations of fraud.

coinbase--amended

123.     Coinbase owed Plaintiff and Class Members a duty of reasonable care, which it breached.   By operating an exchange through which customers, and particularly retail customers, could buy, sell and trade currency, Coinbase owed the highest duties of reasonable care to its customers.

124.     Coinbase was negligent in performing these duties, and in particular, in failing to prevent its employees and other insiders from engaging in insider trading, making deceptive statements and then taking advantage of the resulting market manipulation.

125.     Coinbase was further negligent and failed to use reasonable due care in ensuring that Coinbase could successfully launch BCH, and that its systems could properly handle the number of transactions that would occur once it suddenly launched BCH so that the market for BCH was fair and orderly as represented.

126.     Because Coinbase breached its legal duties, Plaintiff and Class members suffered the damage described herein.

127.     The damages suffered by Plaintiff and Class members were all general and special damages arising from the natural and foreseeable consequences of Coinbase's wrongdoing and were proximately caused by its acts.

128.     Coinbase here does have a responsibility or duty for Plaintiff's purely economic loss.

129.     The facts alleged above indicate that:  (1) the transactions complained of herein were directed at and intended to effect Plaintiff and the defined Class above; (2) the harm of market manipulation of the price of BCH during its Launch, and the failure of Coinbase to have ensured that it was prepared to engage in the Launch, resulted harm to Plaintiff and the defined Class that was reasonably foreseeable; (3) it is certain that Plaintiff and Class members suffered damage in overpaying for or receiving too little BCH, or in being unable to sell their BCH during the Launch (whereas insiders were able to do so); (4) Coinbase's conduct is directly responsible for the damage suffered by Plaintiff and Class members; (5) there is moral blame attached to this conduct as Coinbase's conduct in allowing this manipulation infects the entire

AMENDED CLASS ACTION COMPLAINT

coinbase—amended

cryptocurrency community; and (6) there should be a policy of preventing such future harm, as indicated by the CFTC.

### Count III--Negligent Misrepresentation Against Armstrong and Farmer

130.     Plaintiff repeats the allegations above as if fully set forth herein.  Plaintiff explicitly disclaims any allegations of fraud with respect to this count.

131.     Armstrong and Farmer made the representations of present fact as alleged above without reasonable grounds for believing them to be true and with the intent that Coinbase customers would rely on their statements.

132.     Plaintiff and Class Members were ignorant of the truth and justifiably relied on the statements made by Armstrong and Farmer resulting in damage

133.     There is a strong public interest in Armstrong's and Farmer's proper and non-negligent performance of their duties

### Count IV-Violation of the Commodity Exchange Act Against All Defendants

134.     Plaintiff repeats the allegations above as if fully set forth herein.

135.     Cryptocurrency constitutes a commodity that is regulated under the CEA.

136.     Defendants' conduct, including making false and misleading statements about the Launch and Coinbase's ability to handle the Launch, their tipping of their employees to the date of the Launch, allowing insider trading and the manipulation of the price of BCH, and then taking advantage of the concomitant price inflation, constitutes manipulation under CEA Sections 6 and 9.

137.     Pursuant to this authority, the Commission promulgated Regulations 180.1 and 180.2.  Regulation 180.1, makes it unlawful to: (1) use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud; (2) make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; or (3) engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or

coinbase—amended

1   deceit upon any person.  17 C.F.R. § 180.1(a)(1)(2014).  Regulation 180.2 prohibits conduct that

2   manipulates or attempts to manipulate any trading in commodities.

3       138.   Defendants by making untrue statements of material fact or omitting to state facts

4   necessary to make the statements they made, not untrue or misleading, in connection with the

5   sale of a commodity or contract of sale of a commodity alone constitutes violations of the CEA.

6   And the entire process of the sudden Launch, stopping of trading and reopening, without prior

7   adequate public communications, and the use and control of customers' BCH in its reserves

8   constitute manipulation or attempts to manipulate trading in commodities.

9       139.   Defendants engaged in the acts and practices described above willfully,

10  intentionally, or recklessly.

11      140.   By this conduct, Defendants violated Section 6 and 9 of the Act and Regulations

12  180.1 and 180.2.

13      141.   Each act of: (1) using or employing, or attempting to use or employ, a

14  manipulative device, scheme, or artifice to defraud; (2) making, or attempting to make, untrue

15  or misleading statements of material fact, or omitting to state material facts necessary to make

16  the statements made not untrue or misleading; and (3) engaging, or attempting to engage in any

17  act, practice or course of business, which operated or would operate as a fraud or deceit upon

18  any person, including but not limited to those specifically alleged herein, is alleged as a separate

19  and distinct violation.

20      142.   Plaintiff therefore seeks damages to the extent allowable, and an order enjoining

21  Defendants from engaging in any conduct in violation of the CEA.

22                          **PRAYER FOR RELIEF**

23      WHEREFORE, Plaintiff, on behalf of himself and all other Class members similarly

24  situated, prays for relief and judgment as follows:

25      (a)   Determining that this is a proper class action pursuant to Rule 23(a) and (b)(2)

26  and (3) of the Federal Rules of Civil Procedure and that the claims brought herein are not

27  subject to arbitration;

28

coinbase—amended

1      (b)      Awarding compensatory damage and restitution in favor of Plaintiff and the other

2  Class members against Defendants, jointly and severally, for all damages sustained as a result of

3  Defendants' wrongdoing, in an amount to be determined at trial, including interest thereon,

4  and/or disgorgement of profits earned by Coinbase for the wrongdoing alleged above;

5      (c)      An order finding that Defendants violated the CEA Act and an order permanently

6  enjoying Defendants from any further violations of the Act, ordering payment of  the

7  appropriate civil monetary penalties under the Act, and disgorging any profits.

8      (d)      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in

9  this action, including a reasonable allowance of fees for Plaintiff's attorneys and experts; and

10     (e)      Awarding Plaintiff and the other Class members such other and further relief as

11  the Court deems appropriate.

## JURY TRIAL DEMAND

13      Plaintiff demands a jury trial on all issues so triable.

15  DATED:  July 17, 2018          **GREEN & NOBLIN, P.C.**

17               By:   __/s/ Robert S. Green__
                       Robert S. Green

19               James Robert Noblin
               2200 Larkspur Landing Circle, Suite 101
20               Larkspur, CA  94939
               Telephone:  (415) 477-6700
21               Facsimile:  (415) 477-6710
               Email:  gnecf@classcounsel.com

23               Lynda J.  Grant
               **THEGRANTLAWFIRM, PLLC**
24               521 Fifth Avenue, 17th Floor
               New York, NY 10175
25               Telephone:  212-292-4441
               Facsimile:  212-292-4442
26               Email:  lgrant@grantfirm.com

27               *Attorneys for Plaintiff*

AMENDED CLASS ACTION COMPLAINT

coinbase--amended