1  KEKER, VAN NEST & PETERS LLP
   STEVEN P. RAGLAND - # 221076
2  sragland@keker.com
   BENJAMIN BERKOWITZ - # 244441
3  bberkowitz@keker.com
   ERIN E. MEYER - # 274244
4  emeyer@keker.com
   NICHOLAS D. MARAIS - # 277846
5  nmarais@keker.com
   SEAN M. ARENSON - # 310633
6  sarenson@keker.com
   633 Battery Street
7  San Francisco, CA 94111-1809
   Telephone:    415 391 5400
8  Facsimile:    415 397 7188

9  Attorneys for Defendants
   COINBASE, INC., BRIAN ARMSTRONG
10 and DAVID FARMER

11                    UNITED STATES DISTRICT COURT

12                 NORTHERN DISTRICT OF CALIFORNIA

13

14 JEFFREY BERK, on behalf of himself and      Case No. 3:18-cv-01364-VC
   all others similarly situated,
15                                              **DEFENDANTS' MOTION TO DISMISS**
                      Plaintiff,                **AMENDED CLASS ACTION**
16                                              **COMPLAINT; MEMORANDUM OF**
           v.                                   **POINTS AND AUTHORITIES IN**
17                                              **SUPPORT THEREOF**
   COINBASE, INC., a Delaware Corporation
18 d/b/a Global Digital Asset Exchange          Date:        September 27, 2018
   ("GDAX"), Brian Armstrong and David          Time:        10:00 a.m.
19 Farmer,                                      Dept:        4, 17th Floor

20                    Defendants.               Judge:       Hon. Vince Chhabria

21                                              Date Filed:  March 1, 2018

22                                              Trial Date:  None set

23

24

25

26

27

28

1

# TABLE OF CONTENTS

2
**Page**

3   MEMORANDUM OF POINTS AND AUTHORITIES ........................................................1

4   I.      INTRODUCTION ..........................................................................................................1

5   II.     STATEMENT OF ISSUES TO BE DECIDED ............................................................2

6   III.    BACKGROUND ...........................................................................................................2

7   IV.     ARGUMENT .................................................................................................................3

8           A.      Plaintiff fails to state a claim for relief under the CEA. ....................................3

9                   1.      The CEA does not create a private right of action for Plaintiff's
                            claim....................................................................................................4

10

11                  2.      Plaintiff fails to allege facts constituting manipulation under the
                            CEA......................................................................................................4

12          B.      Plaintiff fails to state a claim for relief under the UCL. ...................................7

13                  1.      Coinbase's alleged conduct was not an unlawful business practice. ...........8

14                  2.      Coinbase's alleged conduct was not an unfair business practice................8

15                  3.      Plaintiff's allegations preclude restitutionary relief...................................10

16          C.      Plaintiff fails to state a claim for negligence. .....................................................11

17                  1.      Plaintiff had no special relationship with Defendants sufficient to
                            impose a cognizable legal duty..............................................................11

18

19                  2.      The economic loss rule bars Plaintiff's negligence claims.......................12

20          D.      Plaintiff fails to state a claim for negligent misrepresentation. ...........................13

    V.      CONCLUSION...............................................................................................................15

21

22

23

24

25

26

27

28

1292470

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Allen v. City of Beverly Hills*
    911 F.2d 367 (9th Cir. 1990) ................................................................................. 15

*Arena Rest. & Lounge LLC v. S. Glazer's Wine & Spirits, LLC*
    No. 17-cv-03805, 2018 WL 1805516 (N.D. Cal. Apr. 16, 2018) ........................... 13

*Ashcroft v. Iqbal*
    556 U.S. 662 (2009) ................................................................................................ 2

*Bell Atl. Corp. v. Twombly*
    550 U.S. 544 (2007) ................................................................................................ 2

*CFTC v. Kraft Foods Group, Inc.*
    153 F. Supp. 3d 996 (N.D. Ill. 2015) ................................................................... 5, 6

*CFTC v. Noble Metals Int'l, Inc.*
    67 F.3d 766 (9th Cir. 1995) ..................................................................................... 4

*CFTC v. Paron Capital Mgmt., LLC*
    No. c 11-4577, 2012 WL 2395259 (N.D. Cal. June 25, 2012) ................................. 4

*Davidson v. Kimberly-Clark Corp.*
    889 F.3d 956 (9th Cir. 2018) ................................................................................... 7

*Dunn v. CFTC*
    519 U.S. 465 (1997) ................................................................................................ 4

*Harry v. Total Gas & Power N. Am., Inc.*
    889 F.3d 104 (2d. Cir. 2018) ................................................................................... 7

*In re Amaranth Nat. Gas Commodities Litig.*
    587 F. Supp. 2d 513 (S.D.N.Y. 2008) ...................................................................... 5

*In re Amaranth Nat. Gas Commodities Litig.*
    730 F.3d 170 (2d Cir. 2013) .................................................................................... 5

*In re Crude Oil Commodity Litig.*
    No. 06 Civ. 6677, 2007 WL 1946553 (S.D.N.Y. June 28, 2007) ............................ 5

*In re Dairy Farmers of Am., Inc., Cheese Antitrust Litig.*
    60 F. Supp. 3d 914 (N.D. Ill. 2014) ......................................................................... 4

*Kalitta Air, LLC v. Cent. Tex. Airborne Sys., Inc.*
    No. c 96-249-CW, 2009 WL 1636036 (N.D. Cal. June 8, 2009) ........................... 13

*Kearns v. Ford Motor Co.*
    567 F.3d 1120 (9th Cir. 2009) ................................................................................. 5

i

1292470

*Klein & Co. Futures v. Bd. of Trade of City of New York*
    464 F.3d 255 (2d Cir. 2006)................................................................................. 4

*Mendia v. Garcia*
    165 F. Supp. 3d 861 (N.D. Cal. 2016) ............................................................ 11, 12

*NuCal Foods, Inc. v. Quality Egg LLC*
    918 F. Supp. 2d 1023 (E.D. Cal. 2013).......................................................... 12, 13

*Phillips v. Apple Inc.*
    No. 15-cv-04879, 2016 WL 5846992 (N.D. Cal. Oct. 6, 2016) ...................... 11, 15

*Ploss v. Kraft Foods Grp., Inc.*
    197 F. Supp. 3d 1037 (N.D. Ill. 2016) .................................................................. 7

*S.M. Wilson & Co. v. Smith Int'l, Inc.*
    587 F.2d 1363 (9th Cir. 1978) ............................................................................ 12

