Robert S. Green (State Bar No. 136183)
James Robert Noblin (State Bar No. 114442)
**GREEN & NOBLIN, P.C.**
2200 Larkspur Landing Circle, Suite 101
Larkspur, CA  94939
Telephone:  (415) 477-6700
Facsimile:  (415) 477-6710
Email:  gnecf@classcounsel.com

Lynda J. Grant *admitted pro hac vice*
**THEGRANTLAWFIRM, PLLC**
521 Fifth Avenue, 17th Floor
New York, NY 10175
Telephone: (212) 292-4441
Facsimile: (212) 292-4442
Email:  lgrant@grantfirm.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEFFREY BERK, on behalf of himself and all others similarly situated,<br><br>        Plaintiff,<br><br>vs.<br><br>COINBASE, INC., a Delaware Corporation d/b/a GLOBAL DIGITAL ASSET EXCHANGE ("GDAX"), BRIAN ARMSTRONG and DAVID FARMER,<br><br>        Defendants. | Case No.:  3:18-cv-01364-VC<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT**<br><br>Date:         September 27, 2018<br>Time:        10:00 a.m.<br>Judge:       Hon. Vince Chhabria<br>Courtroom: 4- 17th Floor<br><br>Date Filed:  March 1, 2018<br><br>Trial Date:  None set |

# TABLE OF CONTENTS

I.   INTRODUCTION ....................................................................................................1

II.  STATEMENT OF ISSUES TO BE DECIDED ...................................................3

III. ARGUMENT ...........................................................................................................3

    A.   Defendants Engaged in Unfair Conduct Under the UCL.....................................3

    B.   Defendants Engaged in Unlawful Conduct Under the UCL and Violated the CEA ...............................................................................................................7

        1.   Plaintiff Has a Private Right of Action Under the CEA............................7

        2.   Conbases's Conduct is Unlawful and Violates CEA, § 6(c) and Regulations 180.1 and 180.2 ...................................................................8

    C.   Pursuant to his UCL Claims, Plaintiff is Entitled to Restitution.......................11

    D.   Plaintiff has Sufficiently Pled Negligence .......................................................11

    E.   Plaintiff Has Sufficiently Pled Negligent Misrepresentation ............................14

IV. CONCLUSION ......................................................................................................15

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01364-VC

00108425.000.docx

1

# TABLE OF AUTHORITIES

2

**Federal Cases**

3

*ATSI Commc'ns., Inc. v. Shaar Fund, Ltd.*
493 F. 3d 87 (2nd Cir. 2007) ...................................................................11

4

*Backus v. General Mills*
122 F. Supp. 3d 909 (N.D. Cal. 2015) .......................................................5

5

*Broomfield v. Craft Brew All., Inc.*
2017 U.S. Dist. LEXIS 142572 (N.D. Cal. Sep. 1, 2017) .......................14

6

*CFTC v. McDonnell*
287 F. Supp. 3d 213 (E.D.N.Y. 2018) .......................................................7

7

*Davis v. HSBC Bank*
691 F. 3d 1152 (9th Cir. 2012) .................................................................4

8

*Harry v. Total Gas & Power N. Am., Inc.*
889 F. 3d 104 (2nd Cir. 2018) ................................................................10

9

*In re Adobe Sys., Privacy Litig.*
66 F. Supp. 3d 1197 (N.D. Cal. 2014) .......................................................3

10

*In re Amaranth Natural Gas Commodities Litig.*
612 F. Supp. 2d 376 (S.D.N.Y. 2009) ........................................................8

11

*In re Coinflip Inc., d/b/a Derivabit, and Francisco Riordan*
CFTC Docket No. 15-29 (Sept. 17, 2015) ..................................................7

12

*In re Commodity Exch. Inc.*
213 F Supp. 3d 631 (S.D.N.Y. 2016) ......................................................8, 9

13

*In re Facebook, Inc. IPO and Sec. and Derivative Litig.*
986 F. Supp. 2d 428 (S.D.N.Y. 2013) ......................................................13

14

*In re London Silver Fixing, Ltd.*
213 F. Supp. 3d 530 (S.D.N.Y. 2016) ........................................................9

15

*In re Platinum and Palladium Antitrust Litig.*
2017 U.S. Dist. LEXIS 46624 (S.D.N.Y. March 26, 2017) .....................10

16

*In re Platinum and Palladium Antitrust Litig.*
2017 U.S. Dist. LEXIS 46624 (S.D.N.Y. March 26, 2017) .....................11

17

*Kalitta Air, L.L.C. v. Cent. Texas Airborne Sys., Inc.*
315 F. App'x 603 (9th Cir. 2008) .............................................................14

18

*Kalitta Air, LLC v. Cen. Tex. Airborne Sys., Inc.*
2009 U.S.  Dist. LEXIS 51282 (N.D. Cal. June 8, 2009) .......................13

19

*Lozano v. AT&T Wireless Servs.*
504 F.3d 718 (9th Cir. 2007) ................................................................3, 4

00108425.000.docx

*Phillips v. Apple Inc.*
    725 F. App'x. 946 (9th Cir. Feb. 20, 2018)................................................11

*Phillips v. Apple Inc.*
    2016 U.S. Dist. Lexis 139320 (N.D. Cal. Oct. 6, 2016)................................11

*Pirozzi v. Apple, Inc.*
    966 F. Supp. 2d 909 (N.D. Cal. 2013)................................................5

*Ploss v. Kraft Foods Grp., Inc.*
    197 F. Supp. 3d 1037 (N.D. Ill. 2016)................................................11

*Rubenstein v. Neiman Marcus Grp., LLC,*
    687 Fed. App'x 564................................................11

*Zamora v. Lyft, Inc.*
    2016 U.S. Dist. Lexis 155027 (N.D. Cal. Nov. 7, 2016)................................4

**State Cases**

*Bardin v. DaimlerChrysler Corp.*
    136 Cal. App. 4th 1255 (2006)................................................5

*Biakanja v. Irving*
    49 Cal. 2d 647 (1958)................................................12

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Cos.*
    20 Cal. 163 (1999)................................................3

*Emery v. Visa Internat. Service Assn.*
    95 Cal. App. 4th 952 (2002)................................................6

*J'Aire Corp. v. Gregory*
    24 Cal. 3d 799 (1979)................................................13

*Melton v. Boustred*
    183 Cal. App. 4th 521 (2010)................................................11, 12

*Ott v. Alfa-Laval Agri., Inc.*
    31 Cal. App. 4th 1439 (1995)................................................13

*Progressive W. Ins. Co. v. Super. Ct.*
    135 Cal. App. 4th 263 (2005)................................................5

*Robinson Helicopter Co., Inc. v. Dana Corp.*
    34 Cal. 4th 979 (2004)................................................13

*Rubenstein v. The Gap, Inc.*
    14 Cal. App. 5th 870 (2017)................................................4

*S. Bay Chevrolet v. Gen. Motors Acceptance Corp.*
    72 Cal. App. 4th 861 (1999)................................................4

*Southern California Gas Leak*
    18 Cal. App. 5th 581 (2017)................................................12

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01364-VC

00108425.000.docx

*State Farm Fire & Cas. Co. v. Super. Ct.*
     53 Cal. Rptr. 2d 229 ( 1996)..........................................................................................3

*Weirum v. RKO General, Inc.*
     15 Cal. 3d 40 (1975).................................................................................................12

*Zhang v. Superior Court*
     57 Cal. 4ᵗʰ 364 (2013)..............................................................................................11

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01364-VC

00108425.000.docx

## I.   INTRODUCTION

This action arises from the disastrous launch ("Launch") of a new form of digital currency, bitcoin cash ("BCH"), by Coinbase, Inc. ("Coinbase "or the "Company") during the period of December 19-21, 2017 (the "Class Period").  In the run up to the Launch, Defendants[1] made a number of misleading statements, not only about when and the extent to which Coinbase would support the new currency, but also its ability to handle the Launch and to "ensure a fair and orderly market."  They also stated that they would not launch BCH unless they knew that there was little risk in doing so.  Not only did they do the complete opposite of this, but they intentionally opened trading for BCH at a time when they knew from their order book that the price would artificially skyrocket and result in an order imbalance.  Nonetheless, they opened trading for BCH for two minutes and then closed down trading.

