KEKER, VAN NEST & PETERS LLP
STEVEN P. RAGLAND - # 221076
sragland@keker.com
BENJAMIN BERKOWITZ - # 244441
bberkowitz@keker.com
ERIN E. MEYER - # 274244
emeyer@keker.com
NICHOLAS D. MARAIS - # 277846
nmarais@keker.com
SEAN M. ARENSON - # 310633
sarenson@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:     415 391 5400
Facsimile:     415 397 7188

Attorneys for Defendants
COINBASE, INC., BRIAN ARMSTRONG
and DAVID FARMER

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEFFREY BERK, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>COINBASE, INC., a Delaware Corporation d/b/a Global Digital Asset Exchange ("GDAX"), Brian Armstrong and David Farmer,<br><br>Defendants. | Case No. 3:18-cv-01364-VC<br><br>**DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT**<br><br>Date:        September 27, 2018<br>Time:       10:00 a.m.<br>Dept:        4, 17th Floor<br><br>Judge:      Hon. Vince Chhabria<br><br>Date Filed: March 1, 2018<br><br>Trial Date: None set |

# **TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ...................................................................................................................1

II. ARGUMENT..........................................................................................................................1

    A. Plaintiff has no claim under the CEA. ......................................................................1

        1. Plaintiff has no CEA standing....................................................................2

        2. Plaintiff has not alleged that BCH is subject to the CEA at all. ................3

        3. Plaintiff has not alleged facts constituting market manipulation...............4

    B. Plaintiff fails to state a claim for relief under the UCL. ...........................................6

        1. Plaintiff has not alleged unlawful or unfair business practices..................6

        2. Plaintiff's allegations preclude restitutionary relief....................................8

    C. Plaintiff fails to state a claim for negligence. ............................................................8

    D. Plaintiff fails to state a claim for negligent misrepresentation. ..............................10

III. CONCLUSION.....................................................................................................................10

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*CFTC v. Co Petro Mktg. Grp., Inc.*
  680 F.2d 573 (9th Cir. 1982) ............................................................................................. 2, 3

*CFTC v. Erskine*
  512 F.3d 309 (6th Cir. 2008) ............................................................................................. 2, 3

*CFTC v. McDonnell*
  287 F. Supp. 3d 213 (E.D.N.Y. 2018) ................................................................................... 4

*CFTC v. Zelener*
  373 F.3d 861 (7th Cir. 2004) ................................................................................................. 2

*Kalitta Air, LLC v. Cent. Tex. Airborne Sys., Inc.*
  No. C 96-2494 CW, 2009 WL 1636036 (N.D. Cal. June 8, 2009) ........................................ 9

*Phillips v. Apple Inc.*
  No. 15-cv-04879-LHK, 2016 WL 5846992 (N.D. Cal. Oct. 6, 2016) .................................... 8

*Three Crown Ltd. P'ship v. Caxton Corp.*
  817 F. Supp. 1033 (S.D.N.Y. 1993) ....................................................................................... 3

*U.S. v. Reliant Energy Servs.*, Inc.
  420 F. Supp. 2d 1043 (N.D. Cal. 2006) ................................................................................. 5

*Whitman v. Am. Trucking Ass'ns*
  531 U.S. 457 (2001) ............................................................................................................... 3

**State Cases**

*Biakanja v. Irving*
  49 Cal. 2d 647 (1958) ............................................................................................................ 9

*Centinela Freeman Emergency Med. Assocs. v. Health Net of Cal., Inc.*
  1 Cal. 5th 994 (2016) ............................................................................................................. 9

*Gentry v. eBay, Inc.*
  99 Cal. App. 4th 816 (2002) ................................................................................................ 10

*Greystone Homes, Inc. v. Midtec, Inc.*
  168 Cal. App. 4th 1194 (2008) .............................................................................................. 9

*J'Aire Corp. v. Gregory*
  24 Cal. 3d 799, 804 (1979) .................................................................................................... 9

