Robert S. Green (State Bar No. 136183)
James Robert Noblin (State Bar No. 114442)
**GREEN & NOBLIN, P.C.**
2200 Larkspur Landing Circle, Suite 101
Larkspur, CA  94939
Telephone:  (415) 477-6700
Facsimile:  (415) 477-6710
Email:  gnecf@classcounsel.com

Lynda J.  Grant (Admitted *Pro Hac Vice*)
**THEGRANTLAWFIRM, PLLC**
521 Fifth Avenue, 17th Floor
New York, NY 10175
Telephone:  (212) 292-4441
Facsimile:  (212) 292-4442
Email:  lgrant@grantfirm.com

*Attorneys for Plaintiffs and the Class*

# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEFFREY BERK, WILLIAM CROWE, PREETHAM PERIASWAMI, NATHANIEL PYRON, SPENCER SOLTAU, MICHAEL SHRIBER, and NIKO YOUNTS, on behalf of themselves and all others similarly situated, | Case No.:  3:18-cv-01364-VC **SECOND AMENDED CLASS ACTION COMPLAINT** |
| Plaintiffs, | **JURY TRIAL DEMAND** |
| vs. | |
| COINBASE, INC., a Delaware Corporation d/b/a Global Digital Asset Exchange ("GDAX"), BRIAN ARMSTRONG, and DAVID FARMER, | |
| Defendants. | |

Plaintiffs Jeffrey Berk ("Berk"), Spencer Soltau ("Soltau"), Michael Shriber ("Shriber"), William Crowe ("Crowe"), Nathaniel Pyron ("Pyron"),  Niko Younts ("Younts") and Preetham Periaswami ("Periaswami" with Berk, Soltau, Shriber, Crowe, Pyron and Younts, "Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned counsel, allege in this second amended class action complaint, the following based upon their knowledge with respect to their own acts, and upon the investigation of their counsel, which include public statements made by defendant Coinbase, Inc.  ("Coinbase" or the "Company"), Brian Armstrong ("Armstrong"), its founder and chief executive officer, and David Farmer ("Farmer"), its director of communications ("Farmer" with Armstrong, the "Individual Defendants", with Coinbase, "Defendants"), a review and analysis of media reports, interviews, social media and other information concerning the Company and its actions with regard to the cryptocurrency Bitcoin Cash ("Bitcoin Cash" or "BCH").

## INTRODUCTION

1.      This is a class action on behalf of all Coinbase customers who placed purchase, sell or trade orders with Coinbase or the GDAX (now known as CoinPro) in connection with Coinbase's launch of BCH (the "Launch") during the period of December 19, 2017 through and including December 21, 2017 (the "Class Period"), for restitution and the monetary losses they sustained as a result of Coinbase's and the Individual Defendants' negligence and wrongdoing (the "Class").  Excluded from the Class are Defendants, any entity owned or controlled by them, and any officer, director, employee or agent of any of the Defendants, and any heirs, assigns, or family members of any Individual Defendant.

2.      This action ("Action") arises from the fraud, negligence and the unfair and unlawful business practices engaged in by the Individual Defendants and Coinbase, in connection with the Launch, in which the Individual Defendants and Coinbase:  (1) made false and deceptive statements about when and the extent to which Coinbase would and could support BCH and Coinbase's compliance with applicable laws; (2) manipulated the price of bitcoin ("BTC") and BCH, in order to draw miners  or those creating BTC and BCH and customers away from BTC and other alternative coins, and to artificially inflate the price of BCH, and

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01364-VC

00109176.000.docx

1  depress the price of BTC; and (3) to aid a pump and dump scheme perpetuated by insiders who

2  were tipped by Coinbase as to when it planned to fully launch BCH, and who used that non-

3  public information to buy and sell BCH during the Launch ahead of other customers.

4       3.     Coinbase and the Individual Defendants engaged in these acts:  (1) in order to

5  increase Coinbase's profits, which were being significantly reduced as the cost of mining BTC

6  was becoming prohibitively expensive; and was slowing transactions as the public entered the

7  cryptocurrency arena, thereby reducing the number of transactions in which Coinbase and

8  customers could and would engage and thus Coinbase's fees;  (2) to depress the price of BTC,

9  and impact the futures contracts and futures trading that was launched by the Commodities

10  Mercantile Exchange ("CME") the day before the Launch; and (3) to enable insiders to sell

11  significant amounts of BCH at inflated prices.

12       4.     As a consequence of this scheme, the Individual Defendants and Coinbase

13  enabled Coinbase to earn significant fees from the trades of its customers, from which Coinbase

14  earned a spread over an inflated price for BCH, and to avoid a "run" on the Company by sellers

15  anxious to take advantage of the inflated price, by closing down trading within minutes of the

16  Launch to all except certain insiders who were positioned to and did sell BCH at inflated prices

17  during the Launch.  This was particularly important, as GDAX operates on a time-price priority

18  basis, meaning essentially that it executes trades on a first in-first out basis so that traders who

19  are able to submit their orders first, and at certain prices, are more likely to get their orders

20  filled.

21       5.     Defendants were also able to significantly increase the price and popularity of

22  BCH, and increase the number of transactions and fees charged by Coinbase, while drawing

23  customers and other investors away from BTC and alternative coins where transactions and fees

24  had slowed.  The sudden Launch was effectively part of an attack by Coinbase and Armstrong

25  to depress the price of BTC and to inflate the price of BCH, to encourage more transactions and

26  greater profitability for Coinbase.

27       6.     As a result of their conduct during the Launch, Coinbase is presently subject to

28  an investigation by the Commodity Futures Trading Commission (the "CFTC") about whether

-2-

1  Coinbase manipulated the spot market for BTC, and thereby impacted the price of BTC futures

2  being traded on the CME.

3      7.    After the bungled Launch, in a tacit admission that its Launch was at least

4  negligent, Coinbase changed the process by which it announced the addition of new assets on its

5  platform to a process which should have been used for the Launch to avoid damage to the Class.

6  As it stated in a September 25, 2018 blog, entitled "Coinbase's New Asset Listing Process", its

7  new process requires Coinbase to pre-announce the listing of a new asset "far in advance", in

8  order to allow for sufficient liquidity and an orderly boot up of the market.

9      8.    It further noted on its March 16, 2018 blog entitled, "Our Process for adding new

10  assets to Coinbase and GDAX (March 2018 update)", that announcements would be made

11  through the Company's blog or Twitter when it began final testing of the technical integration,

12  and that another announcement would be made via its blog and Twitter when the integration

13  was complete and the Company was ready to allow deposits of the asset.  It stated that under

14  this new policy, it would allow at least 24 hours of deposits before opening the order book for a

15  new asset, and that assets would only be added after an internal committee conducted a legal

16  and risk assessment of the proposed asset.  This assessment would include such factors as

17  liquidity, price stability, and other market health metrics, and the persons constituting the

18  committee would be subject to confidentiality and trading restrictions beyond those of a

19  standard employee confidentiality and trading policy.

20      9.    With regard to forked assets, such as BCH, the process would apply "but with the

21  variation that we may offer a forked or airdropped assets in withdrawal-only mode, e.g. similar

22  to how we allowed customers to withdraw Ethereum Classic (ETC)."  That is, such assets could

23  only be withdrawn from the Coinbase platform but not traded on it.

24      10.   It further purportedly conducted an investigation of the insider trading that

25  occurred during the Launch.  Although it subsequently leaked to a Fortune.com reporter that as

26  a result of this investigation, it was not taking any disciplinary action, it did not specifically

27  deny that insider trading had occurred, nor has it specifically made an announcement of the

28  results of the investigation.  It further did not address how the Company and its legal counsel

-3-

00109176.000.docx

1   could conduct an insider trading investigation when some of the trading occurred on other

2   exchanges for which it cannot obtain trader identification information.

3   **Coinbase**

4       11.    Coinbase is one of the largest and most accessible exchanges for the trading,

5   buying and selling of virtual or cryptocurrency in the world.  At this point, it has more retail

6   customers than Charles Schwab, approximately 20 million, and reaches into over 30 countries.

7       12.    Coinbase is the major "on ramp" for individual investors to get involved in

8   cryptocurrency.  It is one of the only cryptocurrency exchanges to accept fiat currency (typical

9   government issued currency) and to maintain banking relationships such that customers,

10  particularly unsophisticated retail customers, can buy and sell cryptocurrency through the use of

11  credit cards and their bank accounts. Many other exchanges only allow for cryptocurrency to

12  cryptocurrency exchanges.

13      13.    Given that it is one of the largest cryptocurrency exchanges in the world, it

14  generally can provide more liquidity to customers seeking to buy, sell or exchange

15  cryptocurrency.

16      14.    Accordingly, whether and how Coinbase supports a particular cryptocurrency on

17  its platform is critical to the liquidity and availability of that virtual currency to customers and

18  directly impacts the price of that currency.  At least one commentator has called listing on

19  Coinbase the "golden ticket for a digital asset."  *Deconstructing the 'Coinbase Effect'*, July

20  2018, https://bravenewcoin.com/insightsdeconstructing-the-coinbase-effect.  This is especially

21  important for retail customers seeking to purchase a particular virtual currency with fiat or legal

22  tender (rather than with another form of cryptocurrency).

23      15.    Coinbase has repeatedly stated that its mission is to have to the most secure and

24  "compliant" digital currency exchange in the world.

25      16.    Armstrong has made repeated statements that "compliance is key to digital

26  currency's success", and in one particular blog, stated that Coinbase "spent many years and

27  millions of dollars working to become the best in the industry at compliance."

28  https://blog.coinbase.com/building-the-bridge-why-compliance-is-key-to-digital-currencys-

-4-

success-7bfdd88a084c.  It presently bills itself as "the easiest and most trusted place to buy and sell crypto." https://blog.coinbase.com.

17.     Coinbase touts its relationship with regulators, and that it is a licensed entity, including holding a "Bitlicense" with the New York Department of Finance ("DFS"). https://blog.coinbase.com/coinbase-obtains-the-bitlicense-f1c3e35c4d75.

18.     It has also announced that it maintains a policy against insider trading by its employees and contractors.  https://blog.coinbase.com/our-employee-trading-policy-at-coinbase-1d4e860b7837.

19.     During the relevant time period, Coinbase also represented to its customers that it had a detailed procedures for determining when to add a digital asset to its platform.

20.     In November 2017, Coinbase published a report called the "GDAX Digital Asset Framework:  Factors we evaluate when considering which new assets to support on GDAX" (the "Digital Asset Framework").

21.     In the Digital Asset Framework,Coinbase indicated that it was providing its customers with insight into how it evaluated digital assets for listing on GDAX.  Some of the standards which Coinbase and Farmer indicated were considered in supporting or launching a new coin was the liquidity and market capitalization of the digital asset, its "trade velocity" and whether "[t]he asset would not affect Coinbase or GDAX's ability to meet compliance obligations, which include:  (1) Anti-Money Laundering (AML) program and (2) obligations under government licenses in any jurisdiction (e.g. Money Transmitter Licenses)".

22.     Accordingly, the Digital Asset Framework gave customers and Class members the impression that Coinbase would not launch a new currency unless there was liquidity and sufficient market capitalization and that the Company had considered the new asset's "trade velocity" and the risk of launching it.  It further provided Class members with the impression that if there was any violation of the law surrounding the addition of a new asset, it would consider that and not launch it.

