KEKER, VAN NEST & PETERS LLP
STEVEN P. RAGLAND - # 221076
sragland@keker.com
BENJAMIN BERKOWITZ - # 244441
bberkowitz@keker.com
ERIN E. MEYER - # 274244
emeyer@keker.com
NICHOLAS D. MARAIS - # 277846
nmarais@keker.com
SEAN M. ARENSON - # 310633
sarenson@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:    415 391 5400
Facsimile:    415 397 7188

Attorneys for Defendants
COINBASE, INC., BRIAN ARMSTRONG
and DAVID FARMER

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEFFREY BERK, WILLIAM CROWE, PREETHAM PERIASWAMI, NATHANIEL PYRON, SPENCER SOLTAU, MICHAEL SHRIBER, and NIKO YOUNTS, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>COINBASE, INC., a Delaware Corporation d/b/a Global Digital Asset Exchange ("GDAX"), Brian Armstrong and David Farmer,<br><br>Defendants. | Case No. 3:18-cv-01364-VC<br><br>**DEFENDANTS' MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:           January 31, 2019<br>Time:           10:00 a.m.<br>Dept:           4, 17th Floor<br><br>Judge:         Hon. Vince Chhabria<br><br>Date Filed:  March 1, 2018<br><br>Trial Date:  None set |

# TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES ..................................................1

I.     BACKGROUND ...........................................................................................1

II.    ARGUMENT ..................................................................................................4

    A.    Plaintiffs fail to state a claim for relief under the UCL. ........................4

        1.    Coinbase's alleged conduct was not an unfair business practice.................4

            a.    Timing claims ................................................................4

            b.    "Orderly market" claims ..............................................6

        2.    Coinbase's alleged conduct was not an unlawful business practice. ...........7

            a.    Commodities Exchange Act ..........................................8

            b.    FinCEN rules .................................................................10

            c.    New York State regulations ..........................................10

    B.    Plaintiffs fail to state a claim for negligence. ........................................11

        1.    Coinbase had no special relationship with Plaintiffs and no duty. ...........11

        2.    Even if Coinbase owed Plaintiffs a duty, it did not breach it. ...................12

        3.    Coinbase's conduct did not cause harm to Plaintiffs. ...............................14

    C.    Plaintiffs fail to state a claim for fraud. ................................................15

III.   CONCLUSION..............................................................................................15

1

2

**<u>TABLE OF AUTHORITIES</u>**

3

**Page(s)**

4

**<u>Federal Cases</u>**

5

*Allen v. City of Beverly Hills*,
  911 F.2d 367 (9th Cir. 1990) ...................................................................................15

6

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)..............................................................................................2, 9

7

8

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)......................................................................................2, 5, 8, 9

9

10

*In re Century Aluminum Co. Sec. Litig.*,
  729 F.3d 1104 (9th Cir. 2013) ...................................................................................9

11

*CFTC v. Kraft Foods Grp., Inc.*,
  153 F. Supp. 3d 996 (N.D. Ill. 2015) ........................................................................8

12

*CFTC v. Wilson*,
  No. 13 CIV. 7884 (RJS), 2018 WL 6322024 (S.D.N.Y. Nov. 30, 2018).............8, 9

13

14

*Eclectic Properties E., LLC v. Marcus & Millichap Co.*,
  751 F.3d 990 (9th Cir. 2014) .....................................................................................9

15

16

*Hodsdon v. Mars, Inc.*,
  891 F.3d 857 (9th Cir. 2018) .....................................................................................4

17

*Morgan v. Apple Inc.*,
  No. 17-CV-05277-RS, 2018 WL 2234537 (N.D. Cal. May 16, 2018)....................12

18

19

*Pickles v. Kate Spade & Co.*,
  No. 15-CV-05329-VC, 2016 WL 3999531 (N.D. Cal. July 26, 2016).....................4

20

21

*Sperling v. Stein Mart, Inc.*,
  291 F. Supp. 3d 1076 (C.D. Cal. 2018) .....................................................................7

22

*U.S. v. Brooks*,
  681 F.3d 678 (5th Cir. 2012) .....................................................................................8

23

24

*U.S. v. Reliant Energy Servs., Inc.*,
  420 F. Supp. 2d 1043 (N.D. Cal. 2006) .....................................................................8

25

**<u>State Cases</u>**

26

27

*Diaz v. Kay-Dix Ranch*,
  9 Cal. App. 3d 588 (1970) .......................................................................................11

28

1315306

*Farmers Ins. Exch. v. Super. Ct.*,
   2 Cal. 4th 377 (1992) ........................................................................................8

*Norwest Mortg., Inc. v. Superior Court*,
   72 Cal. App. 4th 214 (1999) ............................................................................11

*People v. E.W.A.P. Inc.*,
   106 Cal. App. 3d 315 (1980) ............................................................................10

*Quelimane Co. v. Stewart Title Guar. Co.*,
   19 Cal. 4th 26 (1998) ........................................................................................12

*Robinson Helicopter Co. v. Dana Corp.*,
   34 Cal. 4th 979 (2004) ......................................................................................12

**<u>Federal Statutes</u>**

Commodities Exchange Act (CEA) § 1a, 7 U.S.C. § 1a ..........................................8

**<u>Federal Regulations</u>**

17 CFR § 180.1 ........................................................................................................8

17 CFR § 180.2 .....................................................................................................8, 9

31 C.F.R. § 1022.210 .............................................................................................10

31 C.F.R. § § 1022.320 ..........................................................................................10

**<u>State Regulations</u>**

N.Y. Comp. Codes R. & Regs. Title 23, Pt. 200 ...................................................10

**<u>Federal Rules</u>**

Fed. R. Civ. P. 9(b) ..................................................................................................4

Fed. R. Civ. P. 12(b)(6) ...........................................................................................1

