PAGES 1 – 81

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE VINCE CHHABRIA

JEFFREY BERK, ON BEHALF OF HIMSELF )
AND ALL OTHERS SIMILARLY SITUATED, )
                                )
         PLAINTIFF,         )
                                )
  VS.                           ) NO. 18-CV-01364 VC
                                )
COINBASE, INC., A DELAWARE       )
CORPORATION D/B/A GLOBAL DIGITAL   )
ASSET EXCHANGE ("GDAX"), BRIAN    )
ARMSTRONG AND DAVID FARMER,      )
                                ) SAN FRANCISCO, CALIFORNIA
        DEFENDANTS.        ) THURSDAY
                                ) SEPTEMBER 27, 2018
_____ )

**TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND**

**RECORDING  10:31 A.M. – 12:13 P.M.**

**APPEARANCES**:

**FOR PLAINTIFF**         THE GRANT LAW FIRM, PLLC
                        521 FIFTH AVENUE, 17TH FLOOR
                        NEW YORK, NEW YORK 10175
             BY:  **LYNDA J. GRANT, ESQUIRE**

                        GREEN & NOBLIN, P.C.
                        2200 LARKSPUR LANDING CIRCLE, SUITE 101
                        LARKSPUR, CALIFORNIA 94939
             BY:  **ROBERT S. GREEN, ESQUIRE**

**TRANSCRIBED BY:  JOAN MARIE COLUMBINI, CSR #5435, RPR**
                    **RETIRED OFFICIAL COURT REPORTER, USDC**

1    **APPEARANCES (CONTINUED):**

2    **FOR DEFENDANTS**            KEKER, VAN NEST & PETERS LLP
                                    633 BATTERY STREET
3                                   SAN FRANCISCO, CALIFORNIA  94111
                            BY:    **STEVEN P. RAGLAND, ESQUIRE**
4                                  **ERIN E. MEYER, ESQUIRE**

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   THURSDAY, SEPTEMBER 27, 2018                    10:31 A.M.
 2   (TRANSCRIBER'S NOTE: DUE AT TIMES TO COUNSELS' FAILURE TO
 3   IDENTIFY THEMSELVES WHEN SPEAKING, CERTAIN SPEAKER
 4   ATTRIBUTIONS ARE BASED ON EDUCATED GUESS.)
 5                        ---O0O---
 6                        PROCEEDINGS
 7        THE CLERK:  CALLING CASE NO. 18-CV-1364 BERK VERSUS
 8   COINBASE, INC., ET AL.
 9            COUNSEL, PLEASE STEP FORWARD AND STATE YOUR
10   APPEARANCES FOR THE RECORD.  AND, COUNSEL, BE SURE TO ADJUST
11   THE MICROPHONE SO IT'S DIRECTLY IN FRONT OF YOU.
12        MR. GREEN:  GOOD MORNING, YOUR HONOR.  ROBERT GREEN
13   FOR PLAINTIFFS.
14        THE COURT:  GOOD MORNING.
15        MS. GRANT:  GOOD MORNING, YOUR HONOR.  LYNDA GRANT
16   FOR PLAINTIFFS.
17        THE COURT:  GOOD MORNING.
18        MS. MEYER:  GOOD MORNING, YOUR HONOR, ERIN MEYER;
19   KECKER, VAN NEST & PETERS FOR DEFENDANT, ALL THREE DEFENDANTS.
20        THE COURT:  GOOD MORNING.
21        MR. RAGLAND:  GOOD MORNING, YOUR HONOR.  STEVEN
22   RAGLAND, ALSO WITH KECKER, ALSO ON BEHALF OF COINBASE.  WITH US
23   IS SARAH GAMBLIN, REPRESENTATIVE OF COINBASE.
24            FOR THIS ARGUMENT, MS. MEYER WILL BE HANDLING THE
25   ARBITRATION MOTION.  I'LL BE HANDLING THE MOTION TO DISMISS.
```

1          **THE COURT:**  OKAY.  THAT SOUNDS GOOD.

2          AND ALTHOUGH ONE WOULD NORMALLY EXPECT US TO BEGIN BY

3   DISCUSSING THE ARBITRATION MOTION, I WOULD ACTUALLY LIKE TO

4   START BY DISCUSSING THE MOTION TO DISMISS, BECAUSE I THINK THAT

5   DISCUSSION MAY HELP ME DEVELOP A BETTER UNDERSTANDING OF THE

6   CLAIMS, WHICH MAY BETTER INFORM OUR DISCUSSION ON THE

7   ARBITRATION ISSUE AND WHETHER THOSE CLAIMS ARISE UNDER THE

8   CONTRACT.

9          SO, ON THE MOTION TO DISMISS, WHICH OF YOU WILL BE --

10  OR BOTH?

11         **MS. GRANT:**  WELL, YOUR HONOR, I THINK DEPENDING ON

12  THE ISSUE, WE'VE SORT OF DIVIDED IT.

13         **THE COURT:**  THAT'S FINE.  YOU CAN TAG TEAM ME.

14         BUT THE THING ABOUT THIS -- LET ME LET YOU -- TAKE

15  YOUR TIME.  TAKE YOUR TIME NO RUSH.

16         **MS. GRANT:**  (INDISCERNIBLE.)

17         **THE COURT:**  ONE OF THE LAWYERS GOT STUCK ON BART OR

18  SOMETHING LIKE THAT.

19         **MS. GRANT:**  OKAY.

20         **THE COURT:**  ALL SET?

21         **MS. GRANT:**  YES.  THANK YOU.

22         **THE COURT:**  SO THIS, OBVIOUSLY, IS A -- IS A -- YOU

23  KNOW, KIND OF A BRAVE NEW WORLD THAT WE'RE DISCUSSING IN THIS

24  LAWSUIT, RIGHT?  AND IT'S NOT A WORLD THAT I'M REMOTELY

25  FAMILIAR WITH.  AND SO, WHAT I'M -- LET ME SEE IF I CAN SORT OF

1    LAY OUT THE STORY THAT YOU'RE TELLING IN THE COMPLAINT.

2              YOU HAVE COINBASE, WHICH IS THIS EXCHANGE ON WHICH

3    BITCOIN COULD BE TRADED.  THERE WAS A DECISION AT SOME POINT TO

4    FORK THE BLOCK CHAIN -- IS THAT THE RIGHT WAY TO SAY IT?

5         **MS. GRANT:**  OKAY.  WE CAN GO WITH THAT.

6         **THE COURT:**  NO.  IF IT'S THE WRONG WAY TO SAY IT,

7    TELL ME.

8         **MS. GRANT:**  NO, THERE WAS A FORK IN THE BITCOIN BLOCK

9    CHAIN, YES.

10        **THE COURT:**  OKAY.  SO THE SHADOWY GROUP OF PEOPLE WHO

11   ARE RESPONSIBLE FOR THE BITCOIN BLOCK CHAIN MADE A DECISION

12   THERE SHOULD BE A FORK IN THE BITCOIN BLOCK CHAIN, LEAVING US

13   WITH THE OLD BITCOIN BLOCK CHAIN AND THE NEW BITCOIN CASH BLOCK

14   CHAIN, RIGHT?

15             AND COINBASE INITIALLY STATED THAT IT WAS NOT GOING

16   TO SUPPORT TRADING IN BITCOIN CASH, I GATHER BECAUSE THERE WERE

17   CONCERNS ABOUT WHETHER THE TRANSACTIONS WERE SECURE OR WHETHER

18   THE FINANCES INVOLVED IN THOSE TRANSACTIONS WOULD BE SECURE, OR

19   SOMETHING ALONG THOSE LINES.

20        **MS. GRANT:**  CORRECT.

21        **THE COURT:**  RIGHT SO FAR?

22        **MS. GRANT:**  YES.

23        **THE COURT:**  OKAY.  AND THEN AT SOME POINT COINBASE

24   MADE AN ANNOUNCEMENT THAT IN JANUARY -- I CAN'T REMEMBER WHAT

25   YEAR IT WAS, BUT IN JANUARY WE ARE GOING TO -- WE ARE GOING TO

1    SUPPORT COINBASE -- EXCUSE ME -- BITCOIN CASH, TO A DEGREE, BUT

2    IT WAS TO A LIMITED DEGREE.  IT WAS JUST -- THE IDEA, I THINK,

3    WAS JUST THAT PEOPLE WERE GOING TO BE ABLE TO GET CASH FOR

4    THEIR BITCOIN CASH THROUGH COINBASE; IS THAT CORRECT?

5              **MS. GRANT:**  WELL, THEY WOULD BE ABLE TO WITHDRAW

6    THEIR COINS.

7              **THE COURT:**  WITHDRAW THEIR COINS.

8              **MS. GRANT:**  CORRECT.

9              **THE COURT:**  THEIR BITCOIN CASH?

10             **MS. GRANT:**  THAT'S CORRECT.  SO THAT'S JUST

11   WITHDRAWALS, NOT TRADING.

12             **THE COURT:**  GOT IT.  JUST WITHDRAWALS.

13             SO -- SO BEFORE THAT TIME, EVEN THOUGH THE BLOCK

14   CHAIN HAD FORKED AND PEOPLE WHO HAD THEIR BITCOIN IN COINBASE

15   NOW HAD BITCOIN CASH IN COINBASE, COINBASE WAS NOT ALLOWING

16   PEOPLE TO GET -- TO WITHDRAW THEIR BITCOIN CASH, AND THEN THEY

17   ANNOUNCED THEY WOULD START ALLOWING PEOPLE TO WITHDRAW THEIR

18   BITCOIN CASH IN JANUARY; IS THAT RIGHT?

19             **MS. GRANT:**  THAT IS TRUE, YOUR HONOR.

20             **THE COURT:**  AND THAT --

21             **MS. GRANT:**  THERE'S ANOTHER ASPECT ALSO.  THAT IS

22   SOME OF THE --

23             **THE COURT:**  THAT'S TRUE SO FAR?

24             **MS. GRANT:**  YES, BUT THAT'S JUST PART OF THE CLASS.

25   I MEAN, TO BE HONEST, THERE WERE PEOPLE LIKE --

1          **THE COURT:**  WELL, THAT'S PART OF THE CLASS, BUT

2     THAT'S NOT -- THAT'S -- TO A LAY PERSON LIKE ME THAT SEEMS

3     RATHER REMARKABLE, RIGHT?

4          **MS. GRANT:**  YES.

5          **THE COURT:**  THAT COINBASE WOULD SAY, OKAY, YOU'RE --

6     TO USE, I GUESS, A ROUGH ANALOGY:  YOUR BITCOIN STOCK HAS SPLIT

7     INTO, YOU KNOW, HALF BITCOIN SHARES AND HALF BITCOIN CASH

8     SHARES, AND YOU ARE NOT GOING TO HAVE THE ABILITY TO WITHDRAW

9     YOUR BITCOIN CASH SHARES FROM OUR EXCHANGE, TO USE A ROUGH

10    ANALOGY.  THAT SEEMS RATHER REMARKABLE TO ME IF THE ANALOGY I'M

11    DRAWING IS CORRECT, AND MAYBE IT'S NOT, BUT THAT'S NOT YOUR

12    LAWSUIT, RIGHT?

13         **MS. GRANT:**  THAT'S PART OF IT.

14         **THE COURT:**  YOU ARE NOT -- BUT YOU DON'T HAVE A CLAIM

15    BASED ON THAT?  YOU DON'T HAVE A CLAIM THAT SAYS:  THEY DIDN'T

16    LET US WITHDRAW OUR BITCOIN CASH AND WE ARE DAMAGED BY THAT.

17         **MS. GRANT:**  THAT IS -- WE DO NOT HAVE A SEPARATE

18    CLAIM ON THAT.

19         **THE COURT:**  YOU TAKE THEM TO TASK --

20         **MS. GRANT:**  YES.

21         **THE COURT:**  -- IN YOUR COMPLAINT FOR DOING THAT, BUT

22    IT'S REALLY JUST KIND OF ATMOSPHERICS, RIGHT, YOU DON'T HAVE A

23    CLAIM BASED ON IT?

24         **MS. GRANT:**  THAT IS TRUE, ALTHOUGH IT'S A LITTLE BIT

25    MORE THAN ATMOSPHERICS BECAUSE IT GOES TO THE COMMODITIES

```
 1   CLAIM, WHICH I DON'T WANT TO GET INTO UNTIL THE COURT WANTS TO
 2   DISCUSS IT, BUT THERE WAS A WHOLE ISSUE WHETHER THERE WAS A
 3   SWAP TRANSACTION, IT'S A FORWARD CONTRACT, IT'S A FUTURES
 4   CONTRACT, AND THE CONTROL BY THE CUSTOMERS OVER THEIR COINS IS
 5   AN ISSUE.
 6           THE COURT:  RIGHT, BUT -- I UNDERSTAND WHERE YOU'RE
 7   GOING WITH THAT, BUT JUST TO FINISH LAYING OUT --
 8           MS. GRANT:  SURE.
 9           THE COURT:  -- THE CONDUCT THAT YOU'RE COMPLAINING
10   OF, YOU DO NOT HAVE A CLAIM BASED ON COINBASE'S ANNOUNCEMENT
11   THAT IT'S NOT GOING TO ALLOW PEOPLE TO WITHDRAW BITCOIN CASH
12   FROM THE EXCHANGE?
13           MS. GRANT:  THAT'S CORRECT.
14           THE COURT:  OKAY.  SO WHAT YOU'RE COMPLAINING ABOUT
15   HAPPENS A LITTLE BIT LATER, RIGHT?  SO IN -- SO COINBASE HAD
16   PREVIOUSLY ANNOUNCED THAT IN JANUARY PEOPLE WERE GOING TO BE
17   ABLE TO START WITHDRAWING BITCOIN CASH, AND -- BUT IN AROUND
18   NOVEMBER, MID NOVEMBER, BITCOIN -- COINBASE DECIDED INTERNALLY
19   THAT IT WOULD NOT ONLY ALLOW PEOPLE TO WITHDRAW BITCOIN CASH,
20   BUT IT WOULD ACTUALLY BEGIN SUPPORTING TRADING IN BITCOIN CASH
21   ON THE EXCHANGE?
22           MS. GRANT:  CORRECT.
23           THE COURT:  SO THEY BEGAN THE PREPARATIONS IN
24   NOVEMBER TO FACILITATE AND SUPPORT TRADING -- FULL TRADING IN
25   BITCOIN CASH ON THE EXCHANGE.
```

1              **MS. GRANT:**  SURE.

2              **THE COURT:**  AND THEN IN MID DECEMBER, SOMETIME IN

3     DECEMBER, DECEMBER.

4              **MS. GRANT:**  DECEMBER 19TH, YES.

5              **THE COURT:**  THEY ANNOUNCED AT, LIKE, 4:00 P.M.

6     THAT -- AND THIS WAS THE FIRST PUBLIC ANNOUNCEMENT.  THIS WAS

7     THE FIRST PUBLIC STATEMENT IN THIS REGARD.

8              **MS. GRANT:**  CORRECT.

9              **THE COURT:**  THEY ANNOUNCED THAT THEY WERE GOING TO

10    SUPPORT TRADING IN BITCOIN CASH, AND THEY ANNOUNCED THAT

11    TRADING WAS GOING TO BEGIN AT, LIKE, 5:30; IS THAT RIGHT.

12             **MS. GRANT:**  RIGHT.

13             **THE COURT:**  AND TRADING BEGAN AT 5:30.  THE PRICE OF

14    BITCOIN CASH SHOT UP VERY QUICKLY AND VERY FAR, AND THEN, LIKE,

15    TWO MINUTES LATER THEY STOPPED TRADING?

16             **MS. GRANT:**  CORRECT.

17             **THE COURT:**  AND THEY -- AND PEOPLE WHO PUT IN THEIR

18    ORDERS FOR BITCOIN CASH DIDN'T -- THEY MIGHT HAVE PUT IN THEIR

19    ORDER AT -- WHEN BITCOIN CASH WAS AT 2,000 OR 4,000, BUT THEIR

20    ORDERS DIDN'T COME -- THE ORDER WAS FILLED AT 16,000 OR

21    12,000 --

22             **MS. GRANT:**  RIGHT.

23             **THE COURT:**  -- OR SOMETHING LIKE THAT, SO THEY GOT A

24    LOT MORE BITCOIN CASH FOR THEIR REAL CASH THAN THEY

25    ANTICIPATED.

1          **MS. GRANT:**  AND ALSO DIFFERENT THAN THE PRICE THAT
2     WAS QUOTED TO THEM.
3          **THE COURT:**  AND DIFFERENT THAN THE PRICE THAT WAS
4     QUOTED TO THEM, AND YOU HAVE SOME ALLEGATIONS ABOUT HOW THERE
5     WAS AN OPPORTUNITY, APPARENTLY, TO CANCEL, BUT YOU HAVE SOME
6     ALLEGATIONS THAT THE CANCEL BUTTON WASN'T WORKING FOR AT LEAST
7     PART OF THE TIME.  OKAY.
8          SO TO ME -- AND THESE MAY BE DUMB QUESTIONS BY THE
9     WAY, QUESTIONS OF A LAY PERSON.
10         **MS. GRANT:**  NO QUESTION --
11         **THE COURT:**  SOMEBODY WHO DOESN'T UNDERSTAND ENOUGH
12    ABOUT HOW THIS SYSTEM WORKS.
13         **MS. GRANT:**  RIGHT.
14         **THE COURT:**  BUT ONE QUESTION I HAVE FOR YOU IS:  HOW
15    SHOULD COINBASE HAVE DONE THIS?  HOW SHOULD COINBASE HAVE
16    ROLLED THIS OUT AND HOW SHOULD COINBASE HAVE EXECUTED THIS TO
17    AVOID THE PROBLEMS THAT OCCURRED?
18         **MS. GRANT:**  WELL, THERE ARE MULTIPLE ISSUES, YOUR
19    HONOR, AND THE COURT HAS GOTTEN THE STORY PRETTY MUCH CORRECT,
20    BUT THERE ARE A FEW OTHER ISSUES.
21         **THE COURT:**  OKAY.
22         **MS. GRANT:**  LIKE THE FACT THAT THERE WAS INSIDER
23    TRADING THAT COINBASE WAS AWARE OF PRIOR TO ITS -- WHAT WE CALL
24    THE LAUNCH OF BCH, WHEN IT DECIDED TO --
25         **THE COURT:**  WELL, YOU DON'T ALLEGE -- IF I REMEMBER

```
 1   CORRECTLY, YOU DON'T ALLEGE IN YOUR COMPLAINT THAT THERE WAS
 2   INSIDER TRADING THAT COINBASE WAS AWARE OF.  IF I RECALL
 3   CORRECTLY -- AND POINT ME TO THE PART OF YOUR COMPLAINT IF I'M
 4   MISSING IT -- BUT MY RECOLLECTION IS YOU ALLEGE THAT THERE WAS
 5   A SPIKE IN BITCOIN CASH PURCHASES RIGHT AROUND THE TIME THAT
 6   COINBASE MADE THE DECISION TO SUPPORT BITCOIN CASH TRADING, AND
 7   THEREFORE, THERE MUST HAVE BEEN INSIDER TRADING.  BUT YOU DON'T
 8   HAVE ANY ALLEGATIONS, IF I -- IF I REMEMBER CORRECTLY, YOU
 9   DON'T HAVE ALLEGATIONS THAT THE BITCOIN EXECUTIVES KNEW THAT
10   INSIDER TRADING WAS GOING ON, AND YOU DON'T ACTUALLY HAVE
11   ALLEGATIONS THAT THERE DEFINITELY WAS INSIDER TRADING GOING ON;
12   YOU JUST SAY THERE MUST HAVE BEEN GIVEN THE PATTERN, WHICH I
13   SORT OF AGREE WITH YOU, THERE PROBABLY -- IT SEEMS LIKE THERE
14   PROBABLY WAS INSIDER TRADING.
15            MS. GRANT:  YES.  AND, VERY INTERESTING, YOUR HONOR,
16   THE NEW YORK ATTORNEY GENERAL, WHO FOR POLITICAL REASONS HAS
17   JUST SWITCHED, HAS JUST COME OUT WITH A REPORT IN WHICH THEY
18   INDICATE, BASED UPON QUESTIONNAIRES THAT HAVE GONE TO SOME OF
19   THE TOP CRYPTO CURRENCY PLATFORMS, INCLUDING COINBASE, THAT, IN
20   FACT, THERE WAS SIGNIFICANT INSIDER TRADING IN ALL OF THESE
21   PLATFORMS, INCLUDING COINBASE AND --
22            THE COURT:  OKAY.  BUT I'M MORE CONCERNED -- THAT
23   KIND OF DISCUSSION MAY BE RELEVANT TO A REQUEST TO AMEND THE
24   COMPLAINT.
25            MS. GRANT:  OKAY.
```

1          **THE COURT:**  BUT I'M MORE CONCERNED RIGHT NOW WITH

2   WHAT'S IN THE COMPLAINT.

3          **MS. GRANT:**  YEAH, I THINK THAT WE DO ALLEGE --

4          **THE COURT:**  WHERE?

5          **MS. GRANT:**  -- THAT THERE'S INSIDER TRADING.

6          WELL, I'M LOOKING AT PARAGRAPH 12 WHERE WE SAY THE

7   WHOLE PURPOSE OF -- I MEAN, THE WHOLE THEORY OF THE CASE

8   BASICALLY IS COINBASE TIPPED THEIR INSIDERS, THEY DIDN'T

9   MONITOR THEM, THEY KNEW FROM THE START --

10         **THE COURT:**  WHERE -- SO SHOW ME THE LANGUAGE IN

11  PARAGRAPH 12 THAT YOU'RE TALKING ABOUT SAYS COINBASE KNEW THERE

12  WAS INSIDER TRADING.

13         **MS. GRANT:**  (AS READ.)

14                "COINBASE INSIDERS WERE ABLE TO

15         SELL INTO THIS MANIPULATED MARKET AT PRICES

16         FAR ABOVE THOSE IN OTHER EXCHANGES THAT

17         REFLECTED AN UNMANIPULATED SUPPLY AND

18         DEMAND."

19         AND I KNOW THERE ARE NUMEROUS ALLEGATIONS ALONG THOSE

20  LINES.  I DON'T WANT TO TAKE THE COURT'S TIME TO SIT HERE AND

21  LOOK AT THEM, BUT THERE'S CERTAINLY --

22         **THE COURT:**  BUT THIS SAYS THAT COINBASE INSIDERS WERE

23  ABLE TO SELL INTO THIS MANIPULATED MARKET, BUT IT DOESN'T -- IT

24  DOESN'T QUITE SAY THAT THERE WAS -- I MEAN, MAYBE THAT -- MAYBE

25  THAT IS THE EQUIVALENT OF SAYING THAT THERE WAS INSIDER