*Stathakos v. Columbia Sportswear Co.*
    No. 15-cv-04543, 2017 WL 1957063 (N.D. Cal. May 11, 2017)........................... 10

*U.S. v. Reliant Energy Servs., Inc.*
    420 F. Supp. 2d 1043 (N.D. Cal. 2006) ................................................................ 6

**State Cases**

*Bank of the W. v. Super. Ct.*
    2 Cal. 4th 1254 (1992) ....................................................................................... 10

*Bardin v. DaimlerChrysler Corp.*
    136 Cal. App. 4th 1255 (2006) ............................................................................. 9

*Camacho v. Auto. Club of S. Cal.*
    142 Cal. App. 4th 1394 (2006) ........................................................................... 10

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*
    20 Cal. 4th 163 (1999) ...................................................................................... 7, 8

*Clark v. Super. Ct.*
    50 Cal. 4th 605 (2010) ...................................................................................... 10

*Emery v. Visa Internat. Serv. Ass'n*
    95 Cal. App. 4th 952 (2002) ................................................................................. 9

*Farmers Ins. Exch. v. Super. Ct.*
    2 Cal. 4th 377 (1992) .......................................................................................... 8

*Korea Supply Co. v. Lockheed Martin Corp.*
    29 Cal. 4th 1134 (2003) ..................................................................................... 11

*Melton v. Boustred*
    183 Cal. App. 4th 521 (2010) .............................................................................. 11

*Monreal v. Tobin*
    61 Cal. App. 4th 1337 (1998) ............................................................................. 12

ii

1292470

*QDOS, Inc. v. Signature Fin., LLC*
    17 Cal. App. 5th 990, 998 (2017) ........................................................................ 12

*Ragland v. U.S. Nat'l Bank Assoc.*
    209 Cal. App. 4th 182 (2012) ............................................................................. 13

*Robinson Helicopter Co. Inc., v. Dana Corp.*
    34 Cal. 4th 979 (2005) ........................................................................................ 13

*Rubenstein v. The Gap Inc.*
    14 Cal. App. 5th 870 (2017) ................................................................................. 8

*S.F. Unified Sch. Dist. v. W.R. Grace & Co.*
    37 Cal. App. 4th 1318 (1995) ............................................................................. 13

*Yanase v. Auto Club of So. Cal.*
    212 Cal. App. 3d. 468 (1989) ............................................................................. 15

*Zhang v. Superior Court*
    57 Cal. 4th 364 (2013) ........................................................................................ 10

**Federal Statutes**

Commodity Exchange Act §1a, 7 U.S.C. § 1a ...................................................... 4, 7

Commodity Exchange Act § 6(c), 7 U.S.C. § 9 ..................................................... 6, 7

Commodity Exchange Act § 9, 7 U.S.C. § 13 ....................................................... 6, 7

Commodity Exchange Act § 22, 7 U.S.C. § 25 ......................................................... 4

**Federal Regulations**

CFTC Rule 180.1, 17 C.F.R. § 180.1 ................................................................ 5, 6, 7

CFTC Rule 180.2, 17 C.F.R. § 180.2 ................................................................... 5, 6

SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ................................................................. 7

**Federal Rules**

Fed. R. Civ. P. 9(b) ........................................................................................... 4, 5

Fed. R. Civ. P. Rule 12(b)(6) ................................................................................. 2

**Treatises**

2B Cal. Jur. 3d, Agency, § 1 ................................................................................. 9

1292470

1  **TO ALL PARTIES AND TO THEIR COUNSEL OF RECORD:**

2          PLEASE TAKE NOTICE that on September 27, 2018 at 10:00 a.m., or as soon thereafter

3  as this matter may be heard, in the courtroom of the Honorable Vince Chhabria, located in

4  Courtroom 4, 17th Floor of the United States Courthouse, 450 Golden Gate Avenue, San

5  Francisco, CA 94102, Defendants Coinbase, Inc. ("Coinbase"), Brian Armstrong, and David

6  Farmer (collectively, "Defendants") will and hereby do move this Court for an order dismissing

7  all claims in Plaintiff's Amended Class Action Complaint.

8          This motion is based on this Notice of Motion, the following Memorandum of Points and

9  Authorities, the pleadings and other documents on file in this case, all other matters of which the

10  Court may take judicial notice, and any further argument or evidence that may be received by the

11  Court at the hearing.

12  Dated: August 10, 2018                          KEKER, VAN NEST & PETERS LLP

13

14

15                                          By:   */s/ Steven P. Ragland*

16                                               STEVEN P. RAGLAND

17                                               Attorneys for Defendants
                                                 COINBASE, INC., BRIAN ARMSTRONG
18                                               and DAVID FARMER

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT & MPA
Case No. 3:18-cv-01364-VC

1292470

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.      INTRODUCTION

Last December—at the peak of 2017's digital currency boom[1]—Plaintiff Jeffrey Berk placed a bet on a brand-new digital currency called "Bitcoin Cash" (or BCH). Berk hoped to see a quick and profound return on his investment and was disappointed with the results of his speculation.  Today, the BCH he bought at $4,200 is trading at approximately $567.  Searching for someone to blame, Berk claims Coinbase—the digital currency platform he used to purchase BCH—and Coinbase executives Brian Armstrong and David Farmer are responsible for his alleged harm because (1) they failed to stop Coinbase employees from what Berk conjectures *must have* been insider trading and (2) they failed to adequately anticipate the huge demand for BCH on the day it was launched, leading Coinbase to move its books to "cancel-only" mode and thereby supposedly "manipulat[ing]" the exchange rate.

Having previously focused on an insider-trading theory, Berk's Amended Complaint seeks instead to tie his claim to the anti-manipulation provisions of the Commodity Exchange Act ("CEA").  That approach fails for at least two reasons.  First, Plaintiff lacks standing to bring claims under the CEA because its private right of action is limited to plaintiffs who received trading advice from a defendant or who entered into certain types of futures contracts.  Neither happened, nor is alleged to have happened, in this case.  Second, even if Plaintiff had standing, he fails to plead facts constituting market manipulation under the CEA; indeed, he *admits* that the market price of BCH was "unmanipulated."