By the time of the Launch, Defendants well knew that there had been insider trading by their own employees or those tipped by them, resulting in a run up of the price of BCH on other exchanges during the very weekend that they had tipped them. Charts showing the price run up leave little doubt that Defendants knew that there had been insider trading and leaking of their plans to do a full launch of BCH. AC¶15.  Although they determined by mid November 2017 that they would do a full BCH Launch in mid December, they did nothing to correct their earlier statements that they would only support *withdrawals* of BCH, and then not until January 2018. In fact, "roadmap" on their website and their own statements the very morning of the Launch confirmed that was still the plan. AC¶66, 72-74.

Then suddenly, in direct conflict to these statements and without prior notice, at 4:00 p.m. on December 19th, Coinbase announced that it was opening BCH that day for buying, selling and trading, in post-only mode.  Then at 5:15 p.m. PT, Coinbase stated that trading would begin at 5:20 P.M. PT—even though Coinbase knew that the orders in its post-only book were primarily purchase orders that would artificially drive up the price of BCH and cause on order imbalance.

---

[1] Coinbase, Brian Armstrong ("Armstrong"), and David Farmer ("Farmer").  Amended Class Action Complaint ("Amended Complaint", "AC" or "AC ¶__").  AC¶¶27-31.

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01364-VC

Consequently, within minutes of opening trading, the price of BCH skyrocketed at one point to over $16,000 per coin, while it was trading at less that $4,000 per coin on the few other available markets, enabling insiders to dump their BCH at artificial prices.  Coinbase then halted trading and started canceling customer orders, an action that at that point was contrary to its own exchange rules and effectively giving insiders priority.[2]  This left purchasers at a loss as to whether they had made purchases, and if so, at what price, and trapped sellers, who were unable to get out either their coin or their money.  Although Coinbase claims that it then went into a cancel only mode allowing customers to cancel their orders, there is evidence that in the utter disarray of the Launch, the cancel button was disabled.  AC¶84.  In any event, customers were in left in the dark as to the prices at which their purchases were executed, and therefore had insufficient information to start cancelling their trades.  It was not until days later that purchasers learned that their orders had been executed at hyperinflated prices.

In the meantime, Coinbase was able to earn fees by executing these hyperinflated purchases, and saved itself from a run on the market, where it would likely have had to fill the sell orders at the artificially inflated prices that it had caused.  Significantly, the sudden Launch was timed just as the Chicago Mercantile Exchange ("CME") launched its bitcoin ("BTC") futures contracts, the price of which were directly affected by Coinbase's BCH Launch, aiding institutional short sellers who were short BTC by crashing the price of BTC.[3]  Coinbase's actions are now under investigation by the CFTC.

Coinbase's actions in relation to the BCH Launch constitute both an unfair and unlawful business practice under California's Unfair Competition Law ("UCL") and the Commodity Exchange Act ("CEA").  In fact, after the Launch, in a tacit admission of this wrongdoing and in an effort to sweep their manipulation under the rug, Defendants eliminated the artificial price spike from BCH's price history on theCoinbase website, and changed the rules of the GDAX exchange allowing Coinbase to institute artificial circuit breakers—knowing full well that it lacked that capability at the time of the Launch.  AC¶89-90.

---

[2] AC¶¶89-91 (citing the pertinent rules of the GDAX, Coinbase's exchange).
[3] With the launch of BCH, the price of BTC declined as investors sold their BTC for BCH. AC¶92.

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01364-VC

1    Defendants argue that this action is all about insider trading and that Plaintiff wrongly

2    seeks to hold Coinbase and its executives vicariously liable for the trading of unidentified

3    insiders.  It is not.  It is about Coinbase's false and misleading statements and its failure to

4    ensure the integrity of the market for BCH, as it represented it was doing.  It is also about

5    Coinbase's manipulation in facilitating the trading of BCH at artificial prices.  In short, it is

6    about Coinbase's unfair and unlawful actions--- or at least its negligence in the handling of the

7    Launch.  It is also about the statements made by Armstrong and Farmer that misled Plaintiff and

8    other customers into believing that Coinbase could handle the Launch, and that the prices at

9    which they were executing their trades were free from manipulation.  The AC is adequately

10   pled.  Plaintiff should now be able to proceed to discovery.

11   **II.    STATEMENT OF ISSUES TO BE DECIDED**

12          A.    Whether Plaintiff has sufficiently pled claims under the UCL, the CEA and for
                 negligence against Coinbase, and

13
14          B.    Whether Plaintiff has sufficiently pled a claim for negligent misrepresentation
                 against Armstrong and Farmer.

15   **III.   ARGUMENT**

16          **A.    Defendants Engaged in Unfair Conduct Under the UCL**

17          The unfair prong of the UCL creates a cause of action for a business practice that is

18   unfair even if it is not proscribed by some other law.  *In re Adobe Sys., Privacy Litig.*, 66 F.

19   Supp. 3d 1197, 1226 (N.D. Cal. 2014).  In determining whether a business practice relating to

20   consumers is unfair under the UCL, California courts have long applied the "balancing test",

21   which requires "weigh[ing] the utility of the defendant's conduct against the gravity of the harm

22   to the alleged victim" to determine whether the conduct is fair.  *See, e.g., State Farm Fire &*

23   *Cas. Co. v. Super. Ct.*, 53 Cal. Rptr. 2d 229, 234 ( 1996), abrogated in part by *Cel-Tech*

24   *Commc'ns, Inc. v. L.A. Cellular Tel. Cos.*, 20 Cal. 163, 185 (1999); *Lozano v. AT&T Wireless*

25   *Servs.,* 504 F.3d 718, 727 (9th Cir. 2007)("*Lorenzo*").  As this Court stated, "[n]either the

26   California Supreme Court nor the Ninth Circuit has abandoned the traditional balancing test for

27   UCL unfairness." *Zamora v. Lyft, Inc.*, 2016 U.S. Dist. Lexis 155027, at *5 (N.D. Cal. Nov. 7,

28

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01364-VC

00108425.000.docx

2016)("*Zamora*").[4]  Unfair conduct occurs where the practice "offends an established public

policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially

injurious to consumers." *Davis v. HSBC Bank*, 691 F. 3d 1152, 1169 (9th Cir. 2012), citing *S.*

*Bay Chevrolet v. Gen. Motors Acceptance Corp.*, 72 Cal. App. 4th 861, 886-87 (1999).

The harm to  the victims here is apparent—purchases at inflated prices, the payment of

fees to Coinbase for BCH at inflated prices, and the inability to recover either the coin or

monies of sellers for days (in effect conversion), preventing them from being able to trade on

another exchange.  The motive for Coinbase is equally obvious—to enable insiders—its better

employees, to trade BCH at inflated prices, and then to shut down the exchange before Coinbase

experienced a run so that it could avoid payments to sellers at the inflated prices.  Coinbase not

only favored its insiders over the investing public, a violation of its own policies that it would

not prioritize one investor over another, AC¶89, but its own purported insider trading policies.