*Ott v. Alfa-Laval Agri., Inc.*
  31 Cal. App. 4th 1439 (1995) ................................................................................................ 9

*Quelimane Co. v. Stewart Title Guar. Co.*
  19 Cal. 4th 26 (1998), *as modified* (Sept. 23, 1998) ............................................................. 8

*S. Cal. Gas Leak Cases*
   18 Cal. App. 5th 581 (2017) ............................................................................................... 9

**Federal Statutes**

Commodity Exchange Act § 6(c), 7 U.S.C. § 9 ................................................................................. 3

Commodity Exchange Act § 9, 7 U.S.C. § 13 .................................................................................. 3

Commodity Exchange Act § 22, 7 U.S.C. § 25 ............................................................................. 2,3

I.   **INTRODUCTION**

Plaintiff Jeffrey Berk's First Amended Complaint ("FAC") is built on shaky foundations—an admittedly novel claim that Coinbase's launch of support for Bitcoin Cash ("BCH") violated the Commodity Exchange Act ("CEA"). But as Coinbase pointed out in its second Motion to Dismiss (the "Motion"), this novel claim finds no precedential support for a reason. Before Berk can pursue a private claim under the CEA, he *must* allege facts that show (within the meaning of that statute) that BCH is a commodity *and* that he entered into a futures contract. That Berk failed to do so in his FAC is grounds for dismissal; that he has failed to identify any potential cure in his Opposition is grounds for dismissal with prejudice.

When it comes to Berk's ancillary causes of action, his Opposition only highlights his case's deficiencies. He concedes that his UCL-based claim of "unlawful" conduct cannot survive without the CEA claim. He acknowledges that the UCL claim of "unfair" conduct cannot be premised on vicarious liability, but still seeks to hold Coinbase liable for alleged insider trading by unidentified employees. He recognizes that his negligence claim requires a special relationship—evidence of an intent to affect the injured party or parties specifically—but fails to identify any allegations that would support such a finding. And when it comes to negligent misrepresentation, he still cannot point to even one claim that was false when made.

Berk relies on innuendo and implication rather than well-pleaded facts. The Opposition is rife with new allegations that are nowhere found in the FAC: that Coinbase had the ability to set market prices for BCH; that some unexplained foreign entity is now offering BCH futures contracts; that Coinbase "well knew that there had been insider trading by their own employees"; and so on. These new assertions, and others like them, underscore fatal omissions in his FAC—and fatal deficiencies in his legal theories. The FAC should be dismissed with prejudice.

II.   **ARGUMENT**

   **A.   Plaintiff has no claim under the CEA.**

The core of Plaintiff's FAC is, purportedly, a theory that Coinbase manipulated the market for BCH in violation of the CEA. But to pursue a private cause of action under the CEA, Berk's FAC needed to allege facts sufficient to show that: (1) his purchase was a futures contract;

(2) BCH was a commodity, as defined in the CEA; and (3) Coinbase could and did manipulate the market. Berk pleads none of these.