23.     At 5:15 p.m. PT on December 19, 2017, Coinbase sent an email to all GDAX customers stating that it was announcing the opening of trading of BCH on GDAX in which it

1  expressly stated that it was being launched in accord with Coinbase's Digital Asset Framework

2  and that it would remain in "post-only" mode until there is sufficient liquidity for trading.

3  However, at that time Coinbase was not able to launch BCH with reasonable liquidity, market

4  capitalization and reasonable "trade velocity."  In fact, when it launched at 5:20 p.m. PT, it had

5  only purchase orders in its book which caused a massive spike in the price and its systems were

6  unable to handle the trading which shut down 2 minutes, 40 seconds later.

7  Armstrong Advocates for BCH Well Before the Launch

8      24.    On August 1, 2017, the cryptocurrency bitcoin or BTC "forked" (the "Fork")

9  such that a new blockchain was formed and a new currency created known as bitcoin cash or

10 BCH.

11     25.    Several large investors and influential persons in the cryptocurrency world,

12 including Armstrong and non-party, Roger Ver ("Ver'), a very early bitcoin investor sometimes

13 known as the bitcoin "Jesus", had long been proponents of the fork and the creation of another

14 currency that became BCH.

15     26.    Armstrong and Ver publicly stated on numerous occasions, including around the

16 time of the BCH Launch, that the price of BTC transactions had become too high, and that the

17 mining of BCH had become too expensive.

18     27.    They also publicly stated that the time in which it took to create an addition to

19 the blockchain and the limited size of the blocks was slowing down transaction times, such that

20 as early as 2016, they advocated for a fork in the chain.

21     28.    Mining is the process through which cryptocurrency transactions are verified and

22 added to the blockchain, and the means through which new coins of a particular currency are

23 created.  This is done through powerful computers that use a tremendous amount of energy to

24 solve complex computational math problems.  When these math problems are solved, they

25 produce new cryptocurrency.

26     29.    Armstrong had publicly stated that the cost of mining BTC had become too high

27 and had been advocating for the creation of a fork which would cost less to mine, resulting in

28 larger blockchains being formed, and allowing more transactions.

-6-

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01364-VC

00109176.000.docx

30.     Although Armstrong was an advocate for BCH prior to the fork Coinbase made a number of statements that it would not support trading for BCH, in an attempt to keep all the BCH from the Fork for itself.

31.     After customer outrage, and threats of lawsuits for conversion, Coinbase and the Individual Defendants had to change their approach, and started making statements that Coinbase would support BCH by January 2018, and then only for withdrawals so that it could be traded on other exchanges.   They further stated that they would keep their customers informed of their decision regarding adding BCH to the platform, and that they would only support BCH if and when they could ensure an orderly market, liquidity and that there were no additional risks in supporting BCH.

32.     Nevertheless, when  faced with declining profits and long transaction times from BTC, pressure from insider traders and others like Ver, who had over a month lead time to position themselves for the Launch, and competition from the CME futures trading contracts which commenced on December 18, 2018 (and which would have drawn customers away from Coinbase), on December 19, 2017, with barely over an hour lead time, Coinbase announced that it was launching BCH.

33.     Within moments of the opening of BCH trading on GDAX, given the purchasing pressure from insiders who had already placed orders on the order book  and had cash in their USD electronic wallets so that they were ready to trade, and the fact that all of the transactions on the order book were purchase orders, the price of BCH skyrocketed to over $16,000, and then traded around $8-9,000.   At the same time, BCH was trading on other exchanges in a range from around $2,500 to $4,000.  For example, the range for BCH on EXX.com on that day was a low of $2,457 and a high of $4,024; and on Huobi.pro BCH was traded for a low of $1,990 and a high of $2,410.

34.     Coinbase insiders, and possibly Ver and others associated with Armstrong, were able to sell into this manipulated market at prices far above the prices in other exchanges and early in the process, which is particularly important as GDAX orders are filled on a "price-time priority", meaning that earlier in time orders have priority over later orders assuming that the

-7-

1   price of the order can be matched—a critical issue for getting an order filled where there is

2   limited liquidity for an asset, as with BCH.

3       35.     Although customers who had not had prior notice of the Launch placed sell

4   orders,  given the order imbalance (an imbalance of supply and demand for BCH) and the

5   failures in Coinbase's systems to record and present accurate information to traders and the

6   public, Coinbase halted trading, as quickly as it had started it, after about two and a half

7   minutes. It then shut down selling while filling buy orders at what it knew to be  prices

8   artificially inflated by a pump and dump orchestrated by insiders and those who had been tipped

9   off to the Launch date a month before and thus were able to immediately submit orders (and

10  were prepared by having cash in their electronic wallets) taking advantage of the price-time

11  order priority and any liquidity for BCH.

12      36.     Non-insider customers who put in later sell orders were unable to get any

13  execution, however, because Coinbase shut down the exchange given its failure to provide

14  liquidity and reasonable trade velocity, among other problems.

15      37.     Customers and Class members who put in market orders (orders that the

16  purchases be filled at market prices) experienced massive "slippage", or prices far above what

17  was originally quoted to them, as their purchase orders were filled by the BCH sold at inflated

18  prices by insiders.

19      38.     Coinbase then froze the order book at a price of around $9,000 per BCH.  When

20  it opened it the next day, the price per BCH was in the $3,000 range, causing non-insiders to

21  lose thousands of dollars of value.

22      39.     In the face of the price run up, Armstrong stated that it looked like there had been

23  insider trading—presumably in direct conflict with the Company's policies, and that the

24  Company was undertaking an internal investigation.  Yet, no official announcement of the

25  results of this investigation was ever made, nor was anyone ever terminated.

26      40.     This pump and dump was apparent and thus was known or should have been

27  known to Coinbase before the Launch.  As Coinbase stated in its Bitcoin Cash Launch

28  Retrospective published around January 9, 2018, it notified its employees on Monday,

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01364-VC

00109176.000.docx

November 13th that it would fully support BCH trading.  On November 13, 2017 and over the two weekend days prior (November 11 and 12, 2017), BCH experienced the greatest spike in volume and price that occurred during the entire life span of the currency since its issuance on July 23, 2017, as indicated in the following chart:



41.     Although this activity, occurring just at the time that Coinbase announced to its employees the launch date for BCH, was suspicious, Coinbase did little or nothing to investigate it at that time, contrary to its obligations under the FinCen Know Your Customer Rules (the "KYC" rules), nor did it take any steps to enforce its toothless insider trading policy, which it failed to even to disseminate to the many short term contractors which it employed.

42.     The next great spike in volume and price was on the December 19, 2017, the day on which Coinbase opened trading and the couple of days prior (even though Coinbase was still stating publicly as late as the morning of the 19th that it was not yet supporting trading in BCH), unequivocally demonstrating insider trading, as shown in the following chart:

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01364-VC

00109176.000.docx

43.     Notably, although it knew that it was going to fully Launch BCH in mid December,  Coinbase did not revise its false "roadmap" of supported digital currencies that appears in the Supported Digital Currencies section of its website, which noted that only withdrawals of BCH were projected, and said absolutely nothing about a full Launch in mid-December, nor did it inform its customers in advance so that they could be prepared at the Launch—a factor that is particularly important given that orders are filled by price-time priority.

44.     The sudden and unannounced launch of BCH had its intended effect—not only did insiders make massive profits, aided by Coinbase, but the price of BTC and other alt-coins (alternative coins or cryptocurrency other than BTC) dropped dramatically with the Launch and the heralding of BCH as the new bitcoin.

45.     Coinbase and Armstrong, among others, used the Launch to manipulate and depress the price of BTC, to ensure that customers were not driven away by the launch of the CME futures for BTC (which are less risky than spot trading on Coinbase), and to aid the insider trading of BCH.

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01364-VC

00109176.000.docx

46.     Coinbase earned fees on the transactions and a spread on the inflated price at which it filled orders, and halted sales before it would have had to sell out its own reserve of BCH.

47.     Thereafter, Coinbase and Armstrong tried to sweep the entire manipulation scheme under the table by eliminating the price spike from the price history of BCH, as shown on their website which shows the high price for BCH on December 19, 2017 at $2,926.88 and the high on December 20, 2017 as $3,421.45, as demonstrated in the chart below.  Coinbase also changed its own trading rules for the GDAX, as further discussed below.



48.     In yet another tacit admission of its negligence, and that its trading rules were inadequate at the time, on January 11, 2018, Coinbase announced an "update" to its trading rules, which rules, it admitted, were designed to "provide a more fair and orderly market for all customers", including rules that would allow the market to move to full trading mode only when there has been consideration of  order book liquidity and price volatility. http://blog.coinbase.com/market-structure-updatge-2650072c6e3b.

-11-

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01364-VC

49.     The Launch and the events leading up to it constitute violations of the consumer protection laws, fraud and/or negligence. Through this misconduct, Coinbase earned the spread on inflated purchases by filling purchase orders at unfair and inflated prices as well as transaction fees, and thus received monies directly as a result and which were paid by Class members.  It also avoided a run by sellers seeking to sell at inflated prices, which would have caused it to sell out its own reserve of BCH, among other things.

## Jurisdiction and Venue

50.     This action is brought under diversity jurisdiction under the Class Action Fairness Act, 28 U.S.C. §1332(d), in that at least one named Plaintiff is a citizen of state different from at least one of the Defendants, and the aggregate amount in controversy for all Class members exceeds $5,000,000, exclusive of interest and costs. The number of Class members is greater than 100.

51.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b), as Coinbase resides in this judicial district, and all Defendants are residents of the State of California.  Substantial acts in furtherance of the alleged misconduct have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information and the manipulation of the market for BCH, occurred in substantial part in this Judicial District.

## Parties

**Plaintiff Berk**

52.     Plaintiff Berk is a citizen of Arizona.  On December 19, 2017, within about a minute of BCH going live on Coinbase, Plaintiff attempted to purchase BCH.  Plaintiff placed a purchase order for BCH at a time when Coinbase indicated that BCH was trading at about $2000 per coin.

53.     Generally when a purchaser places orders, Coinbase provides the purchaser with a window of 15 to 20 seconds to accept the stated price. If the customer does not accept the price within that window, Coinbase rejects the purchase and tells the purchaser that the price is no longer available.

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01364-VC

54.     That is not what occurred here.  Instead, Plaintiff Berk placed his order at the price of about $2,000 BCH.  The following day, December 20, 2018, at about 3:07 p.m., Plaintiff Berk received notification from Coinbase that his order executed at the inflated price of $4,200.98 per BCH.  Plaintiff Berk's order was executed at a price over 100% greater than the price represented by Coinbase at the time that he submitted his order.

**Plaintiff Soltau**

55.     Plaintiff Soltau is a resident of Wisconsin and has been a Coinbase customer since the summer of 2017.

56.     Plaintiff Soltau received notice that Coinbase was going to list BCH approximately one hour before the Launch.  He placed an order to purchase BCH when it was trading at $3,400 per BCH.  The order executed immediately at a price of $6,999 per BCH, well above the price at which he placed the order.