1   **TO ALL PARTIES AND TO THEIR COUNSEL OF RECORD:**

2          PLEASE TAKE NOTICE that on January 31, 2019, at 10:00 a.m. or as soon thereafter as

3   this matter may be heard, in the courtroom of the Honorable Vince Chhabria, located in

4   Courtroom 4, 17th Floor of the United States Courthouse, 450 Golden Gate Avenue, San

5   Francisco, CA 94102, Defendants Coinbase, Inc. ("Coinbase"), Brian Armstrong, and David

6   Farmer (collectively, "Defendants") will and hereby do move this Court for an order dismissing

7   Plaintiffs' Second Amended Class Action Complaint ("SAC" or "Complaint") with prejudice.

8          This motion is based on this Notice of Motion, the following Memorandum of Points and

9   Authorities, the concurrently-filed Request for Judicial Notice, the accompanying Declaration of

10  Sean Arenson, and the exhibits attached thereto, the pleadings and other documents on file in this

11  case, all other matters of which the Court may take judicial notice, and any further argument or

12  evidence that may be received by the Court at the hearing.

13

14  Dated: December 20, 2018                          KEKER, VAN NEST & PETERS LLP

15                                        By:   */s/ Steven P. Ragland*
16                                              STEVEN P. RAGLAND

17                                              Attorneys for Defendants
18                                              COINBASE, INC., BRIAN ARMSTRONG
                                                and DAVID FARMER

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT & MPA
Case No. 3:18-cv-01364-VC

1315306

## MEMORANDUM OF POINTS AND AUTHORITIES

The third iteration of this complaint introduces six new plaintiffs. Some, like Mr. Berk, allegedly tried to buy a new digital currency, Bitcoin Cash ("BCH"), at the peak of 2017's digital currency boom; others, like Mr. Younts, allegedly tried to sell their BCH at the very same time. Although these Plaintiffs appear adverse to each other—after all, Mr. Younts's complaint is effectively that he wasn't able to take Mr. Berk's money—they share certain characteristics. Each gambled on a volatile new digital asset; each now appears to believe that he should have done better; and each seeks to hold someone else, Coinbase, accountable for his own speculation.

But, even on this *third* attempt, Plaintiffs do not plead facts required to maintain this lawsuit. *First*, Plaintiffs' UCL "unfairness" theory is based on supposedly misleading statements—but they still do not point to any statement, upon which they relied, that was knowingly false when made. *Second*, their "unlawful" UCL claim is based on three inapplicable regulatory regimes: the CEA, which the Court has rejected once before; FinCEN rules that do not regulate the alleged conduct; and a New York State Virtual Currency License rule that prohibits certain conduct *in New York*. *Third*, Plaintiffs' negligence claim—which still fails to establish any special duty—now turns on the supposed violation of a policy that did not even exist at the time. If anything, Plaintiffs' new and inconsistent allegations show that Coinbase did what it had promised: it worked diligently to provide the best marketplace it could for its customers. That is not the basis for a legal claim.

Plaintiffs' losses are the result of market dynamics, not negligence or fraud. Stripping away the noise of the Second Amended Complaint, one continues to wonder—as the Court asked before—just "what Coinbase should have done differently, or why the rollout of Bitcoin Cash would have gone more smoothly had Coinbase done whatever Berk thinks is appropriate." Dkt. 48 ("Order") at 3. The Court should dismiss Plaintiffs' SAC with prejudice.

## I.   BACKGROUND

Coinbase is a digital currency exchange that allows users to buy, sell, and hold assets like Bitcoin, Ether, and Litecoin.[1] *See, e.g.*, Dkt. 51 ("SAC"), ¶ 91. Coinbase provides a platform for

---

[1] For purposes of a Rule 12(b)(6) motion to dismiss, the Court must accept material factual

1315306

1  customers to trade regular "fiat" currency for digital currency, and vice versa.  *Id.* ¶ 12.

2  Plaintiffs' claims focus on Coinbase's introduction of support for a new digital currency, BCH.

3       Plaintiffs are digital currency speculators who hoped to reap major windfalls on BCH.

4  Just *how* they planned to do that varies.  Some first bought BCH after Coinbase opened trading,

5  presumably hoping to profit as the price climbed, *see id.* ¶¶ 54 (Berk), 56 (Soltau), 62 (Shriber),

6  77 (Pyron); others tried to sell BCH they already owned at the same moment, presumably hoping

7  to make money off newer prospectors, *see id.* ¶¶ 66 (Periaswami), 83 (Younts).

8       All Plaintiffs agreed to a User Agreement with Coinbase that governs the relationship

9  between the parties.  That agreement disclaimed any representation that access to "the Coinbase

10 services … will be continuous, uninterrupted, timely, or error-free."  Decl. of Sean M. Arenson in

11 Supp. of Defs.' Req. for Judicial Not. ("Arenson Decl."), Ex. 1, pt. 1 ¶ 8.3.[2]  The User Agreement

12 further provides that, in the event of a fork such as the one that created BCH, Coinbase had the

13 right, "in its sole discretion, [to] decide whether or not to support (or cease supporting) either

14 branch of the forked protocol entirely."  *Id.* at pt. 1 ¶ 3.8.[3]  The User Agreement also incorporates

15 by reference the GDAX Trading Rules ("Trading Rules"), *id.* pt. 3 ¶ 2.1, which provide that "[i]f

16 technical reasons prevent or degrade Traders' ability to place or cancel Orders … or affect the

17 operation of GDAX Order Books or matching engines, then Coinbase may, in its discretion … (a)

18 [t]emporarily disable depositing or withdrawing Assets; (b) [c]ancel Open Orders; (c) [d]isable

19 the ability to place new Orders (Cancel-Only Mode)."  Arenson Decl. Ex. 2 ¶ 3.4.  The Trading

20 Rules also disclose how the exchange functions, including the priority with which orders are

21 processed, the risk of significant price "slippage" for market orders, and the availability of other

22 types of orders, including "limit orders" and "time in force" instructions that traders could use to

23 reduce risk.  *Id.* ¶¶ 1.1–1.30.