```
 1    TRADING, BUT IT DOESN'T QUITE GO SO FAR AS TO SAY THAT COINBASE
 2    KNEW THERE WAS INSIDER TRADING OR THAT THE PURPOSE -- I MEAN,
 3    ONE OF THE THINGS -- JUST TO TAKE A QUICK STEP BACK, ONE OF THE
 4    THINGS I'M TRYING TO UNDERSTAND IS WHY DID COINBASE DO IT THE
 5    WAY THEY DID IT.
 6             MS. GRANT:  OKAY.
 7             THE COURT:  AND HOW SHOULD THEY HAVE DONE IT IF THEY
 8    WERE CONDUCTING THEMSELVES PROPERLY?
 9             AND I -- AND I DON'T HAVE A GOOD UNDERSTANDING OF
10    EITHER OF THOSE TWO QUESTIONS FROM YOUR COMPLAINT OR FROM THE
11    BRIEFS.  EITHER WHY -- WHY DID COINBASE DO IT THE WAY IT DID
12    IT, HOW DID THAT BENEFIT COINBASE TO DO IT THAT WAY?  I DON'T
13    UNDERSTAND -- I DON'T HAVE A GOOD UNDERSTANDING OF THAT FROM
14    THE ALLEGATIONS IN YOUR COMPLAINT.
15             AND HOW SHOULD COINBASE HAVE DONE IT?  LIKE, WHAT'S
16    THE SIDE-BY-SIDE COMPARISON OF THE BUNGLING THAT YOU
17    DESCRIBED -- OR MAYBE "BUNGLING" IS THE WRONG WORD BECAUSE IT
18    DOESN'T HAVE A NEFARIOUS CONNOTATION, BUT WHAT'S THE
19    SIDE-BY-SIDE COMPARISON OF WHAT YOU DESCRIBE HAPPENED AND WHAT
20    SHOULD HAVE BEEN HAPPENED?
21             MS. GRANT:  WELL, FIRST OF ALL, COINBASE PUT UP A
22    FALSE AND MISLEADING STATEMENT ABOUT WHEN IT WAS GOING TO
23    SUPPORT THIS.  WHEN IT KNEW AND HAD MADE A DECISION THAT IT WAS
24    GOING TO SUPPORT THIS, IT SHOULD HAVE PUBLICLY ANNOUNCED.
25    INSTEAD IT JUST TOLD IT TO INTERNAL PEOPLE.
```

1          **THE COURT:**  AND WHY -- WHY -- I MEAN, AGAIN, THAT'S

2    AN IGNORANT QUESTION, BUT WHY SHOULD THEY HAVE PUBLICLY

3    ANNOUNCED ONCE THEY DECIDED THAT THEY WERE GOING TO SUPPORT

4    TRADING IN BITCOIN CASH?

5          **MS. GRANT:**  WELL, THAT COMES WITH AN UNDERSTANDING OF

6    WHAT THIS MARKET IS LIKE.  THERE ARE NOT A LOT OF PLACES TO

7    TRADE.  THERE ARE ONLY A HANDFUL OF PLATFORMS.  COINBASE IS THE

8    LARGEST PLATFORM AND ONE OF THE FEW THAT TAKES FIAT CURRENCY,

9    MEANING --

10          **THE COURT:**  OKAY.

11          **MS. GRANT:**  I MEAN, I HAVE A COINBASE ACCOUNT.  MAYBE

12    I SHOULDN'T TELL DEFENDANTS THAT.

13          **THE COURT:**  WHY?

14          **MS. GRANT:**  WHY?

15          **THE COURT:**  YEAH.

16          **MS. GRANT:**  BECAUSE I THOUGHT ABOUT TRADING CRYPTO

17    MYSELF.

18          AND THEY'RE ONE OF THE FEW AND I THINK THE FIRST TO

19    TAKE -- YOU CAN SIGN UP WITH YOUR BANK ACCOUNT.  SO THAT'S THE

20    ONLY PLACE WHERE RETAIL INVESTORS CAN GO.

21          **THE COURT:**  OKAY.

22          **MS. GRANT:**  IT'S NOT LIKE YOU CAN GO TO A LOT OF

23    DIFFERENT OTHER PLATFORMS -- NOW, MAYBE NOW THAT WE'RE ARGUING

24    THIS MOTION, THERE ARE MORE PLATFORMS, BUT WE'RE TALKING ABOUT

25    ALMOST A YEAR AGO.  THERE WERE FAR FEWER PLATFORMS --

1          **THE COURT:**  OKAY.

2          **MS. GRANT:**  AND THEY --

3          **THE COURT:**  THERE WERE FEWER -- THERE WERE FEWER

4     PLATFORMS?

5          **MS. GRANT:**  RIGHT.

6          **THE COURT:**  AND, THEREFORE, THAT MEANS IF THEY

7     WERE --

8          **MS. GRANT:**  IF YOU WERE GOING TO MAKE A CHANGE -- I'M

9     SORRY TO TALK OVER YOU.

10          IF YOU'RE GOING TO MAKE A CHANGE AND SUDDENLY START

11     TO SUPPORT BCH, THESE PEOPLE NEED TO KNOW THAT AND MAKE A

12     DECISION WHETHER THEY WANT TO SAY ON YOUR PLATFORM, GO TO

13     ANOTHER PLATFORM, DO THEY NEED TO GO TO ANOTHER PLATFORM TO

14     DECIDE THEIR TRADING STRATEGIES --

15          **THE COURT:**  BUT THAT'S NOT WHAT YOU COMPLAIN ABOUT IN

16     THE LAWSUIT.  THAT'S NOT THE INJURY YOU COMPLAIN ABOUT IN THE

17     LAWSUIT, IS IT?  I MEAN, YOU'RE NOT COMPLAINING THAT THE

18     FAILURE TO DISCLOSE UNTIL THE LAST MINUTE THAT COINBASE WAS

19     GOING TO SUPPORT TRADING IN BITCOIN CASH PREVENTED COINBASE

20     USERS FROM ASSESSING WHETHER THEY WANTED TO STAY IN THAT MARKET

21     OR GO INTO A DIFFERENT MARKET.  YOU'RE COMPLAINING THAT THE

22     PEOPLE WHO TRIED TO BUY BITCOIN CASH IN DECEMBER SOMEHOW GOT

23     THE SHORT END OF THE STICK, AND YOU SEEM TO BE SAYING THAT IF

24     COINBASE HAD DISCLOSED WELL IN ADVANCE THAT IT WAS BEGINNING

25     PREPARATIONS TO SUPPORT TRADING AND IT -- IN BITCOIN CASH, IF

1    COINBASE HAD ANNOUNCED THAT WELL IN ADVANCE AND ANNOUNCED A

2    DATE WELL IN ADVANCE WHEN IT WAS GOING TO START, THEN PEOPLE

3    LIKE YOUR CLIENT WOULDN'T HAVE BEEN INJURED IN THE WAY THAT HE

4    WAS INJURED.

5          BUT I GUESS I'M NOT -- BECAUSE THAT'S NOT EXPLAINED

6    IN THE COMPLAINT, I'M NOT -- I DON'T UNDERSTAND IT.  IT SEEMS

7    TO BE AN ASSUMPTION, A BACKGROUND ASSUMPTION, THAT YOU'RE

8    MAKING, BUT YOU DON'T EXPLAIN WHY THAT'S IN THE COMPLAINT, OR

9    IN YOUR OPPOSITION BRIEF WHY THAT'S THE CASE, AND SO I'M HAVING

10   TROUBLE UNDERSTANDING.

11         **MS. GRANT:**  WELL, I THINK YOU HAVE TO LOOK AT IT

12   HOLISTICALLY, WHICH IS WHAT HAPPENED, WHICH IS THEY TIPPED

13   THEIR INSIDERS -- WE KNOW THERE WAS A SPIKE.  THE VERY WEEKEND

14   THAT THEY TIPPED THEIR INSIDERS, THERE'S A SPIKE IN THE TRADING

15   OF THESE --

16         **THE COURT:**  WHEN YOU SAY --

17         **MS. GRANT:**  YEAH.

18         **THE COURT:**  WHEN YOU SAY THEY TIPPED THEIR

19   INSIDERS --

20         **MS. GRANT:**  RIGHT.

21         **THE COURT:**  I MEAN, WHAT YOU REALLY MEAN BY THAT IS

22   THEY BEGAN MAKING PREPARATIONS TO SUPPORT TRADING IN BITCOIN

23   CASH.

24         **MS. GRANT:**  THAT IS CORRECT.

25         **THE COURT:**  OKAY.

1        **MS. GRANT:**  (INDISCERNIBLE.)

2        **THE COURT:**  SO, YOU KNOW, YOUR USE OF THE WORDS

3  "TIPPED THEIR INSIDERS" MAKES IT SOUND LIKE YOU ARE ACCUSING

4  THEM OF GIVING THEM INSIDER INFORMATION WHICH THOSE PEOPLE CAN

5  THEN USE TO ILLEGALLY MAKE A PROFIT.

6        BUT REALLY ALL YOU'VE SAID IN YOUR COMPLAINT IS THAT

7  THEY BEGAN MAKING PREPARATIONS TO SUPPORT FULL TRADING IN

8  BITCOIN CASH ON THE COINBASE EXCHANGE IN MID NOVEMBER, AND, AS

9  A RESULT, BITCOIN -- EXCUSE ME -- COINBASE PEOPLE WERE AWARE OF

10  IT AND COINBASE PEOPLE STARTED TRADING ON OTHER EXCHANGES,

11  BUYING UP BITCOIN CASH, RIGHT?

12        **MS. GRANT:**  WELL, IF I FOLLOW ALL OF THAT --

13        **THE COURT:**  I'M SORRY.  I KEEP BOUNCING -- I MIGHT

14  BE -- I OFTEN ACCIDENTLY SAY "BITCOIN" WHEN I MEAN COINBASE.

15        **MS. GRANT:**  OH, NO --

16        **THE COURT:**  I APOLOGIZE IF I'VE BEEN UNCLEAR.

17        **MS. GRANT:**  THAT'S FINE.

18        THEY TELL THEIR EMPLOYEES -- FIRST OF ALL, THEY KNOW

19  THAT THEIR EMPLOYEES ARE TRADING, OKAY?  THEY'RE TRADING

20  AGAINST THEIR CUSTOMERS, AND I THINK THAT COINBASE ALSO TRADES

21  AGAINST ITS CUSTOMERS IF YOU READ AG'S REPORT.

22        **THE COURT:**  WELL, BUT WHERE'S THAT IN THE -- I WANT

23  TO TRY TO FOCUS --

24        **MS. GRANT:**  OKAY.  THAT IS NOT IN THE --

25        (SIMULTANEOUS COLLOQUY.)

1          **THE COURT:**  I WANT TO TRY TO FOCUS ON WHAT'S IN THE

2    COMPLAINT NOW, BECAUSE MY JOB IS TO DECIDE WHETHER THIS

3    COMPLAINT STATES A CLAIM FOR NEGLIGENCE AND VIOLATION AND

4    UNFAIR BUSINESS PRACTICES.

5          **MS. GRANT:**  RIGHT.

6          **THE COURT:**  AND ALL THAT.

7          **MS. GRANT:**  AND IT'S AN UNFAIR BUSINESS PRACTICE

8    BECAUSE YOU ARE TIPPING YOUR INSIDERS -- YOU'RE NOT MONITORING

9    THEM, YOU ALLOW THEM TO BUY BCH ON THE CHEAP ON OTHER

10   EXCHANGES, AND THEN THEY KNOW THE EXACT TIME AND DATE THAT THIS

11   THING IS GOING TO START TRADING AT FULL SUPPORT.

12         **THE COURT:**  OKAY.

13         **MS. GRANT:**  THE CUSTOMERS DON'T KNOW THAT.  I MEAN,

14   20 MILLION CUSTOMERS DON'T KNOW THAT, BUT THE INSIDERS KNOW IT.

15   THEY SAY THEN, OKAY, WE'RE GOING TO HAVE IT IN POST-ONLY MODE,

16   THAT YOU CAN JUST POST YOUR TRADES.

17         **THE COURT:**  WHAT DOES THAT MEAN, BY THE WAY?

18         **MS. GRANT:**  THAT MEANS YOU JUST POST THE TRADES BUT

19   IT'S NOT OPEN FOR FULL TRADING.

20         SO THAT DAY THEY SAY, WE'RE GOING TO POST-ONLY MODE

21   AND WHEN THERE'S ENOUGH LIQUIDITY, WE'RE GOING TO GO TO FULL

22   TRADING, WHICH THEY WENT TO, I THINK, WITHIN AN HOUR.

23         **THE COURT:**  AGAIN, THIS IS ANOTHER EXAMPLE OF YOU

24   PRESUMING TOO MUCH KNOWLEDGE --

25         **MS. GRANT:**  OKAY.

1          **THE COURT:**  -- ON THE PART OF THE READER OF THE

2    COMPLAINT, RIGHT?  BOTH IN THIS DISCUSSION WE'RE HAVING HERE

3    AND WHAT YOU HAVE WRITTEN IN THE COMPLAINT, BECAUSE I DIDN'T

4    REALLY UNDERSTAND WHAT YOU JUST SAID.

5          **MS. GRANT:**  THE SHORT OF IT IS THIS:  IT'S LIKE

6    INSIDERS TRADING -- I UNDERSTAND WE DON'T HAVE AN INSIDER

7    TRADING CLAIM.  AND PART OF THE PROBLEM IS, LIKE THE GENTLEMAN

8    WHO JUST ARGUED THE TOYOTA CASE, IT --

9          **THE COURT:**  SORRY?  WHAT?

10          **MS. GRANT:**  LIKE THE GENTLEMAN WHO JUST ARGUED THE

11   TOYOTA CASE, SOME OF IT NEEDS A LITTLE BIT FURTHER

12   INVESTIGATION.

13          **THE COURT:**  WELL, BUT THE PROBLEM IS WE DON'T KNOW,

14   RIGHT?  WOULD WE EVER BE ABLE TO FIND OUT IF THERE'S INSIDER

15   TRADING?

16          **MS. GRANT:**  OH, SURE.

17          **THE COURT:**  I MEAN, I THOUGHT THE POINT WAS YOU'RE

18   NOT SUPPOSED TO BE ABLE TO KNOW WHO'S BUYING AND SELLING THIS

19   STUFF.

20          **MS. GRANT:**  WHEN YOU OPEN A COINBASE ACCOUNT, YOU

21   HAVE TO GIVE THEM A LOT OF INFORMATION, AND MY UNDERSTANDING IS

22   THEY HAVE YOUR IP ADDRESS.  I THINK THEY HAVE MY IP ADDRESS

23   BECAUSE I CAN'T EVEN GET INTO MY ACCOUNT, SO --

24          **THE COURT:**  BUT --

25          **MS. GRANT:**  -- SO THEY CAN SEE WHO TRADES.

1          **THE COURT:**  BUT THE TRADING THAT YOU'RE TALKING ABOUT

2      THAT OCCURRED IN NOVEMBER WAS TRADING ON OTHER EXCHANGES,

3      RIGHT?

4          **MS. GRANT:**  THAT IS CORRECT, BECAUSE COINBASE HAD NO

5      (INDISCERNIBLE).  SO WHAT THE INSIDERS WERE DOING WAS BUYING ON

6      THE CHEAP -- IT'S JUST LIKE INSIDER TRADING, RIGHT?  BY BUYING

7      ON THE CHEAP, THEY SPIKE IT DOWN.  COINBASE IS AWARE OF THIS.

8      THIS IS ON THE BLOCK CHAIN, RIGHT?  SO COINBASE CAN SEE THAT

9      THE PRICE IS SPIKING.  IT DOESN'T -- IT KNOWS IT JUST INFORMED

10     ITS INSIDERS OF THE DATE WHEN IT'S GOING TO LAUNCH THE WHOLE

11     THING.  IT DOESN'T DO ANYTHING.  IT THEN, THAT DAY, SUDDENLY ON

12     DECEMBER 19TH, AFTER THAT MORNING TELLING THE PUBLIC WE'RE NOT

13     READY TO SUPPORT THIS, SUDDENLY SAYS, OOPS, GUESS WHAT, WE'RE

14     GOING TO FULLY SUPPORT THIS.

15         **THE COURT:**  IN AN HOUR AND A HALF.

16         **MS. GRANT:**  IN AN HOUR AND A HALF, BUT FIRST WE'RE

17     GOING TO GO TO POST-ONLY MODE.  IT SEES -- AND I KNOW WE HAVE

18     THE SCREEN SHOTS IN THE COMPLAINT -- THE PRICE IS GOING UP AND

19     UP, 9,000 -- IT HIT UP TO 16,000.  THERE'S YOUTUBE VIDEOS WE

20     WERE GOING TO BRING INTO THE COURT, BUT WE DIDN'T, WHICH SHOW

21     PEOPLE JUST MIND BOGGLED, BLOWN AWAY, BY WHAT'S GOING ON WITH

22     THIS PRICE.

23         NO OTHER -- A FEW OTHER PLATFORMS HAVE PRICES AT THIS

24     LEVEL.  AND INSTEAD OF SAYING, OH, WOW, WE'VE GOT AN ORDER BOOK

25     IMBALANCE, WE'VE GOT TOO MANY PEOPLE --

1     **THE COURT:**  WHAT DOES THAT MEAN, ORDER BOOK -- I

2  STILL DON'T KNOW WHAT POST-ONLY MODE IS EXACTLY, AND I DON'T --

3  I DON'T -- I GATHER WHEN YOU SAY "ORDER BOOK IMBALANCE," YOU'RE

4  SAYING THEY'RE LOOKING AT IT AND THEY'RE SAYING FAR MORE PEOPLE

5  WANT TO BUY THAN WANT TO SELL, BUT I DON'T -- THERE'S NO

6  EXPLANATION --

7     **MS. GRANT:**  THERE'S NOT ENOUGH LIQUIDITY, CORRECT.

8     **THE COURT:**  THERE'S NO EXPLANATION IN THE COMPLAINT

9  OF WHAT THAT MEANS OR WHY IT MATTERS OR WHY IT -- WHY WE SHOULD

10  CONSIDER IT AS AMOUNTING TO WRONGDOING ON THE PART OF COINBASE.

11  THAT'S THE PART I DON'T UNDERSTAND.

12     **MS. GRANT:**  WELL, THE QUESTION IS HERE:  WAS THE

13  PRICE MANIPULATED?  YOU'VE GOT YOUR INSIDERS.  THEY'VE PUSHED

14  THE PRICE UP BECAUSE THEY HAD INSIDER KNOWLEDGE.  YOU SEE IT IN

15  YOUR ORDER BOOK, RIGHT?  YOU'VE GOT A PUBLIC ORDER BOOK.  YOU

16  CAN SEE IT.

17     FIRST YOU JUST POST THE TRANSACTIONS AND, PRESUMABLY,

18  WHEN THERE'S MORE LIQUIDITY, THEN YOU GO TO FULL TRADING.  SO

19  THEY'RE JUST POSTING -- THEY'RE NOT TRADING.  THEY'RE JUST

20  POSTING.  THE PRICE IS GOING UP AND UP AND UP, BUT TO

21  ASTRONOMICAL, MIND-BOGGLING RATES.

22     SO INSTEAD OF SAYING, YOU KNOW WHAT, WE CAN'T OPEN

23  THE BOOK, WE ARE GOING TO HAVE AN ORDER BOOK IMBALANCE AND WE

24  DON'T KNOW WHO'S PUSHING UP THE PRICE OF BCH, BECAUSE NO PLACE

25  ELSE IS IT TRADING AT THAT PRICE, THEY OPEN THE BOOK.  AND WHAT

1  DO THEY DO, THEY OPEN THE BOOK, AND, AS FAR AS WE KNOW AT THIS

2  JUNCTURE, IT'S EVERYBODY, ALL THE INSIDERS DUMP THEIR STOCK --

3  IT'S LIKE A PUMP AND DUMP -- DUMP THEIR STOCKS.  AND JUST

4  MINUTES LATER THEY CLOSE IT DOWN, GOING, ORDER BOOK IMBALANCE,