Plaintiff's ancillary claims also fail.  His UCL cause of action largely rises and falls with his deficient CEA claim.  Additionally, it is premised on a claim that Coinbase failed to *prevent* insider trading even though Coinbase had a clear policy prohibiting such activity and in spite of the unavailability of vicarious liability for the acts of others under the UCL. And even if Plaintiff could find a UCL "hook," the remedy he seeks is unavailable as a matter of law: he cannot obtain

---

[1] Plaintiff alleges he "placed a purchase order" for BCH on December 19, 2017.  Dkt. 33 ("Am. Compl."), ¶ 23. That week saw all-time highs for digital currencies across the board. Bitcoin, for instance, peaked at approximately $19,700 on December 17, 2017; today, it is trading at about $6,143, a drop of approximately 69%.  Price history available at:  https://coinmarketcap.com/.

1

1    restitution because he has not alleged that Coinbase has wrongfully taken possession of anything

2    that must be returned to him.

3            Plaintiff's negligence claim also fails because he does not allege facts sufficient to show

4    that Defendants had a legal duty to prevent the losses he claims. And, as with his UCL claim,

5    Plaintiff seeks only remedies (in this case, for economic losses) that are not recoverable under

6    California law.

7            And, finally, Plaintiff fails to plead a case for negligent misrepresentation. Berk bases that

8    cause of action on a series of alleged statements about whether, or when, Coinbase would support

9    BCH, but he fails to demonstrate that those statements were false. Moreover, by the time he

10   placed his "buy" order, he obviously knew that Coinbase was supporting BCH—so it is

11   nonsensical for him to suggest that he "relied" on statements to the contrary.

12           Plaintiff may have buyer's remorse, but, as a matter of law, he cannot place his purported

13   losses at Defendants' feet. His Amended Complaint should be dismissed with prejudice.[2]

14   **II.    STATEMENT OF ISSUES TO BE DECIDED**

15           Whether the Amended Class Action Complaint should be dismissed under Rule 12(b)(6)

16   for failure to state a claim and, if so, whether it should be dismissed with prejudice.

17   **III.   BACKGROUND**

18           Coinbase is a digital currency exchange that allows its users to buy, sell, hold, and transact

19   in currencies like Bitcoin, Ethereum, and Litecoin.[3] *See* Am. Compl. ¶¶ 35–37. Plaintiff's claims

20   center on a new digital currency launched in 2017 called Bitcoin Cash ("BCH") and on

21   Coinbase's decision to add support for BCH to its platform. *Id.* ¶¶ 9–11, 23.

22           Plaintiff alleges that, over time, Coinbase took different positions about whether it would

23   support BCH—first announcing in July 2017 that it "did not plan to support BCH" immediately

24   _____
     [2] Defendants have also filed a Motion to Compel Individual Arbitration and to Stay this action
25   because Coinbase's User Agreement includes a binding arbitration clause. *See* Dkt. 17. This
     Motion to Dismiss is brought in the alternative.

26   [3] For purposes of a Rule 12(b)(6) motion to dismiss, the Court must accept material factual
27   allegations as true, although pleadings that are "no more than conclusions, are not entitled to the
     assumption of truth." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 572 (2007); *Ashcroft v.*
     *Iqbal*, 556 U.S. 662, 679 (2009). The facts in this section are thus taken from the Amended
28   Complaint to assist the Court, although Defendants deny the veracity of many of the allegations.

when the currency was created, *id.* ¶¶ 44–46, then two weeks later explaining that it had indeed "decided to work on adding support for bitcoin cash" and "planned" to provide that support "by January 1, 2018," *id.* ¶¶ 57–58.  Next, on November 13, 2017, Coinbase "formally notified its employees … that it would begin supporting BCH," *id.* ¶ 61, presumably so they could develop the necessary capabilities ahead of the launch.  And finally, on December 17, 2017—before trading opened—Coinbase told the public "that it was opening access to Bitcoin [C]ash that day for buying, selling, and trading, in post-only mode." *Id.* ¶¶ 75–76.

Plaintiff's allegations fall into two buckets.  First, he complains of insider trading, without actually alleging that *anyone* at Coinbase (let alone Coinbase itself) traded on material non-public information.  *See, e.g.*, *id.* ¶¶ 14–16 (alleging that BCH price charts "unequivocally demonstrat[e] insider trading").  Second, he claims that he "*attempted* to purchase" Bitcoin Cash "within about a minute" of its launch—at a time when Coinbase was showing a spot price of approximately $2,000 per BCH.  *Id.* at ¶¶ 23–25 (emphasis added).  A minute later, because of high demand, and before Plaintiff's order was filled, Coinbase "halted" trading and moved its BCH platform to "cancel-only" mode.  *Id.* at ¶¶ 82–83.  As a result, Coinbase customers could no longer place new orders; they *could* cancel pending orders, *id.*, but Plaintiff chose not to do so, waiting instead for his order to be filled at the prevailing spot price.  Plaintiff alleges that his purchase order was ultimately filled the next day "at the inflated price of $4,200.98." *Id.* ¶ 26.

On these facts, Plaintiff has filed a putative class action on behalf of "all Coinbase customers who placed purchase, sale or trade orders with Coinbase or the GDAX in connection with Coinbase's launch of BCH" between December 19 and December 21, 2017.  *Id.* at ¶ 1.

## IV.    ARGUMENT

### A.    Plaintiff fails to state a claim for relief under the CEA.

Plaintiff's claims that Defendants violated the Commodity Exchange Act ("CEA") by manipulating the price of BCH are fatally flawed and must be dismissed for at least two independent reasons.  *First*, Plaintiff lacks standing to bring a private claim under the CEA because the extent of his transaction with Coinbase was the purchase of BCH for immediate delivery (that is, a "spot transaction"), which is outside the scope of the CEA's private right of

1   action.  *Second*, Defendants' alleged misconduct cannot constitute manipulation under the CEA

2   because there is no viable allegation of fraud or artificial market prices.

3             **1.**          **The CEA does not create a private right of action for Plaintiff's claim.**

4           Section 22 of the CEA creates a private right of action—but only for plaintiffs who fall

5   into specific categories enumerated in the statute.  7 U.S.C. § 25(a)(1); *see also Klein & Co.*

6   *Futures v. Bd. of Trade of City of New York*, 464 F.3d 255, 259 (2d Cir. 2006).  In particular, for

7   CEA standing, a plaintiff must have (a) "received trading advice from the violator for a fee,";

8   (b) "made a contract for the sale of a commodity for future delivery through the violator"; or

9   (c) "purchased from or sold to the violator certain options or contracts."  *CFTC v. Paron Capital*

10  *Mgmt., LLC*, No. c 11-4577, 2012 WL 2395259, at *4 (N.D. Cal. June 25, 2012) (citing 7 U.S.C.