AC¶7.  It also violated its own GDAX rules against using artificial circuit breakers to ensure the

integrity of the market.  AC¶90-91.  Moreover, its sudden change of heart in executing the

Launch on December 19th, after repeatedly telling the market otherwise, failing to update

Coinbase's "roadmap" portion of its website, and knowing from the order book that the price

was going to skyrocket, was clearly related to and motivated by the CME's initiation of BTC

futures contracts the day before the sudden Launch (which had the effect of depressing the price

of BTC, the price of which was set by Coinbase, among other exchanges, and used as part of the

CME's index) and is presently the subject of a CFTC investigation.  AC¶93.[5]

Defendants offer no reasons or motives for their actions, nor do they explain the utility

of their actions. Defts. Br. at 8-10.  Thus, Coinbase does not provide the Court with any benefit

---

[4] Defendants advocate the use of the "FTC test" based upon *Rubenstein v. The Gap, Inc.*, 14 Cal. App. 5th 870 (2017)("*Rubenstein*").  Defendants' Motion to Dismiss Amended Class Action Complaint; Memorandum of Points and Authorities in Support Thereof ("Defts. Br.", "Defts. Br. at __") at 8.  *Rubenstein*, however, merely states that the FTC test is applicable in "that court".  *Id*. at * 880.   The FTC test has been rejected by the Ninth Circuit, *see, e.g.*, *Lorenzo*, 504 F.3d at 736, and is it followed by this Court.  *Zamora*, at *5.
[5] The CME forms its BTC futures prices based upon the price of BTC on Coinbase, among other exchanges.  https://cointelegraph.com/news/wsj-cme-and-btc-exchange-dispute-led-us-regulators-to-open-price-manipulation-probe.

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01364-VC

00108425.000.docx

1   or utility that their actions provided to consumers that outweighed the harm that it caused—nor

2   is one readily apparent.  *See, e.g., Pirozzi v. Apple, Inc.*, 966 F. Supp. 2d 909, 922 (N.D. Cal.

3   2013); *Progressive W. Ins. Co. v. Super. Ct.*, 135 Cal. App. 4th 263, 287(2005) ("*Progressive*").

4   Even if Defendants could posit some motive or reason why they suddenly determined to launch

5   BCH at inflated prices to the advantage of their insiders, that analysis would be fact intensive

6   and not appropriate here.  *Progressive*, at 287.  *See also Backus v. General Mills*, 122 F. Supp.

7   3d 909, 929-930 (N.D. Cal. 2015).

8         Defendants cite to the FTC test for unfair business practices.  Defts. Br. at 8.  They

9   further advance a number of unsupportable arguments. For instance, they argue that the

10   Amended Complaint fails to set forth allegations that Coinbase violated its own policies.

11   However, that is exactly what the Amended Complaint asserts. *See, e.g.*, AC ¶¶9, 12, 14, 61-63,

12   68-71, 86 (failure to enforce or monitor insider trading rules); *see, e.g.*, AC¶¶82, 89-91

13   (violation of GDAX rules instituting circuit breakers, and tilting playing field); *see, e.g.,* AC

14   ¶¶10, 47, 56, 58 (violation of representations that Coinbase would maintain a fair and orderly

15   market and would not support a new currency unless there was little risk); *see, e.g.*, AC¶¶17,

16   66-67 (Coinbase would supply an accurate "roadmap" of what currencies it planned to support

17   and the degree of support).  They argue that Coinbase took action when it admitted that insider

18   trading had occurred.  Defts. Br. at 9.  But, they knew about the trading since November and

19   apparently did nothing to prevent it or keep it from skewing the BCH Launch.  AC ¶¶9, 12, 14,

20   61-63, 68-71, 86.  In any event, that does not address the issue of why they opened trading when

21   they knew from the order book that the price would be hyperinflated, and that it was likely that

22   an order book imbalance would occur.

23         They then argue that Plaintiff seeks to hold Coinbase vicariously liable for the insider

24   trading of its employees.  That is not the claim.  Nor is the claim that Coinbase cannot advise its

25   employees in advance of a decision to launch a new currency, as Defendants wrongly assert.[6]

26

27   [6] It is difficult to understand how Coinbase's enforcement of its own policy against insider
trading would be burdensome, as Defendants claim. Defts. Br. at 9.  Nor is requiring them to do

28   so analogous to the situation in *Bardin v. DaimlerChrysler Corp.*, 136 Cal. App. 4th 1255
(2006)(case involving car manufacturer's failure to disclose that exhaust manifolds in cars could

00108425.000.docx

The claim is that Coinbase was aware of this insider trading from the run up of BCH prices in mid-November at the same time that it had disclosed its plan to launch BCH, and did nothing about it resulting, in a pump and dump.  Contrary to Defendants' arguments, Plaintiff specifically asserts when and how insider trading likely occurred and its impact on the BCH market. *See, e.g.*, AC¶¶ 9, 15-16, 61-63.[7]  Further, Coinbase held itself out as being able to maintain an orderly and fair market and that it would not launch BCH if there was significant risk—precisely the opposite of what it did.  *See, e.g.*, AC¶58.  It commenced trading of BCH when it knew from its own order book that the price would be inflated and that an order imbalance was going to occur, and then shut down trading.  AC¶¶75-83.  Its website still touts that "Coinbase is the easiest and most *trusted place* to buy, sell, and manage your digital currency." (emphasis added).  www.coinbase.com.  These are actions that Coinbase directly took and have nothing to do with vicarious liability.  Moreover, they had no utility.[8]

Finally, based upon the FTC standard, Defendants argue that Plaintiff could have avoided his injury by trading on another exchange.  First, Defendants use the wrong standard, as this Court and the Ninth Circuit have recognized.  Second, as the Amended Complaint asserts, Coinbase is the primary on-ramp for individual investors and Plaintiff was a customer of Coinbase.  AC¶3, 35-37.  Therefore, he had no obligation to attempt to purchase BCH elsewhere.  Third, it is not a simple process for individual customers to change from one cryptocurrency exchange to another, AC¶52, and in any event, this is an issue of fact not appropriate for determination on this motion.  Fourth, again as alleged in detailed in the Amended Complaint, because of Defendants' wrongdoing, Plaintiff had insufficient information to determine the price at which his purchase was executed or even if it was executed, and the cancel button was disabled. AC¶¶24-26, 84.  Defendants' speculation, which is diametrically opposed to the detailed allegations in the Amended Complaint, does not support their motion.

---

wear out.  Court found that car manufacturers did not have to disclose cost savings measures for every part in car).

[7] Plaintiff asks the Court at this juncture to make reasonable and plausible inferences from the facts pled, including the fact that Coinbase took steps to cover up the manipulation on its own website by eliminating the price spike that it caused.  Defts. Br. at 9.

[8] *Emery v. Visa Internat. Service Assn.*, 95 Cal. App. 4th 952 (2002), cited by Defendants is inapposite (court dismissing UCL claim against party that had no connection to plaintiffs).