### 1. Plaintiff has no CEA standing.

Plaintiff concedes that he can bring a private claim under the CEA only if he used Coinbase to enter into a "contract of sale of [a] commodity for future delivery." 7 U.S.C. § 25(a)(1)(B); *see* Pl.'s Opp. to Mot. to Dismiss Am. Class Action Compl. ("Opp.") 7. Of course, he made no such allegation in his FAC, so he is now left to speculate that—because the CEA does not expressly define a "contract … for future delivery"—it would be "reasonable to find" that his purchase of BCH through Coinbase suffices. Opp. 7. As support, Plaintiff theorizes that (a) on Coinbase's exchange, "much of the currency is kept in wallets controlled by Coinbase, which has their private keys," and (b) Coinbase did not distribute BCH to users immediately after the hard fork that created the currency.[1] *Id.* But even if Berk had properly pleaded these allegations—he does not cite to his complaint, and the former is nowhere to be found—they are irrelevant. While the CEA itself does not define "contract for future delivery," courts have held that the phrase has "a technical rather than a lay meaning." *CFTC v. Zelener*, 373 F.3d 861, 865 (7th Cir. 2004); *see also CFTC v. Erskine*, 512 F.3d 309, 323 (6th Cir. 2008). Specifically, unlike a "spot" or "forward" transaction, "[a] futures contract, by contrast, does not involve a sale *of the commodity* at all. It involves a sale *of the contract*." *Zelener*, 373 F.3d at 865.[2] That is, the subject of the transaction in a futures market is "a fungible promise to buy or sell a particular commodity at a fixed date in the future." *Id.* at 864 (citation omitted); *see also Erskine*, 512 F.3d at 325; *CFTC v. Co Petro Mktg. Grp., Inc.*, 680 F.2d 573, 579–80 (9th Cir. 1982) ("The fungible nature of [futures] contracts facilitates offsetting transactions."). The answer, then, lies in whether Berk was trading *in the commodity* (actual BCH) or *in the contract* (fungible promises of

---

[1] In the FAC, Plaintiff alleges that, by delaying distributions of BCH to its users after the fork, "Coinbase held their property captive" and violated "common law property principles." FAC ¶ 53. Yet Plaintiff now contends that this delay was an inherent *feature* of his contract. Plaintiff's ex post reframing of this factual allegation would be unpersuasive even if it had any bearing whatsoever on whether Plaintiff entered a contract for future delivery, which it does not.

[2] "Spot" and "forward" transactions are agreements for purchase and sale *of commodities* for near-term and deferred delivery, respectively. *See* Mot. 4 n.4.

future transactions). Plaintiff's FAC places him firmly in the former category: he specifically alleges that he "attempted to purchase BCH," which he argues "constitutes a commodity." FAC ¶¶ 23, 135.[3] That is an allegation that he attempted to trade "in the commodity," not in a futures contract, and it forecloses his purported basis for standing under CEA Section 22.[4]

### 2. Plaintiff has not alleged that BCH is subject to the CEA at all.

Not only has Plaintiff failed to establish that he has standing to pursue a private claim under the CEA, but he has also failed to properly plead that BCH is a commodity subject to the CEA at all. The CEA anti-manipulation provisions Berk invokes apply, in relevant part, only to "commodit[ies] in interstate commerce." 7 U.S.C. §§ 9(1)–(3), 13(a)(2). Plaintiff's Opposition does nothing to explain *why* BCH would be considered a commodity, or to identify any allegations in the FAC that would support that argument. Instead, Plaintiff seeks to delegate his burden by relying on two opinions that do not help him.

First, he points to a CFTC *consent order* from 2015—two years before BCH came into existence—that concludes, without any analysis, that "Bitcoin and other virtual currencies are encompassed in the definition and properly defined as commodities." *In re Coinflip, Inc.*, CFTC No. 15-29 (Sept. 17, 2015); *see* Opp. 7 n.9. Of course, the CFTC's self-serving conclusion is not judicial authority, let alone authority binding on this Court.[5] Moreover, it offers none of the analysis necessary to determine whether Bitcoin (much less the not-yet-existent BCH), or other

---

[3] Some cases define futures transactions in part by reference to the purchaser's lack of a subjective "intention of taking delivery." *Co Petro*, 680 F.2d at 578. These cases have been widely criticized, *see, e.g.*, *Erskine*, 512 F.3d at 325, but in any event, neither Berk's FAC nor his Opposition even suggest that he did not intend to receive delivery of his BCH. To the contrary, he complains that Coinbase did not provide delivery of users' BCH quickly enough. *See, e.g.*, FAC ¶¶ 50, 53.