57.     Plaintiff Soltau immediately tried to sell the BCH at $8,499 per BCH, but trading was halted and he was unable to sell the BCH that he purchased at an inflated price. By the next day, the price of BCH dropped to under $4,000 immediately causing him a loss.  He sold the next day at a loss.

58.     During the period of December 20, 2017 through December 28, 2017, Plaintiff Soltau had communications with Coinbase in which he described the issues surrounding his purchase and his inability to sell.   He was first told by Coinbase Customer Service that the "cause" of his issues was "due to degraded performance" and that it was "squared away" while he and Coinbase Customer Service were on the call, which was untrue.

59.     When he continued to complain to Coinbase's Customer Service representative, he was told that Coinbase customer service was working with a specialist to properly address his issues, but then never heard anything more from Coinbase.

**Plaintiff Shriber**

60.     Plaintiff Shriber, a resident of South Carolina, is a former Marine who was wounded in action and is currently on disability.

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01364-VC

00109176.000.docx

61.     He opened a Coinbase account in or about September 2017.  He learned about the BCH Launch from a colleague and transferred $18,000 into his Coinbase account.

62.     He attempted to purchase $18,000 worth of BCH at the Launch and received a message that that there was a temporary problem with the site, and that it would re-open the following day.  At the time, the price of BCH was $8,500 per BCH.

63.     When the exchange opened the following day, BCH opened at a price of about $3,000 to $3,200 per BCH, and Plaintiff Shriber received confirmation that he had purchased 2.2 BCH.  By that time, however, that BCH was only worth about $6,000, and he lost both about $12,000 and the opportunity to sell his BCH at a high price.  Moreover, given that he received a delayed confirmation of his purchase, he was unable to cancel it on December 19.

**Plaintiff Periaswami**

64.     Plaintiff Periaswami is a resident of India.  He opened his Coinbase account on or about August 10, 2017.  At the time of the events herein, Plaintiff Periaswami lived in South Carolina.

65.     He learned that Coinbase had launched trading in BCH from a colleague and transferred BCH that he had earlier purchased on Bitstamp to his Coinbase account, which transfer was completed.  He received an email confirmation from Coinbase.

66.     He immediate attempted to sell 2.5811 BCH on Coinbase multiple times, at a time when it was trading at $8,500 per BCH, and was prevented by Coinbase from being able to sell his BCH because it had halted trading.

67.     His funds and his BCH were locked until the following day when Coinbase resumed trading, at which time the price of BCH had dropped to about $3,000 per BCH.

68.     He sold his BCH at a loss and a total value of $3,326.

**Plaintiff Crowe**

69.     Plaintiff Crowe opened a Coinbase account in September 2017 and is a resident of New York.

70.     Plaintiff Crowe received an email addressed to "Dear GDAX Customer" on the evening of December 19, 2017, stating "that Bitcoin Cash ("BCH") is now listed and available

-14-

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01364-VC

for trading on GDAX." That email further stated that Coinbase had made the decision to list BCH, "by considering such factors as customer interest, developer support, network security, market capitalization, trading volume, and our Digital Asset Framework," and hyperlinked to the Company's Digital Asset Framework.

71.     The email further stated, "[t]he following order books have been created and will remain in post-only mode until there is sufficient liquidity for trading", and then listed "BCH-USD" as one of those order books.

72.     Relying on this email and the representations therein, Plaintiff Crowe placed a purchase order for two BCH, which according to GDAX at the time these orders were placed, showed a price of $2,000 per BCH. The purchase executed immediately at $5,000 per BCH for a total of $10,000.

73.     When Plaintiff Crowe attempted to immediately sell the BCH he had just purchased, he received messages that the site was down and he found that he was locked out of his account. Although he tried to sell, he was disabled from doing so.

74.     The next day, BCH opened at about $3,000—significantly less than the price at which his purchases had been filled.

75.     He has continued to hold his two BCH and has lost approximately $9,200 in value.

**Plaintiff Pyron**

76.     Plaintiff Pyron has been a customer of Coinbase since October, 2017, and is a resident of California. He is a disabled U.S. Kitty Hawk veteran out of San Diego, who served in the Persian Gulf.

77.     Plaintiff Pryon learned of the BCH Launch within minutes of the Launch when he received a message from GDAX, and immediately placed a purchase order for 113 BCH. At the time he placed his order, BCH was trading at about $3,000 per BCH. Upon placing the order, he received a message that his order was pending, and about two minutes later, that it was filled at $5,000 per BCH for a total of $595,000.

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01364-VC

78.     When he learned of the price at which his purchase executed, he immediately tried a number of times to cancel his purchase, but the system sent him a message that his cancel attempts had been rejected.  The system was then halted.

79.     He called the support line and sent emails to them.  When he was able to finally get through, a technician told him that there had been a "software glitch" and that his account would be rectified.  She further advised Plaintiff Pyron to sign up for text alerts, which he did.

80.     He never heard anything further from Coinbase.

81.     He subsequently sold his BCH at a loss in excess of $350,000.

**Plaintiff Younts**

82.     Plaintiff Younts has had a Coinbase account since early 2013 and is a resident of Ohio.  At the time of the Launch, Plaintiff Younts had 9 BCH in his Coinbase account.

83.     Upon learning of the Launch in an email from Coinbase, he immediately tried selling his BCH through several of Coinbase's platforms, including Coinbase.com, the mobileIOS app on his cellphone, and the GDAX, but could not get execution despite the fact that he had eligible and ready BCH in his account to be sold.

84.     Immediately upon learning of the Launch, Plaintiff Younts hit the sell button (and deposited the exchanged value of USD) to sell the BCH in his account. The trade posted on the GDAX as an active and pending fill/clear order.

85.     Before the conversion of the BCH to USD was executed, however, he was prompted by Coinbase's system to start over losing valuable time.

86.     He then attempted multiple times across Coinbase's platforms and his devices to sell the BCH in his account, but none of his trades were executed or filled/cleared contrary to the information provided to him by the Coinbase systems.

87.     He then spoke to Coinbase executives who told him his order would be filled/cleared and the USD would be deposited in his account.

88.     Contrary to their representations, however, Coinbase never filled his order and his further communications were ignored.

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01364-VC

00109176.000.docx

89.     In the meantime, the header of his screen (and that of all GDAX traders) had the wrong price for BCH, and a price far less than the price at which BCH was trading (between $7,000 to over $9,000 per BCH).

90.     Although Plaintiff Younts had contact with executives at Coinbase about the situation, he never received any responses to his complaints, and continues to hold his 9 BCH.

**Defendants**

91.     Coinbase maintains its principal place of business in San Francisco, California and is incorporated in Delaware. It is one of the most powerful digital currency exchanges in the world, buying and selling Bitcoin, BCH, Litecoin, and Ethereum.

92.     Coinbase is essentially divided into two parts: it provides services for retail customers through its retail division, and secondly, through the GDAX exchange, provides services that are more directed at professional traders.  However, Coinbase uses the GDAX to fill consumer orders.

93.     Armstrong is one of the founders and the chief executive officer of Coinbase, and one of its primary spokespersons.  Armstrong works from the Coinbase headquarters in San Francisco, California.  During the Class Period, Armstrong made repeated statements in relation to the Company's Launch of BCH.

94.     Farmer is Coinbase's Director of Communications.  Farmer works from the Coinbase headquarters in San Francisco.  During the Class Period, Farmer made statements in relation to the Company's Launch of BCH.

95.     Through the GDAX Coinbase is supposed to match buyers and sellers and fulfill orders placed through the retail portion of its platform.

96.     Coinbase makes money in at least two ways.  First, it engages in trading of its own corporate funds on the GDAX.  According to a report entitled, "Virtual Markets: Integrity Initiative", issued by the Office of the New York State Attorney General ("NYAG"), dated September 18, 2018 (the "NYAG Report"), at least 20% of the trading on GDAX is proprietary trading.  The NYAG Report, based upon questionnaires executed by Coinbase and other digital

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01364-VC

00109176.000.docx

currency exchanges, states, "Coinbase, disclosed that almost twenty percent of executed volume on its platform was attributable to its own trading."  NYAG Report at 25.

97.     Although Coinbase has denied this statement, stating "[w]hen Coinbase executes these trades, it does so on behalf of Coinbase Consumers, not itself**",** https://blog.coinbase.com/correcting-the-record-coinbase-does-not-engage-in-proprietary-trading-97e66145af6e, Coinbase's trading rules during the Class Period specifically admit that the Company trades its own corporate funds.  Its GDAX Rules at Rule 4.4 state, "Coinbase, Inc., which owns and operates GDAX, also trades its own corporate funds on GDAX."

98.     Coinbase further makes money through the fees that it charges, which are some of the highest fees in the industry.  Coinbase charges transaction fees on the conversion of fiat currency to virtual currency, the use of credit cards, and the deposit and withdrawal of funds, among other ways.

99.      It further makes money on the spread for each trade. Coinbase charges a pre-determined spread for each trade of 0.50% above the market exchange rate.  Consequently, if a customer is buying one BTC at the price of $6,654.74, the customer must pay an extra 0.5% or $33.37 in fees.  The customer also pays commissions for each transaction to Coinbase in addition to the spread, which can be a variable or flat fee depending upon the size, purchase method and location of the transaction.

100.     The number of transactions and transaction fees is the key to Coinbase's profitability.  As explained in the article entitled, "Coinbase  How They Make Money", https://blocklr.com/news/coinbase-how-they-make-money/:

> Coinbase has 20 million users.  For each of them, Coinbase makes a minimum of $0.99 per deposit, through typically its closer to 3%.  If they choose to exchange currencies on Coinbase Pro, Coinbase take 0.30% per transaction, unless the customer is a very high volume trader.  Next, to convert BTC/USD again, Coinbase take another 3%.
> By Coinbase's count, they've traded more than $150 billion dollars—meaning that they've charged fees on over $150 billion dollars.

101.     According to a January 23, 2018 article, entitled, "Coinbase is Making $2.7 million a Day", https://news.bitcoin.com/coinbase-making-2-7-million-day/, the Company's

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01364-VC

00109176.000.docx

revenues exceeded $1 billion in 2017, most of it from trading fees, and is expected to go public at some point.

102.    Coinbase is an exchange, and a money transmitter, and as such is subject to state regulation as a money transmitter.  It is also licensed by the DFS and must comply with the guidance provided by the DFS, as further discussed below.  Moreover, it is one of four cryptocurrency exchanges that is used to set the benchmark for prices for the CME bitcoin futures exchange.  Accordingly, it is also governed by the CFTC, and must adhere to the rules of the Commodity Exchange Act given its position as one of the entities setting the benchmark for BTC futures.

103.    Transactions on the GDAX are controlled by an electronic book that can be seen by traders called the order book.  The order book, shows open orders for a particular currency, with the sell orders on the top and buy orders on the bottom, divided by buckets of prices and showing the market size at each buy and sell price.  The order book also shows the spread between the buy and sell orders. An algorithm is used to match the buy and sells orders according to certain rules, including time-price priority.  As a general matter, purchases and sales are matched on a first in, first out basis, where possible.  The trading history for a particular asset is also shown in a column to the right of the trading screen.

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01364-VC

104.    For informational purposes a screen on Coinbase Pro (formerly GDAX) showing the information for Bitcoin Cash on November 20, 2018 is shown below. This chart is for BCH to US dollars (USD).  Links for making orders are on the far left.  Next to that is the Order Book, with sell orders in the top half above the USD Spread and buy orders below it. Next to that are graphs showing the price of trades and on the far right is a list of the Trade History.