24 allegations as true, although pleadings that are "no more than conclusions, are not entitled to the
   assumption of truth."  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009); *see also Bell Atl. Corp. v.*
25 *Twombly*, 550 U.S. 544, 572 (2007).  The facts in this section are thus taken from the SAC to
   assist the Court in its analysis, although Defendants deny the veracity of many of the allegations.
26 [2] Defendants respectfully request that the Court take notice of the exhibits to the Arenson
27 Declaration for the reasons articulated in the concurrently filed Request for Judicial Notice.

28 [3] A "fork" is a software update to an existing blockchain that creates a new blockchain.  The
   Bitcoin Cash blockchain was created in a fork of the Bitcoin blockchain.

1    In March 2018, Plaintiff Berk filed a putative class-action complaint against Coinbase and

2  two of its executives.  Berk alleged, without any factual basis, that Coinbase had turned a blind

3  eye to insider trading—by "tipping off its own employees" about the upcoming BCH launch,

4  letting them "swamp[]" the market with "buy and sell orders," and allowing them to "obtain[]

5  BCH at fair prices."  Dkt. 1 (Compl.) ¶¶ 11–12.  The original complaint included two causes of

6  action: a UCL claim, and a claim for "negligence and negligent misrepresentation."  *Id.* ¶¶ 85–99.

7  Rather than litigate that motion to dismiss, Berk amended his complaint.  *See* Dkt. 24.

8    Berk's Amended Complaint pivoted away from his insider-trading theory and towards a

9  new "market manipulation" theory.  Still, it repeated many of the same unfounded claims: that

10  Defendants had made "false and misleading statements about the Launch," that they had tipped

11  off their employees "to the date of the Launch," and that they had "allow[ed] insider trading."

12  *See, e.g.*, Dkt. 33 (Am. Compl. ("FAC")) ¶ 136.  Defendants filed a second motion to dismiss,

13  which was granted—in some aspects with leave to amend, but with prejudice as to the claim for

14  violation of the CEA.  *See* Order.

15    In November, Plaintiff Berk—with six new plaintiffs from various U.S. states and India—

16  took a third swing.  Although the complaint gets longer with each amendment, its core allegations

17  have remained largely unchanged: that Coinbase made "false and deceptive statements" about

18  whether it "could support BCH," that Coinbase intentionally manipulated the price of BCH to

19  draw users to the new currency, and that Coinbase "aid[ed] a pump and dump scheme" to benefit

20  "insiders" who knew, in advance, "when it planned to fully launch BCH."  SAC ¶ 2.  Plaintiffs'

21  new ***first*** cause of action, under the UCL, alleges that Coinbase made "direct representations" that

22  it would "be able to open a fair and orderly market in BCH" when, in truth, it knew it would not.

23  *Id.* ¶ 214.  In Plaintiffs' ***second*** cause of action, for negligence, they claim that Coinbase had "the

24  highest duties of reasonable care" and was negligent in "failing" to make accurate predictions

25  about the launch or "to be able to open an orderly market."  *Id.* ¶¶ 239–242.  And Plaintiffs' ***third***

26  cause of action, for fraud, alleges again that Coinbase "made material misrepresentations" about

27  whether, when, and the extent to which it "would support the launch of BCH."  *Id.* ¶ 245.[4]

28  _____

[4] Plaintiffs's fourth through eighth counts (purported "sub-classes") are derivative of their third.

## II.     ARGUMENT

### A.     Plaintiffs fail to state a claim for relief under the UCL.

Plaintiffs contend that Coinbase violated the UCL by engaging in "unlawful" and "unfair" business practices.  SAC ¶¶ 212–230.  Because Plaintiffs' theory sounds in fraud, their UCL claims are subject to Rule 9(b)'s heightened pleading requirements.  *Pickles v. Kate Spade & Co.*, No. 15-CV-05329-VC, 2016 WL 3999531, at *1 (N.D. Cal. July 26, 2016).  But, whatever the standard, Plaintiffs have again failed to plead a UCL violation because they do not—and cannot—identify any false or misleading statements or any violations of law.

### 1.     Coinbase's alleged conduct was not an unfair business practice.

Plaintiffs' primary claim under the "unfair" prong is that Coinbase engaged in "unfair" business practices by "disseminat[ing] materially false and misleading statements" about "when and the extent to which" it would support Bitcoin Cash.  SAC ¶ 214.  The standard for stating a claim under the UCL's "unfair" prong "is currently in flux."  *Hodsdon v. Mars, Inc.*, 891 F.3d 857, 866 (9th Cir. 2018) (citation omitted).  The *Cel-Tech* test requires "an incipient violation of an antitrust law" or conduct that "significantly threatens or harms competition."  *Id.*  The older *South Bay* test requires conduct that "offends an established public policy" or "is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers."  *Id.*  Plaintiffs' claim —premised on purportedly false or misleading statements—fails under either test because they do not show that Coinbase made *any* false or misleading statements.

As in their FAC, Plaintiffs train their "false statements" case on two sets of forward-looking statements: the first about *when* Coinbase would launch trading in BCH (the "timing claims"); the second, in the run-up to that launch, about whether Coinbase could in fact "open a fair and orderly market in BCH" (the "'orderly market' claims").  *See* SAC ¶ 214.