5  WE'RE CLOSING EVERYTHING DOWN.

6       **THE COURT:**  SO IS -- ARE YOU SAYING, ESSENTIALLY,

7  THAT THE WAY THAT COINBASE HANDLED THIS ROLL OUT FACILITATED A

8  PUMP AND DUMP --

9       **MS. GRANT:**  YES.

10      **THE COURT:**  -- THAT COINBASE SHOULD HAVE KNOWN WAS

11  GOING TO HAPPEN, OR DID KNOW WAS HAPPENING, OR IS THAT -- IS

12  THAT THE WAY TO UNDERSTAND IT?

13      **MS. GRANT:**  THAT IS THE CLAIM, YES, THAT IT REALLY

14  WAS COINBASE FACILITATING A PUMP AND DUMP AND POSSIBLY ITSELF

15  ENGAGING IN PROPRIETARY TRADING AGAINST ITS OWN CUSTOMERS,

16  ALTHOUGH I WILL ADMIT THAT IS NOT -- I'M NOT EVEN SURE IF IT'S

17  INFERRED IN THE COMPLAINT BECAUSE IT'S INFORMATION THAT WE'VE

18  JUST GOTTEN FROM THE NEW YORK AG.

19      **THE COURT:**  OKAY.  AND SO THE WAY THEY SHOULD HAVE

20  DONE IT WAS ANNOUNCED -- I MEAN, THERE ALWAYS WOULD HAVE

21  BEEN -- THERE WAS GOING TO BE -- INEVITABLY, THERE WAS GOING TO

22  BE A PERIOD BETWEEN THE TIME THEY DECIDED TO SUPPORT TRADING IN

23  BITCOIN CASH AND THE TIME THEY PUBLICLY ANNOUNCED IT, AND THERE

24  WAS GOING TO BE A PERIOD WHERE EMPLOYEES KNEW ABOUT IT AND THE

25  PUBLIC DIDN'T KNOW ABOUT IT.

1           BUT WHAT YOU'RE SAYING THEY SHOULD HAVE DONE IS

2     ANNOUNCED IN NOVEMBER, LATE NOVEMBER LET'S SAY JUST

3     HYPOTHETICALLY:  WE ARE BEGINNING PREPARATION TO SUPPORT

4     TRADING IN BITCOIN CASH; WE'RE GOING TO ANNOUNCE A DATE AT SOME

5     POINT, AND THEN THEY SHOULD HAVE ANNOUNCED THE DATE THAT THEY

6     WERE GOING TO START SUPPORTING TRADING IN BITCOIN CASH, AND THE

7     ANNOUNCEMENT SHOULD HAVE TAKEN PLACE FAR LONGER THAN AN HOUR

8     AND A HALF --

9           **MS. GRANT:**  YES.

10          **THE COURT:**  -- BEFORE TRADING BEGAN.  AND BY DOING IT

11    THE WAY THEY DID IT, AS OPPOSED TO THE WAY I'M NOW DESCRIBING

12    IT, THAT FACILITATED -- OR MADE IT LIKELY THAT THERE WAS GOING

13    TO BE THIS DRAMATIC SPIKE IN THE VALUE OF BITCOIN CASH THAT WAS

14    GOING TO FORCE THEM TO SHUT DOWN TRADING?

15          **MS. GRANT:**  YES, THAT'S CORRECT.  THAT'S EXACTLY

16    RIGHT, AND LET ME ADD -- YOUR HONOR, IT'S EXACTLY RIGHT.  PLUS,

17    LET ME ADD ONE OTHER ELEMENT, WHICH IS THEY HAVE SAID ALL

18    ALONG:  WE HAVE AN INSIDER TRADING POLICY, WE DON'T LET OUR

19    PEOPLE TRADE ON INSIDE INFORMATION, BUT THEY SAW IT FROM THE

20    SPIKES THAT, IN FACT, THERE WAS INSIDER TRADING, AND THEY

21    DIDN'T DO ANYTHING ABOUT IT.

22          **THE COURT:**  WHY DID THEY SEE FROM THE SPIKES THAT

23    THERE WAS INSIDER TRADING?  I MEAN, WHY -- WHY WAS IT NOT A

24    SITUATION -- I MEAN, AGAIN, I DON'T KNOW A LOT ABOUT THIS

25    WORLD.  I DON'T EVEN KNOW A LOT ABOUT THE SORT OF MORE

1   TRADITIONAL WORLD OF IPOS AND STUFF, AND I'M NOT EVEN CONFIDENT

2   IT'S APPROPRIATE TO ANALOGIZE TO AN IPO.  BUT WE SEE PEOPLE

3   ANNOUNCE THEY ARE GOING TO HAVE AN IPO, AND THE IPO TAKES

4   PLACE, AND WE SEE THE SHARE PRICE --

5           **MS. GRANT:**  RIGHT.

6           **THE COURT:**  -- SKYROCKET WHEN TRADING BEGINS --

7           **MS. GRANT:**  RIGHT.

8           **THE COURT:**  RIGHT?  AND IT OFTEN SHOOTS DOWN.  I

9   THINK THAT'S --

10          **MS. GRANT:**  BUT THAT'S ALSO ON FULL INFORMATION.

11  HERE YOU HAVE NO INFORMATION.

12          **THE COURT:**  WELL, BUT SO -- SO WHY -- WHY WOULDN'T WE

13  HAVE ALSO EXPECTED THE PRICE OF BITCOIN CASH TO SKYROCKET AT

14  THE OUTSET OF TRADING, EVEN IF COINBASE HAD ANNOUNCED IN

15  ADVANCE THAT IT WAS GOING TO SUPPORT TRADING OF BITCOIN CASH?

16          **MS. GRANT:**  IT COULD HAVE -- I WON'T SAY SKYROCKET.

17  IT MIGHT HAVE HAD A BUMP.  THAT'S NOT UNUSUAL.  BUT THIS

18  SKYROCKETED BEYOND ANYTHING.  I JUST WISH WE BROUGHT THESE

19  YOUTUBE VIDEOS WHERE THESE TRADERS ARE LOOKING AT IT AND

20  THEY'RE IN DISBELIEF AS TO THE PRICE.

21          **THE COURT:**  RIGHT.  I'M HAVING A -- I GUESS I'M STILL

22  HAVING A HARD TIME WRAPPING MY MIND AROUND THE CAUSE AND

23  EFFECT.  LIKE, WHAT WAS THE CAUSE --

24          **MS. GRANT:**  THE CAUSE -- I'M SORRY.

25          **THE COURT:**  YOU KNOW, WHY -- I'M HAVING TROUBLE

1    WRAPPING MY MIND AROUND WHY IT SHOT UP SO MUCH AND WHY IT

2    WOULDN'T HAVE SHOT UP SO MUCH IN, I GUESS, A WAY THAT IT WAS

3    NOT SUSTAINABLE -- WE'LL GET TO THAT IN A SECOND -- BUT WHY IT

4    WOULDN'T HAVE SHOT UP SO MUCH IN A WAY THAT WAS NOT SUSTAINABLE

5    OR WAS ARTIFICIAL IF THEY HAD DONE IT IN THE WAY WE'RE

6    DESCRIBING.  LIKE, WASN'T IT STILL GOING TO BE ALL THESE PEOPLE

7    WHO WERE JUST CRAZED ABOUT BITCOIN CASH AND WANTED TO GET THEIR

8    HANDS ON IT?

9          **MS. GRANT:**  THERE MIGHT HAVE BEEN MORE PREPARATION.

10   THERE MIGHT BE PEOPLE BUYING IT ON OTHER EXCHANGES.  I THINK

11   THERE WOULD HAVE BEEN MORE PREPARATION.

12          THIS IS PARTLY ALL OF THE INSIDERS WERE READY TO GO

13   AND DUMPED IT.  AND DON'T FORGET THEY CLOSED IT WITHIN TWO

14   MINUTES.  IF THEY KEPT IT OPEN AND SAID, OKAY, WE'RE GOING TO

15   CREATE THE LIQUIDITY -- FIRST OF ALL, WE'RE GOING TO EXECUTE

16   THE TRADES AT THE PRICES THAT WE TOLD YOU.  LIKE, MY CLIENT HAD

17   $2,000 ON HIS SCREEN.  HE THOUGHT THAT WAS THE ACCEPTED PRICE,

18   SUDDENLY, IT'S, YOU KNOW, BEING EXECUTED AT WAY OVER 4,000.

19          I HAVE OTHER CLIENTS WHO HAVE RETAINED US IN THIS

20   CASE WHO HAVE GOT THEIR BITCOIN -- I'M SORRY -- THEIR BCH

21   EXECUTED AT 8,500 WHEN THEY THOUGHT IT WAS GOING TO BE EXECUTED

22   AT 3,000.

23          **THE COURT:**  WHAT'S BCH?

24          **MS. GRANT:**  I'M SORRY.  BCH, I'M SORRY, IS BITCOIN

25   CASH.

1          **THE COURT:**  LET'S TRY TO AVOID USING TOO MANY

2    ACRONYMS, BECAUSE THE STUFF IS ALREADY SO HARD TO UNDERSTAND.

3          **MS. GRANT:**  YEAH, I KNOW IT'S VERY COMPLICATED.

4          **THE COURT:**  WHY WOULD WE FILL IT UP WITH ACRONYMS?

5          **MS. GRANT:**  YEAH.

6          **THE COURT:**  IT'S NOT HARD TO SAY "BITCOIN CASH."

7          **MS. GRANT:**  BITCOIN CASH.  SO IF BITCOIN CASH -- IF

8    THEY HAD HELD IT OPEN, IF THEY HAD ENSURED THERE WAS LIQUIDITY,

9    IF THEY HAD CREATED LIQUIDITY THEMSELVES, THE MARKET MIGHT HAVE

10   EVENED OUT.  AND --

11         **THE COURT:**  AGAIN, I THINK THIS IS PROBABLY GOING TO

12   BE -- THESE QUESTIONS ARE PROBABLY GOING TO BE KIND OF

13   IGNORANT, BUT WHEN YOU SAY, "IF THEY CREATED LIQUIDITY," WHAT

14   DO YOU MEAN BY THAT?  AND I THINK A RELATED QUESTION IS:  WHY

15   DID THEY HAVE TO -- YOU KNOW, YOU SAID THEY HAD SHUT DOWN

16   TRADING.

17         **MS. GRANT:**  WELL, THEY DID SHUT DOWN TRADING.

18         (SIMULTANEOUS COLLOQUY.)

19         **THE COURT:**  AND THEY SHUT DOWN TRADING AND YOU SAID

20   THEY DID THAT -- YOU SEEM TO BE SAYING THEY DID THAT TO SAVE

21   THEIR OWN SKIN.

22         **MS. GRANT:**  YES.

23         **THE COURT:**  BUT THERE'S NOT AN EXPLANATION OF THAT IN

24   THE COMPLAINT EITHER, SO I DIDN'T UNDERSTAND PRECISELY.  HOW

25   WAS IT THEY STOOD TO A BENEFIT OR AVOID HARM -- THEY

1    THEMSELVES, COINBASE THEMSELVES, STOOD TO AVOID HARM BY

2    SHUTTING DOWN TRADING TWO MINUTES AFTER IT STARTED?

3            **MS. GRANT:**  WELL, THERE'S ALL THESE PEOPLE -- FIRST

4    OF ALL, IT'S ALL THESE PEOPLE THAT WANT TO SELL AND THE PRICE

5    IS GOING UP AND UP AND UP.  SO WHERE IS THIS GOING TO COME

6    FROM?

7            THERE ARE TWO PARTS TO COINBASE.  IT'S SORT OF LIKE

8    THE RETAIL PART WHERE YOU BUY AND SELL WHERE I, FOR INSTANCE,

9    HAVE MY ACCOUNT.  AND THEN THERE'S THE GDAX, WHICH THEY NOW

10   HAVE NAMED COINPRO, WHICH IS THE EXCHANGE.

11           SO WHERE DO THEY GET COIN FROM, RIGHT?  THEY'VE GOT

12   ALL THESE PEOPLE THAT WANT BCH, AND THE PRICE IS GOING UP AND

13   UP, SO THEY WERE GOING TO HAVE TO GET IT FROM GDAX.  SO THEY

14   WERE GOING HAVE TO SELL, I THINK, THEIR OWN RESERVE OF COIN,

15   AND THEY WERE GOING TO HAVE TO SELL THEM AT ASTRONOMICAL

16   PRICES, AND THEY WERE GOING TO HAVE TO BUY -- I MEAN, FOR ALL

17   THE SELLERS, THEY WERE GOING TO HAVE TO BUY AT ASTRONOMICAL

18   PRICES.

19           FOR INSTANCE, WE HAVE BEEN CONTACTED BY A LOT OF

20   TRADERS DURING THAT TIME THAT HAD BCH THAT THEY HAD PURCHASED

21   ON OTHER EXCHANGES AT A RELATIVELY LOW PRICE.

22           **THE COURT:**  ARE YOU SAYING THAT THERE WAS -- THAT SO

23   MUCH -- I MEAN, AGAIN, THIS IS -- I APOLOGIZE IF THESE ARE

24   RUDIMENTARY QUESTIONS, BUT ARE YOU SAYING THAT THERE WAS SO

25   MUCH BITCOIN CASH BEING PURCHASED THAT THERE WASN'T ANY MORE

1   BITCOIN CASH OUT THERE IN THE EXCHANGE TO BE PURCHASED?

2           **MS. GRANT:**  CORRECT, YES.

3           **THE COURT:**  AND THAT'S WHY THEY HAD TO SHUT IT DOWN?

4           **MS. GRANT:**  THEY SAID THEY LACKED LIQUIDITY, SO I

5   THINK THAT'S ONE OF THE REASONS, AND I THINK THE OTHER REASON

6   WAS --

7           **THE COURT:**  "LACKED LIQUIDITY" MEANING THE MARKET,

8   THERE WAS NOT --

9           (SIMULTANEOUS COLLOQUY.)

10          **MS. GRANT:**  ENOUGH BUYERS AND SELLERS.

11          **THE COURT:**  THERE WAS NO LONGER ANY BIT -- WHAT?

12          **MS. GRANT:**  BUYERS AND SELLERS TO MATCH UP, RIGHT.

13          **THE COURT:**  SO THERE WAS NO BITCOIN CASH TO BE BOUGHT

14  EVEN THOUGH PEOPLE WERE TRYING -- PEOPLE WERE PUTTING IN ORDERS

15  TO BUY IT, AND THERE WAS NOBODY AVAILABLE TO SELL IT, THAT'S

16  WHAT YOU MEAN WHEN YOU SAY THERE WAS NO LIQUIDITY?

17          **MS. GRANT:**  YES.  AND ALSO SELLERS WERE TRYING TO

18  SELL, AND THE PRICE IS GOING UP AND UP AND UP.  SO IF I'M A

19  CUSTOMER AND I BOUGHT IT FOR, YOU KNOW, A THOUSAND DOLLARS ON

20  ANOTHER EXCHANGE AND I'M TRYING NOW TO SELL IT ON COINBASE AND

21  IT'S NOW UP TO 9,500, AND I'M TRYING TO MAKE THAT SPREAD,

22  COINBASE IS, WELL, I DON'T WANT TO HAVE TO PAY 9,500 FOR THIS

23  STUFF.  AND THERE WERE A LOT OF SELLERS IN THERE TRYING TO SELL

24  AT THAT TIME AT VERY INFLATED PRICES, SO THEY SHUT IT DOWN.

25          **THE COURT:**  SO I'M STILL TRYING TO UNDERSTAND WHY --

1    SO WHAT DID -- WHAT HARM WAS COINBASE TRYING AVOID TO ITSELF

2    WHEN IT SHUT DOWN TRADING TWO MINUTES LATER?

3              **MS. GRANT:**  BASICALLY, A RUN.

4              **THE COURT:**  WHAT?

5              **MS. GRANT:**  BASICALLY, LIKE A RUN -- BASICALLY LIKE A

6    RUN ON THE BANK, BASICALLY A RUN ON COINBASE.  THAT'S WHAT THEY

7    WERE TRYING TO AVOID, THAT THEY HAD TO BUY OUT ALL THESE

8    SELLERS AT INFLATED PRICES AND THAT THEY WOULD HAVE TO SUPPLY

9    COIN TO ALL THESE PURCHASERS.

10             **THE COURT:**  BUT WHY WOULD THEY HAVE TO BUY OUT ALL

11   THESE SELLERS AT INFLATED PRICES IF THERE WERE ALL THESE PEOPLE

12   WHO HAD PUT IN ORDERS TO BUY -- I MEAN, I THOUGHT YOU SAID

13   EVERYBODY WAS WANTING TO BUY BITCOIN CASH AND NOBODY WAS

14   WANTING TO SELL IT.

15             **MS. GRANT:**  NO, NO.  THERE WERE A LOT OF SELLERS.  I

16   THINK THE INSIDERS WANTED TO DUMP.  THEY PUSHED THE PRICE --

17   IT'S A PUMP AND DUMP, RIGHT?  SO THEY PUSHED THE PRICE UP.

18             THEN THE MINUTE THAT COINBASE SAYS, WE'RE GOING TO

19   SUPPORT BITCOIN CASH, THEY WANT TO DUMP IT, THEY WANT TO SELL.

20   SO THERE WERE A LOT OF SELLERS, AND THERE WERE BUYERS LIKE THE

21   RETAIL GUYS, LIKE MY GUY, JEFFREY BERK, WHO SAID, OH, WOW

22   THEY'RE SUPPORTING BCH, LET'S BUY SOME, AND HE PUTS IT IN AT

23   2,000 AND IT GETS EXECUTED AT 4,500.  AND I HAVE -- I HAVE SOME

24   OTHER CLIENTS THEY PUT IT IN AT 3,000, IT GETS EXECUTED AT

25   8,500 TWO DAYS LATER.  TWO DAYS LATER, BY THE WAY.

1          SO THERE WERE BUYERS AND SELLERS.  BUT THEY --

2    COINBASE SAID -- I MEAN, THEY SAID, OKAY, THERE'S NO LIQUIDITY,

3    WE'RE GOING TO CUT THIS OFF IN TWO MINUTES.

4          **THE COURT:**  RIGHT, BUT --

5          **MS. GRANT:**  AND OUR CONTENTION IS THE INSIDERS HAVE

6    ALREADY DUMPED WITHIN THAT TIME, AND WE DON'T KNOW ABOUT

7    COINBASE'S PROPRIETARY TRADING AND WHAT IT DID DURING THAT TIME

8    PERIOD.  BUT IT'S JUST FORTUITOUS THAT SOME PEOPLE WERE ABLE TO

9    GET OUT AT 9,500, AND SOME PEOPLE GOT STUCK HAVING TO BUY IT AT

10   9,500, AND THOSE PEOPLE WHO GOT STUCK WERE THE POOR RETAIL

11   CUSTOMER.  AND WE'RE NOT QUITE SURE, BUT WE THINK IT WAS THE

12   INSIDERS WHO GOT OUT AT 9,500, FROM EVERYTHING THAT WE HAVE

13   SEEN.  AND THAT REALLY WAS THE WHOLE POINT.

14          THERE'S NO -- I'M SORRY.

15          **THE COURT:**  YOU MENTIONED EARLIER THAT NOW THERE ARE

16   A NUMBER OF OTHER EXCHANGES -- YOU SAID BACK THEN --

17          **MS. GRANT:**  I THINK THERE ARE MORE EXCHANGES NOW,

18   YES.

19          **THE COURT:**  COINBASE WAS SORT OF WHERE IT'S AT.

20          **MS. GRANT:**  YES.

21          **THE COURT:**  AND NOW THERE ARE MORE EXCHANGES, AND I

22   ASSUME THAT ON THOSE EXCHANGES, YOU CAN TRADE IN BITCOIN CASH.

23          **MS. GRANT:**  NO, NOT IN ALL OF THEM.

24          **THE COURT:**  OKAY.

25          **MS. GRANT:**  NO.