11  § 25(a)(1)(A)–(D)).  Otherwise, there is simply no private right of action under the CEA.

12          Here, given Berk's allegations, he does not fall into any of these enumerated categories.

13  All he alleges is that he bought BCH for *immediate* delivery (i.e., a "spot transaction") on an

14  exchange run by Coinbase.[4]  Critically, a "spot [transaction] is not a 'future' within the meaning

15  of the CEA," and the "CEA therefore does not provide a private right of action to recover for

16  damages suffered in the trading of spot … contracts."  *In re Dairy Farmers of Am., Inc., Cheese*

17  *Antitrust Litig.*, 60 F. Supp. 3d 914, 966 (N.D. Ill. 2014), *aff'd* 801 F.3d 758 (7th Cir. 2015).

18  Thus, Berk's spot purchase of BCH does not give rise to a private CEA claim.

19            **2.**          **Plaintiff fails to allege facts constituting manipulation under the CEA.**

20          Even if Berk had standing under the CEA, his fourth cause of action for market

21  manipulation would still fail to state a claim.  Because "'a claim for market manipulation is a

22  claim for fraud,' … a complaint that alleges manipulation of commodities prices must satisfy

23  Rule 9(b)'s requirement that 'the circumstances constituting fraud … be stated with

24  _____

[4] "Spot" transactions are "agreements for purchase and sale of commodities that anticipate near-
25  term delivery." *Dunn v. CFTC*, 519 U.S. 465, 472 (1997).  By contrast, a "futures contract
provides that a specific amount of the commodity will be 'delivered' to the buyer at a specified
26  date … at an agreed-upon price," although typically there is "no legitimate expectation that
[futures] customers [will] take actual delivery."  *CFTC v. Noble Metals Int'l, Inc.*, 67 F.3d 766,
27  773 (9th Cir. 1995).  When "both parties contemplat[e] and intend[] future delivery of the actual
commodity," the underlying agreements are "cash forward contracts," which are "[e]xcluded
28  from the definition of futures contracts." *Id.*; *see also* 7 U.S.C. § 1a(27).

1292470

particularity.'"  *In re Amaranth Nat. Gas Commodities Litig.*, 587 F. Supp. 2d 513, 535 (S.D.N.Y. 2008) (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 101 (2d Cir. 2007)).[5] Here, not only are there no particular allegations stating a case for fraud, but the Plaintiff "explicitly disclaims *any* allegations of fraud"—a disclaimer he incorporates into his CEA allegations.  *See* Am. Compl. ¶¶ 122, 134.  By the Amended Complaint's own terms, then, Plaintiff cannot state a claim for manipulation.

But even if Plaintiff's own disclaimer were ignored, he would still fail to state a claim because he does not adequately plead scienter under either regulatory provision on which he relies (Regulations 180.1 and 180.2), and because his allegations do not establish the elements of market manipulation.

First, Plaintiff's allegations do not establish scienter.  Regulation 180.1, 17 C.F.R. § 180.1, requires Plaintiff to allege that Defendants' false representations "depart[ed] so far from the standards of ordinary care that it is very difficult to believe the actor was not aware of what he or she was doing."  *CFTC v. Kraft Foods Group, Inc.* ("*Kraft*"), 153 F. Supp. 3d 996, 1007, 1014 (N.D. Ill. 2015)  (citation omitted).  Nothing in the Amended Complaint suggests this level of scienter.  While Plaintiff does assert that Defendants *implied* that Coinbase "had the capacity to handle the Launch," Am. Compl. ¶ 77, nowhere does he allege that—or explain why—their belief in that claim was reckless.  Regulation 180.2, 17 C.F.R. § 180.2, imposes an even *higher* standard, requiring that defendants "specifically intended" to manipulate the market—that is, they acted "with the *purpose or conscious object* of causing or effecting a price or price trend in the

---

[5] Some "other district court opinions … have endorsed a case-by-case approach to determining whether a manipulation claim sounds in fraud and thus must satisfy Rule 9(b)."  *In re Amaranth Nat. Gas Commodities Litig.*, 730 F.3d 170, 181 (2d Cir. 2013).  These courts have noted that "Rule 9(b) 'is cast in terms of the conduct alleged, and is not limited to allegations styled or denominated as fraud'"; instead, they look to "the allegations as pled in the complaint to determine if they sound in fraud."  *In re Crude Oil Commodity Litig.*, No. 06 Civ. 6677, 2007 WL 1946553, at *5 (S.D.N.Y. June 28, 2007) (quoting *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004)).  Where, as here, plaintiffs "assert that defendants made false or misleading statements in support of their claims of manipulation"—and "the crux of plaintiffs' allegations is that defendants misled the market"—their market-manipulation claim sounds in fraud and "should be subject to the heightened pleading standard for Rule 9(b)."  *Id.*; *see also Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009) (holding that even where "fraud is not a necessary element of a claim," when a plaintiff brings a claim based on allegations of "a unified course of fraudulent conduct[,] … the claim is said to … 'sound in fraud,' and the pleading … as a whole must satisfy the particularity requirement of Rule 9(b)" (citation omitted)).

1292470

market that did not reflect the legitimate forces of supply and demand.'"  *Kraft*, 153 F. Supp. 3d at 1020 (citation omitted and emphasis added); *see also U.S.  v. Reliant Energy Servs., Inc.*, 420 F. Supp. 2d 1043, 1056 (N.D. Cal. 2006).  Plaintiff alleges neither.