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01364-VC

**B.    Defendants Engaged in Unlawful Conduct Under the UCL and Violated the CEA**

1.    Plaintiff Has a Private Right of Action Under the CEA

Section 22 of the CEA provides for a private right of action for plaintiffs who have "made a contract for the sale of a commodity for future deliver through the violator". Defendants here argue that the BCH market in issue was a spot market that is not covered by Section 22, rather than a contract for the sale of commodity for future delivery, which is covered.  Defts. Br. at 4.  The CEA, however, does not contain a definition of "contract for the purchase or sale of a commodity for future delivery", much less explain how that term applies to cryptocurrencies.  *See* Section 1a (3) of the CEA.  That is particularly true with the sale of a cryptocurrency on an exchange such as Coinbase, where much of the currency is kept in wallets controlled by Coinbase, which has their private keys.  Given the control of an exchange such as Coinbase over the currencies of its customers, it is more than reasonable to find that purchases of digital currency, such as BTC and BCH, by Coinbase customers, constitute a contract for the sale of a commodity for future delivery.  In the Launch, Coinbase retained the initial BCH after the fork for over four and half months, and did not release this BCH until December.  *See, e.g., CFTC v. McDonnell*, 287 F. Supp. 3d 213, 226-229 (E.D.N.Y. 2018)(holding that the CFTC has jurisdiction over cryptocurrency spot markets where there is fraud, also citing, "A CFTC Primer on Virtual Currencies," stating that the CFTC's "jurisdiction is implicated  . . . if there is fraud or manipulation involving a virtual currency traded in interstate commerce.").[9]  Thus, where, as here, the currency in issue was not immediately available for purchase or sale, and where the manipulation of the market for BCH directly affected futures exchanges trading in BTC, *see*

---

[9] The Court in McDonnell conducted an extensive analysis of cases, policies and statements of the CFTC and identified "a powerful statement by the Commission that it will exercise jurisdiction over cryptocurrencies when there is potential fraud – even if the fraud does not involve derivatives based on cryptocurrencies." *McDonnell,* 287 F. Supp.3d at 229; *see also In re Coinflip Inc., d/b/a Derivabit, and Francisco Riordan*, CFTC Docket No. 15-29 (Sept. 17, 2015)(attached as Exh.A), holding that "Bitcoin and other virtual currencies are encompassed in the definition and properly defined as commodities."  *Id.* at 3.  In August 2018, the CME commenced selling BCH futures. AC¶92; https://cointelegraph.com/news/cme-futures-partner-releases-first-regulated-bitcoin-cash-futures.

1   AC¶92-93, the Defendants' actions fall within the parameters of Section 22, and the Court

2   should allow Plaintiff to proceed with his private right of action.

3          2.      Conbases's Conduct is Unlawful and Violates CEA, § 6(c) and
                   Regulations 180.1 and 180.2
4

5          Coinbase's conduct here constituted manipulation under CEA§ 6, and Regulations 180.1

6   and 180.2.  Plaintiff's CEA claim is properly pled and Plaintiff properly pleads a claim for

7   unlawful conduct under that prong of the UCL. The conduct alleged in the Amended Complaint

8   is prohibited both under Regulation 180.1, concerning the dissemination of materially false and

9   misleading statements in connection with the sale and purchase of BCH during the Launch.[10]  It

10  is also prohibited under Regulation 180.2, in connection with Coinbase's use of manipulative

11  devices which tilted the market toward its insiders, and its opening of BCH at artificially

12  inflated prices, causing an order book imbalance and resulting in the halting of trading.

13         In response to these allegations, Defendants assert a litany of pleading arguments.  They

14  first assert the time worn argument that Plaintiff failed to explain why the alleged statements

15  were reckless.  Defts. Br. at 5.  However, this is precisely what Plaintiff alleges.  AC¶¶59, 64-

16  65, 74, 116-17.  At least since mid-November 2017, Coinbase knew but failed to disclose its

17  plan to launch BCH, including failing to update its then false "roadmap" on its own website.

18  The failure to disclose this information in light of its knowledge or to correct its prior

19  misleading statements out in the market is actionable and at least constitutes recklessness if not

20  outright fraud.  *In re Commodity Exch. Inc.*, 213 F Supp. 3d 631, 670 (S.D.N.Y. 2016)

21  ("*Commodity Exch.*")(recklessness alleged where facts taken as whole demonstrate defendants

22  failed to review or check information they had a duty to monitor, or ignored obvious signs of

23  fraud);  *In re Amaranth Natural Gas Commodities Litig.*, 612 F. Supp. 2d 376, 383-84

24  (S.D.N.Y. 2009) (recklessness shown by defendants' knowledge of facts or access to

25  information contradicting their public statements).  Plaintiff pled the false statements necessary

26  for a claim under Section 180.1, contrary to Defendants' argument.  *See* Defts. Br. at 7.

27  ---

28  [10] Defendants claim that Plaintiff has disclaimed any allegation of fraud for all counts.  Defts.
    Br. at 5.  A proper reading of the Amended Complaint indicates that Plaintiff only disclaimed
    fraud for the negligence claim. AC¶122.

-8-

00108425.000.docx

1    They further argue that under Section 180.2, Plaintiff failed to assert that Defendants

2    "specifically intended" to manipulate the market, or acted with the purpose or conscious

3    objective of causing or effecting a price or price trend in the market that did not reflect

4    legitimate forces of supply and demand.  Defts. Br. at 5-6.  But, by suddenly opening the market

5    for BCH, particularly in light of an incipient run up in its price, and given what the order book

6    looked like, that is precisely what Coinbase allegedly did.  It knew that the price of BCH would

7    skyrocket given the buy orders already on the books.  AC¶¶69-71.  It is more than reasonable to

8    infer from these facts that this is exactly what Coinbase intended to satisfy its insiders.

9    *Commodity Exch.*, at 620 (intent shown by motive and opportunity, and circumstantial evidence

10   of misbehavior or recklessness).

11   Defendants then argue that Plaintiff failed to satisfy the four part test applicable to a

12   market manipulation scheme.  Defts. Br. at 6.  Defendants first argue that given the

13   unmanipulated prices of BCH on other exchanges, there could not be manipulation of the

14   market by Coinbase.  But, Plaintiff specifically alleges that Coinbase was the largest and most

15   used exchange for cryptocurrency in the world and had the ability to set prices.  AC¶¶2-3, 12-

16   13, 29, 35, 37.  In fact, it is one of the few exchanges that the CME uses to set its index for BTC

17   futures.  AC¶92.  Coinbase and its insiders dominated the trading for BCH during the Launch,

18   setting artificial prices.  AC¶¶2-3, 12-13, 29, 35, 37.  The few other exchanges that traded BCH,

19   were thin and had far less liquidity or were too small to influence prices.  AC ¶11.  This is

20   sufficient to plead that Coinbase had the ability to influence the market.  *See,e.g., In re London*

21   *Silver Fixing, Ltd.*, 213 F. Supp. 3d 530, 565 (S.D.N.Y. 2016)(explaining that the ability to

22   influence a market is demonstrated by artificial prices); *Commodity Exch.*, at *668-69 (existence

23   of artificial prices demonstrates ability to influence market).

24   Defendants then argue that Plaintiff did not suffer an injury.  Defendants ask this Court

25   to make a factual ruling that the market at Coinbase was not artificially inflated when it traded

26   as high as $16,000 and ran trades around $9,500, while other exchanges were trading in the

27   range of $2,000 to $4,000, on the ground that Plaintiff's trade closed at $4,200 and one

28   exchange had a high of $5,389.  The fact that one exchange reached a high of $5,389 at some

-9-

1  point during that day is hardly sufficient to support the factual conclusion that Defendants ask

2  this court to draw at the pleading stage.  As stated in *In re Platinum and Palladium Antitrust*

3  *Litig.,* 2017 U.S. Dist. LEXIS 46624, at *101 (S.D.N.Y. March 26, 2017), "artificial prices [are]

4  'those prices that do not reflect the forces of supply and demand in the market *or* do not

5  otherwise comport with contemporaneous prices in comparable markets.'" (emphasis in

6  original, citation omitted). Here, Plaintiff alleges prices in comparable markets that do not

7  comport with the prices at Coinbase.  This satisfies the standard for pleading this element.

8  Further Plaintiff's purchase was executed at well above $4,000 per coin when Coinbase had

9  indicated a price of about $2,000.  This demonstrates that he paid an artificial price for his BCH,

10  which constitutes actual injury, and the facts surrounding these allegations are more than

11  plausible.  *Harry v. Total Gas & Power N. Am., Inc.*, 889 F. 3d 104, 111 (2nd Cir. 2018).