[4] Plaintiff also half-heartedly suggests, without citation, that because the alleged "manipulation of the market for BCH directly affected futures exchanges trading in *BTC*, the Defendants' actions fall within the parameters of Section 22." Opp. 7. An allegation that manipulation of the spot market for *one* asset may have affected the futures market in an entirely *different* commodity is no basis for a private right of action under the CEA. Section 22 provides a private right of action for manipulation of the price of the commodity underlying a futures contract, but only for plaintiffs who purchased *that futures contract*. *See* 7 U.S.C. § 25(a)(1)(D). Nowhere in Plaintiff's FAC does he allege that he purchased BTC futures, and even if he did, he could not allege that BCH underlies those futures. *Three Crown Ltd. P'ship v. Caxton Corp.*, 817 F. Supp. 1033, 1043 (S.D.N.Y. 1993).

[5] Because the CFTC's sweeping conclusion is inconsistent with the plain language of the CEA, it warrants no deference. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 484 (2001) (no deference for agency interpretation of ambiguous statute that rendered statutory language nugatory); *cf. Erskine*, 512 F.3d at 314 (CFTC's definition of "futures contract" not entitled to deference).

virtual currencies, were in fact "commodities" as defined by the CEA. *See* Mot. 7 n.6.

Second, Plaintiff relies on *CFTC v. McDonnell*, 287 F. Supp. 3d 213, 226–29 (E.D.N.Y. 2018), to argue that *all* virtual currencies are commodities subject to the CEA. But, despite some of the loose language in *McDonnell*, the court's focus was not "virtual currencies" writ large, but Bitcoin specifically. In reaching its conclusion, the court explicitly noted that a "commodity" must have an existing futures market—analysis that leads to the opposite conclusion here, where Plaintiff's FAC never alleges the existence of any BCH futures market at all.[6] Without allegations that would bring BCH within the ambit of the CEA, Plaintiff's CEA claim—and with it, his "unlawful" UCL claim—cannot survive.

### 3. Plaintiff has not alleged facts constituting market manipulation.

Even if Plaintiff had standing, he has not pleaded the elements of manipulation.[7]

First, Plaintiff has not pleaded that Defendants' representations regarding the launch of BCH were reckless or "specifically intended" to manipulate the market. Plaintiff's Opposition contends that it was "reckless" for Defendants not to "disclose its plan to launch BCH" because Coinbase knew of its plan "[a]t least since mid-November." Opp. 8. But Plaintiff does not explain why Coinbase had any duty to disclose its business plans in advance—in fact, elsewhere, he concedes that it didn't[8]—or explain how its decision not to do so constitutes manipulation. At

---

[6] In his Opposition, Plaintiff all but concedes that the FAC contains *no* allegation of any futures market in BCH. Rather, in a sleight of hand, he asserts that "the CME commenced selling BCH futures" in August 2018—eight months *after* the conduct at issue here—and points to paragraph 92 of the FAC. Opp. 7 n.9. But FAC paragraph 92 actually alleges that, after Coinbase launched BCH, the Chicago Mercantile Exchange ("CME") "launched its ***Bitcoin*** Futures contracts." FAC ¶ 92 (emphasis added). Plaintiff did not plead the existence of any futures market for ***BCH*** in December 2017—the time that matters—or even that one exists today. His Opposition offers a hyperlink to a website that states "Cryptocurrency trading platform Crypto Facilities"—notably *not* the Chicago Mercantile Exchange as the Opposition wrongly states—"has added Bitcoin Cash (BCH) to its list of futures products." *See* Opp. 7 n.9. Even if it were enough for Plaintiff to identify anyone, anywhere in the world, who claims to sell "futures products" in the relevant asset—months after the relevant transaction—Plaintiff's FAC contains no such allegation.

[7] In fact, "Plaintiff explicitly disclaims any allegations of fraud," foreclosing claims of manipulation. FAC ¶ 122. In his Opposition, Plaintiff disputes this, but the FAC itself says otherwise. For his negligent misrepresentation claim, Plaintiff states that he "explicitly disclaims any allegations of fraud *with respect to this count*," FAC ¶ 130 (emphasis added), but his disclaimer of fraud in paragraph 122 contains no such limitation. And in his CEA claim, Plaintiff specifically incorporates "the allegations above as if fully set forth herein"—one of which is his general fraud disclaimer. FAC ¶ 134.