The URL for this chart is https://pro.coinbase.com/trade/BCH-USD.

**Coinbase's Duties and Obligations**

105.    During his written testimony to Congress in about March 2018, Coinbase's Chief Legal Risk Officer, Michael Lempres ("Lempres") stated that those operating in the cryptocurrency space, including Coinbase, were regulated by four regulatory agencies, including the SEC, the CFTC, with respect to spot markets and market manipulation, FinCen which has authority for Know Your Customer (KYC) and Anti- Money Laundering (AML) matters, and the Federal Trade Commission ("FTC") for false advertising and consumer protection. http://blog.coinbase/coinbase-written-testimony-for-the subcommittee-on-capital-markets-securities-and-investment-47f8a260ce41.

106.    Lempres further stated that "this federal regulatory regime exists alongside vibrant state regulations", noting that Coinbase holds "40 licenses in 38 states, including a

-20-

Bitlicense in New York State.  That Bitlicense is intended to be a comprehensive consumer protection regime specific to operations of digital currency businesses."

107.    Coinbase was issued a Bitlicense by the DFS in about March 2017.  Under the Rules and Regulations pertinent to Virtual Currencies, Rule 200.18, Coinbase is prohibited from engaging in false, misleading or deceptive advertising.

108.    Rule 200.18 (d) states in relevant part: "each Licensee and any person or entity acting on its behalf, shall not, directly or by implication, make any false, misleading, or deceptive representations or omissions."

109.    Rule 200.19, entitled "Consumer protection", provides that Licensees must make certain disclosures to their customers. Under section (c), such disclosures include the "terms of transactions", as follows: "*Prior* to each transaction in Virtual Currency, each Licensee shall furnish to each customer a written disclosure in clear, conspicuous, and legible writing . . . the amount of the transaction." (emphasis added).

110.    Rule 200.19(g) further requires that Coinbase take steps to prevent fraud and that it not engage in fraudulent activity.  That section states: "Prevention of fraud.  Licensees are prohibited from engaging in fraudulent activity.  Additionally, each Licensee shall take reasonable steps to detect and prevent fraud, including by establishing and maintaining a written anti-fraud policy."

111.    The DFS "Guidance on Prevention of Market Manipulation and Other Wrongful Activity" (Feb. 7, 2018), available at https://www.dfs.ny.gov/legal/industry/il180207.pdf, further requires that virtual asset platforms implement measures designed to effectively detect, prevent and respond to fraud and market manipulation.

112.    Coinbase is also governed by FinCen's Know Your Customer Rule as it operates as a money services business.  The KYC rule requires Coinbase to obtain information about its customers in order to, *inter alia*, protect itself from corrupt acts.  Under the KYC requirements, Coinbase was required to adopt policies to monitor transactions and to manage risk.

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01364-VC

113.     Under these regulations, Coinbase is not only required to obtain customer due diligence, but to conduct ongoing monitoring to identify and report suspicious transactions, and to maintain and update customer information.

114.     Although Coinbase had an insider trading policy, it did little or nothing to monitor whether in fact there was insider trading, nor did it enforce its policies even after suspicious trading occurred in BCH about the time that it announced the date of the Launch to its employees.

115.     As one of the exchanges used a benchmark for the CME BTC futures contracts, Coinbase is further governed by certain provisions of the CEA and is under investigation by the CFTC with respect to whether there was market manipulation of the price of BTC in relation to the CME's first contracts for the sale of BTC futures.

116.     As one of the exchanges acting as the benchmark for the CME's BTC figures contracts, Coinbase is under the CFTC's antifraud jurisdiction and is thus subject to the standards set forth Sections 6 and 9 of the CEA, and Rule 180.1, concerning the dissemination of materially false and misleading statements in connection with the sale of a commodity, and 180.2, which prohibits the use of manipulative devices in connection with the sale of a commodity.

117.     Coinbase is further subject to the money transmission laws of the various states in which it is licensed.

**The NYAG Finds Coinbase and other Exchanges Are Conflicted**

118.     Based upon questionnaires responded to by nine cryptocurrency trading platforms including Coinbase, in September 2018, the NYAG produced a report entitled "The Virtual Markets Integrity Initiative" as part of the NYAG's duties of enforcing laws that protect investors and consumers from unfair and deceptive practices.

119.     Through its investigation, the NYAG sought and obtained details on these trading platforms' operations and how they protected customers' assets.

120.     The NYAG Report makes three key findings applicable to Coinbase:  (1) that virtual assets trading platforms are often engaged in several lines of business that create

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01364-VC

conflicts of interest, such as acting akin to a traditional broker dealer, while engaging in proprietary trading, and allowing platform employees with access to customer information and new currency listings to trade on their own or competing platforms; (2) that platforms lack robust real-time and historical market surveillance capabilities, like those found in traditional trading venues, to identify and stop suspicious trading patterns; and (3) that virtual asset trading platforms do not engage in independent auditing procedures necessary to confirm whether they are responsibly holdings their customers' virtual assets.

121.    In particular with employee trading, the NYAG found that Coinbase did not require either pre-clearing or disclosures to be filed by its employees, unlike other platforms.

122.    The NYAG Report further noted that certain fees and processes, like those charged and engaged in by Coinbase, favor professional traders over retail traders.  For instance, the NYAG Report notes that Coinbase charges fees for deposits and withdrawals thereby discouraging retail customers from moving funds onto and off the platform, that it allows for different and complex order types, such post-only mode, that benefit professional traders and do not necessarily benefit retail customers, and that it allows for automated trading.

123.    With regard to market manipulation, although it found that Coinbase had a formal policy, it noted that the industry generally lacks serious market surveillance capacities to detect and punish suspicious activity and did not point to Coinbase as an exception to that rule.

124.    It also found that no platform, including Coinbase, articulated a consistent methodology for determining whether and why to list a particular asset and that even platforms that look at total value or "market capitalization", such as Coinbase, lacked "rhyme or reason" as to how those objective factors were applied.

**Factual Background**

**Cyptocurrency**

125.    BTC   is a digital currency that was created as a response to the 2008 financial crisis and is the first decentralized digital currency that works without a bank or central authority, but rather on a peer to peer basis.

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01364-VC

126.    It is powered by its users who use cryptography to control its creation. The Bitcoin protocol and software are published openly, and all Bitcoin transactions are kept on a ledger visible to all users in a "blockchain".  A blockchain is a continually growing chain of blocks of cryptographically secured records of transactions.  Blocks are created when the distributed computers (miners) complete the work of cryptographically securing the information.

127.    Global actors that do the work of storing and securing the data do so for the chance to obtain cryptocurrency when new chains are formed and are only added to the block chain when there is consensus.  As a general rule, decisions about the blockchain, and any changes in the software are essentially controlled by a group of miners and developers.

128.    Coinbase is one of the most popular and accessible exchanges for the purchase, sale and use of cryptocurrency and one of the only exchange which allows the purchase and sale of digital currency with any fiat currency.

129.    Coinbase customers can set up what is known as a wallet, in which they keep their Bitcoins or other digital currency for later use or for investment.

130.    As one of the largest exchanges for the purchase and sale of Bitcoin and other digital currencies, the issue of whether Coinbase will maintain a market and support a cryptocurrency is essential to people who want to buy or sell the currencies.

**BCH is Created Through a Hard Fork**

131.    Bitcoin is one of the first digital currencies to gain widespread acceptance and use.  As Bitcoin increased in popularity, and the number of transactions increased, a disagreement arose among key miners and Bitcoin developers about how to proceed with Bitcoin, and how to upgrade the network to accommodate more transactions.

132.    After a meeting in Hong Kong, about 80% of Bitcoin miners and developers agreed to split the chain to create a new form of Bitcoin called Bitcoin Cash or BCH through the hard fork process.

133.    A hard fork occurs when a cryptocurrency splits into two, and the cryptocurrency's existing code is changed, resulting in both an old version and a new version of

-24-

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01364-VC

1    the currency.  The hard fork is created through a new ledger with a different set of code

2    requiring all nodes or computers to make a change in their software.

3    134.    On about August 1, 2017, Bitcoin experienced a hard fork, and BCH was created

4    through a change in the Bitcoin protocol. At the time, anyone who held a Bitcoin was supposed

5    to receive the equivalent numbers of BCHs.

6    **Coinbase States that It will Not Support BCH So that it Can Keep It**

7    135.    Although many of Coinbase's customers were due to receive BCH in their on-

8    line wallets maintained by Coinbase, Coinbase and the Individual Defendants made repeated

9    statements that it would not support BCH unless it could ensure an orderly market, liquidity and

10   that there were no "additional" risks in doing so.   They further stated that they would keep

11   customers informed as to their position with regard to supporting BCH.

12   136.    After several comments falsely denying that Coinbase would support BCH at

13   all—despite the fact that Armstrong had been heralding it as the true bitcoin since at least 2016,

14   in a blog on July 27, 2017, Farmer stated, "Our policy is to support only one version of a digital

15   currency.  In order to determine which fork to support we look at factors such as size of the

16   network, market value and customer demand.  We make this decision carefully because safely

17   supporting a new digital currency requires significant work for many teams."

18   137.    In that blog, Farmer further stated that it would keep "users informed about these

19   events through our blog, status page, twitter and support assets page".

20   138.    This statement was deceptive and was intended to give the investing public the

21   false impression that Coinbase was carefully considering the Launch, and various factors, such

22   as market value, when in fact, Armstrong was a massive proponent of BCH and was merely

23   timing the Launch for when it would do the most damage to the price of BTC.  Moreover, it was

24   merely as an excuse for Coinbase to retain the BCH for itself.  When Coinbase ultimately went

25   forward with the Launch, in the context of these statements, it omitted to disclose that Coinbase

26   was not actually able to implement the Launch consistent with these representations.

27

28

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01364-VC

139.   On July 28, 2017, Coinbase publicly tweeted that:

Coinbase does not intend to interact with the Bitcoin Cash Blockchain, or to access bitcoin cash (BCC) [later to become BCH].  In order to safely and securely access bitcoin cash, Coinbase would need to undertake a process of designing and testing significant changes to our systems—including hot and cold storage.  This is one of the core reasons customers will not be able to withdraw bitcoin cash after the fork on August 1st 2017. If this decision were to change in the future and we were to access bitcoin cash, we would distribute to customers bitcoin cash (BCC) associated with bitcoin (BTC) balances at the time of the fork on August 1, 2017.  Coinbase would not keep the bitcoin cash associated with customer bitcoin (BTC) balances for ourselves.

140.   This statement was misleading for the same reason—the real reason Coinbase refused to launch BCH, was so that it could retain the assets for itself.  It also misled Plaintiffs into believing that Coinbase would keep customers updated in a timely fashion as to its decision to distribute and/or launch BCH.  This statement was intended to deceive Class members that they would be timely informed of the distribution of BCH and its Launch, and was reasonably relied upon by them to their detriment.

141.   Customers who kept their Bitcoins on hard drives or off line, were able to access the equivalent amount of BCH.  But Coinbase customers who kept their Bitcoins in their on-line wallets at Coinbase did not receive their distributions, with Coinbase initially keeping the BCH.