#### a.     Timing claims

Plaintiffs' timing claims suffer from the same fatal defects as before.  Most fundamentally, Plaintiffs cannot have relied on months-old statements about *when* Coinbase *might* support BCH.  At the time that Plaintiffs actually placed their buy or sell orders, they necessarily *knew* that the launch had happened.  And Plaintiffs cannot point to *any* categorical

4

1   statements about whether or when Coinbase would support BCH—only that, in July, it said it did

2   "not intend to" do so while noting that its decision could "change in the future."  SAC ¶ 139.  In

3   fact, as Plaintiffs concede, Coinbase's decision *did* change, and by August 2017—months before

4   Plaintiffs traded—Coinbase announced that it had "examined all of the relevant issues" and

5   decided to work on adding support for Bitcoin Cash.  *Id*. ¶ 149.  And, by signing the User

6   Agreement, Plaintiffs expressly "acknowledge[d] and agree[d]" that Coinbase had "sole

7   discretion" over whether to support forked assets like BCH.  Arenson Decl. Ex. 1, pt. 1 ¶ 3.8.

8          In trying to overcome this central flaw, the SAC sweeps in a number of other statements

9   that are not only irrelevant, but render Plaintiffs' theories inconsistent and incoherent.  For

10  instance, Plaintiffs now contend *both*: (1) that, before the fork that created BCH, Coinbase

11  announced "that it would not support trading for BCH, in an attempt to keep all the BCH from the

12  Fork for itself," SAC ¶ 30; *see also id.* ¶¶ 135–138, 145, and (2) that Coinbase's statement that it

13  did *not* plan to support BCH withdrawals was *false* because Coinbase "was merely timing the

14  Launch for when it would do the most damage to the price of BTC," *id.* ¶ 138.  It is difficult to

15  reconcile these two allegations: if Coinbase wanted to "keep all the BCH … for itself," it would

16  not have advanced that goal by secretly planning to allow customer withdrawals.  Plaintiffs are

17  desperate to obfuscate their *contractual agreement* (which gave Coinbase broad discretion over

18  forks) by trying to transform Coinbase's transparent communications (about its deliberations over

19  whether to support a new and unproven digital currency) into some nonsensical conspiracy.  But

20  augmenting the SAC with contradictory and unsubstantiated hypotheses neither rescues their

21  claim nor provides "plausible grounds" for relief.  *Twombly*, 550 U.S. at 555–56.

22         Next, Plaintiffs try a more granular approach, contending that Coinbase "falsely indicated

23  … that BCH would not be in more than withdrawal mode by January 1, 2018."  SAC ¶ 151.  This

24  issue has previously been briefed and rejected by the Court, and the SAC adds nothing new.

25  Plaintiffs allege that, months before the launch, Farmer clarified "that Coinbase planned 'to have

26  support for bitcoin cash by January 1, 2018', but that by support he meant only that customers

27  would be able to withdraw their BCH—not to trade it."  *Id.* ¶ 150.  Plaintiffs' gloss—that BCH

28  trading would not begin before 2018—is *not even implied* by this statement, much less stated.  *Id.*

5

¶¶ 150–51.  But, more importantly, Plaintiffs never plead that Farmer's statements were false when made, as required to state a claim.  Instead, they *admit* that Coinbase's subsequent decision to support trading in BCH was just a "change of plans" from when Farmer made this statement. *Id.* ¶ 156.  Such a "change of plans" was well within the "sole discretion" Plaintiffs contractually granted Coinbase to "decide whether or not to support (or cease supporting) either branch" of a forked protocol.  Arenson Decl. Ex. 1, pt. 1 ¶ 3.8.  It certainly does not give rise to a fraud claim.

Finally, Plaintiffs contend that, even on "the morning of the Launch," Coinbase "disseminate[d] false and misleading statements regarding its support of BCH." *Id.* ¶ 164.  Once again, Plaintiffs misrepresent Coinbase's statements.  They point to a "roadmap" on Coinbase's website which purportedly "shows that support for 'Buy', 'Sell', and 'Deposit' are not planned." *Id.* ¶¶ 158–159.  In fact, all that screenshot shows is the undisputed fact that BCH trading was—at that time, prior to launch—not *currently supported*. *See* Arenson Decl. Ex. 3.[5]

When the SAC is stripped of its unsupported inferences, it boils down to a disagreement about whether Coinbase should have announced its BCH launch further in advance.  That theory is not new; it was tested and found wanting in the previous complaints.  And so, too, here, where Plaintiffs fail to allege that they *relied* on any statement that was *knowingly false* when made.

### b.   "Orderly market" claims

Plaintiffs seek to transform a general, forward-looking statement about Coinbase's intent—to provide a safe and secure market—into an insurance policy for their speculation. Although Plaintiffs contend that Coinbase "made repeated statements that it would not support BCH unless it could ensure an orderly market," SAC ¶ 135, they appear to rely solely on an August 3, 2017 blog post by former Coinbase employee Adam White.  *See id.* ¶¶ 146–151.[6] White stated—accurately—that Coinbase would not add support for an new asset unless it had "invested significant time and care in supporting that digital asset securely." *Id.* ¶ 148. White characterized this as "the best approach for us to maintain customer trust and ensure a fair and

---

[5] Plaintiffs also deceptively allege that Coinbase posted a "FAQ the morning of December 19th" that falsely characterized its plans with respect to BCH.  SAC ¶ 165.  But the FAQ in question was, by its own clear terms, posted on and dated "August 30, 2017." *See* Arenson Decl. Ex. 4.
[6] Plaintiffs falsely attribute these quotes to defendant Farmer. *See* Arenson Decl. Ex. 5.