```
 1            THE COURT:  HAVE THERE BEEN ANY OTHER EXCHANGES THAT
 2    HAVE ROLLED OUT TRADING IN BITCOIN CASH?
 3            MS. GRANT:  THERE ARE A FEW, YES.
 4            THE COURT:  DO WE KNOW ANYTHING ABOUT HOW THEY DID
 5    IT?
 6            MS. GRANT:  THEY DIDN'T CARRY ON THE WAY COINBASE
 7    DID.  THEY DIDN'T COME OUT -- THEY SAID WE'RE GOING TO SUPPORT
 8    IT OR WE'RE NOT GOING TO SUPPORT IT, AND THEY SUPPORTED IT.
 9    THEY DIDN'T SAY, WE'RE NOT GOING TO SUPPORT IT AND -- YOU KNOW,
10    UNTIL THERE'S A FAIR AND ORDERLY MARKET, AND, YOU KNOW, WE'VE
11    GOT TO FIGURE THIS OUT.  THEY DIDN'T DO THAT.
12            HONESTLY, WE DON'T EVEN UNDERSTAND WHY COINBASE
13    DECIDED SUDDENLY TO SUPPORT IT OTHER THAN THIS PRESSURE FROM
14    INSIDER TRADERS AND THE FACT THAT THE DAY BEFORE THIS --
15            THE COURT:  WAIT A MINUTE.  WHAT PRESSURE FROM
16    INSIDER TRADERS?
17            MS. GRANT:  WELL, I MEAN, THE INSIDER TRADERS WERE
18    ANXIOUS TO DUMP WHAT THEY HAD PURCHASED.  SO THEY HAD A LOT OF
19    INSIDERS, WE THINK, THAT WANTED TO HAVE COINBASE SUPPORT
20    TRADING SO THAT THEY COULD DUMP THEIR COIN.
21            THE COURT:  AND WHERE IS THAT IN THE COMPLAINT?
22            MS. GRANT:  WHERE IS THAT?  I FORGET.  I'LL HAVE
23    MR. GREEN FIND THAT IN THE COMPLAINT.
24            THE OTHER INTERESTING --
25            THE COURT:  NO, NO, NO.  I WANT TO KNOW WHERE THAT IS
```

1   IN THE COMPLAINT.

2           **MS. GRANT:**  PERHAPS THE EXPLANATION IS NOT AS GOOD AS

3   IT COULD BE.  I MEAN, WE DO HAVE A WHOLE SECTION IN THERE ABOUT

4   INSIDERS TRADING.

5           **THE COURT:**  SHOW ME.

6           (SIMULTANEOUS COLLOQUY.)

7           **THE COURT:**  SHOW ME WHERE IT IS IN THE COMPLAINT.  IT

8   MAY BE THERE.  I'M NOT SAYING IT'S NOT THERE, BUT I WANT TO SEE

9   IT.  WHERE DOES IT SAY THAT THE REASON THAT COINBASE DECIDED TO

10  SUPPORT TRADING IN BITCOIN CASH IN DECEMBER WAS ON PRESSURE

11  FROM INSIDER TRADERS?

12          **MS. GRANT:**  WELL, I CAN'T SAY THAT IT SAYS THAT

13  PRECISELY.  WHAT IT DOES, HOWEVER, SAY --

14          **THE COURT:**  I MEAN, THE PROBLEM I HAVE WITH THIS CASE

15  IS THAT IT CERTAINLY SEEMS INTUITIVELY LIKE WHAT COINBASE DID

16  WAS NEGLIGENT, AND THAT, YOU KNOW, COINBASE DID NOT HANDLE THIS

17  PROPERLY.

18          **MS. GRANT:**  CORRECT.

19          **THE COURT:**  RIGHT?  THE MOST POWERFUL EVIDENCE OF

20  THAT IS THEY HAD TO STOP TRADING AFTER TWO MINUTES, RIGHT?  AND

21  IT SEEMS INTUITIVELY REMARKABLE THAT, YOU KNOW, THEY WOULD

22  ANNOUNCE AT 4:00 O'CLOCK THAT THEY'RE GOING TO BEGIN, YOU KNOW,

23  SUPPORTING TRADING IN BITCOIN CASH AT 5:30, WHEN ALL THEIR

24  PUBLIC STATEMENTS UP TIL THEN HAD BEEN, NO, WE'RE ONLY GOING TO

25  ALLOW YOU TO WITHDRAW AND WE'RE ONLY GOING TO DO THAT IN

1     JANUARY.

2               **MS. GRANT:**  RIGHT.

3               **THE COURT:**  INTUITIVELY, IT SEEMS LIKE THIS WAS

4     SOMETHING THAT WAS BUNGLED.

5               **MS. GRANT:**  THAT'S CORRECT.

6               **THE COURT:**  BUT I DON'T KNOW HOW WELL THE COMPLAINT

7     EXPLAINS, YOU KNOW, AGAIN, WHY IT WAS BUNGLED AND WHAT THE

8     MOTIVATIONS WERE AND HOW THEY COULD HAVE DONE IT -- HOW THEY

9     SHOULD HAVE DONE IT AND WHAT WOULD HAVE HAPPENED HAD THEY DONE

10    IT DIFFERENTLY.  IT MAY JUST BE BECAUSE THIS IS A, YOU KNOW,

11    NEW WORLD, NEW AREA THAT WE JUDGES DON'T KNOW AS MUCH ABOUT AS

12    WE DO, YOU KNOW, TRADING STOCKS WITH CHARLES SCHWAB OR

13    WHATEVER.

14              **MS. GRANT:**  RIGHT.

15              **THE COURT:**  RIGHT?  BUT THAT'S THE PROBLEM I'M HAVING

16    WITH THE COMPLAINT.  SURE.

17              **MR. GREEN:**  DOESN'T THAT, INDEED, STATE A CLAIM FOR

18    NEGLIGENCE?  YOU KNOW, I MEAN TYPICALLY NEGLIGENCE, YOU DON'T

19    DO IT FOR A REASON, YOU DO IT (INDISCERNIBLE), RIGHT?

20              **THE COURT:**  I DON'T KNOW, BECAUSE I FEEL LIKE FROM

21    READING THE COMPLAINT, YOU'RE LEFT NOT HAVING A GREAT SENSE OF

22    WHAT THEY SHOULD HAVE DONE OR WHAT THE CONSEQUENCES WOULD HAVE

23    BEEN HAD THEY DONE IT THE WAY THEY SHOULD HAVE DONE IT AS

24    OPPOSED TO THE WAY THEY DID IT.  THAT'S THE PART THAT LEAVES

25    ME, YOU KNOW, A LITTLE BIT UNCLEAR, FROM THE WAY THE COMPLAINT

1    IS DRAFTED.

2            **MR. GREEN:**  RIGHT.  AND PART OF THAT ANALYSIS IS THE

3    REPRESENTATIONS OF THE AMOUNT OF PREPARATION THEY WERE GOING TO

4    DO TO MAKE AN ORDERLY MARKET, AND WE DO HAVE THOSE

5    REPRESENTATIONS THROUGHOUT THE COMPLAINT, SO THAT WHEN THEY

6    ACTUALLY DID --

7            **THE COURT:**  YOU MEAN THE STATEMENTS THAT WE'RE NOT

8    GOING TO SUPPORT TRADING IN A CURRENCY UNLESS WE ARE, YOU KNOW,

9    CONVINCED IT'S GOING TO BE SAFE --

10           **MR. GREEN:**  YEAH.

11           **THE COURT:**  -- AND ALL THAT?  AND DID THEY -- BUT DID

12   THEY TALK ABOUT AN ORDERLY -- WERE THEY TALKING ABOUT AN

13   ORDERLY MARKET, OR WERE THEY TALKING ABOUT SAFETY AND SECURITY?

14           **MR. GREEN:**  BOTH, YOUR HONOR.

15           **THE COURT:**  WHERE IS THE PART -- WHERE ARE THE

16   STATEMENTS ABOUT AN ORDERLY MARKET, NOT DOING THIS UNTIL -- I

17   MEAN, I'M NOT EXACTLY SURE WHAT AN ORDERLY MARKET MEANS, BUT

18   PUTTING THAT ASIDE FOR A MOMENT --

19           **MR. GREEN:**  RIGHT, AND --

20           **THE COURT:**  -- WHERE ARE THE STATEMENTS IN THE

21   COMPLAINT ABOUT HOW WE'RE NOT GOING TO DO -- WE'RE NOT GOING TO

22   SUPPORT TRADING IN THIS UNTIL WE KNOW THE MARKET IS GOING TO BE

23   ORDERLY.

24           **MR. GREEN:**  PARAGRAPH 44.

25           **THE COURT:**  FORTY-FOUR, OKAY.

1          **MR. GREEN:**  STARTING THERE.

2          **THE COURT:**  GIVE ME A SECOND.

3          **MR. GREEN:**  THERE'S A NUMBER OF STATEMENTS.

4          **THE COURT:**  WE HAVE -- IT SAYS, "WE HAVE NO PLANS TO

5  SUPPORT ADDITIONAL BLOCK CHAINS AT THIS TIME."

6          **MR. GREEN:**  RIGHT.

7          **THE COURT:**  THAT WAS IN JULY 2017.

8          **MR. GREEN:**  RIGHT.  AND GOING DOWN -- REALLY.

9          **MS. GRANT:**  (INDISCERNIBLE.)

10          **MR. GREEN:**  BEFORE WE GET TO THAT, 47 IS -- SAYS:

11              "IN ORDER TO DETERMINE WHICH FORK

12          TO SUPPORT, WE LOOK AT FACTORS SUCH AS SIZE

13          OF THE NETWORK, MARKET VALUE, AND CUSTOMER

14          DEMAND.  WE MAKE THIS DECISION CAREFULLY

15          BECAUSE SAFELY SUPPORTING A NEW DIGITAL

16          CURRENCY REQUIRES SIGNIFICANT WORK FROM MANY

17          TEAMS."

18          AND THEN IN THE NEXT PARAGRAPH, "IF --" THE LAST

19  COUPLE OF SENTENCES -- "IF WE WERE TO SUPPORT A -- " "WE

20  WOULD -- "

21          LET ME SEE.

22              "IN ORDER TO SAFELY AND SECURE

23          ACCESS BITCOIN CASH, WE NEED TO FURTHER

24          UNDERTAKE A FURTHER PROCESS OF DESIGNING AND

25          TESTING SIGNIFICANT CHANGES TO OUR SYSTEM,

1          INCLUDING HOT AND COLD STORAGE."

2          **THE COURT:**  WHAT'S HOT AND COLD STORAGE?

3          **MR. GREEN:**  YEAH.  I'M NOT GOING TO - I DON'T THINK I

4     CAN --

5          **MS. GRANT:**  (INDISCERNIBLE) STORAGE ON THEIR SYSTEM

6     VERSUS NOT.  COLD STORAGE MEANS -- THIS GOES INTO THE WHOLE

7     WALLET SITUATION.

8          IF I BUY BITCOIN, THE BITCOIN CASH ON COINBASE, THEY

9     CAN HOLD IT ON THEIR SYSTEM.  IT'S IN SORT OF LIKE A WALLET ON

10    THEIR SYSTEM.  THEY HAVE THE PRIVATE KEYS TO IT.  IF IT'S COLD

11    STORAGE, THEY TAKE IT OFF THEIR SYSTEM SO THE CODE, THE PRIVATE

12    CODE KEY THAT ALLOWS YOU TO GET TO THE COIN IS NOT AVAILABLE TO

13    BE HAD.  SO THAT'S HOT AND COLD STORAGE.

14         **THE COURT:**  OKAY.

15         **MR. GREEN:**  THEN PARAGRAPH 56 REFERS TO THE OLDER

16    EARLY MARKET.  SO IN THE CONTEXT OF THESE --

17         **THE COURT:**  WAIT, HOLD ON.

18         **MR. GREEN:**  -- STATEMENTS --

19         **THE COURT:**  LET ME LOOK AT PARAGRAPH 56.

20         **MR. GREEN:**  YEAH.  WE HAVE THE EMPHASIZED PORTION

21    THERE.

22              "IF WE RELEASE IT, YOU CAN BE SURE

23          THAT WE HAVE INVESTED SIGNIFICANT TIME AND

24          CARE IN SUPPORTING THAT DIGITAL ASSET

25          SECURELY.  WE BELIEVE THIS IS THE BEST

1              APPROACH FOR US TO MAINTAIN CUSTOMER TRUST

2              AND ENSURE A FAIR AND ORDERLY MARKET."

3          **THE COURT:**  OKAY.  AND SO YOUR THEORY FOR WHY THEY

4   DIDN'T -- THEY ENDED UP NOT DOING IT THAT WAY, WHY THEY ENDED

5   UP ANNOUNCING AN HOUR AND A HALF BEFORE TRADING WOULD START,

6   HAVING UNTIL THEN TOLD THE PUBLIC THAT THEY WERE NOT GOING TO

7   SUPPORT FULL TRADING IN BITCOIN CASH AND ONLY IN JANUARY WOULD

8   THEY ALLOW WITHDRAWAL, YOUR THEORY FOR WHY THEY DID THAT IS

9   THAT -- WELL, A, I GUESS YOU WOULD SAY:  WHO CARES WHY THEY DID

10  IT, IT WAS NEGLIGENT; AND THEY OWED A DUTY TO THEIR CUSTOMERS

11  TO BE -- TO BE MORE CAREFUL IN THE WAY THEY WERE GOING TO ROLL

12  OUT TRADING OF BITCOIN CASH.

13              AND THEN YOU WOULD SAY:  FURTHERMORE, IT WAS -- IT

14  WAS MOTIVATED BY A DESIRE TO HELP INSIDERS GAIN PROFIT FROM THE

15  ROLLOUT, BECAUSE, I GUESS, YOU WOULD SAY THEY SORT OF KNEW OR

16  PREDICTED THAT THE PRICE WAS GOING TO SPIKE AND THEN INSIDERS

17  WERE GOING TO SELL RIGHT AWAY?

18          **MS. GRANT:**  YES, AND THEY COULD SEE THAT FROM THE

19  ORDERS BOOKS.

20          **THE COURT:**  THAT WHAT?

21          **MS. GRANT:**  THEY COULD SEE IT FROM THE ORDER BOOKS

22  WHEN THEY HAD POST-ONLY ORDER BOOK POSTING.

23          **THE COURT:**  POST ORDER ONLY -- POST-ONLY ORDERS, CAN

24  YOU EXPLAIN TO ME IN A LITTLE MORE DETAIL WHAT THAT MEANS,

25  BECAUSE THAT WASN'T IN THE -- I THINK THAT WAS ANOTHER AREA