Second, Plaintiff has not pleaded the elements of market manipulation under either Regulation 180.1 or 180.2.  Regulation 180.2 is governed by the "traditional four-part test for manipulation that has developed in case law arising under [CEA sections] 6(c) and 9(a)(2)."  *Kraft*, 153 F. Supp. 3d at 1007.  Those required elements are: "(1) the defendants possessed the ability to influence prices, (2) an artificial price existed, (3) the defendant caused the artificial price and (4) the defendant specifically intended to cause the artificial price."  *Reliant Energy*, 420 F. Supp. 2d at 1056 (citation omitted).  Here, Plaintiff claims that Defendants engaged in "manipulation of the *market for BCH*."  Am. Compl. ¶ 115 (emphasis added).  But he admits that, "at the same time" as BCH was supposedly spiking on *Coinbase*'s exchange, it continued to trade on "*other exchanges*" at prices that  "reflected *unmanipulated* supply and demand" for BCH.  *Id.* ¶¶ 11–12 (emphases added); *see also id.* ¶ 80.  That admission alone sinks the first three elements of his claim that Defendants manipulated "the market for BCH," and it makes plain that the market price of BCH was not "artificial."  Moreover, Plaintiff admits that BCH was trading on another exchange, Binance, in the "unmanipulated" range of "a low of $2604 to a high of $5389."  *Id.* ¶¶ 11–12.  Plaintiff says he purchased BCH on Coinbase for "$4200.98 per BCH," *id.* ¶ 26, which is comfortably within his own alleged range of "prices in other exchanges that reflected unmanipulated supply and demand for the currency," *id.* ¶ 12.  In light of these admissions, Plaintiff cannot demonstrate that he paid an "artificial price" for his BCH.  This forecloses Plaintiff from stating a claim under the CEA, even if he otherwise had a right to do so, because a private litigant must "plead 'actual injury caused by the violation' in addition to the elements of whatever violation they allege in order to successfully state a claim."  *Harry v. Total Gas & Power N. Am., Inc.*, 889 F.3d 104, 111 (2d. Cir. 2018).

Plaintiff's failure to allege an artificial price or to plead actual injury likewise dooms his Regulation 180.1 claim.  And that 180.1 claim also fails because Plaintiff has not pled its elements with particularity.  Because Regulation 180.1 is "nearly identical" to Rule 10b-5

6

1  (promulgated under the Securities Exchange Act), it encompasses the same elements: "(1) a

2  material misrepresentation (or omission); (2) scienter; (3) a connection with the purchase or sale

3  of [a commodity]; (4) reliance…; (5) economic loss; and (6) loss causation."  *Kraft*, 153 F. Supp.

4  3d at 1011; *Ploss v. Kraft Foods Grp., Inc.* ("*Ploss*"), 197 F. Supp. 3d 1037, 1056, 1068 (N.D. Ill.

5  2016).  Plaintiff leans on the same supposedly "false and misleading statements" about

6  Coinbase's BCH launch that form the basis of his negligent misrepresentation claim, but as

7  detailed below, those statements were neither false, nor could Plaintiff have relied on them in

8  making his purchase.  *See infra* Section IV.D.  And while it is possible for a defendant to mislead

9  consumers "with its actions, even absent an affirmative misrepresentation," Plaintiff never alleges

10  any "false signals" sent by Coinbase to the market through the launch *itself* (rather than through

11  statements about the launch).  *Ploss*, 197 F. Supp. 3d at 1058–59.  For instance, Defendants are

12  not alleged to have engaged in "uneconomic" transactions intended to mislead the market about

13  future supply or demand.  *See id.* at 1058.  In sum, Plaintiff fails to allege "the who, what, when,

14  where, and how of the misconduct charged, as well as what is false or misleading about the

15  purportedly fraudulent statement, and why it is false."  *Davidson v. Kimberly-Clark Corp.*, 889

16  F.3d 956, 964 (9th Cir. 2018) (citation omitted).  For each of these reasons, his fourth cause of

17  action should be dismissed.[6]

18  **B.    Plaintiff fails to state a claim for relief under the UCL.**

19  Plaintiff contends that Coinbase violated California's Unfair Competition Law ("UCL")

20  by engaging in unfair business practices.  Am. Compl. ¶¶ 114–21.  Not so.  California's UCL,

21  while broad, is by no means boundless.  The UCL prohibits conduct that "can properly be called a

22  business practice and that at the same time is forbidden by law."  *Cel-Tech Commc'ns, Inc. v. L.A.*

23  *Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999).  To sustain a UCL claim, a plaintiff must

---

24  [6] Additionally, Berk brings his market manipulation claims under Sections 6 and 9 of the CEA
   which, as relevant here, apply to defined "commodities" in interstate commerce.  *See* 7 U.S.C.

25  §§ 9(1)–(3), 13(a)(2).  The CEA defines those "commodities" as various agricultural products and
   "all other goods and articles … and all services, rights, and interests … in which contracts for

26  future delivery are presently or in the future dealt in.  7 U.S.C. § 1a(9).  Although Plaintiff asserts
   the bare legal conclusion that "[c]ryptocurrency constitutes a commodity that is regulated under

27  the CEA," he has neither alleged nor demonstrated that BCH meets the CEA's statutory definition
   of a commodity—that is, a good, article, service, right, or interest in which contracts for future

28  delivery are dealt.  This, too, is a fatal flaw in his pleading.

1292470

demonstrate that the defendant has engaged in acts that fall into any of three categories: "unlawful, or unfair, or fraudulent." *Id.* Here, Plaintiff pleads his case under two of those three theories: he alleges that Defendants' conduct was *unlawful* (insofar as it violated the CEA) and *unfair* (insofar as Coinbase violated "its own internal policies, such as the prohibition of insider trading" and made false statements to the market). *See* Am. Compl. ¶¶ 115–117. As set out above and below, those theories fail.

### 1.    Coinbase's alleged conduct was not an unlawful business practice.

To allege an "unlawful" business practice under the UCL, Plaintiff must show that Coinbase has violated some *other* law. Under this prong, the UCL "'borrows' violations of other laws and treats these violations, when committed pursuant to business activity, as unlawful practices independently actionable under [the UCL]." *Farmers Ins. Exch. v. Super. Ct.*, 2 Cal. 4th 377, 383 (1992). Here, Plaintiff premises his UCL claim on his allegation that Coinbase violated the CEA. *See* Am. Compl. ¶ 115. As a result, his "unlawful" UCL claim must rise and fall with his CEA claim—and thus fails for the reasons detailed above. *See supra* Section IV.A.

### 2.    Coinbase's alleged conduct was not an unfair business practice.

To state a claim under the UCL's "unfair" prong, the Plaintiff must demonstrate that the defendant engaged in unfair business practices that cause (1) substantial injury to the consumer, provided that (2) the injury is not outweighed by any countervailing benefits to consumers or competition; and (3) the injury could not reasonably have been avoided by consumers themselves. *Rubenstein v. The Gap Inc.*, 14 Cal. App. 5th 870, 880 (2017) (sustaining demurrer after finding Gap's conduct was not deceptive and did not constitute false advertising).