12       Finally, Defendants argue that Coinbase did not engage in market manipulation under

13  Regulation 180.2.  Defts. Br. at 7.  That is untrue. Coinbase was complicit in a market

14  manipulation with its insiders to skew the launch of BCH to benefit them, by opening trading at

15  a time when its order book demonstrated that the price would skyrocket and that there would be

16  an order imbalance.  AC¶¶76.  They then closed down trading within two minutes, with

17  artificial circuit breakers effectively giving insiders priority contrary to their rules, and

18  instituting artificial circuit breakers for which their rules did not then provide.  AC¶¶82-83,89-

19  90.  By engaging in the Launch when it did, Coinbase sent a false signal that it could effect a

20  fair and orderly market for BCH when it could not.  It provided customers with false signals

21  concerning the supply of BCH and its appropriate price.  In short, the Amended Complaint

22  alleges facts suggesting that Coinbase's sudden Launch of BCH was itself a manipulation of the

23  price of BCH during the few minutes that Coinbase allowed trading, and that the Launch

24  "willfully combined with something more to create a false impression of how market

25  participants value of security."  *Ploss v. Kraft Foods Grp., Inc.,* 197 F. Supp. 3d 1037, at *1058

26

27

28

-10-

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01364-VC

1    (N.D. Ill. 2016), citing *ATSI Commc'ns., Inc. v. Shaar Fund, Ltd.*, 493 F. 3d 87,101 (2ⁿᵈ Cir.

2    2007). *See also* AC¶10, 12, 18, 76, 92-93.[11]

3        **C.    Pursuant to his UCL Claims, Plaintiff is Entitled to Restitution**

4        The Amended Complaint seeks injunctive, compensatory and restitutionary damages,

5    depending upon the claim.  For Plaintiff's claims under the UCL, he seeks restitution; that is,

6    both the fees he paid to Coinbase for his BCH purchases during the Launch, and the amount of

7    that he paid Coinbase for BCH.  AC¶12; Prayer for Relief, ¶(b).  In other words, he seeks to

8    have the parties returned to their *status quo ante* prior to the Launch.  That is appropriate relief

9    under the UCL, an equitable statute that gives a court wide discretion in determining appropriate

10   relief.  *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4ᵗʰ 1134 (2003).

11       Defendants cite to the Amended Complaint at ¶¶83 and 129 for support for their

12   argument that Plaintiff seeks expectation interests not recoverable as damages under the UCL.

13   However, Plaintiff does not seek his lost opportunity costs or profits as damages as part of his

14   UCL claim, as stated above.  *But see Juarez v. Arcadia Financial, Ltd.*, 152 Cal. App. 4ᵗʰ 889,

15   894 (Cal. Ct. App. 2007).  They argue that Plaintiff did not purchase anything from Coinbase.

16   Defts. Br. at 11.  But, that is exactly Plaintiff's claim—that in the Launch he paid for and

17   received BCH from Coinbase.  AC¶¶23-26.[12]

18       **D.    Plaintiff has Sufficiently Pled Negligence**

19       A duty is an element of the tort of negligence.  *Melton v. Boustred*, 183 Cal. App. 4ᵗʰ

20   521, 529-30 (2010)("*Melton*").  In determining duty, California courts distinguish between

21   circumstances of misfeasance and nonfeasance.  *Id*. at 531.  Misfeasance "exists when the

---

[11] Defendants incorrectly argue that the manipulation claim does not meet the requirements of
Rule 9(b).  Since a claim of manipulation involves facts solely within the defendant's
knowledge, at the early stages of litigation, plaintiffs need not plead manipulation to the same
degree as they do a misrepresentation claim.  *In re Platinum and Palladium Antitrust Litig.*,
2017 U.S. Dist. LEXIS 46624, at \*96-97 (S.D.N.Y. March 26, 2017); *see also Rubenstein v.
Neiman Marcus Grp., LLC,* 687 Fed. App'x 564, 567-568 (9(b) requirements relaxed "as to
matters within the opposing partys' knowledge."). (Citation omitted).
[12] *Phillips v. Apple Inc.*, 2016 U.S. Dist. Lexis 139320 (N.D. Cal. Oct. 6, 2016), *aff'd*, 725 F.
App'x. 946 (9ᵗʰ Cir. 2018), is inapposite as plaintiffs there sought to recover against Apple Inc.,
when they had not submitted payments to Apple.  Defendants assert that Plaintiff is not entitled
to attorneys' fees under the UCL, citing *Zhang v. Superior Court*, 57 Cal. 4ᵗʰ 364, 371 (2013).
Defts. Br. at 10, n.11.  Plaintiff asserts a right to fees under Code of Civil Procedure,§1021.5,
where attorneys' fees may be awarded for the vindication of the public interest.  AC¶121.

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01364-VC

00108425.000.docx

defendant is responsible for making the plaintiff's position worse, i.e., defendant has created a risk." *Id.*, citing *Weirum v. RKO General, Inc.*, 15 Cal. 3d 40, 49 (1975).  A duty arises where the defendant's affirmative acts create a foreseeable risk of harm to a third person.  There, the duty is governed by the standard of ordinary care.  *Melton*, at 530. Nonfeasance "is found when the defendant has failed to aid plaintiff through beneficial intervention."  *Id.*

Defendants' motion does not address Plaintiff's allegations of misfeasance, choosing to declare that it does not apply, so they can argue against nonfeasance.  However, the allegations are just the opposite:  Defendants, aware of the risks caused by their conduct, suddenly launched BCH on December 19th placing Plaintiff and the class he seeks to represent in a worse position than they would have been but for Defendants' affirmative acts.  *See* AC¶¶10-11, 75-85.

Defendants argue that business defendants do not have a responsibility for purely economic losses to parties in financial transactions.  Defts. Br. at 12.  In such circumstances, the existence of a duty and the scope of duty is determined by application of the *Biakanja* factors.[13]

Applying those factors supports the imposition of a duty here.  First, there is a clear and identifiable class—the class that is named in the Amended Complaint.  Liability may be imposed for negligent conduct where there is a duty of care owed to the plaintiff or the plaintiff class.  *Centinela*, at 1016.  Second, the harm from selling artificially inflated BCH, and launching its trading before the platform and Coinbase's systems were ready, was clearly foreseeable.  Third, those who purchased BCH at inflated prices, can demonstrate with certainty that the cause was due to the manipulation of the price.  Those who tried to sell on December 19th, and placed sell orders that were cancelled and who were unable obtain either their coins or money, can demonstrate with certainty their damage from the manipulation and Coinbase's inability to handle the Launch.  Fourth, there is a close connection between Coinbase and those

---

[13] Under *Biakanja v. Irving*, 49 Cal. 2d 647 (1958)("*Biakanja*"), "[t]he determination whether in a specific case the defendant will be held liable to a third person not in privity  is a matter of policy and involves the balancing of various factors, among which are [1] the extent to which the transaction was intended to affect the plaintiff, [2] the foreseeability of harm to him, [3] the degree of certainty that the plaintiff suffered injury, [4] the closeness of the connection between the defendant's conduct and the injury suffered, [5] the moral blame attached to the defendant's conduct, and [6] the policy of preventing future harm." *Southern California Gas Leak*, 18 Cal. App. 5th 581, 587 (2017); *citing Centinela Freeman Emergency Medical Assoc. v. Health Net of California, Inc.*, 1 Cal. 5th 994, 1013-14 (2016) (" *Centinela*").

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01364-VC

1    who used its platform on December 19th. Fifth, this action gives rise to moral blame against

2    Coinbase.  It does have a duty to maintain the integrity of its system, and not to engage in

3    commodities manipulation or unfair business practices under the CEA and the UCL.  This case

4    is very similar to *In re Facebook, Inc. IPO and Sec. and Derivative Litig.*, 986 F. Supp. 2d 428

5    (S.D.N.Y. 2013) ("*Facebook IPO*").*,* in which the court upheld negligence claims by investors

6    unable to obtain proper execution of trades when NASDAQ became overwhelmed during the

7    Facebook IPO.  The duty arose not from contract, but from the nature of the services and its

8    impact on the public interest.  *Facebook IPO*, at 460-63. The same is true here.