[8] Opp. 5 ("Nor is the claim that Coinbase cannot advise its employees in advance….").

4
DEFENDANTS' REPLY ISO MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT
Case No. 3:18-cv-01364-VC

1303561

1   most, Plaintiff argues that Coinbase *should* have corrected "prior misleading statements," and that
2   failure to do so "constitutes recklessness if not outright fraud." Opp. 8. Berk's complaint here is
3   that Coinbase previously publicized one timeline for its launch of BCH before deciding to
4   accelerate the schedule.[9] But, as explained in the Motion, by the time Berk and others bought
5   BCH, Coinbase had necessarily made plain the precise timing of its launch—that is, Berk had to
6   have known that trading was open when he traded. *See, e.g.*, FAC ¶¶ 23, 75–77. In the absence
7   of specific allegations, Plaintiff contends it is "*reasonable to infer*" that Coinbase "'specifically
8   intended' to manipulate the market" because "[i]t knew that the price of BCH would skyrocket
9   given the buy orders already on the books." Opp. 9 (emphasis added). Even if Coinbase knew
10  there were more buyers than sellers when it launched BCH trading, that shows only that the price
11  was likely to climb when demand exceeded supply; it does not demonstrate a specific intent to
12  create an artificial price that "did not reflect legitimate forces of supply and demand." *Id*.

13         Second, the FAC fails to plead the other elements of manipulation. In his Opposition,
14  Plaintiff seeks to cure that problem by relying almost entirely on brand-new allegations. He now
15  contends that Coinbase "had the ability to set prices" and that "[t]he few other exchanges that
16  traded BCH, were thin and had far less liquidity or were too small to influence prices"—
17  allegations that appear neither in the paragraphs Plaintiff cites nor anywhere else in the FAC.
18  Opp. 9. So, too, for his irrelevant contention that Coinbase "is one of the few exchanges that the
19  CME uses to set its index for BTC futures." *Id.* What matters here is the text of Plaintiff's
20  FAC—and all that leaves him with is an allegation that Coinbase is a popular and influential
21  exchange (and the unsupported legal conclusion that BCH launch prices were artificial). *See*
22  Opp. 9. These allegations aren't enough to show that the Defendants "possessed the ability to
23  influence prices," let alone that they did in fact cause an artificial price. *U.S. v. Reliant Energy*
24  *Servs.*, Inc., 420 F. Supp. 2d 1043, 1056 (N.D. Cal. 2006). And if Plaintiff were to make this
25  claim in the future, he could not overcome his pleaded admission that, "at the same time" as
26  Coinbase was supposedly manipulating *the market*, BCH continued to trade on "other exchanges"
27  at prices that "reflected *unmanipulated* supply and demand." FAC ¶¶ 11–12.
28  [9] For more, *see* Mot. 13–14 (discussing the "timing" claims).

Nor has Plaintiff pleaded the elements of market manipulation under Regulation 180.1, which requires him to identify some material misrepresentation upon which he reasonably relied. *See* Mot. 6–7.  He contends that, by launching BCH trading, Coinbase sent false signals that it "could effect a fair and orderly market" and about "the supply of BCH and its appropriate price." Opp. 10.  In other words, although he does not identify specific misrepresentations, *see infra* section II.D, Berk felt that Coinbase's actions signaled a promise that demand and supply were calibrated and the market would remain stable.  That, of course, is not how markets work.  And Berk has neither identified any representation by the Defendants that could reasonably be construed that way, nor explained how, if such representations had been made, they would manipulate the market and cause an artificial price.  And even if Plaintiff could meet those requirements, he still cannot claim that he reasonably relied on the supposed "signals."  In fact, by his own admission, his BCH order was not executed for 22 hours—well after "the price of BCH skyrocketed"—and there is no allegation that he tried to cancel his order during that window.[10]

### B. Plaintiff fails to state a claim for relief under the UCL.

#### 1. Plaintiff has not alleged unlawful or unfair business practices.

Plaintiff's Opposition significantly narrows the UCL issues in dispute.  *First*, it is now clear that the "hook" for Plaintiff's would-be claim under the UCL's "unlawful" prong is, indeed, his theory that Coinbase's alleged misconduct violated the CEA.  *See* Opp. 7–11 (discussing only CEA allegations).  This claim fails for the reasons discussed above.  *See* Mot. 3–7; *supra* II.A.