142.   Although customers' BCH was associated with their Bitcoins, they were unable to withdraw their Bitcoins, or access and trade or sell their BCH.

143.   Given the length of time that it takes for customers to move from one exchange to another, moreover, it was impossible for Coinbase customers to quickly move their BTC from Coinbase to another exchange that was supporting BCH, so that they could access  their BCH and could commence trading it.

144.   In essence, Coinbase held their property captive forcing them to lose millions in value, and causing at least one cryptocurrency expert, Professor Tim Wu, to publicly state that Coinbase could be held liable under common law property principles.

-26-

00109176.000.docx

**After a Customer Uproar, Coinbase Announces That it Will Support BCH Withdrawals by January 2018  If it Can Make An Orderly Market, There is Liquidity and "No Additional Risks" Emerge**

145.     Coinbase's plan to retain the BCH which Armstrong so greatly supported, however, was foiled when customers began accusing Coinbase of converting their property.

146.     In response to this customer outrage, Coinbase and the Individual Defendants were forced to change their position regarding launching BCH.  Thus, on August 3, 2017, Farmer, issued a blog entitled, "Update on Bitcoin Cash".

147.     In that blog, Farmer stated that "[a]dding new digital assets to GDAX . . .  must be approached with caution," and noted that Coinbase's "top priority is always the safety of customer funds."

148.     He further stated that "we spend extensive time designing, building, testing and auditing our systems to ensure that the digital assets we support remain safe and secure."  As Farmer explained, "[w]e may not always be first in adding an asset, but if we do, you can be *sure that we have invested significant time and care in supporting that digital asset securely. We believe this is the best approach for us to maintain customer trust and ensure a fair and orderly market.*" (emphasis added).

149.     Farmer then went on to state that:

> Over the last several days, we've examined all of the relevant issues and have decided to work on adding support for bitcoin cash for all GDAX customers.  We made this decision based upon factors such as the security of the network, customer demand, trading volumes, and regulatory considerations.

150.     Farmer then clarified that Coinbase planned "to have support for bitcoin cash by January 1, 2018", but that by support he meant only that customers would be able to withdraw their BCH—not to trade it.  He further stated that such support would be forthcoming only if no "additional risks emerge[d] during that time."

151.     Farmer's statements, made only to quell the customer uprising, falsely indicated to the investing public: (1) that Coinbase would only support BCH when it was sure that it could maintain a "fair and orderly" market; (2) that BCH would not be in more than withdrawal mode

by January 1, 2018; and (3) that such support would occur only if no additional risks occurred—all of which were untrue when made or were rendered misleading by the failure to state at the time of the Launch that Coinbase was not in a position to maintain a fair and orderly market, that BCH was in full trading mode in mid-December 2017 and that Coinbase was supporting trading in the face of significant risks of its inability to do so.

152.    However, retaining BCH until that time had a great benefit for Coinbase, as it was able to raise $100 million in Series D funding from a group of private equity and venture capital investors, including Spark Capital, Greylock Partners, Battery Ventures, Section 32, and Draper Associates on August 10, 2017.

**Coinbase Determines that It will Launch BCH and Insiders Start to Trade**

153.    Although Coinbase maintains that it formally notified its employees on November 13, 2017 that it would begin supporting BCH, trading in the currency spiked in volume and price over the two day weekend prior to the 13th and continued on that day

154.    Although there was purportedly a policy in place at Coinbase that prohibited insider trading, this spike in trading in BCH indicated to Coinbase and Armstrong that there was insider trading based upon this information and that Coinbase did not and could not enforce its anemic insider trading policy, consistent with the NYAG Report, nor did it investigate this suspicious activity under the KYC rules.  *See* Bitcoin Cash Chart in Paragraph 40.

155.    Given it exponential growth at that time, moreover, Coinbase was staffed in significant part with many short term temporary employees, at all levels of the Company. However, Coinbase did not take steps to monitor much less ensure that these employees were informed about its insider trading policies.

156.    Moreover, despite the fact that Coinbase knew that statements made by Farmer and the Company regarding BCH were false, and that in fact, it was going to fully support trading in mid December, neither Coinbase, nor the Individual Defendants  did anything to inform their customers or the investing public about this change of plans, or to correct the Company's and Farmer's earlier statements.

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01364-VC

00109176.000.docx

157.    Further, the Company took no steps to correct its now false and inaccurate "roadmap" or that section of its website concerning which currencies it would support and the degree of support.

158.    As demonstrated in the screen shot below of Coinbase's website on December 13, 2017, a full month after it had made the decision to fully launch BCH, its website shows that support for "Buy", "Sell", and "Deposit" are not planned and that that support of the currency for withdrawals only is "projected".   https://medium.com/@MishaGuttentag/5-important-unanswered-questions-after-gdax-coinbases-bch-retrospective-37e573a9a8f1.

-29-

Supported Digital Currencies

Coinbase and GDAX provide varying levels of support for different Digital Currencies.

Availability for buying, selling, depositing, and withdrawing supported Digital Currencies varies by Digital Currency. Fees and availability also depend on your country, and payment method.

The following table lists all supported Digital Currencies on Coinbase and GDAX:

|  | Coinbase | | | | GDAX | | | |
|---|---|---|---|---|---|---|---|---|
|  | Buy | Sell | Deposit | Withdraw | Buy | Sell | Deposit | Withdraw |
| Bitcoin (BTC) | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Litecoin (LTC) | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Ethereum (ETH) | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Ethereum Classic (ETC) | ✕ | ✕ | ✕ | ✕* | ✕ | ✕ | ✕ | ✕ |
| Bitcoin Cash (BCH) | ✕ | ✕ | ✕ | Projected | ✕ | ✕ | ✕ | Projected |
| Bitcoin2x (B2X) | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected |

Digital Currencies or other tokens that are not listed on this page are not supported by Coinbase. Coinbase is unable to process any transaction made using an unsupported Digital Currency. For more information, please refer to our User

159.    Neither Coinbase, nor its spokesmen, Armstrong or Farmer, said anything publicly that indicated that Coinbase had been testing its systems and was building functionality to buy, sell or trade BCH, and did not update this "roadmap" until the day that it commenced the Launch.

160.    By failing to timely inform customers of the Launch, Defendants ensured that customers would not have enough time to place orders, so that Coinbase's order books for BCH would be "fair and orderly" as represented previously by Farmer. Moreover, they knew and

-30-

1   intended that Class members would reasonably rely upon these statements, and Class members

2   did rely upon these statements proximately causing them damage.

3       161.    By failing to take any steps to prevent insider trading and price manipulation,

4   they further ensured that the price of BCH would be inflated at the time of the Launch.

5       162.    This in fact did start a run up of the price.  As the referenced chart shows, days

6   before the actual Launch, insiders commenced cheaply purchasing BCH on other exchanges,

7   running up the price of the asset.  *See* Bitcoin Cash Chart in Paragraph 42.

8       163.    Although this should have been apparent to Coinbase and the Individual

9   Defendants, they did nothing to stop this run up or the insider trading that contributed to the run

10  up, nor did they investigate or report this suspicious activity.

11  **Coinbase Continues to Disseminate Materially False Statements on the Day of the Launch**

12      164.    Even the morning of the Launch, December 19th, Coinbase continued to

13  disseminate false and misleading statements regarding its support of BCH.

14      165.    In a Coinbase FAQ the morning of December 19th, Coinbase again stated that it

15  was only supporting withdrawals: "for now, Coinbase plans on supporting bitcoin cash

16  withdrawals.  If this changes, we will notify all customers with an update e-mail", and further

17  stated that Coinbase would not support BCH withdrawals until January 1, 2018.

18      166.    It again stated that it was "*currently* designing, building, testing and auditing our

19  systems, to enable you to *withdraw* your bitcoin cash balance," (emphasis added) at a time when

20  it presumably had achieved full functionality.

21      167.    These statements were was materially false but were reasonably relied upon by

22  Class members, who were misled into believing that if Coinbase launched BCH, it was prepared

23  to do so and had performed the necessary work so that Coinbase could ensure an orderly market,

24  and sufficient liquidity.  This statement was intended to and did induce Class members to place

25  purchase and sales orders during the Launch, from which they sustained damage.

26  **Coinbase Suddenly Proceeds with the BCH Launch Which is a Disaster**

27      168.    Suddenly, at about 4:06 p.m. Pacific Time on December 19th, with minimal prior

28  notice, Coinbase indicated that it was opening access to Bitcoin cash that day for buying, selling

-31-

and trading, in post-only mode; that is, in a mode where only what is known as "maker" orders would be posted.  (GDAX divides orders between maker and taker.  A maker order is an order that is at a different price than all other orders on the order books and will remain open at the price until the order books filled, cancelled or expired.  It essentially makes the market.  Taker orders are matched according to price-time priority with maker orders, until the taker order is filled, thus taking liquidity).  The alleged purpose was to establish liquidity, encourage price discovery and mitigate the risk of a volatile market.

169.    Then, at 5:15 p.m. Pacific Time, Coinbase stated that trading would begin at 5:20 on the BCH-USD trading book, and orders began matching. At this time, Coinbase knew the orders on its post-only book were primarily purchase orders that would drive the price sharply higher.

170.    Nonetheless, in a tweet, Coinbase stated, "Buy, sell and receive Bitcoin Cash on Coinbase," and cited to its blog implying that it now had the capacity to handle the Launch.

171.    On its blog, Coinbase stated that its failure to support BCH was contrary to its prior public statements and its purported mission statement that it operated "by the principle that our customers should benefit to the greatest extent possible from forks or other network events" and that doing so was essential to its "mission to make Coinbase the most trusted, safe, and easy-to-use digital currency exchange."

172.    It further stated that "Sends and receives" were available immediately, and that buys and sells would be available to all customers once there was sufficient liquidity on GDAX, within a few hours, despite the fact that it knew from its order books that the majority of the transactions on the books were purchases that would artificially drive up the price of BCH.

173.    Within minutes of this announcement, given the effective lack of prior notice, and post-only trades from insider traders who were prepared to trade at the opening and take advantage of the time-price priority (including by having cash in their USD Coinbase wallet, among other things), the price of BCH was run up to artificially inflated prices, which insiders then took advantage of by selling at these inflated prices, knowing that non-insider customers would submit taker purchase orders which would be used to fill their sell orders at inflated

-32-

prices.  Given the timing, these early trades could only have been effected by insiders or those tipped by insiders who knew and thus were prepared for the time and date of the Launch.  Every other customer would have to make sure that they had cash in their Coinbase wallet or were immediately prepared to sell their cryptocurrency (either on Coinbase or on another exchange), and to immediately purchase (and then sell) BCH.

174.    Given the fact that the initial transactions were effectively only purchases, as insiders well knew they would be, the price of BCH skyrocketed to over $16,000 per coin, and then to about $9,500 per coin—thousands of dollars more than the price at which it was selling on any other exchange.

175.    From the moment trading commenced, the public facing website for GDAX was unable to accurately reflect the trading that was occurring within the site, showing that the trading price was $9,500 when the price was both above and below that amount, and the trading graph stuck at $8,499.025.  Likewise, Class members, including Plaintiffs Berk and Pyron, were shown prices different from those at which their purchases were filled.