1    orderly market." *Id.*  Of course, this was not a guarantee—nor could anyone have provided a

2    guarantee—that, months in the future, when Coinbase decided to offer trading in BCH, the

3    market would function flawlessly from the start.  It was, at most, a statement of intent to "invest[]

4    significant time and care in supporting [BCH] securely," which Coinbase did.  *Id.*  Plaintiffs do

5    not allege that Coinbase failed to keep their BCH "secure."  And Coinbase's obligations with

6    respect to "security" are defined by the User Agreement to which all Plaintiffs agreed.  *See*

7    Arenson Decl. Ex. 1.  Plaintiffs do not contend that Coinbase breached those obligations.

8            Plaintiffs also seek to rely on a memorandum—the "GDAX Digital Asset Framework"—

9    that Coinbase published in November 2017.  SAC ¶ 20.  Once again, Plaintiffs do not contend

10   that this Framework contained any specific false or misleading statement.  Instead, they argue that

11   it gave "Class members the *impression* that Coinbase would not launch a new currency unless

12   there was liquidity and sufficient market capitalization and that the Company had considered the

13   new asset's 'trade velocity' and the risk of launching it…."  *Id.* ¶ 22 (emphasis added).  But

14   Plaintiffs rest that "impression" on a selective reading of the Framework.  Indeed, its opening

15   lines make plain that it was simply "designed to provide insight into how we evaluate digital

16   assets for listing on GDAX" and that Coinbase "reserve[s] *full and absolute discretion* to list, not

17   list, or de-list any asset for trading on GDAX *regardless of how the criteria in this framework*

18   *may apply to the asset*."  *See* Arenson Decl. Ex. 6, p.2 (emphases added).  And, again, by signing

19   the User Agreement, Plaintiffs expressly "acknowledge[d] and agree[d]" to Coinbase's "sole

20   discretion" about whether to support forked assets such as BCH.  *Id.*, Ex. 1, pt. 1 ¶ 3.8.  In any

21   event, whether there was "sufficient market capitalization" and "liquidity" are necessarily

22   subjective assessments, even in retrospect.  Plaintiffs cannot substitute their hindsight judgment

23   for Coinbase's real-time decisions and then cry fraud.  At most, Plaintiffs plead that Coinbase

24   failed to accurately predict how the launch would unfold—not that they lied.  A UCL "unfair"

25   claim premised on "false or misleading" statements that were, in fact, neither, cannot survive.

26   *See Sperling v. Stein Mart, Inc.*, 291 F. Supp. 3d 1076, 1086 (C.D. Cal. 2018).

27            **2.      Coinbase's alleged conduct was not an unlawful business practice.**

28       To allege an "unlawful" business practice under the UCL, Plaintiffs must show that

7

1315306

Coinbase has violated some *other* law.  *See Farmers Ins. Exch. v. Super. Ct.*, 2 Cal. 4th 377, 383 (1992).  In the SAC, Plaintiffs allege that Coinbase's conduct violated three regulatory regimes: one the Court has heard before—the Commodities Exchange Act (CEA); and two new "hooks"— the FinCEN "Know Your Customer" ("KYC") rules, and the New York State "BitLicense" regulations.  *See* SAC ¶¶ 218–228.  As detailed below, none of these regimes applies here.

### a.    Commodities Exchange Act

Plaintiffs claim once again that Coinbase violated the anti-manipulation provisions of the CEA.  This Court has already rejected this argument once, and none of the allegations Plaintiffs have added to their SAC commands a different outcome.  First, Plaintiffs still fail to establish that BCH is a "commodity" subject to the CEA.  The CEA limits covered "commodities" to various agricultural products and "other goods and articles … and all services, rights, and interests … in which contracts for future delivery are presently or in the future dealt in."  7 U.S.C. § 1a(9).  Thus, unless there existed a futures market *in BCH* at the time of the alleged misconduct, the CEA simply does not apply.  *See id.*; *U.S. v. Brooks*, 681 F.3d 678, 694 (5th Cir. 2012).  As before, Plaintiffs make no allegation of any then-extant futures market in BCH.

Second, even if the CEA somehow applied to BCH, Plaintiffs still have not pleaded market manipulation.  Fraud-based manipulation under Rule 180.1 requires "a material misrepresentation (or omission)," *CFTC v. Kraft Foods Grp., Inc.*, 153 F. Supp. 3d 996, 1011 (N.D. Ill. 2015), and as explained above, Plaintiffs have not identified *any* false or misleading statements.  Non-fraud-based manipulation under Rule 180.2 requires that "(1) the defendants possessed the ability to influence prices, (2) an artificial price existed, (3) the defendant caused the artificial price and (4) the defendant specifically intended to cause the artificial price."  *U.S. v. Reliant Energy Servs., Inc.*, 420 F. Supp. 2d 1043, 1056 (N.D. Cal. 2006) (citation omitted).  In the SAC—as in the FAC before it—Plaintiffs provide mere "formulaic recitations of the elements of a cause of action" without "factual allegations" that "raise a right to relief above the speculative level" to the "plausible" level.  *Twombly*, 550 U.S. at 555–56.

An artificial price is one that "does not reflect basic forces of supply and demand."  *CFTC v. Wilson*, No. 13 CIV. 7884 (RJS), 2018 WL 6322024, at *13 (S.D.N.Y. Nov. 30, 2018) (citation

8

1   omitted).  But the only coherent theory provided for the increase in the BCH price is that its

2   listing on Coinbase *increased demand*.  Plaintiffs seek to satisfy the first element of Rule 180.2—

3   ability to influence prices—by alleging that a digital asset is more valuable to consumers simply

4   because Coinbase chooses to support it.  *See, e.g.*, SAC ¶ 14.  But the ability to influence *demand*

5   for an asset does not imply—let alone demonstrate—an ability to create an *artificial price* not

6   reflective of supply and demand.  Plaintiffs are not the first to confuse these distinct issues:

7           [T]he CFTC … resorts to a tautological fallback argument that endeavors to
        conflate artificial prices with the mere intent to affect prices. … [T]he CFTC
8       essentially argues that *any* price influenced by Defendants' bids was "illegitimate,"
        and by definition "artificial," because Defendants understood and intended that the
9       bids would have an effect on the settlement prices.