```
 1    WHERE YOU PROBABLY ASSUMED THAT I KNEW WHAT THAT MEANT, BUT I

 2    DON'T.

 3            MS. GRANT:  MY UNDERSTANDING IS THAT YOU CAN POST

 4    ONLY, WHICH MEANS THEY'RE NOT GOING TO START TRADING YET.

 5    YOU'RE JUST GOING TO POST ORDERS TO SEE WHAT THE ORDER BOOK

 6    LOOKS LIKE.  AND THEY DID THAT FIRST.  AND THEY SAID, ONCE

 7    THERE'S SUFFICIENT LIQUIDITY FOR ALL THESE ORDERS THAT ARE

 8    POSTED, THEN WE'RE GOING TO OPEN THE BOOK.  THAT'S WHEN THEY

 9    SAW THE PRICES SKYROCKETING, AND YET THEY OPENED -- THERE

10    WASN'T LIQUIDITY, AND YET THEY OPENED THE BOOK ANYWAY.

11            LET ME JUST ADD ONE OTHER --

12            THE COURT:  SO YOUR VIEW IS THAT THEY SHOULD NEVER

13    HAVE OPENED TRADING IN THE FIRST PLACE.  WHEN DID THESE

14    POST-ONLY ORDERS START COMING IN?  AT 4:00 O'CLOCK, OR AT 5:30.

15            MR. GREEN:  4:00 TO 5:00, 4:00 TO 5:00.  SO THEY WERE

16    FOR ABOUT AN HOUR.  SO THEY KNEW -- THEY KNEW WHAT THE ORDERS

17    WERE WHEN THEY DECIDED TO OPEN.

18            THE COURT:  IS THAT IN THE COMPLAINT?

19            MR. GREEN:  YES.  IF THEY WERE ALL --

20            THE COURT:  BECAUSE I DIDN'T -- I REMEMBER KIND OF

21    SCRATCHING MY HEAD WONDERING ABOUT THOSE ALLEGATIONS, TOO.  CAN

22    YOU SHOW ME THAT?

23            MR. GREEN:  YES.  THEY WERE ALL BUY ORDERS.  THEN

24    THEY WOULD SEE IT WAS NOT BALANCED, BUT THEY WENT AHEAD AND

25    OPENED IT ANYWAY, AND THAT'S WHAT DROVE THE PRICE UP.
```

1          **MS. GRANT:**  I THINK THERE'S A SCREEN SHOT THAT

2    DEMONSTRATES THAT.

3          **MR. GREEN:**  PARAGRAPH 76, YOUR HONOR -- 75 AND 76.

4          **THE COURT:**  OH, I SEE.  SO YOU'RE -- SO, I GOT THE

5    FACTS A LITTLE BIT WRONG.

6          SO, THEY ANNOUNCED AT 4:00 P.M. THAT THEY -- FOR THE

7    FIRST TIME THAT THEY WERE OPENING TRADING IN POST-ONLY MODE,

8    AND THEN ACTUAL TRADING, ACTUAL EXCHANGES, THEY ANNOUNCED AT

9    5:15 THAT ACTUAL TRADING WOULD BEGIN AT 5:20; IS THAT RIGHT?

10          **MR. GREEN:**  APPROXIMATELY, WITHIN A COUPLE OF MINUTES

11    OF THE TIME, YES.

12          **THE COURT:**  OKAY.  AND --

13          **MR. GREEN:**  THAT'S ACTUALLY (INDISCERNIBLE).

14          **THE COURT:**  AT THIS TIME COINBASE KNEW THE ORDERS ON

15    ITS POST-ONLY BOOK WERE PRIMARILY PURCHASE ORDERS THAT WOULD

16    DRIVE THE PRICE SHARPLY HIGHER?

17          **MR. GREEN:**  RIGHT.

18          **THE COURT:**  OKAY.  AND THEN GOING BACK TO MY IPO

19    ANALOGY -- I MEAN, YOU KNOW, WHEN YOU OPEN TRADING ON

20    SOMETHING, PRESUMABLY, IT'S NOT UNCOMMON FOR THERE TO BE MOSTLY

21    BUY ORDERS THAT DRIVES THE PRICE UP SHARPLY, RIGHT?

22          **MS. GRANT:**  YEAH, THE IPO, THOUGH, IS A WHOLE

23    DIFFERENT SITUATION.  YOU'VE GOT A LOT OF DISCLOSURE.  YOU'VE

24    GOT INVESTMENT BANKERS WHO ARE MAKING A MARKET JUST SO YOU

25    DON'T HAVE THE CRAZINESS THAT HAPPENED HERE.  THE PROBLEM HERE

1    IS YOU DON'T HAVE THAT KIND OF -- THEY DON'T HAVE THOSE

2    PROTECTIONS HERE, AND THAT'S WHY THIS IS SUCH A CRITICAL ISSUE,

3    BECAUSE THIS IS HAPPENING ALL OVER THE PLACE.

4              AND THERE AREN'T -- I MEAN CFTC HAS JURISDICTION.

5    THE SEC HAS IPO -- ICO'S, WHICH ARE INITIAL COIN OFFERINGS.

6    MAYBE THEY HAVE JURISDICTION ON SOME OF THEM DEPENDING ON THE

7    CHARACTERISTICS, BUT THE PROTECTIONS THAT YOUR HONOR IS TALKING

8    ABOUT WITH AN IPO ARE ABSENT HERE, AND THAT'S WHY THIS IS SO

9    CRITICAL, AND THIS KEEPS HAPPENING OVER AND OVER AGAIN.  SO --

10             **THE COURT:**  WHEN YOU SAY THIS KEEPS HAPPENING OVER

11   AND OVER AGAIN, WHAT DO YOU MEAN?

12             **MS. GRANT:**  I MEAN, THERE'S A LOT OF FRAUD, AND

13   THERE'S A LOT OF PUMP AND DUMP GOING ON IN THE CRYPTO CURRENCY

14   MARKET.  I MEAN, THERE ARE A LOT OF PEOPLE WHO USED TO TRADE

15   -- THIS IS NOW ME TALKING.  BUT THERE'S A LOT OF PEOPLE WHO

16   USED TO TRADE -- MR. BERK, FOR INSTANCE, DOESN'T WANT TO TRADE

17   ANY MORE CRYPTO CURRENCY, BECAUSE IT'S BEEN SO SUFFUSED WITH

18   FRAUD AND ALL KINDS OF SHENANIGANS THAT ARE NOT REGULATED AT

19   THIS POINT, THERE ARE A LOT OF PEOPLE WHO DON'T -- ESPECIALLY

20   RETAIL INVESTORS DON'T WANT TO TRADE ANY MORE.

21             **THE COURT:**  ANY RESPONSE TO --

22             **MR. RAGLAND:**  THERE'S A FEW THINGS, YOUR HONOR, I

23   THINK I NEED TO POINT OUT.

24             FIRST, A LOT OF THINGS HAVE BEEN SAID AT THIS HEARING

25   AND IN THE PLEADING -- IN THE PAPERS, THE OPPOSITION BRIEF,

1   THAT AREN'T ANYWHERE IN THE COMPLAINT, AND I THINK YOUR HONOR

2   HAS POINTED THOSE OUT.

3           ALSO THERE'S A LOT OF THINGS SAID HERE.  "PUMP AND

4   DUMP" HAS BEEN REPEATED.  THAT'S NOWHERE IN THE COMPLAINT.

5   THAT'S A VERY SERIOUS ALLEGATION, AND I THINK IT'S TOTALLY

6   IMPROPER TO MAKE THOSE ALLEGATIONS UNLESS IN A SWORN PLEADING.

7           **THE COURT:**  WELL, BUT I THINK -- I AGREE WITH YOU

8   THEY'RE THROWING THAT TERM AROUND A LOT, BUT I THINK WHEN YOU

9   SORT OF STRIP AWAY THE RHETORIC, WHAT THEY ARE SAYING IS

10  THAT -- I'M SURE THEY'LL CORRECT ME IF I'M WRONG, BUT I THINK

11  WHAT THEY'RE SAYING IS THAT, AT A MINIMUM, COINBASE ROLLED THIS

12  OUT IN A WAY THAT FACILITATED A KIND OF QUASI-PUMP AND DUMP,

13  RIGHT, FACILITATED THE ABILITY OF PEOPLE TO DRIVE UP THE PRICE

14  AND THEN SELL AT THE CEILING, SORT OF KNOWING THAT IT WOULD

15  COME DOWN?

16          **MR. RAGLAND:**  RIGHT.

17          **THE COURT:**  AND THAT THE WAY THEY ROLLED THIS OUT

18  REALLY FACILITATED THAT, AND THE WAY THEY ROLLED IT OUT WAS

19  CONTRARY TO THE PROMISE OF, YOU KNOW, MAKING SURE THAT THEIR

20  MARKETS WOULD BE "ORDERLY MARKETS"; IS THAT FAIR?

21          **MR. RAGLAND:**  YEAH, I BELIEVE THAT'S THEIR

22  IMPLICATION.  THOSE ALLEGATIONS ARE NOWHERE IN THE COMPLAINT.

23  THERE'S ALL THIS TALK OF INSIDER TRADING.  THERE'S NOT A SINGLE

24  ALLEGATION IDENTIFYING ANY PARTICULAR TRADE, THE WHO, WHAT,

25  WHERE, WHEN.  *IQBAL* AND *TWOMBLY* HAVE TO MEAN SOMETHING, MUCH

1    LESS --

2              **THE COURT:**  I MEAN, THAT IS ONE THING I'M CONFUSED

3    ABOUT.  I'M CONFUSED ABOUT HOW IMPORTANT THE ALLEGATIONS OF

4    INSIDER TRADING ARE TO THIS LAWSUIT, RIGHT?  BECAUSE, I MEAN,

5    YOU COULD IMAGINE -- AND I GUESS -- IS THIS THE FIRST AMENDED

6    COMPLAINT?

7              **MR. RAGLAND:**  IT IS, YOUR HONOR.

8              **THE COURT:**  BUT IT'S THE FIRST MOTION TO DISMISS THAT

9    I'VE CONSIDERED, SO I'D HAVE --

10             **MR. RAGLAND:**  WE MOVED ON THE FIRST COMPLAINT, WHICH

11   WAS AN INSIDER TRADING THEORY.  WE MOVED TO DISMISS THAT.

12             **THE COURT:**  RIGHT.

13             **MR. RAGLAND:**  AND THEN THEY FILLED A NEW COMPLAINT

14   RATHER THAN --

15             (SIMULTANEOUS COLLOQUY.)

16             **THE COURT:**  THEY KIND OF WALKED BACK THE INSIDER

17   TRADING PART, BUT THERE'S STILL A LOT OF NOISE IN THERE ABOUT

18   INSIDER TRADING.  WHAT IF THERE WAS NOTHING ABOUT INSIDER

19   TRADING, THOUGH?  I MEAN, WHAT IF -- AND THIS IS A QUESTION

20   DESIGNED TO GET AT HOW IMPORTANT ARE THESE ALLEGATIONS ABOUT

21   INSIDER TRADING TO THESE NEW THEORIES THAT THEY'RE ARTICULATING

22   IN THE FIRST AMENDED COMPLAINT?

23             IF -- LET'S SAY THERE'S NO ALLEGATION OF INSIDER

24   TRADING AND THEY MERELY ALLEGED WHAT I JUST DESCRIBED, RIGHT,

25   WHICH IS THEY ROLLED THIS OUT IN A WAY WHERE IT OBVIOUSLY WAS

1    NOT GOING TO BE ORDERLY, RIGHT, AND, YOU KNOW, THEY HAD

2    PREVIOUSLY MADE ALL THESE STATEMENTS ABOUT HOW THEY WEREN'T

3    GOING TO DO THIS, AND THEN ALL OF A SUDDEN AT 4:00 THEY

4    ANNOUNCE THEY'RE DOING IT POST ONLY; 5:15, THEY ANNOUNCE

5    TRADING IS GOING TO START AT 5:20.  AT 5:15 THEY WOULD HAVE

6    EVERY REASON TO SEE THAT THERE ARE ALL THESE BUY ORDERS IN AND

7    THAT THE STOCK IS GOING TO -- STOCK -- THE PRICE OF THE BITCOIN

8    CASH IS GOING TO SHOOT UP AND IN THE WAY THAT, YOU KNOW, THAT

9    WAS NOT GOING TO -- THE MARKET WAS GOING TO -- THEIR MARKET,

10   THE EXCHANGE, WAS NOT GOING TO BE ABLE TO SUSTAIN.  AND HAD

11   THEY DONE IT IN A MORE ORDERLY WAY BY ANNOUNCING IN ADVANCE

12   THAT THEY ARE MAKING PREPARATIONS TO SUPPORT TRADING AND THEN

13   SORT OF GAVE PEOPLE TIME TO SORT OF ADJUST TO THAT AND THEN

14   LAUNCHED IT, IT WOULD HAVE GONE IN A MUCH MORE ORDERLY WAY.

15        THAT DOESN'T HAVE ANYTHING TO DO WITH INSIDER

16   TRADING.  IT JUST -- IT'S AN ALLEGATION THAT THEY BUNGLED THE

17   ROLL OUT THAT IS -- IN A WAY THAT IS AT LEAST NEGLIGENT, IF NOT

18   UNFAIR BUSINESS PRACTICE.

19        **MR. RAGLAND:**  THOSE ALLEGATIONS THAT STATE THAT CLAIM

20   ARE NOT IN THIS COMPLAINT, YOUR HONOR.

21        **THE COURT:**  OKAY.

22        **MR. RAGLAND:**  ALSO, I THINK THE TIMELINE IS

23   IMPORTANT, VERY IMPORTANT TO THAT ISSUE.

24        MR. BERK, THE PLAINTIFF HERE, HE SIGNED UP FOR THE

25   COINBASE PLATFORM ON AUGUST 30TH, 2017.  THAT'S AN IMPORTANT

1    DATE.  THAT'S ALMOST A MONTH AFTER THE HARD FORK, WHERE BITCOIN

2    CASH FORKED OFF FROM BITCOIN.  SO LET'S LOOK AT THE TIMELINE.

3    THESE ARE ALL FROM THE ALLEGATIONS IN THE COMPLAINT.

4          JULY 19TH, 2017, COINBASE ALERTED THE CUSTOMERS THAT

5    IT WILL NOT SUPPORT A FORK OF BITCOIN, WHICH WAS THE

6    ESTABLISHED DIGITAL CURRENCY.  AT THAT POINT THERE WAS

7    DISCUSSION IN THE COMMUNITY, WILL IT BE SEGWIT, WILL IT BE

8    SOMETHING ELSE, THEY DIDN'T KNOW WHAT THE FORK WOULD LOOK LIKE,

9    BUT THEY'RE TALKING ABOUT A FORK IN THE BLOCK CHAIN.

10         JULY 27TH --

11         **THE COURT:**  WILL IT BE WHAT?  WHAT WAS THAT YOU SAID?

12   THERE WAS TALK -- WILL THERE BE --

13         **MR. RAGLAND:**  THERE WILL BE A FORK OF THE BITCOIN

14   BLOCK CHAIN.

15         **THE COURT:**  YEAH.

16         **MR. RAGLAND:**  BUT THERE WAS A DISCUSSION IN THE

17   COMMUNITY WHAT THAT FORK WOULD LOOK LIKE.  FOR EXAMPLE, ARE WE

18   GOING TO TAKE A CURRENCY, AND ARE WE GOING TO, YOU KNOW,

19   REVALUE IT, WHAT WILL THE REVALUATION BE, WHATEVER.

20         THERE WAS A COUPLE OF BLOCK CHAIN CANDIDATES FOR THAT

21   FORK, ONE SEGWIT, WHICH IS IMPORTANT BECAUSE --

22         **THE COURT:**  SEGWIT, WHAT'S THAT?

23         **MR. RAGLAND:**  IT WAS ANOTHER, BASICALLY, BITCOIN

24   CASH -- A FORK OF THE BITCOIN BLOCK CHAIN.  IT'S SORT OF LIKE

25   FEW THINK BACK TO IS BETAMAX OR VHS GOING TO WIN THE VIDEOTAPE

1  WARS.  I'M CERTAINLY OLD ENOUGH TO REMEMBER THAT.  SEGWIT WAS

2  BETAMAX, AND, YOU KNOW, BITCOIN CASH WAS VHS.  WHO WON?

3  BITCOIN CASH.

4          THAT'S IMPORTANT BECAUSE ONE OF THE SPIKES THEY

5  IDENTIFY IN THE PRICE COINCIDES WITH WHEN THE DECISION WAS MADE

6  BY BITCOIN CASH THIS IS HOW WE'LL GO.  SO THAT'S VERY IMPORTANT

7  AS FAR AS GETTING BEHIND THAT.

8          THE COURT:  IN OTHER WORDS, MID JULY.

9          MR. RAGLAND:  RIGHT.  THERE'S ALL KINDS -- AND ALSO

10  THERE'S --

11          THE COURT:  WHEN WAS THE DECISION MADE ABOUT THE HARD

12  FORK AGAIN?

13          MR. RAGLAND:  WELL, THE DECISION -- AUGUST 1ST WAS

14  THE HARD FORK, AUGUST 1ST, 2017, 29 DAYS BEFORE MR. BERK BOUGHT

15  BITCOIN -- SIGNED UP FOR COINBASE AND BOUGHT BITCOIN.

16          THE COURT:  OKAY.

17          MR. RAGLAND:  SO THAT'S IMPORTANT BECAUSE HE KNEW,

18  BECAUSE COINBASE HAD SAID A MONTH AND A HALF EARLIER, WE'RE NOT

19  SUPPORTING A FORK OF BITCOIN.

20          THE COURT:  RIGHT.

21          MR. RAGLAND:  YOU BUY BITCOIN WITH US, THAT'S ALL YOU

22  GET.

23          THE COURT:  OKAY.

24          MR. RAGLAND:  ON AUGUST -- ON JULY 27TH, COINBASE

25  REITERATED, WE'RE NOT SUPPORTING BITCOIN CASH; WE ARE NOT

1  SUPPORTING A FORK OF BITCOIN, WE'RE NOT GOING TO DO IT.

2          **THE COURT:**  OKAY.

3          **MR. RAGLAND:**  SO ALL THE CUSTOMERS WHO HAD BITCOIN AT

4  THE TIME -- NOT MR. BERK BECAUSE HE WASN'T A CUSTOMER YET OR A

5  USER OF THE EXCHANGE -- THEY COULD TAKE THEIR BITCOIN OUT AND

6  PUT IT IN ONE OF THE MANY OTHER EXCHANGES THAT EXISTED.  THE

7  COMPLAINT REFERS TO THREE OR FOUR OF THEM THAT EXISTED AT THE

8  TIME.  SO --

9          **THE COURT:**  BUT MY UNDER -- JUST TO PAUSE --

10          **MR. RAGLAND:**  SURE.

11          **THE COURT:**  I DON'T WANT TO PREVENT YOU FROM

12  CONTINUING WHAT YOU'RE SAYING, SO -- BUT JUST TO PAUSE VERY

13  BRIEFLY.  MY UNDERSTANDING -- AND, AGAIN, THIS IS NOT REALLY

14  FLESHED OUT IN THE COMPLAINT, BUT MY UNDERSTANDING IS IT --

15  IT'S NOT -- IT'S ACTUALLY A DIFFICULT AND TIME CONSUMING

16  PROCESS TO MOVE YOUR BITCOIN FROM ONE EXCHANGE TO ANOTHER; IS

17  THAT RIGHT?

18          **MR. RAGLAND:**  I THINK THAT'S OVERSTATED IN THE

19  COMPLAINT.  WHEN YOU INITIALLY SIGN UP, IN ORDER TO GET YOUR

20  U.S. CURRENCY TO PURCHASE BITCOIN, FOR EXAMPLE, THERE IS -- YOU

21  GO THROUGH AN AUTHORIZATION TO MAKE SURE IT'S YOU.  IT'S FRAUD

22  PREVENTION.  SO IT MIGHT TAKE A COUPLE OF DAYS.  I KNOW IN MY

23  PERSONAL EXPERIENCE IT TOOK A COUPLE OF DAYS TO SET UP AN

24  ACCOUNT AND TO BE ABLE TO START TRADING.

25          **THE COURT:**  WHAT ABOUT TO GET YOUR BITCOIN OUT OF AN

1    EXCHANGE?

2            **MR. RAGLAND:**  YOU KNOW, I DON'T HAVE -- THERE ARE NO

3    SPECIFIC ALLEGATIONS AS TO THAT.  THERE'S SOME GENERALIZED,

4    WHICH I THINK DON'T PASS THE STANDARD.  I'M NOT SURE THAT'S

5    ACCURATE.  I DON'T KNOW HOW ACCURATE THAT IS, BUT, YOU KNOW,

6    THAT'S SOMETHING THAT I'LL LOOK INTO, AND I THINK IT NEEDS TO

7    BE ALLEGED IF THEY'RE GOING TO STATE A CLAIM.

8            **THE COURT:**  OKAY.

9            **MR. RAGLAND:**  BUT, AGAIN, WE'RE TALKING ABOUT

10   JULY 19TH.  THIS IS, YOU KNOW, WEEKS BEFORE THE HARD FORK, AND

11   ALSO MORE THAN A MONTH BEFORE MR. BERK SIGNED UP --

12           **THE COURT:**  WAIT.  WHAT IS WEEKS BEFORE THE HARD

13   FORK?  SORRY.

14           **MR. RAGLAND:**  JULY 19TH WHEN COINBASE SAID, WE'RE NOT

15   SUPPORTING THE HARD FORK.

16           **THE COURT:**  RIGHT, RIGHT.

17           **MR. RAGLAND:**  THEREFORE, IF YOU HAVE BITCOIN, TAKE IT

18   SOMEWHERE ELSE IF YOU WANT TO TRADE IN THE HARD FORK CURRENCY.

19           SO ON JULY 28TH, 2017, AGAIN COINBASE ALERTED ITS

20   CUSTOMERS, ITS USERS, THAT THEY WILL NOT BE ABLE TO WITHDRAW

21   BITCOIN CASH AFTER THE HARD FORK.  AGAIN, JUST SO YOU KNOW, IF

22   YOU WANT TO TAKE YOUR BITCOIN OUT -- ALL THESE EDUCATED -- BUT

23   IF DOWN THE ROAD COINBASE DECIDES TO SUPPORT BITCOIN CASH,

24   YOU'LL GET THAT EQUIVALENT.

25           SO WHAT HAPPENED ON THE HARD FORK DAY -- I HAVE A

1   HUNDRED BITCOIN, FOR EXAMPLE.  I HAVE A HUNDRED BITCOIN, A

2   HUNDRED BITCOIN CASH.  I GET THE EQUIVALENT NUMBER OF BITCOIN

3   CASH UNITS AS I HAD BITCOIN ON THE HARD FORK.

4           WHAT COINBASE IS SAYING IS, WE'RE NOT SUPPORTING THE

5   FORK, IF WE DECIDE LATER TO, WE'RE NOT GOING TO KEEP YOUR

6   BITCOIN CASH, WE'RE GOING TO GIVE IT TO YOU, AND IT WILL BE IN

7   YOUR ACCOUNT, AND YOU CAN DO WITH IT WHAT YOU WILL.

8           **THE COURT:**  AND WE'RE GOING TO GIVE IT TO YOU AT THE

9   VALUE AS OF THE TIME OF THE HARD FORK?

10          **MR. RAGLAND:**  PRESUMABLY, PRESUMABLY.  THAT'S HOW I

11  READ IT.  I HAVEN'T INVESTIGATED THAT (INDISCERNIBLE).

12          **THE COURT:**  OKAY.

13          **MR. RAGLAND:**  BUT WE CERTAINLY CAN -- HARD FORK ON

14  AUGUST 1ST.  AGAIN -- SO AUGUST 3RD THEN, THERE'S A BLOG POST

15  WHERE COINBASE SAYS, HEY, WE HEARD YOU, COMMUNITY; THE HARD

16  FORK HAS HAPPENED TO BITCOIN CASH, WE GET IT, YOU ALL WANT US

17  TO SUPPORT BITCOIN CASH.  WE'RE WORRIED THERE'S SECURITY

18  CONCERNS, AND WE'RE NOT GOING TO SUPPORT A CURRENCY UNLESS

19  WE'RE -- YOU'RE NOT GOING TO GET YOUR INFORMATION STOLEN, YOUR

20  BANK ACCOUNTS HACKED, THINGS LIKE THAT.

21          **THE COURT:**  YOU MEAN TO MAKE SURE THERE'S GOING TO BE

22  AN ORDERLY MARKET?

23          **MR. RAGLAND:**  SO WE'LL WORK ON THAT SUPPORT -- AGAIN,

24  THIS IS AUGUST 3RD.  AND THEY SAID, QUOTE, WE'RE PLANNING TO

25  HAVE SUPPORT FOR BITCOIN CASH BY JANUARY 1ST, NOT ON

1    JANUARY 1ST, BUT JANUARY 1ST, ASSUMING NO ADDITIONAL --

2            **THE COURT:**  BUT -- BUT IT WAS ONLY -- AT LEAST

3    ACCORDING TO THE ALLEGATIONS IN THE COMPLAINT, THAT WAS TO BE

4    ABLE TO WITHDRAW YOUR BITCOIN CASH, RIGHT.

5            **MR. RAGLAND:**  RIGHT.  WHAT IT SPECIFICALLY SAID --

6    AND THE ALLEGATIONS IN THE COMPLAINT ARE A LITTLE BIT LOOSEY

7    GOOSEY, AND SO -- AND IN THE OPPOSITION BRIEF, TOO, WE CITED

8    AND I BELIEVED WE ATTACHED THE ACTUAL BLOG POST, WHICH IS IN

9    THE RECORD.  I HAVE COPIES HERE IF THE COURT WOULD LIKE.

10           WHAT IT ACTUALLY SAID IS, ONCE BITCOIN CASH IS

11   SUPPORTED, CUSTOMERS CAN WITHDRAW BITCOIN CASH.

12           **THE COURT:**  WITHDRAW?

13           **MR. RAGLAND:**  RIGHT.  WE'LL MAKE A DETERMINATION --

14   AND THIS IS AN EXACT QUOTATION.

15                   "WE'LL MAKE A DETERMINATION AT A

16               LATER DATE ABOUT ADDING TRADING SUPPORT."

17           NOT WE'LL NEVER SUPPORT IT, BUT WE'LL DECIDE.

18   THEY'RE FIGURING THIS OUT, BEING TRANSPARENT WITH THE

19   COMMUNITY.

20           AGAIN, THIS WAS 27 DAYS BEFORE MR. BERK SIGNED UP

21   WITH COINBASE, SIGNED THE USER AGREEMENT, AND BOUGHT BITCOIN.

22           **THE COURT:**  OKAY.

23           **MR. RAGLAND:**  SO 29 DAYS LATER WHEN HE SIGNED UP, HE

24   KNEW ALL THIS INFORMATION HERE.

25           **THE COURT:**  OKAY.

1              **MR. RAGLAND:**  WE'VE GOT TO LOOK AT THE PLAINTIFF HERE

2    AND THE MATERIALITY.  SO, OBVIOUSLY, NO ALLEGED

3    MISREPRESENTATIONS (INDISCERNIBLE) ALLEGED TO BE FALSE AT THE

4    TIME MADE ANYWAY, BUT NONE OF THOSE ARE IN ANY WAY RELEVANT TO

5    MR. BERK, WHO IS THE ONLY PLAINTIFF HERE, BECAUSE HE SIGNED UP

6    ON AUGUST 30TH.

7              AND THEN ON NOVEMBER 13TH, COINBASE NOTIFIED ITS

8    EMPLOYEES, WE'RE ACTUALLY GOING TO SUPPORT, YOU KNOW, BITCOIN

9    CASH, KEEP THIS SECRET, REMEMBER OUR INSIDER TRADING POLICIES,

10   ALL THOSE, AND THEY TRIED TO IMPLY THAT HAVING AN INSIDER

11   TRADING POLICY IS A BAD THING.  I THINK IT'S A GOOD THING.

12             **THE COURT:**  IS THERE ANYTHING IN THE COMPLAINT ABOUT

13   BITCOIN -- ABOUT COINBASE SAYING:  REMEMBER OUR INSIDER TRADING

14   POLICY.

15             **MR. RAGLAND:**  NOTHING IN THE COMPLAINT.  THEY DO

16   REFER TO THE INSIDER TRADING POLICY.

17             **THE COURT:**  OKAY.

18             **MR. RAGLAND:**  THERE'S ALSO NOTHING IN THE COMPLAINT

19   THAT SAYS THEY DIDN'T TELL THEIR EMPLOYEES ABOUT THE INSIDER

20   TRADING POLICY.

21             **THE COURT:**  OKAY.

22             **MR. RAGLAND:**  AND THERE'S, OBVIOUSLY, NO ALLEGATION

23   OF ANY INSIDER ACTUALLY ALLEGING --

24             OKAY.  WELL, THEY DID -- ACTUALLY -- THANK YOU.

25             MS. MEYER POINTS ME TO PARAGRAPH 63 OF THE COMPLAINT.