Plaintiff alleges that Coinbase's conduct "constitutes unfair business practices" because Coinbase "violated its own internal policies, such as the prohibition of insider trading."[7] But nowhere does the Amended Complaint allege facts to support the idea that *Coinbase* ever violated the policies it had implemented.[8] Quite the opposite: Berk admits that Coinbase "maintains a

---

[7] *See* Am. Compl. ¶ 115. In the same paragraph, Plaintiff goes on to claim that "Coinbase then tried to hide these violations by changing the price history of BCH on its website, and changing the GDAX rules to justify their conduct." Those allegations are irrelevant because they *post-date* Plaintiff's purchase of BCH and thus could not have affected his decision.

[8] Plaintiff's UCL cause of action is leveled against Coinbase alone, not Farmer or Armstrong.

policy against insider trading by its employees," *id.* ¶ 7; and that it took those policies so seriously that when it heard rumors of insider trading, it promptly "[undertook] an internal investigation." *Id.* ¶ 14.  Tellingly, the Amended Complaint *never* alleges that Coinbase or its executives participated in insider trading, or that they directed or encouraged employees to do so.

At heart, Plaintiff wants to hold *Coinbase* vicariously liable, under the UCL, for actions that some unidentified individuals allegedly took in *direct contravention* of Coinbase's policies. But, "[t]he concept of vicarious liability has no application to actions brought under the unfair business practices act….  A defendant's liability must be based on his personal 'participation in the unlawful practices' and 'unbridled control' over the practices that are found to violate section 17200 or 17500." *Emery v. Visa Internat. Serv. Ass'n*, 95 Cal. App. 4th 952, 960 (2002).[9]

What's more, even if the alleged misconduct *could* be attributed to Coinbase, it still would not support a UCL claim.  First, Plaintiff's "insider trading" allegations are threadbare.  He never specifically alleges that anyone actually traded on non-public information, instead encouraging the reader to infer nefarious conduct from historic price data, much of which **predates** Coinbase's announcements.  Second, Plaintiff cannot contend that it was unfair or unreasonable for Coinbase to notify its employees—before telling the public—that it planned to launch a new service. Businesses act, and necessarily must act, that way all the time, and a rule curbing their ability to do so would affect all sorts of legitimate business activity without serving any conceivable public policy.  It would have been impossible for Coinbase to begin supporting BCH without informing its employees, whose job responsibilities would have included preparing to provide this new service.  Where, as here, a plaintiff's theory under the UCL would impose a "huge" burden on a defendant as compared to the benefit the public would receive, the challenged conduct will not be found to be unfair.  *See Bardin v. DaimlerChrysler Corp.*, 136 Cal. App. 4th 1255, 1263 (2006).

Furthermore, Plaintiff's own allegations demonstrate that he could have easily avoided his

---

[9] Plaintiff has also not alleged facts that could support a claim that these unidentified, rogue "insiders" were acting as Coinbase's *agents*—and it is difficult to see how he could. An agent "is anyone who undertakes to transact some business, or manage some affair, for another, by authority of and on account of the latter, and to render an account of such transactions."  2B Cal. Jur. 3d, Agency, § 1. To the extent anyone allegedly traded on nonpublic information, they did so in their private capacity and in violation of Coinbase policy, not "by authority" of Coinbase.

1    supposed injury.  *See Camacho v. Auto. Club of S. Cal.*, 142 Cal. App. 4th 1394, 1403 (2006) (an

2    "unfair practice" must cause an injury "that consumers themselves could not reasonably have

3    avoided").  First, he admits that BCH was traded on *other* exchanges before Coinbase decided to

4    list it.  *See, e.g.*, Am. Compl. ¶ 70 (alleging that "insiders commenced cheaply purchasing BCH

5    on other exchanges").  If Plaintiff wanted to buy BCH on or before December 19, 2017, he had

6    ample alternatives in the marketplace to do so.  So, too, if he had wanted to place an order for

7    BCH when, or soon after, Coinbase commenced trading.  *See, e.g.*, *id.* ¶ 11 (alleging that, at the

8    moment Coinbase launched its BCH platform, BCH was simultaneously trading on "other

9    exchanges").  Second, Plaintiff alleges that the order he placed on Coinbase was not executed for

10   approximately 22 hours.  *Id.* ¶ 26 ("The following day … Plaintiff received notification from

11   Coinbase that his order executed at [an] inflated price….").  According to Plaintiff's own

12   allegations, he could have canceled his order during that 22-hour window—a time when he knew

13   as well as anyone that "the price of BCH skyrocketed."  *Id.* ¶ 80.[10]

14                **3.      Plaintiff's allegations preclude restitutionary relief.**

15           Under the UCL, plaintiffs can seek only two forms of remedy: restitution and injunctive

16   relief.  *See Clark v. Super. Ct.*, 50 Cal. 4th 605, 608–09 (2010).  "The only nonpunitive monetary

17   relief available under the [UCL] is the disgorgement of money that has been wrongfully obtained

18   …."  *Bank of the W. v. Super. Ct.*, 2 Cal. 4th 1254, 1266 (1992).[11]

19           Plaintiff claims he was harmed by Coinbase's conduct because he "lost any opportunity to

20   buy [BCH] at a fair price," and "receiv[ed] too little BCH" at the price he paid.  Am. Compl.

21   ¶¶ 83, 129.  But these are classic *expectation interests* of the type typically recoverable as

22   *damages*, and not properly recoverable through restitution under the UCL.  *See, e.g.*, *Stathakos v.*

23   *Columbia Sportswear Co.*, No. 15-cv-04543, 2017 WL 1957063, at *11 (N.D. Cal. May 11,

24

---

25   [10] Plaintiff now claims that, although Coinbase's BCH platform was operating "in cancel only
     mode, the cancel button for the most part was disabled."  *Id.* ¶ 84. He does not, however, allege
26   that he tried to cancel his "buy" order at any time, let alone that he was prevented from doing so.

     [11] Plaintiff does not seek injunctive relief. He *does* seek attorneys' fees, *see* Am. Compl. ¶ 121,
27   another form of relief that is generally prohibited in UCL cases. *See, e.g.*, *Zhang v. Superior
     Court*, 57 Cal. 4th 364, 371 (2013) ("Prevailing plaintiffs are generally limited to injunctive relief
28   and restitution. Plaintiffs may not receive damages ... or attorney fees.") (citations omitted).