9          Moreover, the negligence claim is not barred by the economic loss rule. Where there is a

10   special relationship giving rise to a duty under the *Biakanja* factors, as demonstrated above, an

11   exception to the economic rule arises.  *J'Aire Corp. v. Gregory*, 24 Cal. 3d 799, 803

12   (1979)("*J'Aire*"), citing *Biakanja; see also Southern California Gas Leak*, at 588.

13         Defendants make the argument that Plaintiff cannot plead a special relationship here

14   because the action is brought on behalf of a class.  The first *Biakanja* factor applies to either a

15   plaintiff or an identifiable class of plaintiffs, as here. *See, e.g., Ott v. Alfa-Laval Agri., Inc.*, 31

16   Cal. App. 4th 1439, 1449 (1995)( explaining that "[t]he Supreme Court began its analysis by

17   noting, 'Liability for negligent conduct may only be imposed where there is a duty of care owed

18   by the defendant to the plaintiff or *to a class of which the plaintiff is a member*.'")(emphasis

19   added). *See Kalitta Air, LLC v. Cen. Tex. Airborne Sys., Inc.*, 2009 U.S. Dist. LEXIS 51282

20   (N.D. Cal. June 8, 2009)("*Kalitta*"); *see also Facebook IPO*, at 461 (where court found duty on

21   behalf of identified class that used exchange within certain time period).[14]  Plaintiff satisfied the

22   *Biakanja* factors, and similar to *Facebook IPO*, has sufficiently pled his negligence claims.[15]

23

---

24   [14]Defendants further argue that Plaintiff cannot recover economic losses for negligent conduct
     under the independent duty theory, and that only intentional conduct can form a basis for such
25   an independent duty.  However, this is an issue not yet ruled upon by the California Supreme
     Court.  As discussed in *Robinson Helicopter Co., Inc. v. Dana Corp.*, 34 Cal. 4th 979, 989
26   (2004), an independent duty has been found where the breach of duty has been accompanied by
     a common law tort, such as fraud or conversion, both of which occurred here.
27   [15] Defendants' motion ambiguously adds the words "and negligent misrepresentation" into a
     parenthetical of a discussion directed to the negligence claim, that it is moving against the
28   negligent misrepresentation claim based on the the economic loss doctrine.  Ninth Circuit

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01364-VC

### E.      Plaintiff Has Sufficiently Pled Negligent Misrepresentation

Defendants' argument on negligent misrepresentation incorrectly attempts to parse Plaintiff's allegations into "timing" claims and "capacity" claims when these representations are alleged to have formed a pattern of statements that were intertwined to create the impression that when the Launch occurred, Coinbase would be fully ready and able to handle it, that it would be free of manipulation, and thus that the prices at which Coinbase would offer BCH, would not be artificially induced.  Defendants then incorrectly argue that the timing of representations regarding Coinbase's support of BCH were "true" because December 19, 2017 is prior to January 1, 2018 and therefore, BCH was trading by January 1st.[16]  Defendants disregard the fact that these statements were repeated over a period of time, including on December 19th, the day they opened trading, when they were not true.  AC ¶¶72-74.  Defendants further ignore the impact of related misrepresentations that touted Coinbase's ability to open trading in an orderly and fair manner, free from risk.  Plaintiff alleges a series of representations commencing in July 2017, in which Coinbase stated that it was not going to support BCH at all and that it was making this decision "carefully because safely supporting a new digital currency requires significant work from many teams."  *Id.*  ¶¶44-47.  Other statements continued to create the false impression that Coinbase would only launch BCH if it was fully vetted and could be safely supported.  On July 28, 2017, in a tweet, Coinbase discussed what it would need to do to "safely and securely access bitcoin cash."  *Id.* ¶48.  Later, Farmer, on a Coinbase blog stated that Coinbase would only approach new digital assets with caution and that its "top priority is always the safety of customer funds."  *Id.* ¶55.  He went on to state that when Coinbase adds a digital asset, customers could "be sure that we [Defendants] have invested significant time and

precedent, however, precludes that argument. *Broomfield v. Craft Brew All., Inc.*, 2017 U.S. Dist. LEXIS 142572 (N.D. Cal. Sep. 1, 2017); *see Kalitta Air, L.L.C. v. Cent. Texas Airborne Sys., Inc.*, 315 F. App'x 603, 607 (9th Cir. 2008)("'We hold that California law classifies negligent misrepresentation as a species of fraud for which economic loss is recoverable.')."

[16] Contrary to Defendants' argument, Defts. Br. at 14, in his August 3, 2017 statement, Farmer specifically stated that only *BCH withdrawals* would be support by January 2018—not full support.  In fact, he stated that would occur later. AC¶58.  Neither he nor anyone else at Coinbase ever corrected this and similar misleading statements made to the market about when Coinbase would commence full support of BCH.  Only Coinbase's insiders were privy to that information and thus prepared to trade.

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01364-VC

1  care in supporting that digital asset securely," such that customers could trust that Coinbase

2  would "ensure a fair and orderly market." *Id.* ¶56.

3      It is further alleged that Coinbase launched BCH on December 19th, at the end of the day

4  barely an hour after saying that its order book would be open, and then closed them after 2 ½

5  minutes of disastrous trading, that continued the next day.  Plaintiff and the Class were entitled

6  to rely on these repeated statements of caution, care and safety, particularly when they were

7  made in connection with Defendants' statements about when trading of BCH would begin.

8  These statements and the impression that Coinbase would only launch full support for BCH

9  when it was safe and it was fully prepared to do so were proven false by the facts of the Launch.

10 Moreover, the prices were false and artificially induced, although Plaintiff and other Class

11 members relied upon Coinbase and its prior promises to ensure the integrity of the market.

12 They were therefore misled to purchase at artificially inflated prices by Coinbases's assurances

13 that the market would be safe, orderly and fair.  Similarly, sellers were misled to use Coinbase,

14 and then were damaged when they could not get out either their money or their coins for days.

15     Defendants cherry pick isolated half- statements from the Amended Complaint that do

16 not fairly describe the misleading statements made.  Defts. Br. at 14-15. When reviewed in

17 context, the Amended Complaint sets forth a series of materially false and misleading

18 statements that demonstrate that Defendants, in particular, Armstrong and Farmer, at least

19 negligently gave their customers the misleading impression that they would not launch BCH

20 until it was safe to do so and when Coinbase was prepared.  Plaintiff and others relied upon

21 these statements in using Coinbase during the BCH launch to their detriment.[17]

22 **IV.    CONCLUSION**

23     For the foregoing reasons, Plaintiff requests that the Court deny Defendants' motion to

24 dismiss, and to the extent any part of the motion is granted, Plaintiff requests leave to amend.

25

26

27

28
---
[17] Ironically, Defendants argue that Plaintiff could have used another exchange to purchase BCH, but ignore that he relied upon their statements of safety and security in any BCH Launch.