*Second*, when it comes to the "unfair" prong, Plaintiff now disclaims certain theories.  He no longer takes issue with Coinbase's decision to alert its own employees of plans to launch BCH before informing the public.  *See* Opp. 5.  Nor, according to Plaintiff, does he intend to hold Coinbase vicariously liable (and, as a matter of law, he cannot).  Instead, Berk uses his Opposition to find news ways to blame Coinbase, many of which are unsupported (or contradicted) by the FAC, and each of which is fatally flawed.

First, he now argues that Coinbase "favored its insiders [*i.e.*, its employees] over the

---

[10] FAC ¶¶ 11, 26, 80, 83.  Although Plaintiff claims that "the cancel button *for the most part* was disabled," he does not allege that he even tried to cancel his "buy" order at any time, let alone that he was prevented from doing so.  *Id.* ¶ 84 (emphasis added); *see also* Opp. 2.

6
DEFENDANTS' REPLY ISO MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT
Case No. 3:18-cv-01364-VC

1303561

investing public, a violation of its own policies." Opp. 4.  Importantly, this theory—that Coinbase *proactively* took steps to "favor" insiders—is in direct tension with allegations in Plaintiff's FAC.  *See, e.g.*, FAC ¶¶ 9, 63, 69 (accusing Coinbase of "*fail[ing]* to monitor obvious insider trading," taking "*no steps* to … root out the source of this trading," and "*failing* to take any steps to prevent insider trading").  And the FAC does not allege, let alone explain how, Coinbase could have prioritized its employees' trades on an open market.[11]  Ultimately, however Berk dresses this claim up, it is at heart still a theory of vicarious liability—Coinbase should be held liable for trading by its employees—which fails to state a claim under the UCL.  *See* Mot. 9.

Next, Plaintiff seeks to blame Coinbase for "suddenly determin[ing] to launch BCH at inflated prices," when it should have known "from the order book that the price would be hyperinflated."  Opp. 5.  Here, too, Plaintiff's theory is undermined by his own complaint: there, he alleges—as one would expect—that Coinbase announced its decision to launch a BCH platform *before* receiving thousands of buy orders that drove the price up.  *See generally* FAC ¶¶ 75–76, 80–81.  In other words, it was the market, not Coinbase, that determined the price.

Finally, Plaintiff seeks to shore up his "insider trading" theory by arguing that he "specifically assert[ed] when and how insider trading likely occurred" in the months leading up to the BCH launch.  Opp 6.  It is difficult to imagine how Plaintiff could have made a "specific assertion" when the most he will commit to—even now—is that "insider trading *likely* occurred."  *Id.*  The FAC is just as equivocal: nowhere does he ever allege that any individual traded on non-public information, or where or when they did so.  The closest he ever gets is a guess that, based on his review of BCH price charts, *someone* must surely have been trading on non-public information.  (Tellingly, Plaintiff uses the passive voice so as to avoid even alleging that that someone was a Coinbase employee.  *See* FAC ¶ 16.)  That is by no means a "specific assertion."

Given that Plaintiff's FAC fails to allege any adequate "unfair business practice," it is no surprise that he tries to shift the burden to the Defendants: "Defendants offer no reasons or motives for their actions …."  Opp. 4.  That is, of course, not how a motion to dismiss works.

---

[11] Plaintiff's case has long been that, when BCH went live on Coinbase's platform, *everyone* had at least some prior notice, *see, e.g.*, *id.* ¶ 10; and that, after the launch, supply and demand factors pushed the price of BCH higher and higher, *id.* ¶ 82 ("liquidity quickly thinned").