176.    Two minutes and 40 seconds later, the order book was closed, trading was suddenly halted and over 4,443 orders were placed with 3,461 orders matched, equal to $15.5 million of trading.  Coinbase cancelled "resting orders" or orders "resting" in the order book and cleared the BCH order books.

177.    Unsurprisingly, given the lack of notice enabling an orderly opening, liquidity quickly thinned by insiders who were prepared to first purchase  and then sell at BCH's sudden opening (as market makers), leaving other Coinbase customers to buy insiders' BCH at inflated prices (as market takers), and/or without liquidity to sell. After two minutes, Coinbase halted and cancelled trading, leaving its customers and Class members with the inability to get out their money or their BCH, or to sell the BCH that Coinbase had effectively caused them to purchase at highly inflated prices.

178.    By 6:30 pm  PST, Coinbase announced that the BCH-USD, BCH-EUR, and BCH-BTC books would move to "cancel-only" mode (which prevent trades from filling and allow traders to cancel their orders (although the cancel button was also disabled)), due to

-33-

thinning liquidity and that all open orders essentially for any other Coinbase customers seeking to trade that day, would be cleared so that any Coinbase customer who did not know or who was not immediately prepared to trade at Coinbase's sudden open, was prevented from buying at a fair price, rather an artificially manipulated price, or to sell their BCH, even where they were sold BCH at an inflated price.  Moreover, they were made to pay fees and a spread over this inflated price.

179.    In effect, Coinbase froze the market at about $9,000 per BCH (although it would open it the next day at about $3,000 locking in losses for its non-insiders).

180.    Moreover, in addition to the fact that the cancel button failed to work, many of these purchases executed almost immediately at inflated prices (as insiders and market makers dumped at inflated prices), preventing non-insiders from cancelling their trades, and/or the trade information was not sent until the following day, so that customers had no information and thus did not know that their purchases had executed at artificially inflated prices.

181.    Despite the fact that the price of BCH was clearly highly inflated through insider trading, and that because of the time-price priority, insiders prepared to sell at the opening, benefitting them at the expense of the average customer, Coinbase nonetheless continued to fill purchase orders at highly inflated prices, treating customers as takers and forcing them to take insiders inflated maker sell orders.

182.    No other exchanges had the same impact on prices or the liquidity that Coinbase had, and given that, and the cost and difficulty for retail investors seeking to withdraw or move their funds (and the lack of time given the sudden Launch), Coinbase had the power to and could manipulate the price of BCH and depress the price of BTC.  In fact, BCH did trade at artificially high prices.

**Coinbase Hides the Evidence**

183.    Given the unprecedented run up of the price of BCH before the Launch, Armstrong himself finally publicly admitted that there might have been insider trading, and that Coinbase was commencing an investigation.

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01364-VC

184.    However, neither Coinbase nor the Individual Defendants ever announced the results of this investigation. Rather, at some point in July 2018, Coinbase leaked to a Fortune.com reporter that two law firms had conducted an investigation and that as result, Coinbase was not going to take disciplinary action against any employee or contractor but fell short of actually stating that insider trading did not take place.

185.    Moreover, Defendants then falsely eradicated the artificial price spike that they had created on December 19th, from BCH's trading history as found on their website, in an effort to sweep the entire manipulation scheme and their own negligence, among other things, under the proverbial rug, but locked in massive losses for customers.

186.    On December 21, two days later, Defendants changed the GDAX rules to justify their conduct.

187.    Prior to December 21, 2017, Section 3.3 of the GDAX rule provided only that, "[a]ll traders have equal access to the GDAX API and Web Interface.  Coinbase does not provide prioritized access to any trader."  Section 3.11 of the GDAX Rules stated that GDAX does not use artificial market integrity measures such as 'circuit breakers' or trading halts.

188.    However, on December 21, 2017, Coinbase suddenly changed these rules adding the following clause to Section 3.3, "GDAX Market Operations has the authority to take any action deemed appropriate to preserve market integrity. Such actions include, but are not limited to, the halting of trading, modifying risk-mitigation parameters, restricting Trader access to GDAX or any other actions deemed to be in the best interests of the Exchange."

189.     In other words, Coinbase effectively changed the rules to provide its insiders with priority access to trading, while allowing it to halt trading of other customers because insiders had run up the price of BCH.

**Coinbase is Under Investigation by the CFTC After Refusing to Provide Data About BTC Manipulation**

190.    On December 1, 2017, the CME announced that it was commencing the sale of BTC futures, and that Coinbase would be one of four exchanges that would be used to set the

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01364-VC

00109176.000.docx

1   benchmark prices for BTC.  The settlement price is determined at 3:00 p.m. Central Time each

2   business day.

3        191.   The CME futures commenced trading on December 18, 2017, with a reference or

4   benchmark for BTC of $19,500—the day before the sudden BCH Launch.

5        192.   After the settlement of the first contract in January 2018, the CME requested

6   trading information from each of the four exchanges it used as a benchmark, including

7   Coinbase.  Several of the exchanges, however, responded that the requests were intrusive and

8   refused to provide the CME with all of the requested trading data, or provided it with limited

9   information for selected market participants rather than a complete order book.

10        193.   The CFTC is presently investigating whether there has been manipulation in the

11   price of BTC on the various benchmark exchanges, including Coinbase.

12        194.   However, the sudden BCH Launch, had its intended effect on the price of BTC,

13   which experienced a pullback in its price.

14                          **CLASS ACTION ALLEGATIONS**

15        195.   Plaintiffs bring this Action as a class action pursuant to Federal Rule of Civil

16   Procedure 23(a) and (b)(2) and (b)(3) on behalf the Class defined in paragraph 1, above.

17        196.   The members of the Class are so numerous that joinder of all members is

18   impracticable.  Throughout the Class Period, Coinbase had over 20 million customers, and

19   approximately $11 billion (USD) of BCH was traded on December 20, 2017.

20        197.   While the exact number of Class members are unknown to Plaintiffs at this time

21   and can only be ascertained through appropriate discovery, customers may be determined

22   through Coinbase's documents.

23        198.   Plaintiffs' claims are typical of the claims of the members of the Class as all

24   members of the Class are similarly affected by Defendants' wrongful conduct.

25        199.   Plaintiffs will fairly and adequately protect the interests of the members of the

26   Class and have retained counsel competent and experienced in class litigation.

27

28

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01364-VC

200.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     Whether Defendant Coinbase violated California Unfair Competition Law;

(b)     Whether Defendant Coinbase's conduct and that of the Individual Defendants in launching BCH at the time in which they did, was negligent; and

(c)     Whether Defendant Coinbase's conduct and that of the Individual Defendants in launching BCH and the statements attendant to that Launch constitute fraud.

201.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the monetary losses suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

202.     The claims asserted herein are a matter of public policy, and do not arise out of the Plaintiffs' or any other customer contract.

**The Arbitration Agreement is not Enforceable**

203.     The Arbitration Agreement found in the User Agreement is not enforceable.

204.     First, the Arbitration Agreement specifically states that, "[i]f a court decides that any provision of this section 7.2 is invalid or unenforceable, that provision shall be severed and the other parts of this section 7.2 shall still apply."   This section is not conditional.

205.     Thus, the Court must determine in the first instance, the enforceability of the Arbitration Agreement.

206.     Second, the "delegation provision" or the reference to the AAA rules conflicts with the Arbitration Agreement making any delegation ambiguous at best, which cannot be decided by an arbitrator.

207.     The delegation agreement was never agreed to and was merely part of the AAA Rules that were hyperlinked to the User Agreement that was also hyperlinked.

-37-

208.    The User Agreement is 30 pages long.  At page 10, the User Agreement, in a section regarding Customer Disputes that was not referenced at the "click" stage, is yet another hyperlink to the AAA Rules, which are over 44 pages. At page 17 of those rules is one paragraph regarding the delegation. A consumer merely by clicking a button at the opening page has not formed consent to a provision that is nested over 30 pages and two hyperlinks away from the opening account page.

209.    Further, this Arbitration Agreement constitutes a consumer contract of adhesion and is thus procedurally unconscionable.

210.    Moreover, it contains an unconscionable fee shifting provision making it unenforceable.

211.    As the Court found in the Order Denying Motion to Compel and Granting Motion to Dismiss, entered on October 23, 2018, the claims asserted here do not arise under the User Agreement and therefore, are not subject to the Arbitration Agreement.

## COUNTS

### Count I:  Violation of California's Unfair Competition Law (Cal. Bus. & Prof. Code 17200, *et seq.*) Against Coinbase

212.    Plaintiffs incorporate all of the above allegations as if fully set forth herein.

213.    Coinbase violated California's Unfair Competition Law, which prohibits unfair competition, including unlawful, unfair or fraudulent business practices.

214.    Coinbase disseminated materially false and misleading statements respecting when and the extent to which Coinbase would support BCH and add it to the platform as well as its compliance with applicable laws and regulations.  Coinbase made direct representations in emails and messages to its customers and those who would trade in BCH to the effect that it could and intended to be able to open a fair and orderly market in BCH before it opened for trading.  Coinbase omitted to disclose in its announcements that market for trading BCH was opening that Coinbase was opening trading when it was not prepared or able to maintain that orderly market and that it had undisclosed reasons, such as impacting the CME futures in bitcoin, for opening trading on December 19, 2017 at 5:20 p.m. PT.

-38-

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01364-VC

00109176.000.docx

215.     Plaintiffs reasonably relied upon the misrepresentations and omissions alleged above.

216.     Coinbase's acts and practices constitute "unfair" business acts and practices, in that the harm caused by its wrongful conduct outweighs any utility of such conduct, and such conduct (i) offends public policy, (ii) is immoral, unscrupulous, unethical, oppressive, deceitful and offensive, or (iii) has caused and will continue to cause substantial injury to consumers such as Plaintiffs and the Class.

217.     These unfair practices have no utility and the damage that they caused to Class members far outweighs any utility that these actions had if they had any utility.

218.     Coinbase's wrongful conduct is unlawful as it violates a number of regulations and statutes to which Coinbase must adhere.

219.     The conduct alleged above violates provisions of Coinbase's Bitlicense and is applicable to the extent that Coinbase engages in business involving New York State, or residents of New York State.  That prohibits Coinbase from, among other things, making false and misleading statements, or omissions (Rule 200.18).  It further requires that prior to each transaction in virtual currency, Coinbase is required to provide to each customer, the amount of the transaction prior to the transaction.

220.     It also requires that Coinbase not engage in fraudulent activity and that it take reasonable steps to detect and prevent fraud (Rule 200.19(g)).

221.     These actions were a violation of the KYC rules, which require Coinbase to adopt policies to monitor transactions and to manage risk and to report suspicious activity.

222.     Although during the relevant period, Coinbase had a written insider trading policy, and required certain identifying information to be provided by its customers, it was aware, since at least mid-November 2017, that there had been suspicious trading in BCH that was timed to its disclosure of the Launch date to its employees, but failed to take any actions or to report or monitor this activity until after the Launch.

223.     Coinbase launched BCH at time when it knew from at least the order books, if not from other indicia, such as an increase in mining, and a spike in BCH's prices on other

-39-

00109176.000.docx

1  exchanges that there was suspicious activity in the trading of BCH, but did nothing to

2  investigate and instead opened trading in order to draw customers away from the CME futures

3  market.  Moreover, it could discern from the order books before trading commenced that all of

4  the orders on its order  book were for purchases which generated increasingly higher and

5  inflated prices.