10  *Wilson*, 2018 WL 6322024, at *14.  The court in *Wilson* rightly held that "[t]his theory … finds

11  no basis in law" and "is simply an attempt to read out the artificial price element … by collapsing

12  it into the subjective intent requirement."  *Id.* at *15.  Here, too, Plaintiffs assert that Coinbase

13  was *capable* of affecting BCH prices, but fail to show that prices were *artificial*, or explain why

14  they would be.  As the Ninth Circuit has explained: "When faced with two possible explanations,

15  only one of which can be true and only one of which results in liability, plaintiffs cannot offer

16  allegations that are 'merely consistent with' their favored explanation but are also consistent with

17  the alternative explanation."  *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1108 (9th

18  Cir. 2013) (citations omitted).  Here, an "innocuous alternative explanation" comes straight from

19  Plaintiffs' own complaint: that the BCH prices moved in response to a *bona fide* change in

20  demand because "whether and how Coinbase supports a particular cryptocurrency on its platform

21  … is especially important for retail customers" and "directly impacts the price of that currency,"

22  SAC ¶ 14.  *See Eclectic Properties E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 998 (9th

23  Cir. 2014).  Thus, "Plaintiffs have not met their burden to do 'something more' to 'render their

24  allegations plausible within the meaning of *Iqbal* and *Twombly*.'"  *Id.* at 999 (citation omitted).

25          And Plaintiffs have still not adequately pleaded *scienter*.  Their "threadbare recital[]" that

26  "[t]he entire process of the sudden Launch" had the "intended purpose of artificially inflating the

27  price of BCH," SAC ¶ 227, is "not entitled to the assumption of truth."  *Iqbal*, 556 U.S. at 679

28  (2009).  Nor is their purported rationale for Coinbase's supposed attempt to manipulate the price

1315306

1   of BCH: "to draw customer [sic] and miners away from BTC, to avoid losing customers to the

2   CME upon the launch of BTC futures, and to aid and abet insiders … who were pumping and

3   planned to dump BCH at the Launch."  SAC ¶ 247; *see also id.* ¶ 45.  This is their third attempt,

4   and Plaintiffs still provide no cogent explanation of why Coinbase would have sought to "aid and

5   abet" unnamed "insiders" in violating Coinbase's policy against insider trading and manipulation.

6   *See id.* ¶ 114; Arenson Decl. Ex. 2 ¶¶  3.12–3.14, 4.7.

7                    **b.    FinCEN rules**

8           Next, Plaintiffs claim that Coinbase violated the FinCEN "Know Your Customer"

9   ("KYC") Rules by failing "to adopt policies to monitor transactions and to manage risk and to

10  report suspicious activity."  SAC ¶ 221.  Plaintiffs provide only the vaguest explanation of

11  Coinbase's supposed obligations under the KYC rules—likely because those regulations are

12  intended to prevent money laundering and have little to do with the conduct Plaintiffs allege.  The

13  "monitoring" required by the KYC regulations envisions "an effective anti-money laundering

14  program … that is reasonably designed to prevent the money services business from being used to

15  facilitate money laundering and the financing of terrorist activities."  31 C.F.R. § 1022.210(a).

16  The "reporting" requirements are similarly inapplicable: they reach only transactions that are

17  "conducted or attempted by, at, or through" the regulated money services business.  31 C.F.R.

18  § 1022.320(a)(2).  When Plaintiffs accuse Coinbase of failing to report "suspicious trading," they

19  mean trading *prior* to the BCH launch on Coinbase—which necessarily must have occurred on

20  *other* exchanges (if at all).  *See* SAC ¶¶ 114, 162–163, 222.  The FinCEN rules do not apply here.

21                    **c.    New York State regulations**

22          Plaintiffs next hitch their *California* UCL claim to a *New York* state regulation.  By its

23  own terms, that "BitLicense" regulation applies only to certain activities "*involving New York or*

24  *a New York Resident*."  N.Y. Comp. Codes R. & Regs. tit. 23, § 200.2(q) (emphasis added).

25  Defendants are unaware of ***any*** authority for predicating a California UCL claim on a foreign law

26  not applicable in California.  Certainly, the types of laws that can be "borrowed" under the

27  unlawful prong have "been liberally construed so as" to prevent business practices that are

28  "forbidden by law."  *People v. E.W.A.P. Inc.*, 106 Cal. App. 3d 315, 318–19 (1980).  But the term

1    "unlawful" in the statutory text has always been read, as it must be, to mean unlawful *in*

2    *California*.  Holding otherwise would produce absurd results: should two foreign jurisdictions

3    adopt mutually exclusive regulations, every business in California would be subject to liability.

4    California has no legitimate interest in enforcing foreign regulations enacted to protect non-

5    California-residents.  *See Norwest Mortg., Inc. v. Superior Court*, 72 Cal. App. 4th 214, 222

6    (1999) (presumption that legislature "did not intend the statutes of this state to have force or

7    operation beyond the boundaries of the state."); *cf. Diaz v. Kay-Dix Ranch*, 9 Cal. App. 3d 588,

8    592–93 (1970) ("unlawful" prong encompasses federal immigration law because Californian

9    plaintiffs were intended "beneficiaries" of the policy);

10          But even if violations of New York state regulations could form the basis of a UCL claim,

11   Plaintiffs have not alleged such violations here.  First, as explained above and in previous motions

12   to dismiss, Plaintiffs have not alleged any false, misleading, or deceptive statements, or any

13   fraudulent activity.  Second, Plaintiffs do not contend that Coinbase failed to maintain a written

14   anti-fraud policy.  Finally, Plaintiffs do not claim that they were in the dark about the size of their

15   transactions; at most, they claim they paid more for *each unit* of BCH than anticipated, not that

16   the total dollar amount of their transactions was anything but what they expected and intended.