```
 1   THIS IS TO YOUR HONOR'S QUESTION JUST NOW, WHERE THEY DO SAY

 2   THAT COINBASE APPARENTLY --

 3           THE COURT:  OKAY.

 4           MR. RAGLAND:  -- TOLD ITS EMPLOYEES NOT TO TRADE.  SO

 5   THEY ADMIT THEY TOLD ITS EMPLOYEES NOT TO TRADE.

 6           SO THEN ON DECEMBER 19TH IS WHEN THE ANNOUNCEMENT AND

 7   THE TRADING WAS OPENED.  THIS IS IMPORTANT FOR THE MANIPULATION

 8   CLAIM.  THERE'S NO DOUBT THAT COINBASE IS A SIGNIFICANT

 9   EXCHANGE AND HAS AN EFFECT ON WHAT IT DOES.

10           IF COINBASE HAD SAID IN NOVEMBER, IN JUNE, WHENEVER,

11   WE'RE SUPPORTING BITCOIN CASH ON THIS DATE, THEY WOULD BE

12   ACCUSED OF MARKET MANIPULATION, YOU'RE JUST DRIVING UP THE

13   PRICE SO YOU -- I MEAN, IT'S DAMNED IF YOU DO, DAMNED IF YOU

14   DON'T.

15           WHAT COINBASE DID WAS ANNOUNCED TRADING WAS OPENED

16   WHEN THEY'RE -- AS SOON AS THEY WERE READY AND CONFIDENT THAT

17   WOULD BE POSSIBLE TO DO THAT TECHNOLOGICALLY.

18           WHEN THE BOOKS OPENED -- I DON'T THINK THE DISCUSSION

19   OF POST-ONLY MODE AND 4:00 O'CLOCK AND 5:00 O'CLOCK, I DON'T

20   THINK THAT'S FULLY ACCURATE.  IT'S CERTAINLY NOT ALLEGED IN THE

21   COMPLAINT.  IT NEEDS TO BE.

22           AND THEN THEY SHUT THINGS DOWN WHEN IT LOOKED BAD.

23           COINBASE IS AN EXCHANGE.  MR. BERK POSTED, I WANT TO

24   BUY SOME BITCOIN CASH.  SOMEONE ELSE, WE DON'T KNOW WHO, SAID I

25   WANT TO SELL IT.  HE PLACED AN ORDER AT THE TIME THE PRICE WAS
```

1    AROUND $2,000 A UNIT.  BY THE TIME THAT ORDER GOT FILLED, JUST,

2    LIKE OTHER MARKETS -- YOU KNOW, THERE'S A LINE FOR PEOPLE TO

3    FILL -- AT THE TIME IT WAS FILLED, IT WAS $4,000, $4,200.  HE

4    HAD THE OPPORTUNITY TO CANCEL.  THERE'S ALLEGATIONS THE CANCEL

5    BUTTON WASN'T WORKING AT SOME POINT, BUT NO ALLEGATION THAT

6    MR. BERK WAS UNABLE TO CANCEL OR THAT HE TRIED TO AND --

7              **THE COURT:**  QUICK QUESTION ABOUT THAT.  IS THERE --

8    AND, AGAIN, THIS IS SOMETHING THAT'S NOT IN THE COMPLAINT, BUT

9    IS THIS, LIKE, A REGULAR -- LIKE, IF YOU HAVE AN ACCOUNT ON

10   CHARLES SCHWAB, OR WHATEVER, AND YOU'RE BUYING STOCK, IS IT A

11   SITUATION WHERE YOU PUT IN AN ORDER TO BUY SOMETHING, AND IT'S

12   OUT THERE PENDING, AND YOU'RE WATCHING THE STOCK PRICE GO UP?

13   IS ONE ABLE TO WATCH THE PRICE OF BITCOIN CASH GO UP?

14             **MR. RAGLAND:**  YES.  YES, THERE IS.

15             **THE COURT:**  AFTER THEY'VE PUT IN THEIR ORDER?

16             **MR. RAGLAND:**  AND, IMPORTANTLY, ALSO, WHEN YOU PLACE

17   YOUR ORDER, YOU CAN SET A LIMIT.  YOU CAN SAY:  I WANT A

18   HUNDRED UNITS OF BITCOIN CASH, BUT I DON'T WANT TO PAY MORE

19   THAN $2,000 PER UNIT.  AND IF THE PRICE IS TOO HIGH BY THE TIME

20   THE ORDER GETS TO BE FILLED, YOUR ORDER WON'T BE COMPLETED.

21             SO, AGAIN, THAT'S SOMETHING THAT IS -- THAT'S A FACT

22   THAT'S ABSENT FROM THE COMPLAINT THAT'S VERY IMPORTANT.

23             SO I THINK THAT, YOUR HONOR -- I'M HAPPY TO ANSWER

24   ANY QUESTIONS.  I THINK WHERE WE ARE IS THERE'S NO ALLEGATION

25   OF HOW COINBASE BENEFITED FROM ANY OF THIS.  THERE'S NO ACTUAL

1    ALLEGATIONS OF ANY ACTUAL INSIDER TRADING OR ANY CONDUCT THAT

2    IS ALLEGED THAT CAN STATE A CLAIM FOR ANY OF THESE CLAIMS.

3             AND I'LL ANSWER ANY QUESTIONS THE COURT HAS.

4         **THE COURT:**  WELL, I MEAN, I GUESS THE ONLY QUESTION,

5    I GUESS, I HAVE FOR YOU RIGHT NOW IS:  COULDN'T YOU -- IT MAY

6    BE THAT THEY NEED TO DO A BETTER JOB OF ALLEGING IT AND JUST

7    SORT OF A MORE THOROUGH JOB OF EXPLAINING HOW ALL THIS WORKS

8    AND WHY THE CHOICES THAT COINBASE MADE WERE BAD CHOICES AND ALL

9    THAT.  BUT COULDN'T YOU -- I MEAN, IF YOU'RE BEING CHARITABLE

10   TO THE ALLEGATIONS IN THE COMPLAINT, I MEAN, COULDN'T YOU TEASE

11   OUT A NEGLIGENCE CLAIM AT A MINIMUM FOR THE REASONS THAT I'VE

12   KIND OF ALREADY LAID OUT?

13        **MR. RAGLAND:**  RIGHT.  THAT'S -- I'M HAPPY TO ADDRESS

14   NEGLIGENCE.  SO THE ANSWER, I THINK, IS NO, CERTAINLY NOT BASED

15   ON THESE ALLEGATIONS.  WELL FOR A COUPLE OF REASONS.  ONE AS TO

16   A MATTER OF LAW, THEY ALLEGE ONLY ECONOMIC LOSSES, AND THE

17   ECONOMIC LOSS RULE DOES NOT PERMIT THEM TO GET ONLY ECONOMIC

18   LOSSES UNDER TORT.  SO IT'S GONE FOR THAT REASON.

19             THEY NEED SOME SORT OF SPECIAL RELATIONSHIP.  THEY

20   HAVEN'T ALLEGED IT.  THAT'S THE (INDISCERNIBLE) FACTORS.  AND

21   SO, NO, THEY CAN'T -- THE NEGLIGENCE.  ALSO, THEY DON'T

22   ACTUALLY ALLEGE WHAT WAS NEGLIGENT.  WE'RE NOT IN A RES IPSA

23   SITUATION.

24        **THE COURT:**  I GUESS I'M PIVOTING A LITTLE BIT TO --

25   WELL, THEY DEFINITELY DON'T DO A GREAT JOB OF ALLEGING IT, BUT

1   COULDN'T YOU TEASE OUT FROM THE ALLEGATIONS THAT -- CAN YOU

2   INFER FROM THE ALLEGATIONS THAT WHAT COINBASE REALLY SHOULD

3   HAVE DONE IS ANNOUNCED FURTHER IN ADVANCE THAT THEY WERE GOING

4   TO -- MAKING PREPARATIONS TO SUPPORT TRADING IN BITCOIN CASH

5   AND ANNOUNCED -- GIVEN MORE LEAD TIME TO THE -- TO ITS

6   CUSTOMERS IN THE ANNOUNCEMENT ABOUT WHEN TRADING IN BITCOIN

7   CASH WAS GOING TO START?

8   **MR. RAGLAND:**  BUT I DON'T UNDERSTAND HOW IT WAS

9   NEGLIGENT NOT TO DO THAT?  I THINK THEY NEED TO ARTICULATE

10   THAT, OR ELSE WE'RE IN A SITUATION WHERE HEADS I WIN, TAILS YOU

11   LOSE.  IT'S LIKE IF THE ANNOUNCEMENT IS EARLIER, YOU'RE

12   MANIPULATING THE MARKET, TRYING TO DRIVE THE PRICE UP, BENEFIT

13   YOUR INSIDERS.  IF THE ANNOUNCEMENT IS IN REAL TIME SO THE

14   ENTIRE WORLD KNOWS WHEN IT'S GOING TO START, THEN IT'S:  YOU'RE

15   MANIPULATING THE MARKET.  I MEAN, IT NEEDS TO BE ALLEGED.

16   I DON'T UNDERSTAND BASED ON THAT -- BASED ON THAT,

17   HOW IS IT THAT ADDITIONAL LEAD TIME WOULD SOMEHOW BE -- NOT

18   GIVING THAT WAS SOMEHOW NEGLIGENT.  THEY DON'T ARTICULATE IT.

19   I HONESTLY DON'T HAVE ANY CLUE HOW THAT'S NEGLIGENT.

20   **THE COURT:**  OKAY.

21   **MR. RAGLAND:**  ASIDE FROM THE ECONOMIC LOSS RULE AND

22   ALL THE OTHER LEGAL REASONS WHY THEY HAVEN'T MET THEIR BURDEN

23   ON A NEGLIGENCE CLAIM.

24   **THE COURT:**  OKAY.  BEFORE WE TURN TO THE ARBITRATION

25   ISSUE, DO YOU WANT TO JUST HAVE THE LAST WORD ON THE MOTION TO

1  DISMISS?

2          **MR. GREEN:**  A COUPLE OF POINTS, YOUR HONOR.

3          FIRST OF ALL, ONCE THEY HAD THE ORDER BOOK IN THE

4  POST-ONLY MODE FOR AN HOUR AND A HALF, THEY COULD MAKE A

5  DECISION WHETHER OR NOT TO GO FORWARD OR NOT AT 5:15 AND 5:20,

6  AND THEY DECIDED TO GO AHEAD.  I THINK THAT'S PART OF WHAT WE

7  ALLEGE AS THE NEGLIGENCE.

8          **THE COURT:**  BUT THAT HAS NOTHING TO DO WITH THE WAY

9  IT WAS ROLLED OUT AND THE FACT THAT IT WASN'T ANNOUNCED IN

10  ADVANCE; THAT IS JUST ABOUT THE DECISION TO -- THE SORT OF

11  SPLIT SECOND DECISION TO NOT -- TO NOT STOP THE PRESSES,

12  BASICALLY, AT 5:15 OR 5:20 OR WHATEVER IT WAS.

13          **MR. GREEN:**  THAT'S ONE OF THE DECISIONS THAT WAS MADE

14  ALONG THE WAY THAT WAS NEGLIGENT.

15          BUT, ALSO, I THINK WE'VE LAID OUT THE FACTS THAT

16  DEMONSTRATE THAT THEIR SYSTEMS WERE NOT CAPABLE OF HANDLING

17  THIS PROCESS IN A WAY THAT IT SHOULD HAVE BEEN ABLE TO HANDLE

18  IT, IN A WAY THAT THEY SAID THEY WERE GOING TO BE ABLE TO

19  HANDLE IT.  AND IT REALLY FOLLOWS THE SAME ANALOGY --

20          **THE COURT:**  WHERE ARE YOU IN THE COMPLAINT ON THAT

21  ISSUE?

22          **MR. GREEN:**  WELL, I MEAN, THAT'S REALLY ALL THE

23  REPRESENTATIONS THAT WE TALKED ABOUT EARLIER, ABOUT HOW THEY

24  WERE GOING TO DO THE WORK AND WHAT IT WOULD TAKE TO DO IT

25  RIGHT, FOLLOWED BY THE CHRONOLOGY OF HOW IT ACTUALLY