10

2017) ("[A]warding plaintiffs expectation damages, without accounting for the amount of money plaintiffs actually lost in the process," is "outside the scope of [California] restitution remedies."). It is well established that, while the "conduct covered by the UCL is broad, its remedies are limited," and "damages cannot be recovered." *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1144 (2003). A monetary remedy under the UCL is permissibly restitutionary only if it constitutes "the return of money or property that was once in [a plaintiff's] possession," or the recovery of "money or property in which he or she has a vested interest." *Id.* at 1149. Conspicuously absent from the Amended Complaint, however, is any allegation that Plaintiff bought anything *from* Coinbase, or lost anything in which he had a prior vested interest. Where, as here, a plaintiff does not "specify the source or the amount of the money that [he] seek[s]," and does not "allege any connection between the money [he] spent and money in [a defendant's] possession," dismissal is appropriate. *Phillips v. Apple Inc.*, No. 15-cv-04879, 2016 WL 5846992, at \*10 (N.D. Cal. Oct. 6, 2016), *aff'd*, 725 F. App'x 496 (9th Cir. Feb. 20, 2018).

Because Berk has no remedy under the UCL, his first cause of action must be dismissed.

### C. Plaintiff fails to state a claim for negligence.

Plaintiff alleges that Coinbase was negligent in two now-familiar ways: (1) by "failing to prevent its employees and other insiders from engaging in insider trading"; and (2) by failing "to use reasonable due care in ensuring that Coinbase could successfully launch BCH …." Am. Compl. ¶¶ 124–25.  To sustain a negligence claim in California, plaintiffs must establish four required elements: "(1) duty; (2) breach; (3) causation; and (4) damages." *Mendia v. Garcia*, 165 F. Supp. 3d 861, 878 (N.D. Cal. 2016) (citation and internal quotation marks omitted).

Here, Plaintiff's negligence case fails in at least two ways.

### 1. Plaintiff had no special relationship with Defendants sufficient to impose a cognizable legal duty.

"The existence of a duty is a question of law for the court." *Melton v. Boustred*, 183 Cal. App. 4th 521, 531 (2010) (citation omitted).  "[T]he legal duty to use due care may be of two general types: (1) the duty of a person to use ordinary care in activities from which harm might reasonably be anticipated; and (2) an affirmative duty where the person has a particular

1    relationship to others." *Monreal v. Tobin*, 61 Cal. App. 4th 1337, 1349 (1998). The type of legal

2    duty determines the level of required care: "With regard to the first type of legal duty, the person

3    is not liable unless he or she is actively careless; with regard to the second, he or she may be

4    liable for failure to act affirmatively to prevent harm." *Id.* at 1349–50. In other words, the duty

5    to use ordinary care generally prohibits "misfeasance," whereas a special relationship giving rise

6    to a heightened affirmative duty is required for mere "nonfeasance" to be actionable. *See id.* at

7    1350 (distinguishing between malfeasance and nonfeasance claims).

8          Here, Plaintiff's negligence allegations are grounded in nonfeasance, not misfeasance—

9    that is, Plaintiff alleges that Coinbase failed to *affirmatively act* to "prevent" certain negative

10   outcomes or "ensure" certain positive outcomes. Am. Compl. ¶¶ 124–25. Thus, liability is

11   "largely limited to those circumstances in which some special relationship can be established,"

12   *Monreal*, 61 Cal. App. 4th at 1350. Plaintiff fails to allege facts establishing a special

13   relationship. At times, he baldly asserts that "[b]y operating an exchange" through which

14   customers could buy and sell digital currency, "Coinbase owed the highest duties of reasonable

15   care to its customers." Am. Compl. ¶ 123. But, in the business context, "[r]ecognition of a duty

16   [under negligence law] to manage business affairs so as to prevent purely economic loss to third

17   parties in their financial transactions is the exception, not the rule." *QDOS, Inc. v. Signature Fin.,*

18   *LLC*, 17 Cal. App. 5th 990, 998 (2017), *rev. denied* (Mar. 14, 2018) (citations omitted). Here,

19   Plaintiff points to no statute, contract, or other basis for any special relationship. The mere fact

20   that Coinbase operates a business that serves customers is not enough.

21                    **2.    The economic loss rule bars Plaintiff's negligence claims.**

22         Plaintiff's claim for negligence (and negligent misrepresentation) also fails because he has

23   not pled damages that are cognizable under the law. Damages, of course, are a necessary element

24   of a properly pled negligence claim. *See Mendia*, 165 F. Supp. 3d at 878. And under the

25   economic loss rule, "purely economic losses are not recoverable in tort." *NuCal Foods, Inc. v.*

26   *Quality Egg LLC*, 918 F. Supp. 2d 1023, 1028 (E.D. Cal. 2013); *see also S.M. Wilson & Co. v.*

27   *Smith Int'l, Inc.*, 587 F.2d 1363, 1376 (9th Cir. 1978). "Economic loss generally means

28   pecuniary damage that occurs through loss of value or use of the goods sold or the cost of repair

1    together with consequential lost profits when there has been no claim of personal injury or

2    damage to other property." *S.F. Unified Sch. Dist. v. W.R. Grace & Co.*, 37 Cal. App. 4th 1318,

3    1327 n.5 (1995) (citation, alteration, and emphasis omitted).  Here, Plaintiff does not claim that

4    Defendants' conduct caused any personal injury or damage to other property.  Accordingly, the

5    economic loss rule bars Plaintiff's claims, none of the exceptions apply,[12] and Plaintiff's

6    negligence cause of action should be dismissed.

7        **D.    Plaintiff fails to state a claim for negligent misrepresentation.**

8        Plaintiff claims that Armstrong and Farmer are liable for negligent misrepresentation

9    because they made certain claims "without reasonable grounds for believing them to be true and

10   with the intent that Coinbase customers would rely on [them]." Am. Compl. ¶ 131.

11       The elements of a negligent misrepresentation claim are "(1) a misrepresentation of a past

12   or existing material fact, (2) made without reasonable ground for believing it to be true, (3) made

13   with the intent to induce another's reliance on the fact misrepresented, (4) justifiable reliance on

14   the misrepresentation, and (5) resulting damage." *Ragland v. U.S. Nat'l Bank Assoc.*, 209 Cal.

15   App. 4th 182, 196 (2012)).

16       In his "negligent misrepresentation" case, Plaintiff focuses on two sets of forward-looking

17   statements: the first about *when* Coinbase would launch a BCH platform ("timing claims"); the

18   second, in the run-up to that launch, about whether Coinbase "was ready from a technical

19   standpoint to support a full launch of BCH" ("capacity claims").  Am. Compl. ¶ 116.

20       When it comes to the **timing claims**, Plaintiff alleges that Defendants misleadingly

21   announced that Coinbase would "not support the new blockchain or its associated coin [BCH]."