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01364-VC

00108425.000.docx

1    DATED:  August 30, 2018                 **GREEN & NOBLIN, P.C.**

2

3                                            By:  ___/s/ Robert S. Green_____
                                                  Robert S. Green
4
                                             James Robert Noblin
5                                            2200 Larkspur Landing Circle, Suite 101
                                             Larkspur, CA  94939
6                                            Telephone: (415) 477-6700
                                             Facsimile: (415) 477-6710
7                                            Email:  gnecf@classcounsel.com

8                                            Lynda J. Grant, *admitted pro hac vice*
9                                            **THEGRANTLAWFIRM, PLLC**
                                             521 Fifth Avenue, 17th Floor
10                                           New York, NY 10175
                                             Telephone: (212) 292-4441
11                                           Facsimile: (212) 292-4442
                                             Email:  lgrant@grantfirm.com
12

13                                           *Attorneys for Plaintiff*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                           -16-

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01364-VC

**EXHIBIT A**

**UNITED STATES OF AMERICA**
**Before the**
**COMMODITY FUTURES TRADING COMMISSION**

| | |
|---|---|
| In the Matter of: | ) |
| | ) |
| | ) |
| Coinflip, Inc., d/b/a Derivabit, and | ) |
| Francisco Riordan, | )   CFTC Docket No.  15-29 |
| | ) |
| Respondents. | ) |
| | ) |
| | ) |

**RECEIVED CFTC**

Office of Proceedings
Proceedings Clerk
**1:58 pm, Sep 17, 2015**

---

**ORDER INSTITUTING PROCEEDINGS PURSUANT TO
SECTIONS 6(c) AND 6(d) OF THE COMMODITY EXCHANGE ACT, MAKING
FINDINGS AND IMPOSING REMEDIAL SANCTIONS**

**I.**

The Commodity Futures Trading Commission ("Commission") has reason to believe that from in or about March 2014 to at least August 2014 (the "Relevant Period"), Coinflip, Inc., d/b/a Derivabit ("Coinflip") and Francisco Riordan ("Riordan") (the "Respondents") violated Sections 4c(b) and 5h(a)(1) of the Commodity Exchange Act, as amended (the "Act"), 7 U.S.C. §§ 6c(b) and 7b-3(a)(1) (2012), and Commission Regulations 32.2 and 37.3(a)(1), 17 C.F.R. § 32.2 and 37.3(a)(1) (2014).  Therefore, the Commission deems it appropriate and in the public interest that public administrative proceedings be, and hereby are, instituted to determine whether the Respondents engaged in the violations set forth herein and to determine whether any order should be issued imposing remedial sanctions.

**II.**

In anticipation of the institution of an administrative proceeding, the Respondents have submitted an Offer of Settlement ("Offer"), which the Commission has determined to accept. Without admitting or denying any of the findings or conclusions herein, Respondents consent to the entry of this Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, Making Findings and Imposing Remedial Sanctions ("Order") and acknowledge service of this Order.[1]

---

[1]  Respondents consent to the entry of this Order and to the use of these findings in this proceeding and in any other proceeding brought by the Commission or to which the Commission is a party; provided, however, that Respondents do not consent to the use of the Offer, or the findings or conclusions in the Order consented to in the Offer, as the sole basis for any other proceeding brought by the Commission, other than in a proceeding in bankruptcy or to enforce the terms of this Order.  Nor do Respondents consent to the use of the Offer or the Order, or the findings or conclusions in this Order consented to in the Offer, by any other party in any other proceeding.

## III.

The Commission finds the following:

**A.   Summary**

During the Relevant Period, Respondents violated Sections 4c(b) and 5h(a)(1) of the Act and Commission Regulations 32.2 and 37.3(a)(1) by conducting activity related to commodity options contrary to Commission Regulations and by operating a facility for the trading or processing of swaps without being registered as a swap execution facility or designated contract market.  Specifically, during the Relevant Period, Respondents operated an online facility named Derivabit, offering to connect buyers and sellers of Bitcoin option contracts.[2]

**B.   Respondents**

**Coinflip, Inc.** is a Delaware corporation with a principal place of business in San Francisco, California.  During the Relevant period, Coinflip operated Derivabit and its website derivabit.com.  Coinflip has never been registered with the Commission.

**Francisco Riordan** is an individual residing in San Francisco, California.  Riordan is a founder, the chief executive officer, and controlling person of Coinflip.  Riordan has never been registered with the Commission.

**C.   Facts**

Coinflip Conducted Activity Related to Illegal Commodity Options

Beginning in March 2014, Coinflip advertised Derivabit as a "risk management platform . . . that connects buyers and sellers of standardized Bitcoin options and futures contracts." During this period, Coinflip designated numerous put and call options contracts as eligible for trading on the Derivabit platform.[3]  For these contracts, Coinflip listed Bitcoin as the asset underlying the option and denominated the strike and delivery prices in US Dollars.  According to the derivabit.com website, a customer could place orders by registering as a user and depositing Bitcoin into an account in the user's name.  Premiums and payments of settlement of the option contracts were to be paid using Bitcoin at a spot rate determined by a designated third-party Bitcoin currency exchange.  Users had the ability to, and in fact did, post bids or offers for

---

[2] Bitcoin is a "virtual currency," defined here as a digital representation of value that functions as a medium of exchange, a unit of account, and/or a store of value, but does not have legal tender status in any jurisdiction. Bitcoin and other virtual currencies are distinct from "real" currencies, which are the coin and paper money of the United States or another country that are designated as legal tender, circulate, and are customarily used and accepted as a medium of exchange in the country of issuance.

[3] Although referenced it its solicitation materials, Coinflip did not offer any futures contracts during the Relevant Period.

the designated options contracts. Coinflip confirmed the bid or offer by communicating it to all users through its website.[4]

During the Relevant Period, Derivabit had approximately 400 users.

Riordan Controlled Coinflip and Directed Its Operations

Riordan was the founder, engineer and Chief Executive Officer of Coinflip. He exercised control over Coinflip's daily operations and possessed the power or ability to control all aspects of the Derivabit platform. Riordan participated in key aspects of Coinflip's illegal activity, including designing and implementing the Derivabit trading platform. Riordan's control enabled him to make design and substantive changes to Coinflip's operations, including the transition from offering Bitcoin options to OTC Bitcoin Forward Contracts. Ultimately, Riordan possessed the power and ability to direct Coinflip to cease operating the Derivabit platform.

## LEGAL DISCUSSION

**A.      Virtual Currencies Such as Bitcoin are Commodities**

Section 1a(9) of the Act defines "commodity" to include, among other things, "all services, rights, and interests in which contracts for future delivery are presently or in the future dealt in." 7 U.S.C. § 1a(9). The definition of a "commodity" is broad. *See, e.g., Board of Trade of City of Chicago v. SEC*, 677 F. 2d 1137, 1142 (7th Cir. 1982).   Bitcoin and other virtual currencies are encompassed in the definition and properly defined as commodities.

**B.      Coinflip Violated Sections 4c(b) Act and Commission Regulation 32.2**

Section 4c(b) of the Act makes it unlawful for any person to "offer to enter into, enter into or confirm the execution of, any transaction involving any commodity . . . which is of the character of, or is commonly known to the trade as, an 'option' . . . , 'bid', 'offer', 'put', [or] 'call' . . . contrary to any rule, regulation, or order of the Commission prohibiting any such transaction." Section 1.3(hh) defines a "commodity option transaction" and "commodity option" to "mean any transaction or agreement in interstate commerce which is or is held out to be of the character of, or is commonly known to the trade as, an 'option,' 'privilege,' 'indemnity,' 'bid,' 'offer,' 'call,' 'put,' 'advance guaranty,' or 'decline guaranty,' and which is subject to regulation under the Act and these regulations." Section 32.2 of the Commission's Regulations, in turn,

---

[4] In July 2014, Coinflip began to offer what it characterized as "OTC Bitcoin Forward Contracts" for trading. Under this model, a Derivabit user would be matched through competitive bidding with a counterparty to execute a contract to exchange US Dollars for Bitcoins at a predetermined price and date. As part of its services, Coinflip would calculate and hold initial and maintenance margin payments and would also calculate and facilitate the transfer of final settlements at maturity or early termination. Coinflip advertised that the users could choose to institute an early termination at any time if its position was "in the money." Although the price would be expressed as an exchange rate between US Dollars and Bitcoins, Coinflip required all settlements and margin payments to be transacted in Bitcoins. No bids or offers were posted by Derivabit users for these contracts. Although these activities may have violated, or led to violations of, the Commodity Exchange Act, the Commission does not address this conduct here.

provides that it shall be unlawful for any person to "offer to enter into, enter into, confirm the execution of, maintain a position in, or otherwise conduct activity related to any transaction in interstate commerce that is a commodity option transaction unless: (a) [s]uch transaction is conducted in compliance with and subject to the provisions of the Act, including any Commission rule, regulation, or order thereunder, otherwise applicable to any other swap, or (b) [s]uch transaction is conducted pursuant to [Regulation] 32.3."