1  Plaintiff must plead allegations that demonstrate—at a minimum—that he suffered damages
2  because of some *business practice* sanctioned and carried out by Defendants.  It isn't enough to
3  allege that *others*, unnamed in this lawsuit, benefited by trading on non-public information; to
4  claim that Coinbase launched the BCH platform when it *should have known* the price was
5  artificially inflated; and to argue that Defendants are thus liable for Berk's bad bet.

**2.    Plaintiff's allegations preclude restitutionary relief.**

Plaintiff contends that he is entitled to restitution of "both the fees he paid to Coinbase for his BCH purchases during the Launch, and the amount of that [sic] he paid Coinbase for BCH." Opp. 11.  But Plaintiff's Opposition does not change that he has failed to plead that he paid anything *to* Coinbase or bought anything *from* Coinbase.  Plaintiff points to paragraphs 23–26 of the FAC, which say nothing about whom he purchased BCH *from* or whom he paid money *to*. Indeed, elsewhere in the FAC, Plaintiff alleges that it was "insiders," *not Coinbase*, who "were able to sell into this manipulated market." FAC ¶ 12; *see also* Opp. 2 (asserting that it was "insiders" who were able to "dump their BCH at artificial prices").  Moreover, Plaintiff repeatedly alleges that Coinbase is an "exchange," *see, e.g.*, FAC ¶¶ 2–4, 27–28, 35, 37—that is, "[a]n organization that *brings together buyers and sellers* of securities, commodities, and the like," Black's Law Dictionary (10th ed. 2014) (emphasis added).  If anything, the FAC suggests that Coinbase did not sell BCH to Plaintiff.  In other words, Plaintiff has not specified either "the source or the amount of the money that [he] seek[s]," and he does not "allege any connection between the money [he] spent and money in [a defendant's] possession." *Phillips v. Apple Inc.*, No. 15-cv-04879-LHK, 2016 WL 5846992, at *10 (N.D. Cal. Oct. 6, 2016), *aff'd*, 725 F. App'x 496 (9th Cir. Feb. 20, 2018).  This, too, mandates dismissal of his UCL claim.

**C.    Plaintiff fails to state a claim for negligence.**

Plaintiff does not dispute that his claim for negligence is based on purely economic losses, or that imposing duties on a business to prevent such economic losses "is the exception, not the rule, in negligence law." *Quelimane Co. v. Stewart Title Guar. Co.*, 19 Cal. 4th 26, 58 (1998), *as modified* (Sept. 23, 1998); *see* Opp. 12–13.  Instead, he argues that he has a "special relationship" with Defendants, which gives rise to an exceptional duty in this case. Opp. 13.  Not so.

8
DEFENDANTS' REPLY ISO MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT
Case No. 3:18-cv-01364-VC
1303561

The factors set forth in *Biakanja v. Irving*, 49 Cal. 2d 647, 650 (1958), determine the existence of an exceptional duty to prevent purely economic losses. *See J'Aire Corp. v. Gregory*, 24 Cal. 3d 799, 804 (1979); *see also Kalitta Air, LLC v. Cent. Tex. Airborne Sys., Inc.*, No. C 96-2494 CW, 2009 WL 1636036, at *3 (N.D. Cal. June 8, 2009). The first *Biakanja* factor is "the extent to which the transaction was intended to affect the plaintiff." *S. Cal. Gas Leak Cases*, 18 Cal. App. 5th 581, 590 (2017). Even though "[n]o appellate authority addressing negligent liability for purely economic loss to third parties has found the existence of a duty of care in the absence of the first factor," *id.*, Plaintiff glosses over this factor—stating only that "there is a clear and identifiable class—the class that is named in the Amended Complaint." Opp. 12. While it is *possible* to satisfy the first *Biakanja* factor in a putative class action, merely pleading a "clear and identifiable class" is not nearly enough. No court has found that a defendant intended to affect a class of plaintiffs that was not identifiable *at the time* of the allegedly negligent conduct—nor would such a holding make any sense. *Cf. Centinela Freeman Emergency Med. Assocs. v. Health Net of Cal., Inc.*, 1 Cal. 5th 994, 1014 (2016) (class was "reasonably identifiable … at the time").