6       224.    Coinbase and the Individual Defendants violated Sections 6 and 9 of the

7  Commodities Exchange Act ("CEA"), and Rules 180.1 and 180.2 promulgated thereunder.

8       225.    Coinbase's conduct, including making false and misleading statements about the

9  Launch and Coinbase's ability to handle the Launch, their failure to report or monitor suspicious

10  trading activity in BCH commencing in November 2017, and even on the post-only order book

11  before full trading began, which were all intended to artificially inflate the price of BCH (and

12  depress the price of BTC), constitutes manipulation under CEA Sections 6 and 9.

13       226.    Regulation 180.1 makes it unlawful to: (1) use or employ, or attempt to use or

14  employ, any manipulative device, scheme, or artifice to defraud; (2) make, or attempt to make,

15  any untrue or misleading statement of a material fact or to omit to state a material fact necessary

16  in order to make the statements made not untrue or misleading; or (3) engage, or attempt to

17  engage, in any act, practice, or course of business, which operates or would operate as a fraud or

18  deceit upon any person.  Regulation 180.2 prohibits conduct that manipulates or attempts to

19  manipulate any trading in commodities.

20       227.    Coinbase by making untrue statements of material fact or omitting to state facts

21  necessary to make the statements it made, not untrue or misleading, in connection with the sale

22  of a commodity or contract of sale of a commodity alone violated the CEA. The entire process

23  of the sudden Launch, with its intended purpose of artificially inflating the price of BCH, and

24  depressing the price of BTC and other alt-coins in order to draw miners and customers away

25  form BTC, and increase Coinbase's profitability, the day after the CME launch of BTC futures

26  constitutes manipulation or attempts to manipulate trading in commodities.

27       228.    Each act of: (1) using or employing, or attempting to use or employ, a

28  manipulative device, scheme, or artifice to defraud; (2) making, or attempting to make, untrue

-40-

1   or misleading statements of material fact, or omitting to state material facts necessary to make

2   the statements made not untrue or misleading; and (3) engaging, or attempting to engage in any

3   act, practice or course of business, which operated or would operate as a fraud or deceit upon

4   any person, including but not limited to those specifically alleged herein, is alleged as a separate

5   and distinct violation.

6       229.   Plaintiffs and Class members are entitled to and do seek an order of restitution

7   and disgorgement of amounts they paid to Coinbase in connection with their orders to buy and

8   sell BCH during the class period, including fees charged, the amount of the "spread" and any

9   other revenues obtained by Coinbase in that process..

10      230.   Plaintiffs are entitled to recover their attorneys' fees and costs under California

11  Code of Civil Procedure, Section 1021.5.

12                    **Count II: Negligence Against Coinbase**

13      231.   Plaintiffs repeat the allegations above as if fully set forth herein, other than those

14  sounding in fraud.  Plaintiffs explicitly disclaim any allegations of fraud in relation to this

15  Count.

16      232.   Coinbase owed Plaintiffs and Class Members a duty of reasonable care, which it

17  breached by engaged in misfeasance, when it suddenly opened BCH for full trading before it

18  was fully prepared to do so.

19      233.   Coinbase's New Asset Listing Process, which set forth a process to be able to

20  ensure sufficient liquidity and an orderly market for a new assets with a stable price sets forth an

21  alternative process that could have been used to launch BCH.  That process requires Coinbase to

22  pre-announce the listing of a new asset far in advance.  Such announcements would include an

23  announcement at the time of when it began final testing of the technical integration of the asset,

24  and another when it was ready to allow deposits.

25      234.   It would then allow 24 hours for deposits before opening the order book.

26      235.   With assets created by a fork, that would also include limiting activity to

27  withdrawals (as Coinbase announced it was going to initially do with BCH), and listing the asset

28

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01364-VC

1   only after an internal committee, subject to the highest confidentiality, determined that such

2   listing was appropriate.

3       236.   In November 2017, Coinbase published a report called "GDAX Digital Asset

4   Framework:  Factors we evaluate when considering which new assets to support on GDAX"

5   (the "Digital Asset Framework").

6       237.   In the Digital Asset Framework, Coinbase indicated that it was providing its

7   customers with insight into how it evaluated digital assets for listing on GDAX.  Some of the

8   standards which Coinbase and Farmer indicated were considered by Coinbase in supporting or

9   launching a new coin, was the liquidity and market capitalization of the digital asset, its "trade

10  velocity" and whether "[t]he asset would not affect Coinbase or GDAX's ability to meet

11  compliance obligations, which include:  (1) Anti-Money Laundering (AML) program and (2)

12  obligations under government licenses in any jurisdiction (e.g. Money Transmitter Licenses)".

13      238.   The way in which Coinbase launched BCH was a violation of its Digital Asset

14  Framework.

15      239.    By operating an exchange through which retail customers, could buy, sell and

16  trade currency, Coinbase owed the highest duties of reasonable care.

17      240.   Coinbase was negligent in performing these duties, and in failing to make

18  accurate pre-announcements about the Launch, and to take deposits sufficiently in advance to

19  allow liquidity to develop, and to be able to open an orderly market.

20      241.   Coinbase's failure to take these steps was responsible for putting Plaintiffs and

21  Class members in a worse position and created a foreseeable risk of harm, giving rise to a duty

22  to act with reasonable and ordinary care.  Its  actions were intended to impact an identifiable

23  class—the Class pled here.

24      242.   As a proximate result of Coinbase's actions, Plaintiffs and Class members

25  suffered general and special damages.

26      243.   Coinbase has a responsibility or duty for Plaintiffs' economic loss.in that:  (1) the

27  transactions complained of were directed at and intended to effect Plaintiffs and the defined

28  Class above; (2) the harm of market manipulation of the price of BCH during its Launch, and

-42-

the failure of Coinbase to ensure that it was prepared to engage in the Launch, resulted in harm to Plaintiffs and the Class that was reasonably foreseeable; (3) it is certain that Plaintiffs and Class members suffered damage in overpaying for or receiving too little BCH, paying a spread to Coinbase and paying transaction fees, or being unable to sell their BCH during the Launch; (4) Coinbase's conduct is directly responsible for the damage suffered by Plaintiffs and Class members; (5) there is moral blame attached to this conduct as Coinbase's conduct in allowing this manipulation infects the entire cryptocurrency community; and (6) there should be a policy of preventing such future harm.

## Count III:  Fraud Against Coinbase and the Individual Defendants by Plaintiff Pyron Under California law on Behalf of a Nation-Wide Class

244.    Plaintiff Pyron repeats and realleges each and every allegation stated above as if fully set forth herein, other than those allegations relating to negligence.

245.    During the relevant time period and the Class period alleged herein, Coinbase and the Individual Defendants made material misrepresentations of fact, and material non-disclosures respecting if and when Coinbase would support the launch of BCH, and whether it would fully support such a launch or only withdrawals.  They also made materially false and misleading statements regarding Coinbase's compliance with relevant regulations and rules pertinent to its operations, as stated above in paragraphs 15-23, 135-140, 146-151, 157-159, 164-167 and 185.

246.    At the time that Coinbase and the Individual Defendants made these statements, they knew that: (1) Armstrong favored BCH over BTC and other alt-coins; (2) Coinbase was attempting to maintain possession and control over the BCH that was awarded to certain Class members in the Fork; (3) Coinbase and Armstrong disfavored BTC because it had become too expensive and slow and were taking steps to launch BCH; (3) Coinbase had tipped insiders and their employees as to the date upon which Coinbase was going to announce and commence a full launch of BCH; (4) insider trading of BCH had caused a spike in the price of BCH about the time that they were told of the Launch date, contrary to Coinbase's insider trading policy, but Coinbase did not take steps to prevent insider trading; (5) the order book in post-only mode

-43-

before full trading on December 19, 2017, demonstrated that Coinbase would be unable to maintain an orderly market for BCH during a sudden launch and that there would be a lack of liquidity; and (6) that the CME was about to launch its BTC futures contracts and the date upon which the CME was going to make that launch, and that Coinbase intended to launch BCH at that time.

247. Defendants made these statements with an intent to deceive their customers about how and when they were going to Launch BCH, and failed to disclose the truth about when they were going to engage in the Launch, in order to draw customer and miners away from BTC, to avoid losing customers to the CME upon the launch of BTC futures, and to aid and abet insiders and others associated with Armstrong, such as Ver, who were pumping and planned to dump BCH at the Launch.

248. Plaintiff Pyron and members of the Class justifiably relied upon these material false statements, and were damaged thereby, as further discussed above.

### Count IV:  Fraud against Coinbase and the Individual Defendants, Alternatively Brought by Plaintiff Berk on Behalf of an Arizona Subclass

249. Plaintiff Berk repeats and realleges each and every allegation stated above as if fully set forth herein, other than those allegations relating to negligence.

250. During the relevant time period and the Class period alleged herein, Coinbase and the Individual Defendants made material misrepresentations of fact, and material non-disclosures respecting if and when Coinbase would support the launch of BCH, and whether it would fully support such a launch or only withdrawals.  They also made materially false and misleading statements regarding Coinbase's compliance with relevant regulations and rules pertinent to its operations.

251. At the time that Coinbase and the Individual Defendants made these statements, they knew that: (1) Armstrong favored BCH over BTC and other alt-coins; (2) Coinbase was attempting to maintain possession and control over the BCH that was awarded to Subclass members in the Fork; (3) Coinbase and Armstrong disfavored BTC because it had become too expensive and slow and were taking steps to launch BCH; (3) Coinbase had tipped insiders and

-44-

their employees as to the date upon which Coinbase was going to announce and commence a full launch of BCH; (4) insider trading of BCH had caused a spike in the price of BCH about the time that they were told of the Launch date, contrary to Coinbase's insider trading policy, but Coinbase did not and could not take steps to prevent insider trading; (5) the order book in post-only mode before full trading on December 19, 2017, demonstrated that Coinbase would be unable to maintain an orderly market for BCH during a sudden launch and that there would be a lack of liquidity; and (6) that the CME was about to launch its BTC futures contracts and the date upon which the CME was going to make that launch, and that Coinbase intended to launch BCH at that time.

252.    Defendants made these statements when they knew that they were materially false and misleading and made them with an intent to deceive their customers about how and when they were going to Launch BCH, and failed to disclose the truth about when they were going to engage in the Launch, in order to draw customer and miners away from BTC, to avoid losing customers to the CME upon the launch of BTC futures, and to aid and abet insiders and others associated with Armstrong, such as Ver, who were pumping and planned to dump BCH at the Launch.  They made these statements with the intention that they be acted upon or not acted upon in a manner which they reasonably contemplated.

253.    Plaintiff Berk and members of the Arizona Subclass were ignorant of the falsity of these statements, and justifiably relied upon these materially false statements, and had a right as customers of Coinbase to rely upon them, and suffered proximate damages thereby, as further discussed above.

**Count V:  Fraud Against Coinbase and the Individual Defendants, Alternatively Brought by Plaintiff Crowe on Behalf of a New York Subclass**

254.    Plaintiff Crowe repeats and realleges each and every allegation stated above as if fully set forth herein, other than those allegations relating to negligence.