17          **B.       Plaintiffs fail to state a claim for negligence.**

18          Plaintiff alleges that Coinbase was negligent "when it suddenly opened BCH for full

19   trading before it was fully prepared to do so."  SAC ¶ 232.  Once again, Plaintiffs renew an

20   argument this Court has already rejected in their previous complaint, and once again, they fail to

21   overcome the preexisting flaws.  Because the Court instructed Plaintiffs to "describe the scope or

22   content of Coinbase's duty in … more than broad generalities," Order 3, they now rely on recent

23   changes to Coinbase's policies—which they mischaracterize.  What Plaintiffs fail to explain is

24   why Coinbase had a duty to follow those policies months *before* they were introduced.  And,

25   most fundamentally, Plaintiffs still do nothing to explain "why the rollout of Bitcoin Cash would

26   have gone more smoothly had Coinbase done whatever Berk thinks is appropriate."  *Id.*

27          **1.       Coinbase had no special relationship with Plaintiffs and no duty.**

28   The existence of a duty is "[t]he threshold element of a cause of action for negligence,"

11

1315306

and "is a question of law to be resolved by the court." *Quelimane Co. v. Stewart Title Guar. Co.*, 19 Cal. 4th 26, 57 (1998), as modified (Sept. 23, 1998) (citation omitted).  Plaintiffs contend Coinbase had a duty to prevent their purely economic harm.  "Recognition of a duty to … prevent purely economic loss … is the exception, not the rule, in negligence law," and is limited to plaintiffs with a "special relationship" to the defendant.  *See id*. at 58.  The first factor in determining the existence of a special relationship is "the extent to which the transaction was intended to affect the plaintiff." *Id.*  Thus, "[c]ourts routinely reject negligence theories proceeding on the special relationship doctrine in situations such as this where a plaintiff fails to allege, nor could it, that the [defendant] marketed a product with the *specific plaintiff in mind* rather than the general public." *Morgan v. Apple Inc.*, No. 17-CV-05277-RS, 2018 WL 2234537, at *9 (N.D. Cal. May 16, 2018) (emphasis added).  Here, Plaintiffs have not shown that Coinbase *specifically* intended to affect them—much less the entire class they purport to represent—as opposed "the general public."  Nor could they; Coinbase could not have intended to specifically affect an unidentifiable group of *potential* customers.  "No appellate authority addressing negligent liability for purely economic loss to third parties has found the existence of a duty of care in the absence of the first factor." *S. Cal. Gas Leak Cases*, 18 Cal. App. 5th 581, 590 (2017).

The economic loss rule "prevent[s] the law of contract and the law of tort from dissolving one into the other," and "is designed to limit liability in commercial activities that negligently or inadvertently go awry." *Robinson Helicopter Co. v. Dana Corp.*, 34 Cal. 4th 979, 988, 991 n.7 (2004).  Here, Coinbase's duties vis-à-vis Plaintiffs were governed not by the law of negligence, but by the law of contract and, specifically, the User Agreement between the parties.  Plaintiffs have not alleged a breach of that agreement, and therefore cannot recover purely economic losses.

### 2. Even if Coinbase owed Plaintiffs a duty, it did not breach it.

Plaintiffs now contend that Coinbase was negligent because it failed to follow its own "New Asset Listing Process." SAC ¶¶ 7, 233.  But Plaintiffs concede that this policy did not exist until it was announced in a September 25, 2018 blog post, more than nine months after the BCH launch.  Plaintiffs cannot explain why Coinbase had a duty to follow procedures that it had not announced or even conceived at the time of the BCH launch.  Announcing new policies is not a

"tacit admission" of anything, *id.* ¶¶ 7, 48; it is a manifestation of Coinbase's continuous efforts to improve its product in furtherance of its "mission to make Coinbase the most trusted, safe, and easy-to-use digital currency exchange," *id.* ¶ 171.[7]  (And, of course, retroactively punishing companies for policies they develop in the future would be disastrous public policy.)

Further, it is unsurprising that the price of BCH climbed in the hours after the launch—Plaintiffs contributed to that climb, and presumably had hoped to capitalize on it.  As Plaintiffs allege, a listing on Coinbase is a "golden ticket for a digital asset." *Id.* ¶ 14.  That prices rose, as Plaintiffs expected, by no means indicates "negligence," and Plaintiffs fail to explain why those prices would have been any less impacted if Coinbase had announced its plans further in advance.

Next, after admitting that class members "put in market orders (orders that the purchases be filled at market prices)," Plaintiffs complain about "slippage"—that is, that their market-order trades filled at "prices far above what was originally quoted to them." *Id.* ¶ 37.  But "slippage" for a new asset in high demand is hardly surprising.  In fact, all Plaintiffs agreed to Trading Rules that expressly disclosed the possibility of "significant[]" slippage on market orders:

> **There is no guarantee that a Market Order will Fill at the price specified.  A Market Order may Fill at a number of different prices**, based on the quantity of the Market Order and the quantities of the existing Orders on the Order Book at the time. … **[T]he Market Order may Fill at a price less favorable than the most recent trade price, in some cases significantly so**.  This is commonly referred to as 'slippage'.

Arenson Decl. Ex. 2 ¶¶ 1.10–1.12 (emphases added).  Moreover, the Trading Rules provided options to avoid slippage: traders could place a "Limit Order [that] will only ever Fill at the specified price or a better price," and they could apply "Time in Force" instructions to ensure their orders were either filled immediately or cancelled. *Id.* ¶¶ 1.4, 1.6–1.7, 1.19.  Plaintiffs cannot assert ignorance or irrelevance of the Trading Rules to which they agreed; the "Price-Time Priority" method of filling orders specified in the Trading Rules is referenced in the SAC at least eight times.  *See* SAC ¶¶ 4, 34, 35, 43, 103, 168, 173, 181; *see also* Arenson Decl. Ex. 2 ¶¶ 1.23–1.25, 6.  Plaintiffs do not allege that Coinbase executed their trade instructions in a way other than

---

[7] Plaintiffs also mischaracterize these new procedures.  Far from "requir[ing] Coinbase to pre-announce the listing of a new asset far in advance," SAC ¶¶ 7, 233, they state that Coinbase "expect[s] to publicly announce the addition of new assets only *at or near the time of public launch* across one or more Coinbase products." *See* Arenson Decl. Ex. 7 (emphasis added).