```
 1   HAPPENED --
 2              THE COURT:  OKAY.
 3              MR. GREEN:  -- TOGETHER.
 4              AND IT REALLY FOLLOWS THE SAME ANALYSIS OF THE IPO
 5   CASE THAT WE CITED IN OUR BRIEF, THE NASDAQ IPO AND SECURITIES
 6   AND DERIVATIVE LITIGATION -- I'M SORRY -- THE FACEBOOK, IN
 7   WHICH NASDAQ WAS FOUND NEGLIGENT OR FILED A COMPLAINT ON
 8   NEGLIGENCE, APPLYING TO SAME KIND OF DUTY THEORY THAT WE HAVE
 9   HERE AND IN THE SAME KIND OF:  YOU SAID YOU WERE GOING TO BE
10   ABLE TO HANDLE THIS KIND OF AN ORDERLY MARKET AND YOU WERE NOT
11   ABLE TO DO THAT, THEREFORE, IT STATES A NEGLIGENCE CLAIM.  SO
12   WE'RE REALLY RELYING ON THAT ANALYSIS THAT'S SET OUT THERE.
13              AND THEN THE FINAL POINT I WOULD MAKE ON THIS IS THAT
14   THE DEFENDANTS HAVE KIND OF TWISTED OUR NEGLIGENT
15   MISREPRESENTATION CLAIMS INTO TRYING TO ADDRESS STATEMENTS OF
16   WE DON'T SAY ARE FALSE.  BUT, REALLY, WHAT IT COMES DOWN TO,
17   WHEN THEY DID OPEN THE MARKET AT 5:15 OR 5:20, OR EVEN THE
18   4:00 O'CLOCK ON THAT DAY, AFTER HAVING MADE THE REPRESENTATIONS
19   ABOUT WE WILL NOT DO THIS UNLESS WE ARE FULLY CAPABLE AND IT
20   WILL BE AN ORDERLY MARKET, THAT BECOMES THE MISREPRESENTATION
21   THAT PEOPLE RELY ON, BECAUSE YOU'RE SAYING WE'RE OPEN, WELL,
22   YOU ALREADY TOLD US YOU WOULDN'T OPEN UNLESS IT WERE SAFE AND
23   ORDERLY, SO SAYING WE'RE OPEN MEANS YOU'RE OPEN SAFE AND
24   ORDERLY, AND 2-1/2 MINUTES LATER IT'S CLOSED, AND THEY GO
25   THROUGH ALL THIS CRAZY PROCESS.
```

1          SO THE NEGLIGENT REPRESENTATION IS REALLY WRAPPED UP

2     IN THAT.

3          **THE COURT:**  IT'S REALLY -- I MEAN, IN THAT RESPECT,

4     IT'S SORT OF -- I MEAN, IS IT A MISREPRESENTATION OR IS IT AN

5     OMISSION.

6          **MR. GREEN:**  I COULD ARGUE BOTH SIDES OF IT.  I MEAN,

7     YOU'VE MADE A STATEMENT AT THAT POINT WHICH COULD -- WE'RE

8     OPEN; WELL, THAT'S TRUE, BUT THERE'S FURTHER INFORMATION THAT'S

9     NEEDED TO UNDERSTAND -- FOR A PURCHASER OR TRADER IN BITCOIN

10    CASH, THERE'S FURTHER INFORMATION THAT'S NECESSARY IN ORDER TO

11    MAKE THAT STATEMENT NOT MISLEADING, BECAUSE YOU'RE MAKING IT IN

12    THE CONTEXT OF HAVING MADE EARLIER STATEMENTS YOU WOULD ONLY DO

13    SO IF YOU'VE DONE ALL THE WORK TO MAKE IT ORDERLY.

14         **THE COURT:**  OKAY.  ALL RIGHT.

15         **MR. GREEN:**  SO THE ADDITIONAL INFORMATION WOULD BE,

16    YEAH, BUT WE HAVEN'T -- WE'RE DOING IT SUDDENLY FOR WHATEVER

17    REASON AT 5:20 ON DECEMBER 19TH AND WE HAVEN'T DONE ALL THE

18    WORK NECESSARY TO MAKE IT ORDERLY.

19         **THE COURT:**  AND I GUESS WE SHOULD REALLY TURN TO THE

20    ARBITRATION ISSUE, BUT LET ME JUST ASK ONE MORE QUESTION.

21         CAN YOU TELL ME A LITTLE BIT MORE ABOUT THE REASON --

22    ARE THERE ANY MORE FACTS ABOUT THE REASON WHY COINBASE DECIDED

23    TO SUPPORT TRADING WHEN IT DID AT THE PARTICULAR TIME THAT IT

24    DID?

25         **MR. GREEN:**  THE OTHER FACT THAT WE HAVEN'T TALKED

1    ABOUT IS THE FACT THAT THE CME BEGAN -- MAYBE YOU CAN ADDRESS

2    THIS --

3          **MS. GRANT:**  THE CME BEGAN FUTURES TRADING THE DAY

4    BEFORE --

5          **THE COURT:**  CHICAGO MERCANTILE EXCHANGE?

6          **MS. GRANT:**  YES, THE DAY BEFORE -- NOW, NOT ON

7    BITCOIN CASH, WHICH, BY THE WAY, DOES TRADE FUTURES, BUT ON

8    BITCOIN ITSELF.

9          **THE COURT:**  AND WHAT'S -- SO -- THAT WAS ANOTHER

10   QUESTION THAT I HAD FROM READING THE COMPLAINT, IS YOU SEEM TO

11   INTIMATE IN THE COMPLAINT THAT THE TIMING OF COINBASE'S

12   DECISION TO SUPPORT TRADING RE- -- AND DECISION ABOUT WHEN TO

13   START SUPPORTING TRADING RELATED IN SOME WAY TO THE OPENING OF

14   BITCOIN FUTURES ON THE CHICAGO MERCANTILE EXCHANGE.  BUT I

15   COULDN'T UNDERSTAND -- THIS IS ANOTHER EXAMPLE OF I DIDN'T --

16   YOU SEEM TO THINK THAT I WOULD UNDERSTAND THE RELATIONSHIP

17   BETWEEN THOSE TWO THINGS, BUT I DIDN'T -- THERE WAS -- AND,

18   THEREFORE, PERHAPS THERE WAS NO REAL EXPLANATION OF THE

19   RELATIONSHIP BETWEEN THOSE TWO THINGS IN THE COMPLAINT, AND I

20   DIDN'T UNDERSTAND IT.

21         **MS. GRANT:**  I CAN'T SAY, YOUR HONOR, AT THIS

22   JUNCTURE, THAT WE TOTALLY UNDERSTAND IT OURSELVES.  I DO

23   UNDERSTAND THAT IT'S UNDER INVESTIGATION BY THE CFTC.

24         AND BECAUSE OPENING BCH AND LAUNCHING IT WHEN THEY

25   DID AFFECTED THE PRICE OF BITCOIN THAT WAS BEING TRADED BY THE

1   CME.  SO THE CME'S TRADING FUTURES.  THEY USE COINBASE AS ONE

2   OF THE PLATFORMS TO -- AS AN INDEX TO SET PRICES.  AND THEY

3   KNEW THAT ONCE COINBASE OPENED BCH, INITIALLY EVERYBODY WAS

4   GOING TO RUN INTO BCH, AND IT WAS GOING TO TANK AND LOWER THE

5   PRICE OF BITCOIN CASH -- OF BITCOIN.  I'M SORRY.  AND THAT WAS

6   GOING TO AFFECT THE PRICE ON THE FUTURES EXCHANGE.

7          THE TIMING IS JUST TOO FORTUITOUS THAT THAT HAPPENED

8   AND THAT THERE IS A CONNECTION BETWEEN THE PRICE OF BITCOIN

9   CASH AND BITCOIN, PARTICULARLY AT THAT TIME.  AND, IN FACT,

10   THAT'S WHAT HAPPENED, WHICH IS BITCOIN'S PRICE PLUMMETED AS A

11   RESULT OF COINBASE LAUNCHING BITCOIN CASH.

12          **THE COURT:**  AND SO THE THEORY IS THAT THE REASON

13   COINBASE WAS IN A RUSH TO SUPPORT TRADING AND ANNOUNCED IT SO

14   QUICKLY, AND THE ANNOUNCEMENT WAS SO SUDDEN, IS THAT BITCOIN

15   FUTURES BEGAN BEING TRADED ON THE CHICAGO MERCANTILE EXCHANGE

16   THE DAY BEFORE?

17          **MS. GRANT:**  THAT'S CORRECT.

18          **THE COURT:**  AND COINBASE KNEW THAT THIS LAUNCH WOULD

19   REDUCE THE PRICE OF --

20          **MS. GRANT:**  BITCOIN.

21          **THE COURT:**  -- OF THE FUTURES?

22          **MS. GRANT:**  YES.

23          **THE COURT:**  AND THAT SO IT'S ANOTHER --

24          **MS. GRANT:**  REDUCE THE PRICE OF BITCOIN, SO ANYONE

25   WHO HAD FUTURES, AND ESPECIALLY IF THEY WERE SHORT FUTURES,

1  WOULD MAKE A KILLING.  SO WE THINK THERE'S A CONNECTION.

2          **THE COURT:**  AND SO YOUR THEORY -- YOU HAVEN'T ALLEGED

3  IT, BUT YOUR THEORY IS THAT SOMEBODY WHO WAS INVOLVED --

4  SOMEBODY AT COINBASE WHO WAS INVOLVED IN THE DECISION TO

5  HURRIEDLY ANNOUNCE THAT IT WAS SUPPORTING TRADING IN BITCOIN

6  CASH WAS -- STOOD TO BENEFIT FROM THE PRICE OF BITCOIN FUTURES

7  GOING DOWN ON THE CHICAGO MERCANTILE EXCHANGE?

8          **MS. GRANT:**  ESSENTIALLY, YES.

9          **THE COURT:**  BUT, AGAIN, THAT'S NOT IN THE COMPLAINT,

10  SO WHAT AM I SUPPOSED TO DO WITH THAT THEORY THAT YOU'VE

11  JUST -- THAT YOU'VE JUST AFFIRMED?

12          **MS. GRANT:**  IT PERHAPS CAN USE A LITTLE -- I MEAN,

13  THE ALLEGATION IS IN THE COMPLAINT.  PERHAPS IT COULD USE A

14  LITTLE MORE FLUSHING OUT.  THE PROBLEM IS IT'S CURRENTLY UNDER

15  INVESTIGATION, AND THERE'S JUST SO MUCH ABOUT IT THAT WE KNOW.

16          **MR. RAGLAND:**  MAY I RESPOND TO THAT POINT, YOUR

17  HONOR?

18          **THE COURT:**  SURE, BRIEFLY.

19          **MR. RAGLAND:**  WELL, FIRST, IT'S JUST FALSE, AND THIS

20  IS AN EXAMPLE OF MANY THINGS THEY SAID, THIS MUST HAVE HAPPENED

21  BECAUSE OF THIS, WHICH ARE JUST STATEMENTS WITH NO EVIDENTIARY

22  SUPPORT, NO ALLEGATION TO SUPPORT IN THE COMPLAINT, AND THAT

23  HAPPENED TO BE JUST FALSE.

24          AND AS FAR AS LOOKING AT THE COMPLAINT, THIS BRINGS

25  UP JUST THE PURE -- YOU KNOW, MS. GRANT SAID, WE DON'T

1    UNDERSTAND, OURSELVES, THE CONNECTION BETWEEN THIS CHICAGO

2    MERCANTILE EXCHANGE, BITCOIN AND THIS.

3          IF YOU DON'T UNDERSTAND, YOURSELF, DON'T ALLEGE IT IN

4    OPEN COURT AND AGAINST MY CLIENT.  I THINK THAT'S IMPROPER.

5          IF WE LOOK AT THE COMPLAINT, INDICATIVE OF THIS

6    WHOLE, THIS HAPPENED AND, THEREFORE, IT MUST BE BAD, IS

7    PARAGRAPH 16, WHICH THEY RELY ON HEAVILY, THEY SAY THERE'S

8    THESE SPIKES IN TRADING AND THAT INDICATES SOMETHING WRONG.

9    THEY DON'T EVEN SAY THAT THEY KNOW IT'S INSIDER TRADING.  THEY

10   SAY SPECIFICALLY THAT IT IMPLIES.

11          **THE COURT:**  DOESN'T IT PRETTY STRONGLY IMPLY, THOUGH?

12          **MR. RAGLAND:**  WELL, THEY DON'T IDENTIFY ANY PURPORTED

13   INSIDER.  THEY DON'T IDENTIFY ANY TRADES.  THEY DON'T IDENTIFY

14   ANY VOLUMES SUFFICIENT TO CAUSE THOSE SPIKES.  WHAT'S THE

15   VOLUME THAT CAUSES THE SPIKE?

16          **THE COURT:**  BUT THERE'S NO PUBLIC RECORD --

17          **MR. RAGLAND:**  IT MIGHT BE BILLIONS OF DOLLARS WORTH

18   OF TRADES.

19          **THE COURT:**  THERE'S NO PUBLIC RECORD OF WHO'S TRADING

20   IN THIS STUFF, RIGHT?

21          **MR. RAGLAND:**  BUT THERE'S VOLUME RECORDS.  THEY CAN

22   FIGURE OUT HOW MUCH VOLUME WOULD BE REQUIRED TO CAUSE THAT

23   SPIKE.  IT MIGHT BE BILLIONS OF DOLLARS.  IT MIGHT BE MORE THAN

24   THE ENTIRE HOLDINGS WITHIN THE COINBASE PLATFORM.  I DON'T

25   KNOW.  BUT THEY HAVEN'T ALLEGED THAT.  AND SO IT'S JUST AN

1    EXAMPLE OF THESE ALLEGATIONS THAT I THINK DON'T PASS *TWOMBLY*

2    AND *IQBAL* STANDARDS, MUCH LESS RULE 9(B) STANDARDS AND THAT I

3    THINK NEED TO BE PARTICULARIZED BECAUSE WE NEED TO KNOW WHAT

4    WE'RE SHOOTING AT BECAUSE SO MUCH HAS BEEN SAID THAT'S JUST

5    SIMPLY FALSE.

6          **THE COURT:**  OKAY.  ON THE ARBITRATION, MS. MEYER, I

7    GUESS I SHOULD TALK TO YOU PRIMARILY.

8          **MR. RAGLAND:**  THANK YOU, YOUR HONOR.

9          **THE COURT:**  THANK YOU.

10         **MS. MEYER:**  YES, YOUR HONOR.

11         **THE COURT:**  OKAY.  I GUESS LET ME MAKE TWO

12   PRELIMINARY -- LET ME GIVE YOU TWO PRELIMINARY THOUGHTS.  LET

13   ME PULL UP THE ARBITRATION STUFF HERE.

14         OKAY.  SO, FIRST, ON THE DELEGATION ISSUE, IT SEEMS

15   TO ME THAT THE PROBLEM YOU HAVE IS IN THE WAY THE ARBITRATION

16   PROVISION HAS BEEN DRAFTED, RIGHT?  AND YOU HAVE -- YOU KNOW,

17   YOU HAVE THE REFERENCE TO THE AMERICAN ARBITRATION

18   ASSOCIATION'S RULES, AND THERE'S SOME QUESTION ABOUT IN THIS

19   CONTEXT WHETHER THE REFERENCE TO THE AMERICAN ARBITRATION

20   ASSOCIATION'S RULES ON ITS OWN, WITHOUT MORE, IN THIS CONTEXT

21   WOULD CONSTITUTE A CLEAR AND UNMISTAKABLE DELEGATION.

22         BUT LET'S ASSUME -- LET'S ASSUME THAT WITHOUT MORE IT

23   WOULD.  THE PROBLEM IS YOU HAVE THIS SENTENCE AT THE END OF THE

24   ARBITRATION PROVISION THAT SAYS IF A COURT DECIDES THAT ANY

25   PROVISION OF THIS SECTION 7.2 IS INVALID OR UNENFORCEABLE, THAT

1  PROVISION SHALL BE SEVERED AND THE OTHER PARTS OF THIS SECTION

2  IN 7.2 SHALL STILL APPLY.

3          SO IN CONTRAST TO THE *MOHAMED VERSUS UBER* CASE, AND

4  IN CONTRAST TO, I THINK, ALL OF THE DISTRICT COURT CASES YOU

5  CITE WHERE THAT SEVERABILITY PROVISION REFERENCES THE ENTIRE

6  CONTRACT, THIS SEVERABILITY PROVISION REFERENCES ONLY THE

7  ARBITRATION PROVISION WITHIN THE CONTRACT.

8          AND SO IN LIGHT OF THAT, I THINK THAT -- I THINK THAT

9  JUDGE CHEN'S ANALYSIS, JUDGE CHEN'S ASSESSMENT OF THE

10  SIGNIFICANCE OF THE SEVERABILITY PROVISION DIDN'T WORK IN

11  *MOHAMED VERSUS UBER*, BUT DOES WORK HERE.  IN OTHER WORDS, THAT

12  KIND OF -- THAT ANALYSIS DOES APPLY HERE SINCE THAT

13  SEVERABILITY PROVISION IS IN THE ARBITRATION PROVISION AND

14  REFERENCES ONLY THE ARBITRATION PROVISION.

15          SO THAT'S NUMBER ONE.  YOU CAN ADDRESS -- OBVIOUSLY,

16  YOU CAN ADDRESS THAT.

17          BUT, NUMBER TWO, I GUESS, WOULD BE -- LET'S ASSUME

18  THAT YOU ARE UNABLE TO TALK ME OUT OF THE POSITION THAT I JUST

19  ARTICULATED ON THAT, WOULDN'T THE -- WOULDN'T IT MAKE THE MOST

20  SENSE -- WELL, YOU KNOW WHAT?  THE SECOND POINT I'M

21  ARTICULATING IS A LITTLE COMPLICATED, AND SO WHY DON'T WE

22  BOOKMARK IT AND TALK ABOUT THE FIRST POINT FIRST.  GO AHEAD.

23          **MS. MEYER:**  OKAY.  SO I THINK THE IMPORTANT THING TO

24  KEEP IN MIND ABOUT THE *MOHAMED* DECISION, BOTH JUDGE CHEN'S

25  DECISION INITIALLY AND THEN THE NINTH CIRCUIT'S REVERSAL OF

1    JUDGE CHEN'S ORDER, IS THAT WE WEREN'T TALKING ABOUT A

2    SEVERABILITY PROVISION.  WE WERE TALKING ABOUT A VENUE

3    PROVISION.

4            **THE COURT:**  OH, OKAY.

5            **MS. MEYER:**  AND, YES, THAT WAS SEPARATE FROM THE

6    ARBITRATION CLAUSE.

7            **THE COURT:**  YES.

8            **MS. MEYER:**  BUT WHAT THE VENUE PROVISION --

9            **THE COURT:**  BUT THE DISTRICT COURT CASES THAT YOU

10   CITED TO ME WERE ABOUT SEVERABILITY PROVISIONS, AM I

11   REMEMBERING THAT CORRECTLY?

12           **MS. MEYER:**  YES, YOUR HONOR.  THOSE DISTRICT COURT

13   CASES DID INVOLVE A SEVERABILITY PROVISION OUTSIDE OF THE

14   ARBITRATION AGREEMENT.

15           **THE COURT:**  RIGHT.

16           **MS. MEYER:**  SO THERE ISN'T A CASE THAT IS EXACTLY ON

17   POINT WITH THE FACTS WE HAVE HERE.  HOWEVER, IN *MOHAMED* --

18           **THE COURT:**  BUT DOESN'T THAT -- BUT -- BUT DOESN'T

19   THAT MAKE A VERY BIG DIFFERENCE?  I MEAN, IF THE SEVERABILITY

20   PROVISION GOVERNS THE ENTIRE CONTRACT, THEN, OF COURSE, THERE

21   WOULD BE EVERY REASON TO INCLUDE THE SEVERABILITY PROVISION

22   THAT REFERENCES A COURT EVEN IF THERE WERE A CLEAR AND

23   UNMISTAKABLE DELEGATION TO THE ARBITRATOR TO DECIDE

24   ARBITRABILITY BECAUSE WE KNOW THERE ARE OTHER REASONS YOU MIGHT

25   END UP IN COURT ON THE CONTRACT, THE INJUNCTIVE RELIEF,

1   WHATEVER.  BUT SINCE THE SEVERABILITY PROVISION, WHICH

2   CONTEMPLATES COURT ACTION, IN THE ARBITRATION PROVISION

3   THERE -- THAT SEEMS TO RENDER IT AMBIGUOUS BECAUSE --

4   PARTICULARLY, IN LIGHT OF THE FACT THAT THERE IS NO ACTUAL

5   EXPLICIT STATEMENT IN THE ARBITRATION PROVISION ABOUT

6   DELEGATIONS, JUST A REFERENCE TO THE RULES OF THE AMERICAN

7   ARBITRATION ASSOCIATION.  I MEAN, THERE WOULD BE NO -- DOESN'T

8   IT MAKE IT AMBIGUOUS ABOUT WHETHER THERE MIGHT SOMETIMES BE

9   COURT INVOLVEMENT ON THE ARBITRABILITY QUESTION?

10         **MS. MEYER:**  I DON'T THINK IT DOES RENDER IT AMBIGUOUS

11  AND THIS IS WHY:  OBVIOUSLY, THERE ARE SITUATIONS EVEN WHEN YOU

12  HAVE A DELEGATION PROVISION WHERE YOU'RE GOING TO END UP IN

13  COURT TALKING ABOUT ENFORCEABILITY OF THAT DELEGATION

14  PROVISION.  THAT'S WHY WE'RE HERE TODAY.  YOUR HONOR, IS

15  DECIDING WHETHER --

16         **THE COURT:**  WELL, IT'S ENFORCEABILITY OF THE

17  ARBITRATION PROVISION AT ALL.

18         **MS. MEYER:**  ARBITRATION PROVISION, BUT ALSO -- THAT'S

19  TRUE, BUT --

20         **THE COURT:**  SO WHAT WOULD BE -- SO IF THERE WERE A

21  CLEAR AND UNMISTAKABLE DELEGATION TO THE ARBITRATOR TO DECIDE

22  THE QUESTION OF ARBITRABILITY, WHAT WOULD BE THE CIRCUMSTANCE

23  IN WHICH YOU WOULD BE IN COURT ARGUING ABOUT WHETHER SOME OF

24  THESE PROVISIONS IN THIS ARBITRATION CLAUSE SHOULD BE SEVERED?

25         **MS. MEYER:**  WELL, THIS CASE IS AN EXAMPLE.  WE'RE

1   HERE ARGUING ABOUT -- THERE IS CLEAR AND --

2           **THE COURT:**  WE'RE HERE ARGUING ABOUT WHETHER

3   THERE'S -- ARGUING ABOUT WHETHER THERE'S A CLEAR AND

4   UNMISTAKABLE DELEGATION.

5           **MS. MEYER:**  I UNDERSTAND THAT.  BUT PART OF THE

6   ARGUMENT IS THAT, MR. BERK, FOR EXAMPLE, IS AN UNSOPHISTICATED

7   CONSUMER, AND THAT, THEREFORE, THE DELEGATION PROVISION IS NOT

8   ENFORCEABLE AS TO HIM IN THE CONTEXT OF THIS CASE.  AND YOUR

9   HONOR IS GOING TO DECIDE THE ENFORCEABILITY OF THE DELEGATION

10  PROVISION IN THE CONTEXT OF THAT CASE AND SO THE SEVERABILITY

11  PROVISION --

12          **THE COURT:**  BUT THERE'S NOTHING ABOUT SEVERABILITY

13  THERE, THOUGH, IN WHAT YOU JUST SAID --

14          **MS. MEYER:**  I DISAGREE.

15          **THE COURT:**  THE QUESTION IS JUST -- WOULD MERELY BE

16  ABOUT WHETHER -- WHETHER TO DELEGATE -- WHETHER THE -- WHETHER

17  THE ARBITRABILITY QUESTION SHOULD BE DELEGATED TO THE

18  ARBITRATOR, RIGHT?

19          **MS. MEYER:**  I SUPPOSE THAT'S THE CASE, BUT THE IDEA,

20  I BELIEVE, OF WHAT IS HAPPENING IN SECTION 7.2 IS THAT EVEN IF

21  THE ARBITRATION QUESTIONS AREN'T DELEGATED TO THE ARBITRATOR,

22  THE REST OF 7.2 AND THE REST OF THE RULES SET OUT IN 7.2 ARE

23  STILL IN PLACE, EVEN IF THAT ONE PROVISION THROUGH THE AAA

24  RULES ISN'T ENFORCEABLE.

25          AND SO IT'S A -- IT'S A CONDITIONAL PROVISION.  IF WE

 1    END UP IN A SITUATION WHERE A COURT IS DECIDING ENFORCEABILITY

 2    OF THIS SECTION 7.2, THEN THE REMAINDER OF THE ARBITRATION

 3    PROVISION REMAINS IN PLACE.  IT'S NOT SAYING THAT WE AGREE THAT

 4    A COURT SHOULD DECIDE SEVERABILITY OF SECTION 7.2, AND I THINK

 5    THAT'S IMPORTANT --

 6         **THE COURT:**  SO, IN OTHER, WORDS YOU'RE SAYING THAT

 7    THE WAY THIS PROVISION SHOULD BE -- THIS SENTENCE SHOULD BE

 8    READ IS --

 9         **MS. MEYER:**  IF, IF.

10         **THE COURT:**  WE CLEARLY -- WE HAVE DELEGATED THE

11    QUESTION OF ARBITRABILITY TO AN ARBITRATOR, BUT IF FOR SOME

12    REASON THE COURT CONCLUDES WE HAVEN'T AND THEN THE COURT

13    FURTHER CONCLUDES THAT SOME PROVISION IN SECTION 7.2 IS

14    INVALID, THAT PROVISION -- YOU SAY COST SHIFTING OR SOMETHING

15    LIKE THAT -- THAT PROVISION IS SEVERABLE?

16         **MR. RAGLAND:**  ABSOLUTELY, ABSOLUTELY.  AND I THINK

17    THAT'S IMPORTANT TO LOOK AT IT THAT WAY IN LIGHT OF *MOHAMED*,

18    BECAUSE IN THE *MOHAMED* CASE, WHAT THAT VENUE PROVISION SAID WAS

19    ANY DISPUTE -- ANY DISPUTE BETWEEN THE PARTIES IS WITHIN THE

20    EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS.

21         IT'S MORE OF A PRESCRIPTIVE PROVISION THAN SOME OF

22    THESE SEVERABILITY CLAUSES IN THE OTHER DISTRICT COURT CASES

23    THAT WE'VE BEEN LOOKING AT, BECAUSE IF THAT'S NOT AMBIGUOUS AND

24    IF THE NINTH CIRCUIT IS SAYING THAT PROVISION, REFERRING TO ANY

25    DISPUTE, IS ARTIFICIAL AND NOT CREATING AMBIGUITY AS TO THE

1   DELEGATION CLAUSE, THEN I THINK THE SAME RESULT HAS TO BE THE

2   CASE HERE.

3        **THE COURT:**  I DO SEE WHAT YOU'RE SAYING, BUT I -- I

4   GUESS -- I THINK THE PROBLEM YOU HAVE IS A COMBINATION OF TWO

5   THINGS, RIGHT?  ONE IS THAT THERE IS THIS -- IT'S MERELY A

6   REFERENCE TO THE AMERICAN ARBITRATION ASSOCIATION RULES.  IT'S

7   NOT A CLEAR STATEMENT IN THE CONTRACT ITSELF THAT SAYS THAT

8   WE'RE DELEGATING ARBITRABILITY TO THE ARBITRATOR.  THAT'S

9   NUMBER ONE.

10        AND THEN NUMBER TWO, YOU HAVE THE SEVERABILITY

11   PROVISION, WHICH COULD HAVE BEEN WRITTEN MORE CLEARLY TO SAY

12   WHAT YOU'RE SAYING NOW, WHICH IS, BY THIS SEVERABILITY

13   PROVISION, WE'RE NOT CONCEDING THAT THERE'S ANYTHING AMBIGUOUS

14   ABOUT OUR DELEGATION TO THE ARBITRATOR OF THE DECISION TO

15   ARBITRATE WHETHER IT SHOULD BE ARBITRATED, BUT IF A COURT

16   DISAGREES WITH US ABOUT THIS, THE SEVERABILITY PROVISION WILL

17   GOVERN THE COURT'S REVIEW OF THE ARBITRATION PROVISION.

18        SO YOU HAVE KIND OF TWO -- TWO AMBIGUITIES IN THERE

19   WITH RESPECT TO DELEGATION TO THE ARBITRATOR OF THE DECISION

20   WHETHER THE CASE SHOULD BE SUBJECT TO ARBITRATION.  AND MAYBE

21   IF YOU ONLY HAD ONE, YOU'D HAVE A STRONGER ARGUMENT, BUT THE

22   TWO IT SEEMS COMBINED -- TO ME, COMBINED, TO DEFEAT YOUR

23   ARGUMENT.

24        **MS. MEYER:**  I DON'T WANT TO BELABOR THE POINT, BUT I

25   WILL JUST NOTE, I THINK -- I DON'T KNOW THAT THE QUESTION IS

1  WHETHER OR NOT THE DELEGATION PROVISION IS AMBIGUOUS IS

2  SOMETHING THAT IS A POSSIBLE OUTCOME -- APPROPRIATE OUTCOME

3  UNDER NINTH CIRCUIT PRECEDENT.  I THINK THE QUESTION IS:  DOES

4  *BRENNAN* APPLY AND DOES THE REASONING IN *BRENNAN* APPLY TO

5  CONSUMER CONTRACTS INVOLVING UNSOPHISTICATED CONSUMERS.

6        BUT AS WE SAID, THAT'S NOT WHERE WE'RE AT TODAY.

7  MR. BERK IS NOT AN UNSOPHISTICATED CONSUMER.  HIS COUNSEL HAS

8  ESSENTIALLY CONCEDED IN THE MOTION TO DISMISS A PORTION OF THE

9  ARGUMENT THAT HE -- I BELIEVE THEY MENTION HE WAS AN INVESTOR.

10 HE, IN HIS COMMUNICATIONS WITH COINBASE, REPRESENTS HIMSELF AS

11 A REGISTERED INVESTMENT ADVISER.  THIS IS NOT, YOU KNOW,

12 SOMEONE WITH NO EXPERIENCE IN BUSINESS TRANSACTIONS.

13        AND SO I THINK ONCE YOU GET TO THAT POINT AND ONCE

14 YOU LOOK AT THE WEIGHT OF THE AUTHORITY, BOTH IN THIS DISTRICT

15 AND IN OTHER CIRCUITS -- THE QUESTION IS WHETHER -- IT'S NOT --

16        (SIMULTANEOUS COLLOQUY.)

17        **MS. MEYER:**  -- IS AMBIGUOUS, IT'S WHETHER *BRENNAN*

18 APPLIES HERE OR NOT.

19        **THE COURT:**  THE WEIGHT OF AUTHORITY ON -- THE WEIGHT

20 OF AUTHORITY ON THE QUESTION OF WHETHER --

21        **MS. MEYER:**  (INDISCERNIBLE.)

22        **THE COURT:**  -- REFERENCE TO THE AMERICAN ARBITRATION

23 ASSOCIATION IS ENOUGH, IS THAT WHAT YOU'RE --

24        **MS. MEYER:**  NO, THE WEIGHT OF THE AUTHORITY ABOUT

25 WHETHER THE REASONING IN *BRENNAN* APPLIES TO CONSUMER CONTRACTS.

1              **THE COURT:**  ALL RIGHT.

2              **MS. MEYER:**  AND THE GREAT WEIGHT OF THE AUTHORITY IN

3    THIS DISTRICT, WHICH IS CONSISTENT WITH OTHER CIRCUITS AS WELL,

4    IS THAT IT DOES APPLY AND MERE INCORPORATION SO BY REFERENCE IS

5    CLEAR AND UNMISTAKABLE EVIDENCE OF DELEGATION.

6              **THE COURT:**  OKAY.

7              **MS. MEYER:**  AND SO THAT WOULD JUST BE MY ONE RESPONSE

8    TO YOUR FIRST POINT, YOUR FIRST POINT ABOUT AMBIGUITY.  I DON'T

9    THINK THERE IS ANY AMBIGUITY HERE, IF WE AGREE AS A LEGAL

10   MATTER THAT *BRENNAN* EXTENDS TO THIS CASE.

11             **THE COURT:**  I UNDERSTAND THAT.  OKAY.  SO MY SECOND

12   QUESTION ABOUT --

13             **MS. MEYER:**  OKAY.

14             **THE COURT:**  -- THE MOTION TO COMPEL IS -- MY SECOND

15   THOUGHT -- I'M TRYING TO FIGURE OUT HOW TO HANDLE IT IN LIGHT

16   OF THE MOTION TO DISMISS.  IT SEEMS TO ME -- THAT ALTHOUGH THE

17   CLAIMS THEY ARE ARTICULATING, OR TRYING TO ARTICULATE, NOW IN

18   THE CURRENT ITERATION OF THE COMPLAINT ARE NOT -- THEY DO NOT

19   SEEM TO BE CLAIMS THAT ARISE UNDER THE CONTRACT.  BUT, OF

20   COURSE, IT'S NOT CLEAR TO ME THAT THEY'VE ADEQUATELY

21   ARTICULATED THEIR CLAIMS, AND SO IT -- ONCE THEY ADEQUATELY --

22   ONCE THEY KIND OF FILL IN THE GAPS IN THE STORY THAT THEY'RE

23   TELLING, MAYBE WE WILL HAVE A BETTER SENSE OF WHETHER THE

24   CLAIMS ARISE UNDER THE CONTRACT OR NOT.

25             BUT IT SEEMS TO ME THAT RIGHT NOW, BASED ON WHAT

1    THEY'VE ARTICULATED, TO THE EXTENT I CAN DISCERN WHETHER THEY

2    ARE CLAIMS THAT ARISE UNDER THE CONTRACT OR NOT, IT SEEMS LIKE

3    THEY DON'T, AND SO IT -- BUT IT -- SO IT SEEMS LIKE THE

4    APPROPRIATE COURSE -- ASSUMING I CONTINUE TO DISAGREE WITH YOU

5    ON THE AMBIGUITY ISSUE THAT WE JUST DISCUSSED, IT SEEMS LIKE

6    THE APPROPRIATE COURSE MIGHT BE TO DENY THE MOTION TO COMPEL

7    BUT WITHOUT PREJUDICE TO RERAISING IT IN RESPONSE TO A NEWLY

8    FILED COMPLAINT, ASSUMING I -- ASSUMING I DISMISS THE COMPLAINT

9    WITH LEAVE TO AMEND.

10           **MS. MEYER:**  IF YOUR HONOR IS GOING TO FIND THAT THE

11   CLAIMS AS PLED IN THE FIRST AMENDED COMPLAINT DON'T ARISE UNDER

12   THE CONTRACT, THEN WE WOULDN'T HAVE AN OBJECTION.  AND I'M SURE

13   THAT MR. RAGLAND WILL COME UP HERE AND TELL ME IF I'M WRONG.

14   BUT I'M SURE WE WOULDN'T HAVE AN OBJECTION TO FILING ANOTHER

15   MOTION TO COMPEL AFTER A SECOND --

16           **THE COURT:**  WELL, I'M NOT EVEN SURE I COULD PREVENT

17   YOU FROM DOING IT, FRANKLY.

18           **MS. MEYER:**  FAIR ENOUGH.

19           **THE COURT:**  I MEAN, IF I SAID THAT THIS -- IF I SAID

20   THIS COMPLAINT, THE CLAIMS IN THIS COMPLAINT --

21           **MS. MEYER:**  RIGHT.

22           **THE COURT:**  -- DO NOT ARISE UNDER THE CONTRACT AND --

23   BUT I SAY -- I DISMISS THE COMPLAINT BECAUSE THEY HAVEN'T

24   ADEQUATELY EXPLAINED THE WRONGDOING, AND THEN THEY COME BACK

25   AND THEY INCLUDE A LOT MORE, I WOULD THINK YOU WOULD BE WITHIN

1    YOUR RIGHTS TO SAY, DEPENDING ON WHAT THEY ALLEGE, HEY, LOOK,

2    NOW IT'S CLEAR THAT, YOU KNOW, THESE CLAIMS ARE ARISING UNDER

3    THE CONTRACT.

4         **MS. MEYER:**  I AGREE WITH YOU.  BUT I THINK IF YOUR

5    HONOR WOULD PERMIT ME, I WOULD LIKE TO TAKE A SHOT AT

6    CONVINCING YOU THAT THE CLAIMS AS CURRENTLY PLEAD DO IN FACT

7    ARISE UNDER THE (INDISCERNIBLE).

8         **THE COURT:**  GO.

9         **MS. MEYER:**  BECAUSE I THINK THAT IF WE LOOK AT IT,

10   THEY REALLY ARE INEXTRICABLY BOUND TO THE PROVISIONS OF THE

11   CONTRACT.

12        SO I MADE A COUPLE OF NOTES DURING THE MOTION TO

13   DISMISS ARGUMENT, AND I THINK WE CAN GO THROUGH THE WAY THAT

14   PLAINTIFFS CHARACTERIZED THEIR CLAIMS DURING THE ARGUMENT.  AND

15   SO ONE OF THE KEY POINTS OF THEIR CLAIM -- OF ALL FOUR CLAIMS

16   IN THE FIRST AMENDED COMPLAINT IS THAT THEY PURCHASED BITCOIN

17   CASH AT A DIFFERENT -- OR THAT MR. BERK PURCHASED BITCOIN CASH

18   AT A DIFFERENT PRICE THAN THE PRICE THAT WAS QUOTED TO HIM.

19   THAT CAN'T BE DETERMINED.  IT CAN'T BE RESOLVED BY A FACT

20   FINDER WITHOUT LOOKING AT WHAT BOTH THE USER AGREEMENT AND THE

21   TRADING RULES SAY ABOUT CONVERSION RATES AND PURCHASE PRICES.

22        AND, YOU KNOW, THIS IS A CONCEPT THAT CAME UP IN --

23   IN PARAGRAPH 82 OF THE AMENDED COMPLAINT.  AND THEN IF YOU GO A

24   COUPLE OF PARAGRAPHS LATER AND YOU LOOK AT PARAGRAPHS 89 TO

25   91 --