22   _____

23   [12] "Courts have recognized exceptions to the economic loss rule where (1) a special relationship
     exists between the plaintiff and the defendant, or (2) the conduct violates a duty independent of

24   the contract arising from principles of tort law." *Arena Rest. & Lounge LLC v. S. Glazer's Wine
     & Spirits, LLC*, No. 17-cv-03805, 2018 WL 1805516, at *6 (N.D. Cal. Apr. 16, 2018) (citations

25   omitted). Neither exception applies here. To demonstrate a "special relationship", Plaintiff would
     need to show or allege that the transactions at issue "affect[ed] the plaintiff in particular as

26   opposed to similarly situated purchasers." *Kalitta Air, LLC v. Cent. Tex. Airborne Sys., Inc.*, No.
     c 96-249-CW, 2009 WL 1636036, at *5 (N.D. Cal. June 8, 2009).  Here, the opposite is true:

27   Plaintiff seeks to represent an entire class of similarly situated users.  To demonstrate an
     "independent duty," Plaintiff would need to show intentionally tortious conduct, not—as pled

28   here—negligence.  *See, e.g.*, *Robinson Helicopter Co. Inc., v. Dana Corp.*, 34 Cal. 4th 979, 991
     (2005); *NuCal Foods*, 918 F. Supp. 2d at 1030.

1    *See, e.g.*, Am. Compl. ¶ 45; *see also id.* ¶ 46 ("We have no plans to support the Bitcoin cash fork

2    … because it is hard to predict how long" the new currency might survive).  To be clear,

3    Coinbase did not claim that it would *never* support Bitcoin cash—only that, in July, it "ha[d] no

4    plans" to do so.  *Id.*  Indeed, by August 2017—months before Plaintiff made any trades—

5    Coinbase made plain that it had re-examined "all of the relevant issues and ha[d] decided to work

6    on adding support for bitcoin cash for all GDAX customers."  *Id.* ¶ 57; *see also id.* ¶ 58 ("Farmer

7    then clarified that Coinbase planned 'to have support for bitcoin cash by January 1, 2018 ….'").

8    While Plaintiff concludes that these statements *ultimately* proved to be untrue—a questionable

9    allegation, given that Coinbase did indeed support BCH by January 2018—he does not allege that

10   they were inaccurate *when made*.

11           Additionally, Plaintiff cannot reasonably allege that he relied on *any* of these pre-launch

12   statements.  According to his Amended Complaint, the first time he attempted to purchase BCH

13   was on December 19, 2017—***after*** it was made available on Coinbase's platform.  (Indeed, the

14   proposed class excludes anyone who purchased earlier than that.)  Neither Plaintiff nor any

15   putative class member could possibly have relied on months-old "misrepresentations" about *when*

16   Coinbase *might* launch its BCH platform because by the time they traded, they knew, for a fact,

17   precisely when Coinbase *had* launched its BCH platform.

18           When it comes to his **capacity claims**, Plaintiff fails to allege any misrepresentation at all.

19   At most, the Amended Complaint identifies four potentially relevant announcements:

| ¶ | Alleged "misrepresentation" | Failure to state a claim |
|---|---|---|
| 77 | On December 19, Coinbase tweeted, "'Buy, sell and receive Bitcoin Cash on Coinbase,' and cited to its blog ***implying*** that it now had the capacity to handle the Launch." | Plaintiff alleges that he *did* buy BCH in the wake of this tweet, confirming that the statement was indeed true.  *See, e.g.*, Am. Compl. ¶ 23. Plaintiff must identify a *false* statement; he cannot premise a negligent misrepresentation claim on what he *inferred*. |
| 78 | At some unidentified time, Coinbase stated that its "*mission*" was "to make Coinbase the most trusted, safe, and easy-to-use digital currency exchange." | Even accepting Plaintiff's complaint at face value, there is no basis to conclude that this forward-looking statement—about Coinbase's "mission" and its intentions—was false. |
| 79 | Coinbase "stated that '"[s]ends and receives" were available | Plaintiff does not allege that he attempted to send or receive BCH, so the first half of this statement is |

DEFENDANTS' MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT & MPA
Case No. 3:18-cv-01364-VC

1292470

| | | immediately, and that buys and sells would be available to all customers once there was sufficient liquidity on GDAX.'" | irrelevant.  As to the second, Plaintiff's claim is that he placed a buy order on December 19 that was not filled immediately (because of "thinning liquidity"), but was filled the following day (when liquidity improved).  Those allegations do not undermine the veracity of this statement—they support it. |
| 83 | About an hour after trading opened, "Coinbase announced that the BCH–USD, BCH–EUR, and BCH–BTC books would move to 'cancel-only' mode, due to thinning liquidity." | This statement is *consistent* with Plaintiff's allegations. Am. Compl. ¶ 83 (acknowledging that the platform moved, at least intermittently, to cancel-only mode).  In any event, Plaintiff could not possibly have *relied* on this statement: it was allegedly made approximately 90 minutes *after* he placed his order.  *Compare id.* ¶ 23 *with id.* ¶ 83. |

Moreover, Plaintiff attributes each of these statements to "Coinbase," not to Armstrong or Farmer, who are the only defendants named in his third cause of action.  He also fails to show that—or explain why—these statements were false at the time they were made, let alone that Defendants knew as much.  Without those fundamentals, Plaintiff's third cause of action must fail. *See Phillips*, 2016 WL 5846992, at *11 (dismissing negligent misrepresentation claim for failure to allege that defendant made any "positively false assertions"); *Yanase v. Auto Club of So. Cal.*, 212 Cal. App. 3d. 468, 472–73 (1989) (same).

## V.    CONCLUSION

For the foregoing reasons, Defendants respectfully request that Plaintiff's Complaint be dismissed in its entirety.  Because the defects identified herein are fatal to Plaintiff's claims and he cannot now plead around the facts alleged, the dismissal should be with prejudice. *See, e.g.*, *Allen v. City of Beverly Hills*, 911 F.2d 367, 373–74 (9th Cir. 1990) (affirming district court's dismissal and denying plaintiff leave to amend second amended complaint where further amendment would be futile).

Dated:  August 10, 2018                                        KEKER, VAN NEST & PETERS LLP

By:    */s/ Steven P. Ragland*
       STEVEN P. RAGLAND

       Attorneys for Defendants
       COINBASE, INC., BRIAN ARMSTRONG
       and DAVID FARMER