Between at least March 2014 and July 2014, Respondents conducted activity related to commodity option transactions, offered to enter into commodity option transactions and/or confirmed the existence of commodity option transactions. The options transactions were not conducted in compliance with Section 5h(a)(1) of the Act or Regulation 37.3(a)(1), a section of the Act and a Commission regulation otherwise applicable to swaps (*see infra* Section C) and were not conducted pursuant to Regulation 32.3.[5]  Accordingly, Coinflip violated Section 4c(b) of the Act and Commission Regulation 32.2.

## C.      Coinflip Violated Section 5h(a)(1) of the Act

Section 5h(a)(1) of the Act forbids any person from operating "a facility for the trading or processing of swaps unless the facility is registered as a swap execution facility or as a designated contract market . . . ."  7 U.S.C. § 7b-3(a)(1).  Section 1a(47) of the Act's definition of "swap" includes option contracts. 7 U.S.C. § 1a(47)(A)(i). Regulation 37.3(a)(1) similarly requires that any "person operating a facility that offers a trading system or platform in which more than one market participant has the ability to execute or trade swaps with more than one other market participant on the system or platform shall register the facility as a swap execution facility under this part or as a designated contract market under part 38 of this chapter."  17 C.F.R. § 37.3(a)(1) (2014).

During the Relevant Period, Coinflip operated a facility for the trading of swaps. However, Coinflip did not register the facility as a swap execution facility or designated contract market.  Accordingly, Coinflip violated Section 5h(a)(1) of the Act and Regulation 37.3(a)(1).

## D.      Riordan Is Liable for Coinflip's Violations as Its Controlling Person Under Section 13(b) of the Act

Riordan controlled Coinflip, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, Coinflip's acts in violation of the Act and Regulations; therefore, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2012), Riordan is liable for Coinflip's violations of Sections 4c(b) and 5h(a)(1) of the Act, 7 U.S.C. §§ 6c(b) and 7b-3(a)(1) (2012) and Regulations 32.2 and 37.3(a)(1), 17 C.F.R. §§ 32.2 and 37.3(a)(1) (2014).

---

[5] To take advantage of the "trade option" exemptions set forth in Regulation 32.3, the offeror of the option must be an eligible contract participant as defined in Section 1a(18) of the Act or "producer, processor, or commercial user of, or a merchant handling the commodity," and have a reasonable basis to believe that the offeree was a "producer, processor, or commercial user of, or a merchant handling the commodity that is the subject of the commodity option transaction, or the products or by-products thereof, and such offeree is offered or entering into the commodity option transaction solely for purposes related to its business as such." 17 C.F.R. §§ 32.3(a)(1)(i)-(ii) and 32.3(a)(2).

IV.

## FINDINGS OF VIOLATIONS

Based on the foregoing, the Commission finds that, during the Relevant Period, Respondents violated Sections 4c(b) and 5h(a)(1) of the Act, 7 U.S.C. §§ 4c(b) and 7b-3(a)(1) (2012), and Commission Regulations 32.2 and 37.3(a)(1), 17 C.F.R. §§ 32.2 and 37.3(a)(1) (2014).

V.

## OFFER OF SETTLEMENT

Respondents have submitted an Offer in which they, without admitting or denying the findings and conclusions herein:

A.      Acknowledge receipt of service of this Order;

B.      Admit the jurisdiction of the Commission with respect to all matters set forth in this Order and for any action or proceeding brought or authorized by the Commission based on violation of or enforcement of this Order;

C.      Waive:

      1.      the filing and service of a complaint and notice of hearing;

      2.      a hearing;

      3.      all post-hearing procedures;

      4.      judicial review by any court;

      5.      any and all objections to the participation by any member of the Commission's staff in the Commission's consideration of the Offer;

      6.      any and all claims that they may possess under the Equal Access to Justice Act, 5 U.S.C. § 504 (2012) and 28 U.S.C. § 2412 (2012), and/or the rules promulgated by the Commission in conformity therewith, Part 148 of the Commission's Regulations, 17 C.F.R. §§ 148.1-30 (2014), relating to, or arising from, this proceeding;

      7.      any and all claims that they may possess under the Small Business Regulatory Enforcement Fairness Act of 1996, Pub. L. No. 104-121, §§ 201-253, 110 Stat. 847, 857-868 (1996), as amended by Pub. L. No. 110-28, § 8302, 121 Stat. 112, 204-205 (2007), relating to, or arising from, this proceeding; and

8.    any claims of Double Jeopardy based on the institution of this proceeding or the entry in this proceeding of any order imposing a civil monetary penalty or any other relief;

D.    Stipulate that the record basis on which this Order is entered shall consist solely of the findings contained in this Order to which Respondents have consented in the Offer;

E.    Consent, solely on the basis of the Offer, to the Commission's entry of this Order that:

1.    makes findings by the Commission that Respondents violated Sections 4c(b) and 5h(a)(1) of the Act, 7 U.S.C. §§ 6c(b) and 7b-3(a)(1) (2012), and Commission Regulations 32.2 and 37.3(a)(1), 17 C.F.R. §§ 32.2 and 37.3(a)(1) (2014);

2.    orders Respondents to cease and desist from violating Sections 4c(b) and 5h(a)(1) of the Act and Commission Regulations 32.2 and 37.3(a)(1); and

3.    orders Respondents and their successors and assigns to comply with the conditions and undertakings consented to in the Offer and as set forth in Part VI of this Order.

Upon consideration, the Commission has determined to accept Respondents' Offer.

## VI.

## ORDER

**Accordingly, IT IS HEREBY ORDERED THAT:**

A.    Respondents shall cease and desist from violating Sections 4c(b) and 5h(a)(1) of the Act, 7 U.S.C. §§ 6c(b) and 7b-3(a)(1) (2012), and Commission Regulations 32.2 and 37.3(a)(1), 17 C.F.R. §§ 32.2 and 37.3(a)(1) (2014).

B.    Respondents and their successors and assigns shall comply with the following conditions and undertakings set forth in the Offer:

1.    <u>Public Statements:</u>  Respondents agree that neither they nor any of their successors and assigns, agents, or employees under their authority or control shall take any action or make any public statement denying, directly or indirectly, any findings or conclusions in the Order or creating, or tending to create, the impression that the Order is without a factual basis; provided, however, that nothing in this provision shall affect Respondents' (i) testimonial obligations; or (ii) right to take legal positions in other proceedings to which the Commission is not a party.  Respondents and their successors and assigns shall undertake all steps necessary to ensure that all of their agents and/or employees under their authority or control understand and comply with this agreement.

2.    <u>Cooperation with the Commission:</u>  Respondents shall cooperate fully and expeditiously with the Commission, including the Commission's Division of

Enforcement, and any other governmental agency in this action, and in any investigation, civil litigation, or administrative matter related to the subject matter of this action or any current or future Commission investigation related thereto.

**The provisions of this Order shall be effective as of this date.**

By the Commission.

Christopher J. Kirkpatrick
Secretary of the Commission
Commodity Futures Trading Commission

Dated:  September 17, 2015

7