Plaintiff relies on *Ott v. Alfa-Laval Agri., Inc.*, 31 Cal. App. 4th 1439, 1449 (1995), to argue that "[l]iability for negligent conduct may ... be imposed where there is a duty of care owed by the defendant to ... a class of which the plaintiff is a member." Opp. 13. But in *Ott*, the court held that the first *Biakanja* factor was *not* satisfied because "neither the pleadings nor the evidence suggests the [subject of the disputed transaction] was 'intended to affect' the plaintiffs in any way particular to the plaintiffs, as opposed to all potential purchasers." *Ott*, 31 Cal. App. 4th at 1455. Without more, there could be no "special relationship" or duty. *Id.* at 1455–56; *see also Greystone Homes, Inc. v. Midtec, Inc.*, 168 Cal. App. 4th 1194, 1231 (2008).

So too here, where Plaintiff purports to represent "all Coinbase customers who placed purchase, sale or trade orders" for BCH with Coinbase in December 2017. FAC ¶ 1. Plaintiff has not shown that this class was identifiable at the time of Defendants' allegedly negligent conduct—nor could he—and Defendants cannot have specifically intended to affect an unidentifiable group of potential customers. Plaintiff has not pleaded a special relationship sufficient to state a claim for negligence based on purely economic losses.

**D.     Plaintiff fails to state a claim for negligent misrepresentation.**

To support a claim for negligent misrepresentation, Plaintiff must allege conduct sufficient to meet each of the requisite elements: that one of the *Defendants* represented as fact something that he knew was not (or that he had no reasonable basis to believe to be true); that he intended Plaintiff to rely on that misrepresentation; that Plaintiff did; and that Plaintiff's reliance on that fact was "a substantial factor in causing his harm." *See, e.g.*, CACI No. 1903. Defendants' Motion identified each of the supposed "misstatements" and explained how—for each—Plaintiff had not alleged falsity, intent, or reliance. *See* Mot. 13-15.

Berk's Opposition further demonstrates this pleading deficiency. Desperate to tag *one* of the Defendants with *some* misrepresentation, Berk hones in on a series of forward-looking, aspirational statements. For instance, he focuses on a *July* 2017 blog post by Defendant Farmer stating that Coinbase's "top priority is always the safety of customer funds." Opp. 14 (citing FAC ¶ 55). By alleging that Farmer made that statement, Plaintiff meets *half* of *one* of the four elements identified above. But he *never* alleges that Farmer's statement was false *when made*; or that Farmer knew as much; or that Plaintiff relied on that statement. (In his Opposition, Berk says only that the class members were "*entitled to rely*" on such statements, not that they did. Opp. 15.) And even if Berk's theory were that, six months *after* Farmer made that statement, it *turned out* that Coinbase's "top priority" was not "the safety of customer funds" (he never alleges as much), that isn't enough. *See Gentry v. eBay, Inc.*, 99 Cal. App. 4th 816, 835 (2002) ("essential" for negligent misrepresentation claim that "the defendant must have made a misrepresentation as to a past or existing material fact."). Plaintiff has never alleged—and still has not identified—a single statement that meets the necessary elements, so the claim must be dismissed.

**III.   CONCLUSION**

For the foregoing reasons, and those discussed in their moving papers, Defendants respectfully request that the FAC be dismissed in its entirety, with prejudice.

Dated: September 13, 2018					KEKER, VAN NEST & PETERS LLP

							By: */s/ Steven P. Ragland*
							STEVEN P. RAGLAND

							Attorneys for Defendants
							COINBASE, INC., BRIAN
							ARMSTRONG and DAVID FARMER