255.    During the relevant time period and the Class period alleged herein, Coinbase and the Individual Defendants made material misrepresentations of fact, and/or material non-disclosures respecting if and when Coinbase would support the launch of BCH, and whether it

-45-

1  would fully support such a launch or only withdrawals.  They also made materially false and

2  misleading statements regarding Coinbase's compliance with relevant regulations and rules

3  pertinent to its operations.

4       256.     At the time that Coinbase and the Individual Defendants made these statements,

5  they knew that: (1) Armstrong favored BCH over BTC and other alt-coins; (2) Coinbase was

6  attempting to maintain possession and control over the BCH that was awarded to Subclass

7  members in the Fork; (3) Coinbase and Armstrong disfavored BTC because it had become too

8  expensive and slow and were taking steps to launch BCH; (3) Coinbase had tipped insiders and

9  its employees as to the date upon which Coinbase was going to announce and commence a full

10  launch of BCH; (4) insider trading of BCH had caused a spike in the price of BCH about the

11  time that they were told of the Launch date, contrary to Coinbase's insider trading policy, but

12  Coinbase did not take steps to prevent insider trading; (5) the order book in post-only mode

13  before full trading on December 19, 2017, demonstrated that Coinbase would be unable to

14  maintain an orderly market for BCH during a sudden launch and that there would be a lack of

15  liquidity; and (6) that the CME was about to launch its BTC futures contracts and the date upon

16  which the CME was going to make that launch, and that Coinbase intended to launch BCH at

17  that time.

18       257.     Defendants made these statements with an intent to deceive their customers about

19  how and when they were going to Launch BCH, and failed to disclose the truth about when they

20  were going to engage in the Launch, in order to draw customer and miners away from BTC, to

21  avoid losing customers to the CME upon the launch of BTC futures, and to aid and abet insiders

22  and others associated with Armstrong, such as Ver, who were pumping and planned to dump

23  BCH at the Launch.

24       258.     Plaintiff Crowe and members of the New York Subclass justifiably relied upon

25  these materially false statements, and were damaged thereby, as further discussed above.

26

27

28

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01364-VC

00109176.000.docx

1    **Count VI:  Fraud Against Coinbase and the Individual Defendants, Alternatively Brought**

2    **by Plaintiff Shriber on Behalf of a South Carolina Subclass**

3    259.    Plaintiff Shriber repeats and realleges each and every allegation stated above as if

4    fully set forth herein, other than those allegations relating to negligence.

5    260.    During the relevant time period and the Class period alleged herein, Coinbase

6    and the Individual Defendants made material misrepresentations of fact, and/or material non-

7    disclosures respecting if and when Coinbase would support the launch of BCH, and whether it

8    would fully support such a launch or only withdrawals.  They also made materially false and

9    misleading statements regarding Coinbase's compliance with relevant regulations and rules

10   pertinent to its operations.

11   261.    At the time that Coinbase and the Individual Defendants made these statements,

12   they knew that: (1) Armstrong favored BCH over BTC and other alt-coins; (2) Coinbase was

13   attempting to maintain possession and control over the BCH that was awarded to Subclass

14   members in the Fork; (3) Coinbase and Armstrong disfavored BTC because it had become too

15   expensive and slow and were taking steps to launch BCH; (3) Coinbase had tipped insiders and

16   their employees as to the date upon which Coinbase was going to announce and commence a

17   full launch of BCH; (4) insider trading of BCH had caused a spike in the price of BCH about the

18   time that they were told of the Launch date, contrary to Coinbase's insider trading policy, but

19   Coinbase did not and could not take steps to prevent insider trading; (5) the order book in post-

20   only mode before full trading on December 19, 2017, demonstrated that Coinbase would be

21   unable to maintain an orderly market for BCH during a sudden launch and that there would be a

22   lack of liquidity; and (6) that the CME was about to launch its BTC futures contracts and the

23   date upon which the CME was going to make that launch, and that Coinbase intended to launch

24   BCH at that time.

25   262.    Defendants made these statements they knew that they were materially false and

26   misleading and made them with an intent to deceive their customers about how and when they

27   were going to Launch BCH, and failed to disclose the truth about when they were going to

28   engage in the Launch, in order to draw customer and miners away from BTC, to avoid losing

-47-

1  customers to the CME upon the launch of BTC futures, and to aid and abet insiders and others

2  associated with Armstrong, such as Ver, who were pumping and planned to dump BCH at the

3  Launch.  They made these statements with the intention that the be acted upon or not acted upon

4  in a manner which they reasonably contemplated.

5  263.  Plaintiff Shriber and members of the South Carolina Subclass were ignorant of

6  the falsity of these statements, and justifiably relied upon these materially false statements, and

7  had a right as customers of Coinbase to rely upon them, and suffered proximate damages

8  thereby, as further discussed above.

9  **Count VII:  Fraud Against Coinbase and the Individual Defendants, Alternatively**

10  **Brought by Plaintiff Soltau on Behalf of a Wisconsin Subclass**

11  264.  Plaintiff Soltau repeats and realleges each and every allegation stated above as if

12  fully set forth herein, other than those allegations relating to negligence.

13  265.  During the relevant time period and the Class period alleged herein, Coinbase

14  and the Individual Defendants made material misrepresentations of fact, and/or material non-

15  disclosures respecting if and when Coinbase would support the launch of BCH, and whether it

16  would fully support such a launch or only withdrawals.  They also made materially false and

17  misleading statements regarding Coinbase's compliance with relevant regulations and rules

18  pertinent to its operations.

19  266.  At the time that Coinbase and the Individual Defendants made these statements,

20  they knew that: (1) Armstrong favored BCH over BTC and other alt-coins; (2) Coinbase was

21  attempting to maintain possession and control over the BCH that was awarded to Subclass

22  members in the Fork; (3) Coinbase and Armstrong disfavored BTC because it had become too

23  expensive and slow and were taking steps to launch BCH; (3) Coinbase had tipped insiders and

24  their employees as to the date upon which Coinbase was going to announce and commence a

25  full launch of BCH; (4) insider trading of BCH had caused a spike in the price of BCH about the

26  time that they were told of the Launch date, contrary to Coinbase's insider trading policy, but

27  Coinbase did not take steps to prevent insider trading; (5) the order book in post-only mode

28  before full trading on December 19, 2017, demonstrated that Coinbase would be unable to

-48-

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01364-VC

1    maintain an orderly market for BCH during a sudden launch and that there would be a lack of

2    liquidity; and (6) that the CME was about to launch its BTC futures contracts and the date upon

3    which the CME was going to make that launch, and that Coinbase intended to launch BCH at

4    that time.

5        267.    Defendants made these statements with an intent to deceive their customers about

6    how and when they were going to Launch BCH, and failed to disclose the truth about when they

7    were going to engage in the Launch, in order to draw customer and miners away from BTC, to

8    avoid losing customers to the CME upon the launch of BTC futures, and to aid and abet insiders

9    and others associated with Armstrong, such as Ver, who were pumping and planned to dump

10   BCH at the Launch.

11       268.    Plaintiff Soltau and members of the Wisconsin Subclass justifiably relied upon

12   these materially false statements, and were damaged thereby, as further discussed above.

13   **Count VIII:  Fraud Against Coinbase and the Individual Defendants, Alternatively**

14   **Brought by Plaintiff Younts on Behalf of an Ohio Subclass**

15       269.    Plaintiff Younts repeats and realleges each and every allegation stated above as if

16   fully set forth herein, other than those allegations relating to negligence.

17       270.    During the relevant time period and the Class period alleged herein, Coinbase

18   and the Individual Defendants made material misrepresentations of fact, and/or material non-

19   disclosures respecting if and when Coinbase would support the launch of BCH, and whether it

20   would fully support such a launch or only withdrawals.  They also made materially false and

21   misleading statements regarding Coinbase's compliance with relevant regulations and rules

22   pertinent to its operations.

23       271.    At the time that Coinbase and the Individual Defendants made these statements,

24   they knew that: (1) Armstrong favored BCH over BTC and other alt-coins; (2) Coinbase was

25   attempting to maintain possession and control over the BCH that was awarded to Subclass

26   members in the Fork; (3) Coinbase and Armstrong disfavored BTC because it had become too

27   expensive and slow and were taking steps to launch BCH; (3) Coinbase had tipped insiders and

28   their employees as to the date upon which Coinbase was going to announce and commence a

-49-

full launch of BCH; (4) insider trading of BCH had caused a spike in the price of BCH about the time that they were told of the Launch date, contrary to Coinbase's insider trading policy, but Coinbase did not and could not take steps to prevent insider trading; (5) the order book in post-only mode before full trading on December 19, 2017, demonstrated that Coinbase would be unable to maintain an orderly market for BCH during a sudden launch and that there would be a lack of liquidity; and (6) that the CME was about to launch its BTC futures contracts and the date upon which the CME was going to make that launch, and that Coinbase intended to launch BCH at that time.

272.   Defendants made these statements with an intent to deceive their customers about how and when they were going to Launch BCH, and failed to disclose the truth about when they were going to engage in the Launch, in order to draw customer and miners away from BTC, to avoid losing customers to the CME upon the launch of BTC futures, and to aid and abet insiders and others associated with Armstrong, such as Ver, who were pumping and planned to dump BCH at the Launch.

273.   Plaintiff Younts and members of the Ohio Subclass justifiably relied upon these materially false statements, and were damaged thereby, as further discussed above.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and all other Class members similarly situated, pray for relief and judgment as follows:

(a)   Determining that this is a proper class action pursuant to Rule 23(a) and (b)(2) and (3) of the Federal Rules of Civil Procedure and that the claims are not subject to arbitration;

(b)   Awarding compensatory damage and restitution in favor of Plaintiffs and the Classes against Defendants, jointly and severally, in an amount to be determined at trial, including interest, and/or disgorgement of profits earned by Coinbase for the wrongdoing alleged above;

(c)   Awarding Plaintiffs and the Classes punitive damages according to proof for their fraud claims;

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01364-VC

1      (d)     Awarding Plaintiffs and the Classes their reasonable costs and expenses incurred

2 in this action, including a reasonable allowance of fees for Plaintiffs' attorneys and experts; and

3      (e)     Awarding Plaintiffs and the Classes such other and further relief as the Court

4 deems appropriate.

5                  **JURY TRIAL DEMAND**

6      Plaintiffs demand a jury trial on all issues so triable.

7

8 DATED:  November 20, 2018      **GREEN & NOBLIN, P.C.**

9

10                By:    /s/ Robert S. Green
                        Robert S. Green

11

12                James Robert Noblin
                2200 Larkspur Landing Circle, Suite 101

13                Larkspur, CA  94939
                Telephone:  (415) 477-6700

14                Facsimile: (415) 477-6710
                Email:  gnecf@classcounsel.com

15

16                Lynda J.  Grant (Admitted *Pro Hac Vice*)
                **THEGRANTLAWFIRM, PLLC**

17                521 Fifth Avenue, 17th Floor
                New York, NY 10175

18                Telephone:  212-292-4441
                Facsimile:  212-292-4442

19                Email:  lgrant@grantfirm.com

20                *Attorneys for Plaintiffs and the Class*

21

22

23

24

25

26

27

28

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-01364-VC