13

1    as agreed in the User Agreement and Trading Rules.  To the contrary, they allege Coinbase filled

2    their orders consistent with their own instructions and Coinbase's Trading Rules.

3           Finally, Plaintiffs again complain that shortly after Coinbase opened trading, it decided to

4    close the order book and "cancel[] 'resting orders'" to ensure that they were not filled at

5    "inflated" prices.  SAC ¶ 176–177.[8]  Plaintiffs characterize Coinbase's actions as part of some

6    nefarious scheme, although they cannot decide to what end.  They argue both that Coinbase

7    "clos[ed] down trading" to "avoid a 'run' on the Company by *sellers* anxious to take advantage of

8    the inflated price," and also that Coinbase "halted sales before it would have had to sell out its

9    own reserve of BCH" due to excess demand from *buyers*.[9]  SAC ¶¶ 4, 46 (emphases added).

10   Again, Plaintiffs offer contradictory motives for Coinbase's conduct in a failed effort to identify

11   some wrongful act.  But there is a much more benign and logical explanation for why the order

12   book was temporarily closed: to protect customers.  Indeed, the User Agreement and Trading

13   Rules specifically contemplated and permitted these sorts of steps.  The User Agreement put

14   Plaintiffs on notice that "Coinbase reserves the right to refuse to process, or to cancel or reverse,

15   any purchases or sales of Digital Currency in its sole discretion," and—as stated in all-capital

16   letters—that Coinbase does not guarantee that its services will be "continuous, uninterrupted,

17   timely, or error-free."  Arenson Decl. Ex. 1, pt. 1 ¶¶ 4.5, 8.3.  The Trading Rules explained that if

18   "technical reasons prevent or degrade Traders' ability to place or cancel Orders … or affect the

19   operation of GDAX Order Books or matching engines, then Coinbase may, in its discretion, …

20   Cancel Open Orders [or] Disable the ability to place new Orders…."  *Id.*, Ex. 2 ¶ 3.4.

21                     **3.    Coinbase's conduct did not cause harm to Plaintiffs.**

22          To state a claim for negligence, Plaintiffs must establish that Coinbase's conduct caused

23   their alleged harm.  They fail.  As discussed above, there is no allegation that Coinbase executed

24   their orders in a manner inconsistent with Plaintiffs' instructions or Coinbase's User Agreement

25   ────────────────

     [8] For Plaintiffs Periaswami and Younts—whose only attempted transactions were sales—this is
26   their *only* complaint.  They purport to have a claim against Coinbase because they were *unable to
     sell* BCH at allegedly inflated prices.  Ironically, had they made the sales Coinbase allegedly
27   prevented, their counterparties would presumably be putative class members in this case.

     [9] Plaintiffs do not explain how such a "run" could occur, or why Coinbase would have been
28   *compelled* to buy or sell BCH from or to anyone, much less at any particular price.

─────────────────────────────────────────
                                          14
1315306

1   and Trading Rules.  What *might have* happened if Coinbase had announced its launch plans "far

2   in advance," as Plaintiffs now propose, is pure speculation.  Plaintiffs do not explain why they

3   would have paid less for BCH if Coinbase had given them more notice.  Nor can they allege that

4   Coinbase's conduct in temporarily closing the order book caused them any harm—because that

5   would require them to show that, but for Coinbase's decision to close the order book, they would

6   have found willing buyers at prices higher than they paid.  At best, they allege that "Coinbase

7   froze the market at about $9,000 per BCH."  But that does not mean that Plaintiffs, wherever their

8   price-time priority for selling was, would have found a buyer at that, or any other, price.

9        When it comes to damages, some of the newly identified Plaintiffs have an even more

10   tenuous claim.  For Periaswami and Younts, their only alleged activity was an *attempt* to sell

11   BCH at prices their co-Plaintiffs allege were "artificially inflated."  SAC ¶ 35.  There is a real

12   tension: how can Coinbase have been negligent in allowing prices to soar *and simultaneously*

13   negligent in denying them the opportunity to sell at inflated prices?  These sell-side Plaintiffs'

14   complaint, as with their co-Plaintiffs', is that they gambled on a new digital asset and did not win.

15   Coinbase neither caused that misfortune, nor is responsible for insuring Plaintiffs against it.

16        **C.**    **Plaintiffs fail to state a claim for fraud.**

17        Plaintiffs contend that Defendants engaged in fraud by (i) making "material

18   misrepresentations of fact," (ii) failing to disclose "if and when Coinbase would support the

19   launch of BCH," and (iii) making misstatements about "Coinbase's compliance with relevant

20   regulations and rules pertinent to its operations."  SAC ¶¶ 245, 250, 255, 260, 265, 270.  Each of

21   these allegations is addressed above.  Without a single material misrepresentation or a plausible

22   theory of *scienter*, Plaintiffs cannot state a claim for fraud, and all six counts based on common

23   law fraud should be dismissed in their entirety.

24   **III.**    **CONCLUSION**

25        Defendants respectfully request that the SAC be dismissed in its entirety—with prejudice.

26   Plaintiffs have taken three swings and missed each time.  There is no reason to permit a fourth.

27   *Allen v. City of Beverly Hills*, 911 F.2d 367, 373–74 (9th Cir. 1990).

28

1

2      Dated:  December 20, 2018                              KEKER, VAN NEST & PETERS LLP

3                                                     By:     /s/ Steven P. Ragland
4                                                             STEVEN P. RAGLAND

5                                                             Attorneys for Defendants
                                                              COINBASE, INC., BRIAN ARMSTRONG
6                                                             and DAVID FARMER

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT & MPA
Case No. 3:18-cv-01364-VC

1315306