```
 1              THE COURT:  WAIT.  HOLD ON.  LET ME PULL THAT BACK

 2    UP.

 3              MS. MEYER:  SURE.

 4              THE COURT:  OKAY.

 5              MS. MEYER:  MR. BERK --

 6              THE COURT:  WHAT PARAGRAPHS DID YOU SAY?

 7              MS. MEYER:  PARAGRAPHS 89 TO 91.

 8              THE COURT:  AND THEN WHAT WAS THE FIRST PARAGRAPH?

 9              MS. MEYER:  EIGHTY-TWO.  MR. BERK --

10              THE COURT:  SORRY, GIVE ME ONE QUICK SECOND.

11              MS. MEYER:  YEAH, SURE.

12              ACTUALLY, LET'S -- YOU KNOW WHAT, LET'S HOLD OFF ON

13    89 TO 91 FOR A, MINUTE BECAUSE I WANT TO -- I WANT TO GET BACK

14    TO THAT.  THAT ACTUALLY HAS -- THAT GOES TO A DIFFERENT POINT I

15    WAS GOING TO MAKE.

16              LET'S TALK ABOUT CONVERSION RATE, PURCHASE PRICES,

17    THE PRICE AT WHICH HIS PURCHASE WAS EXECUTED.

18              THE COURT:  OKAY.

19              MS. MEYER:  THE CONVERSION IS DEFINED IN SECTION 4.1

20    OF THE USER AGREEMENT.

21              THE COURT:  WAIT.  HOLD ON.  LET ME GO BACK TO THE --

22              MR. RAGLAND:  OKAY.

23              THE COURT:  -- USER AGREEMENT.

24              WHAT DECLARATION --

25              MR. RAGLAND:  IT'S THE POLLAK DECLARATION, EXHIBIT 4.
```

1              **THE COURT:**  I KNOW I'VE LOOKED AT IT IN HERE BEFORE.

2              **MR. RAGLAND:**  WELL, I HAVE A QUOTE, SO I CAN JUST

3    READ FROM IT --

4              **THE COURT:**  GO AHEAD.

5              **MR. RAGLAND:**  -- AND THEN I'LL POINT YOU SOMEWHERE

6    ELSE.

7              SO SECTION 4.1 SAYS:

8                   "THE CONVERSION RATE MEANS THE

9              PRICE OF A GIVEN SUPPORTED DIGITAL CURRENCY

10             AMOUNT IN TERMS OF FIAT CURRENCY OR OTHER

11             DIGITAL CURRENCY AS QUOTED ON THE COINBASE

12             SITE."

13             AND SO MR. BERK IS MAKING AN ARGUMENT ABOUT THE

14   CONVERSION RATE HE WAS QUOTED.  WE HAVE TO LOOK AND SEE, WHAT

15   DOES THAT MEAN, WHAT WAS THE QUOTED CONVERSION RATE AND HOW IS

16   THAT DEFINED BY THE USER AGREEMENT.  BUT PERHAPS MORE -- AND

17   GOING ON IN SECTION 4.1, IT SAYS THAT:

18                   "AS A CONDITION OF USING COINBASE

19             CONVERSION SERVICES, THE USER MUST ACCEPT THE

20             CONVERSION RATE AS THE SOLE CONVERSION

21             METRIC."

22             SO IS THE CONVERSION RATE THE PRICE MR. BERK IS

23   SAYING HE SAW AT 2,000 OR WAS IT THE PRICE MR. BERK IS SAYING

24   HIS PURCHASE WAS EXECUTED AT 4,200?  HOW ARE WE DEFINING

25   CONVERSION RATE?  HOW ARE WE LOOKING AT IT?  THAT'S GOING TO BE

1    AN IMPORTANT PIECE OF THE RESOLUTION.

2              **THE COURT:**  OH, I DON'T KNOW.  I THINK WHAT HE'S

3    SAYING IS BECAUSE OF THE WAY THAT THIS WAS BUNGLED, IF IT HAD

4    NOT BEEN BUNGLED, HE WOULD HAVE PUT IN AN ORDER FOR 2,000, HE

5    WOULD HAVE GOTTEN THE PRICE AT 2,000, OR SOMEWHERE THEREABOUTS,

6    BUT BECAUSE THE ROLLOUT WAS BUNGLED, HE PUT IN AN ORDER AT

7    2,000, AND THEN TWO DAYS LATER HE RECEIVED CONFIRMATION OF HIS

8    PURCHASE AT 4,000 PLUS.

9              **MS. MEYER:**  EXACTLY.  AND HE'S SAYING THAT WAS

10   IMPROPER?

11             **THE COURT:**  AND SO IT DOESN'T MATTER WHETHER IT WAS

12   BREACH OF CONTRACT OR NOT.  WHAT MATTERS IS THE WAY THEY

13   BUNGLED THE ROLLOUT, AND HAD THEY NOT BUNGLED IT, HE WOULD HAVE

14   GOT -- THERE WOULD HAVE BEEN A DIFFERENT RESULT.

15             **MS. MEYER:**  I THINK THAT'S PART OF IT, BUT HE'S ALSO

16   MAKING ALLEGATIONS ABOUT THE FACT THAT COINBASE DIDN'T GO BACK

17   AND CANCEL PENDING CUSTOMER ORDERS ONCE THE PRICE WAS

18   SKYROCKETING.  THEY'RE TALKING ABOUT COINBASE'S OBLIGATIONS

19   ABOUT WHAT SHOULD HAVE HAPPENED WITH THOSE PENDING ORDERS AFTER

20   TRADING WAS HALTED.

21             **THE COURT:**  I WAS JUST RESPONDING TO YOUR COMMENT

22   WHICH IS --

23             **MS. MEYER:**  THAT'S FAIR.  THAT'S FAIR.

24             BUT THEN MY NEXT POINT IS THE CONVERSION RATE RULES

25   ARE EXPANDED UPON IN THE GDAX TRADING RULES, AND THE PLAINTIFFS

1    TALK ABOUT THE GDAX TRADING RULES IN THEIR COMPLAINT.  THOSE

2    RULES ARE ACTUALLY INCORPORATED INTO THE USER AGREEMENT.  IN

3    PART THREE OF THE USER AGREEMENT THEY'RE INCORPORATED BY

4    REFERENCE.

5                AND SO THOSE GDAX RULES ALLOWS USERS TO SET CERTAIN

6    LIMITS --

7                **THE COURT:**  THOSE ARE THE RULES THAT THEY ALLEGE WERE

8    CHANGED --

9                **MR. RAGLAND:**  EXACTLY.

10               **THE COURT:**  -- AFTER THE ROLLOUT?

11               **MR. RAGLAND:**  BUT MR. GREEN ATTACHED THE VERSION OF

12   THE RULES THAT HE SAYS WAS IN PLACE ON DECEMBER 19TH, 2017, AS

13   EXHIBIT 1 TO HIS DECLARATION.  SO THAT'S IN THE RECORD.

14               AND THOSE RULES ALLOW USERS TO SET CERTAIN LIMITS ON

15   ORDERS.  THEY ALLOW THEM TO DEFINE THE AMOUNT AT WHICH THE USER

16   IS WILLING TO PURCHASE DIGITAL CURRENCY.  AND SO MR. BERK IS

17   SAYING, WELL, I WOULDN'T HAVE PURCHASED IT AT 4200.  BUT WHAT

18   DID THE TRADING RULES SAY ABOUT HOW HE SET UP HIS PURCHASE

19   TRANSACTION?  AND WHY WAS THE AMOUNT -- WHY WAS THE PURCHASE

20   ACTUALLY EXECUTED AT THAT HIGHER AMOUNT IF HE DIDN'T AUTHORIZE

21   IT?  AND SO THE QUESTION ABOUT HIS INJURY AND WHETHER OR NOT IT

22   WAS AN ACTUAL INJURY IS GOING TO REQUIRE REFERENCE TO AND

23   INTERPRETATION OF THE USER AGREEMENT, THE GDAX RULES.

24               **THE COURT:**  I THINK THEY WOULD HAVE THE SAME ANSWER,

25   WHICH IS, NO, IT DOESN'T MATTER WHETHER IT WAS ALL OF --

```
 1    EVERYTHING THAT EVERYBODY DID WAS CONSISTENT WITH THE GDAX
 2    RULES, IT'S THAT -- IN OTHER WORDS, IT DOESN'T MATTER WHETHER
 3    THERE WAS ROOM FOR THIS TO HAPPEN WITHIN THE GDAX RULES, WHAT
 4    MATTERS IS THAT IT WOULDN'T HAVE HAPPENED HAD THEY NOT BUNGLED
 5    THE ROLLOUT.
 6          MS. MEYER:  I AGREE THAT'S WHAT THEY WERE GOING TO
 7    SAY, BUT I DISAGREE THAT --
 8          THE COURT:  WHY ISN'T THAT THE ANSWER?  WHY DOESN'T
 9    THAT MEAN WE DON'T NEED TO LOOK AT THE GDAX RULES BECAUSE IT
10    DOESN'T MATTER?
11          MS. MEYER:  BECAUSE PART OF THE DEFENSE OF THESE
12    CLAIMS IS GOING TO BE:  YOU AGREED, YOU AGREED THIS WAS AN
13    APPROPRIATE PRICE AT WHICH YOU WOULD PURCHASE BITCOIN CASH; YOU
14    SAID THIS WAS ACCEPTABLE AND THIS WAS A TRANSACTION IN WHICH
15    YOU WANTED TO ENGAGE.
16          AND SO YOU'VE GOT TO LOOK AT WHAT THOSE RULES WERE AT
17    THE TIME HE MADE HIS PURCHASE.  I THINK THERE'S NO WAY AROUND
18    THAT.
19          THE COURT:  OKAY.
20          MS. MEYER:  AND SO I WANT TO GO BACK BECAUSE I
21    MENTIONED PARAGRAPHS 89 TO 91, AND I THINK THAT'S IMPORTANT.
22          THE COURT:  I FINALLY FOUND THE USER AGREEMENT, NOW I
23    GOT TO GO BACK -- HOLD ON.
24          MS. MEYER:  SORRY.
25          THE COURT:  GIVE ME ONE SECOND.
```

1              **MS. MEYER:**  THAT'S FINE.

2              **THE COURT:**  OKAY.

3              **MS. MEYER:**  OKAY.  SO WE'VE BEEN TALKING ABOUT

4    NEGLIGENCE CLAIMS.  THEY SAID THEY WERE NEGLIGENT BECAUSE THEY

5    SHOULDN'T HAVE HALTED TRADING.  WE ARE TALKING ABOUT WHETHER OR

6    NOT THE ROLLOUT AND THE SUBSEQUENT HALTING OF TRADING WAS AN

7    UNFAIR BUSINESS PRACTICE UNDER THE UCL, AND WE'RE TALKING ABOUT

8    WHETHER OR NOT THAT VIOLATED THE CEA.  SO THIS HALT OF TRADING

9    IS A REALLY KEY PART OF THE PLAINTIFF'S CASE.

10             **THE COURT:**  OKAY.

11             **MR. RAGLAND:**  AND THE PLAINTIFFS SAY THE GDAX

12   RULES --

13             **THE COURT:**  WHERE ARE YOU NOW?

14             **MR. RAGLAND:**  -- ABOUT -- 89 TO 91.

15             **THE COURT:**  OKAY.

16             **MR. RAGLAND:**  THEY SAY THEY CHANGED THOSE GDAX RULES

17   AFTER THE FACT TO MAKE IT LOOK LIKE THEY COULD HAVE HALTED

18   TRADING.

19             WE'VE GOT TO GO BACK AND LOOK AT WHAT THE GDAX RULES

20   ACTUALLY SAID AT THE TIME THE TRADES WERE EXECUTED TO DETERMINE

21   WHETHER COINBASE AND MR. BERK AND OTHER USERS -- WHAT

22   CONDITIONS DID THEY AGREE TO ABOUT HALTING TRADING.

23             **THE COURT:**  OKAY.

24             **MS. MEYER:**  BECAUSE IF YOU LOOK AT MR. GREEN'S

25   DECLARATION, EXHIBIT 1, THE GDAX RULES, SECTION 3.4 PROVIDES

THAT IN CERTAIN SITUATIONS -- AND THIS IS THE VERSION THAT WAS

IN PLACE ON DECEMBER 19TH, 2017, ACCORDING TO MR. GREEN -- THAT

IN CERTAIN SITUATIONS COINBASE MAY DISABLE THE ABILITY TO PLACE

NEW ORDERS.  COINBASE CAN HALT TRADING IN CERTAIN CASES, AND SO

IF WE'RE LOOKING -- HOW COULD THIS BE AN UNFAIR BUSINESS

PRACTICE, THAT THEY HALTED TRADING, IF BEFORE THE FACT MR. BERK

AND COINBASE AGREED THESE WERE THE CONDITIONS UNDER WHICH

TRADING WOULD BE HALTED.

YOU CAN'T GET AROUND IT.  WE'VE GOT TO LOOK AT THE

RULES, WE'VE GOT TO LOOK AT THE CONTRACT.  WE CAN'T RESOLVE

MR. BERK'S UCL CLAIM, OR HIS NEGLIGENCE CLAIM, OR HIS CEA

CLAIM, OR HIS NEGLIGENT MISREPRESENTATION CLAIM, FOR THAT

MATTER, WITHOUT LOOKING AT WHAT THE RULES -- WHAT THE PARTIES

AGREED TO IN ADVANCE.

**THE COURT:**  OKAY.  I UNDERSTAND THE ARGUMENTS.

THERE'S JUST ONE -- I DON'T NEED TO HEAR A RESPONSE

FROM YOU ON THE ARBITRATION STUFF.  THERE'S ONLY JUST ONE OTHER

THING I WANTED TO SAY TO YOU ALL.  I'M SAYING IT BECAUSE YOU

REMIND ME OF HER.  I'M FRIENDS WITH -- I'M SORT OF CASUAL

FRIENDS WITH A MEMBER OF THE BOARD OF DIRECTORS ON COINBASE.  I

BELIEVE SHE'S ON THE BOARD OF DIRECTORS ON COINBASE.  HER NAME

IS KATIE HAUN.  AND I HAVE NEVER SPOKEN WITH HER ABOUT COINBASE

OR ANY OF THE ACTIVITIES THAT TAKE PLACE ON COINBASE.

IN FACT, I DIDN'T EVEN KNOW THAT SHE WAS ON THE BOARD

OF DIRECTORS OF COINBASE UNTIL I LOOKED IT UP LAST NIGHT.  I

1    KNEW THAT SHE WAS IN THAT WORLD, AND I PUNCHED IT UP AND I

2    LOOKED AT IT, AND I SAID, OH, SHE'S ON THE BOARD OF DIRECTORS

3    OF COINBASE, I BETTER LET THE PARTIES KNOW THIS, BUT SHE -- SO

4    WE'RE, LIKE I SAID, SORT OF CASUAL PROFESSIONAL FRIENDS.  I'VE

5    KNOWN HER SINCE ABOUT 2001 WHEN WE WERE BOTH IN D.C. CLERKING

6    AT THE SUPREME COURT.  WE'VE OCCASIONALLY KEPT IN TOUCH

7    ABOUT -- PRIMARILY ABOUT PROFESSIONAL MATTERS.

8             LIKE I SAID, WE'VE NEVER TALKED ABOUT COINBASE.  I

9    DON'T CONSIDER IT TO BE AN ISSUE.  I DON'T CONSIDER IT TO

10   AFFECT MY ABILITY TO ADJUDICATE THIS CASE AT ALL, BUT I THOUGHT

11   I WOULD AT LEAST LET YOU KNOW THAT.

12            AND FOR A MOMENT I THOUGHT IT SEEMED LIKE KATIE HAUN

13   WAS TALKING TO ME, WHICH IS WHAT REMINDED ME OF IT.

14            **MS. GRANT:**  WE HAVE NO PROBLEM WITH IT.

15            **THE COURT:**  OKAY.  SO I'LL TAKE THIS UNDER

16   SUBMISSION.  I'LL ISSUE A RULING FAIRLY SHORTLY, I THINK.

17            **MS. MEYER:**  THANK YOU, YOUR HONOR.  WE DO HAVE A CMC

18   ON CALENDAR FOR OCTOBER 9TH.  DO WE WANT TO KEEP THAT?

19            **THE COURT:**  OH.  YEAH, LET'S -- I WILL TELL YOU NOW

20   MY PRETTY STRONG LEAN IS TO -- AND I WILL GO BACK AND THINK

21   ABOUT ALL OF THIS MORE -- BUT MY FAIRLY STRONG LEAN IS TO DENY

22   THE MOTION TO COMPEL ARBITRATION WITHOUT PREJUDICE TO REFILING

23   IT AND TO GRANT THE MOTION TO DISMISS WITH LEAVE TO AMEND BASED

24   ON WHAT WE'VE DISCUSSED HERE TODAY.

25            BUT I WILL THINK ABOUT IT MORE AND ISSUE A RULING.

1    SO FOR NOW WE CAN GO AHEAD AND VACATE THE CASE MANAGEMENT

2    CONFERENCE.

3            **MS. MEYER:**  THANK YOU, YOUR HONOR.

4            **THE COURT:**  OKAY.  THANK YOU.

5            (PROCEEDINGS ADJOURNED AT 12:13 P.M.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **CERTIFICATE OF TRANSCRIBER**

2

3         I CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT

4    TRANSCRIPT, TO THE BEST OF MY ABILITY, OF THE ABOVE PAGES OF

5    THE OFFICIAL ELECTRONIC SOUND RECORDING PROVIDED TO ME BY THE

6    U.S. DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA, OF THE

7    PROCEEDINGS TAKEN ON THE DATE AND TIME PREVIOUSLY STATED IN THE

8    ABOVE MATTER.

9         I FURTHER CERTIFY THAT I AM NEITHER COUNSEL FOR,

10   RELATED TO, NOR EMPLOYED BY ANY OF THE PARTIES TO THE ACTION IN

11   WHICH THIS HEARING WAS TAKEN; AND, FURTHER, THAT I AM NOT

12   FINANCIALLY NOR OTHERWISE INTERESTED IN THE OUTCOME OF THE

13   ACTION.

14

15                        _JMColumbini_

16                   JOAN MARIE COLUMBINI

17                    OCTOBER 11, 2018

18

19

20

21

22

23

24

25