Robert S. Green (State Bar No. 136183)
James Robert Noblin (State Bar No. 114442)
**GREEN & NOBLIN, P.C.**
2200 Larkspur Landing Circle, Suite 101
Larkspur, CA  94939
Telephone:  (415) 477-6700
Facsimile:  (415) 477-6710
Email:  gnecf@classcounsel.com

Lynda J. Grant *admitted pro hac vice*
**THEGRANTLAWFIRM, PLLC**
521 Fifth Avenue, 17th Floor
New York, NY 10175
Telephone: (212) 292-4441
Facsimile: (212) 292-4442
Email:  lgrant@grantfirm.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEFFREY BERK, WILLIAM CROWE, PREETHAM PERIASWAMI, NATHANIEL PYRON, SPENCER SOLTAU, MICHAEL SHRIBER, and NIKO YOUNTS, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>COINBASE, INC., a Delaware Corporation d/b/a Global Digital Asset Exchange ("GDAX"), BRIAN ARMSTRONG, and DAVID FARMER,<br><br>Defendants. | Case No.:  3:18-cv-01364-VC<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>Date:          April 25, 2019<br>Time:         10:00 a.m.<br>Judge:        Hon. Vince Chhabria<br>Courtroom: 4- 17th Floor<br><br>Date Filed:  March 1, 2018<br><br>Trial Date:   None set |

# TABLE OF CONTENTS

I.   INTRODUCTION ...............................................................................................1

II.  STATEMENT OF ISSUES TO BE DECIDED ..................................................3

III. ARGUMENT ....................................................................................................3

     A.   Defendants Engaged in Unfair and Fradulent Conduct Prohibited by the UCL ....3

     B.   Defendants Engaged in Unlawful Conduct Under the UCL .................................9

     C.   Plaintiffs have Sufficiently Pled Negligence.......................................................12

     D.   Plaintiffs have Sufficiently Pled Fraud ...............................................................15

IV.  CONCLUSION ...............................................................................................15

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS SECOND AMENDED CLASS ACTION
COMPLAINT - CASE NO. 3:18-cv-01364-VC

# TABLE OF AUTHORITIES

**Federal Cases**

*Backus v. General Mills*
122 F. Supp. 3d 909 (N.D. Cal. 2015)..................................................................6

*CFTC v. Kraft Foods Group, Inc*
153 F.Supp. 3d 996 (N.D. Ill. 2006)..................................................................10

*CFTC v. McDonnell*
287 F. Supp. 3d 213 (E.D.N.Y. 2018)..................................................................9

*CFTC v. My Big Coin Pay, Inc.*
2018 U.S. Dist. LEXIS 164932 (D. Mass. Sept. 26, 2018)..............................9

*CFTC v. Wilson*
2016 U.S. Dist. LEXIS 177705 (S.D.N.Y. Sept. 30, 2016) ...........................12

*CFTC v. Wilson*
2018 U.S. Dist. LEXIS 207376 (S.D.N.Y. November 30, 2018) ...................11

*CFTC v. Wilson*
27 F.Supp. 3d 517 (S.D.N.Y. 2014) ................................................................12

*Hodsdon v. Mars, Inc.*
891 F.3d  857 (9th Cir. 2018) .............................................................................5

*In re Adobe Sys., Privacy Litig.*
66 F. Supp. 3d 1197 (N.D. Cal. 2014).................................................................3

*In re Amaranth Natural Gas Commodities Litig.*
612 F. Supp. 2d 376 (S.D.N.Y. 2009) ..............................................................10

*In re Commodity Exch. Inc.*
213 F Supp. 3d 631 (S.D.N.Y. 2016) ...........................................................10, 11

*In re Facebook, Inc. IPO and Sec. and Derivative Litig.*
986 F. Supp. 2d 428 (S.D.N.Y. 2013) ...................................................13, 14, 15

*In re London Silver Fixing, Ltd.*
213 F. Supp. 3d 530 (S.D.N.Y. 2016) ..............................................................11

*In re Platinum and Palladium Antitrust Litig.*
2017 U.S. Dist. LEXIS 46624 (S.D.N.Y. March 26, 2017)............................11

*Kalitta Air, LLC v. Cen. Tex. Airborne Sys., Inc.*
2009 U.S.  Dist. LEXIS 51282 (N.D. Cal. June 8, 2009)................................14

*Lozano v. AT&T Wireless Servs.*
504 F.3d 718 (9th Cir. 2007) ..............................................................................3

*Pirozzi v. Apple, Inc.*
966 F. Supp. 2d 909 (N.D. Cal. 2013).................................................................6

*U.S. v. Brooks*
    681 F.3d 678 (5th Cir. 2012) ..................................................................9

*Zamora v. Lyft, Inc.*
    2016 U.S. Dist. Lexis 155027 (N.D. Cal. Nov. 7, 2016) ...................4

**State Cases**

*Biakanja v. Irving*
    49 Cal. 2d 647 (1958) ....................................................................13

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Cos.*
    20 Cal. 163 (1999) ...........................................................................3

*J'Aire Corp. v. Gregory*
    24 Cal. 3d 799 (1979) ....................................................................14

*LiMandri v. Judkins*
    52 Cal. App. 4th 326 (1997) ..........................................................5

*Melton v. Boustred*
    183 Cal. App. 4th 521 (2010) ......................................................13

*Ott v. Alfa-Laval Agri., Inc.*
    31 Cal. App. 4th 1439 (1995) ......................................................14

*Progressive W. Ins. Co. v. Super. Ct.*
    135 Cal. App. 4th 263 (2005) ........................................................6

*Rutledge v. Hewlett-Packard Co.*
    238 Cal. App. 4th 1164 (2015) ...................................................5, 6

*S. Bay Chevrolet v. Gen. Motors Acceptance Corp.*
    72 Cal. App. 4th 861 (1999) .........................................................4

*Southern California Gas Leak*
    18 Cal. App. 5th 581 (2017) .......................................................13

**Federal Statutes**

17 C.F.R. §180.1 ....................................................................................9

17 C.F.R.§180.2 ...................................................................................11

## I.    INTRODUCTION

In response to the Court's comments on the prior complaint, Plaintiffs filed their Second Amended Complaint ("SAC") adding significant allegations about the motivations of Defendants to conduct the Launch of Bitcoin Cash ("BCH") in such a way as to depress the price of Bitcoin, to further their own profits and to enable insiders to sell BCH at inflated prices. Plaintiffs also added detail about steps that Coinbase could have taken to address the issues of its negligent conduct of the Launch, and added additional individual plaintiffs that provide a fuller picture of the impact that Defendants' unlawful conduct had on real people.  The SAC alleges that Coinbase violated the unfair, unlawful and fraudulent prongs of the UCL, that its conduct was negligent and that Coinbase, along with its officers Brian Armstrong and David Farmer committed fraud.

Coinbase touted to the market that it was the most trusted cryptocurrency firm, in part because its compliance is key to digital currency's success.  SAC ¶¶15-16.  Coinbase identified its relationship with regulators, including the New York Department of Finance as a reason that it could be trusted.  *Id.* ¶17.  It described its policy against insider trading and published its Digital Asset Framework, identifying the factors it considers when evaluating a digital asset.  *Id.* ¶¶19-23.  In testimony before Congress, Coinbase's Chief Legal Officer testified that it was regulated by the CFTC, by FinCen for Know Your Customer rules, and by New York in connection with its Bitlicense.  *Id.*  ¶¶105-106. The public responded by opening 20 million accounts, providing Coinbase with $150 billion of trades from which to collect fees.  *Id.* ¶¶11, 100-101.

In this context, Coinbase made a series of representations about when it would begin to support trading in BCH and the extent of the work that it would do to ensure that its systems were capable of handling the launch of that digital asset.  In July 2017, Defendant Farmer stated that "safely supporting a new digital currency requires significant work for many teams," and stated that Coinbase would keep users informed about its process of handling forked assets. SAC ¶¶136-138.  Later in July 2017, Coinbase tweeted about BCH, telling its customers that to "safely and securely access bitcoin cash, Coinbase would need to undertake a process of

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS SECOND AMENDED CLASS ACTION
COMPLAINT - CASE NO. 3:18-cv-01364-VC

designing and testing significant changes to our systems – including hot and cold storage." *Id.*
¶¶139-140.  On August 3, 2017, Coinbase provided an update on BCH that said that when it
adds an asset, "you can be sure that we have invested significant time and care in supporting
that digital asset securely.  We believe that this is the best approach for us to maintain customer
trust and ensure a fair and orderly market." It went on to say that it had examined all of the
relevant issues and decided to work on supporting BCH.  *Id.* ¶¶147-151.  Coinbase also stated
that the plan was to have support by January 1, 2018 and that it would do so only if no
additional risks emerge.  *Id.*

   Coinbase then told its employees "on November 13, 2017" that it was planning support
for full trading in BCH, and BCH experienced a massive spike in trading prior to and on the
13th.  *Id.* ¶¶40, 153-154.  Notwithstanding this internal communication, Coinbase continued to
tell its customers, through and including December 19th, that it was not supporting anything
more than withdrawals of BCH and then only in January 2018.  *Id.* ¶¶157-158, 164-167.  And
on December 19th, Coinbase sent an email to its customers stating that it was announcing the
opening of trading, five minutes later, in accordance with its Digital Asset Framework.  *Id.*¶¶23,
70-71.

   Somehow, after touting its regulatory compliance and safety, its work on systems to
establish an orderly market that would only be limited to withdrawals in January 2018, Coinbase
opened trading late in the day on December 19, 2017, with about an hour notice, and only
purchase orders on its book.  SAC ¶23.   This turned out to be the perfect moment to pump the
price of BCH, derail Bitcoin, and allow insiders to dump at artificially inflated prices.  *Id.* ¶¶2-5.
It was not, however, the moment that was consistent with any of Defendants' statements to the
public and Congress about the systems that it would have in place to ensure an orderly market.
Its systems failed from the opening bell.  *Id.*  ¶¶33-38, 52-90.  And customers who had trusted
Coinbase, paid in substantial amounts of money to Coinbase for these trades, and suffered
serious losses as a result of Coinbase's conduct.  *Id.*

   In its motion to dismiss, Coinbase does little more than isolate a couple of the
misrepresentations it made to the market and then argue that they were true when made, or that

Plaintiffs knew that the statements were false when Coinbase surprised the market by opening trading on December 19th , instead of the later January date. Oddly, in support of a motion to dismiss, Defendants submit a ream of evidence, for which they request Judicial Notice. Plaintiffs do not oppose the Request for Judicial Notice, except to note that nothing submitted changes any of the allegations in the SAC, which states valid claims. Moreover, none of the documents filed by Defendants answer the question as to why Coinbase, in violation of everything that it had previously said to the market, and without adequate preparation or compliance with its touted regulatory obligations, fired up the Launch of full trading in BCH late on the afternoon of December 19th, with virtually no notice to the market and with an unbalanced order book and inadequate systems. Nor does it answer the question of what Coinbase knew of the insider trading that spiked around the dates that it told its employees about the Launch and the previously unannounced date of the Launch. These are questions that can only be answered on the merits at trial, not in the context of a motion to dismiss.

Defendants' motion should be denied.

## II. STATEMENT OF ISSUES TO BE DECIDED

    A.     Whether Plaintiffs have sufficiently pled claims under the UCL and for negligence against Coinbase, and

    B.     Whether Plaintiffs have sufficiently pled a claim for fraud against Coinbase, Armstrong and Farmer.

## III. ARGUMENT

### A.     Defendants Engaged in Unfair and Fraudlent Conduct Prohibited by the UCL

The unfair prong of the UCL creates a cause of action for a business practice that is unfair even if it is not proscribed by some other law. *In re Adobe Sys., Privacy Litig.*, 66 F. Supp. 3d 1197, 1226 (N.D. Cal. 2014). In determining whether a business practice relating to consumers is unfair under the UCL, California courts have long applied the "balancing test", which requires "weigh[ing] the utility of the defendant's conduct against the gravity of the harm to the alleged victim" to determine whether the conduct is fair. *See, e.g., Lozano v. AT&T Wireless Servs.*, 504 F.3d 718, 727 (9th Cir. 2007). As this Court stated, "[n]either the California Supreme Court nor the Ninth Circuit has abandoned the traditional balancing test for

UCL unfairness." *Zamora v. Lyft, Inc.*, 2016 U.S. Dist. Lexis 155027 at *5 (N.D. Cal. Nov. 7, 2016).[1]  "This standard is intentionally broad, thus allowing courts maximum discretion to prohibit new schemes to defraud." *S. Bay Chevrolet v. Gen. Motors Acceptance Corp.*, 72 Cal. App. 4th 861, 886 (1999).

　　Here, Defendants focus all of their fire solely on the alleged affirmative misrepresentations, thereby waiving any arguments regarding the alleged unfair conduct not based on affirmative representations (*e.g.* SAC ¶¶119-123, 161-163, 173-182, 184-185 and 216-228), or on material omissions (*e.g.* ¶¶138, 151, 156-157 and 214-215).  Defendants' motion limits its arguments to the false premise that Plaintiffs' primary claim under the unfair prong is disseminating materially false and misleading statements about when and the extent to which it would support Bitcoin cash. Defts. Br. at 4.  Defendants then address representations they made about the timing of the Launch and representations they made about an orderly market, arguing basically that Coinbase changed its mind about the timing of the Launch, so the timing statements were not knowingly false when made, and that the statements about an orderly market did not constitute a guarantee that "the market would function flawlessly from the start." *Id.* at 4-7.  Plaintiffs will first address the unfair conduct and the alleged material omissions and then discuss Defendants' arguments with regard to the affirmative misrepresentations.

　　Coinbase's conduct of the Launch constitutes unfair conduct, from the radical departure from its own stated policies of not launching until it was assured of a fair and orderly market, with careful consideration of adequate security, customer demand, trading volumes and regulatory considerations, to its insiders' own ulterior motives.  SAC ¶¶44-46, 147-150. Coinbase launched BCH at the end of the business day on the West Coast, with barely an hour notice, when it knew that all of its pending orders were purchases that would drive up the price and it was unable to process the orders or provide accurate market information.  *Id.* ¶¶ 32-35, 56-57, 62-63, 66-67, 72-73, 77-79, 83-89, 124, 173-182.  The result was a disaster that damaged

---

[1] Defendants also assert incorrectly that Plaintiffs' complaint does not meet the *Cel-Tech*  test. Defendants' Motion to Dismiss Second Amended Class Action Complaint; Memorandum of Points and Authorities in Support Thereof ("Defts. Br.") at 4.

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT - CASE NO. 3:18-cv-01364-VC

nearly everyone who attempted to trade on that platform.  *Id.*  And after the Launch, Coinbase continued to provide false information to the market. *Id.* ¶ 47.

Conflicts of interest permeate Coinbase's business model, including acting essentially as a broker dealer, while engaging in proprietary trading, and allowing employees with access to customer information and new currency listings to trade on Coinbase or competing platforms. SAC ¶120.  The impact of these policies can be seen in the run up of BCH prices around the dates that Coinbase announced to its employees that it would support BCH and around the date that it began trading in BCH. *Id.* ¶¶40-42.  Coinbase platforms lack robust real-time and historical market surveillance capabilities to identify and stop suspicious trading patterns, such at those identified in the SAC.  And even though Defendants recognized patterns of suspicious trading in BCH and caused an investigation, no action was taken on the results of that investigation, nor does it appear that the investigators had the ability to address the issues. *Id.* ¶¶ 121, 153-155, 161-163 and 183-184.  Coinbase does not engage in independent auditing procedures necessary to confirm whether they are responsibly holding their customers' virtual assets. *Id.* ¶120.   These facts give rise to an "unfair" claim beyond the existence of fraudulent representations or omissions.

Moreover, Coinbase's  conduct of the Launch was preceded by false and misleading statements about when it would support trading and the processes it would follow to ensure its systems were prepared to handle that level of trading.  Even if these alleged misrepresentations were technically true when made, as Defendants argue, those statements nevertheless gave rise to a duty to disclose at the time of the Launch that Coinbase was not in a position to maintain a fair and orderly market in compliance with the regulatory standards that it had previously cited. *Compare* Defts. Br. at 4-7 *with* SAC ¶¶ 138, 151, 156-157 and 215.

Under the UCL, a duty to disclose arises where a defendant has exclusive knowledge of material facts not known or reasonably accessible to the plaintiff and when a defendant makes partial representations that are misleading because some other material fact has not been disclosed.  *Hodsdon v. Mars, Inc.,* 891 F.3d  857, 862 (9th Cir. 2018), citing *LiMandri v. Judkins,* 52 Cal. App. 4th  326 (1997).  In *Rutledge v. Hewlett-Packard Co.,* 238 Cal. App. 4th

1164 (2015), the court upheld failure to disclose claims where the defendant sold laptop computers with defective screens and the manufacturer had placed advertisements showing and describing the display screens. *Id.* at 1176. This was enough to create a triable issue of fact as to a duty to disclose the defect. *Id.*

Here, Coinbase's representations about how it would handle the launch of new assets expressly identified factors such as liquidity, market capitalization, "trade velocity" and compliance with regulatory requirements. SAC ¶21-22. These aspects of its "Digital Asset Framework" were identified in the email sent by Coinbase to open trading in BCH. *Id.* ¶23. Yet, when it suddenly decided to launch, Coinbase did not disclose that it was unable to provide the orderly trading that it had represented, or that all of the orders it had were purchases that would create a lopsided market surge. *Id.* ¶¶168-182. In its argument, Coinbase falls back on the language in its Digital Asset Framework in which it reserved to itself the full and absolute discretion to "list, not list or de-list any asset for trading." Defts. Br. at 7. But Coinbase is again missing the point. The allegation here is not that it violated the contract in deciding to list BCH for trading. Rather, the argument here is that having made the statements it did about the timing of the Launch and the factors that would have to be in place in order to conduct the Launch, Coinbase was then obligated to disclose that it had not met those requirements once it decided it would list BCH. SAC ¶214.

Defendants offer no reasons or motives for their actions, nor do they explain the utility of their actions. Defts. Br. at 8-10. Thus, Coinbase does not provide the Court with any benefit or utility that their actions provided to consumers that outweighed the harm that it caused—nor is one readily apparent. *See, e.g., Pirozzi v. Apple, Inc.*, 966 F. Supp. 2d 909, 922 (N.D. Cal. 2013); *Progressive W. Ins. Co. v. Super. Ct.*, 135 Cal. App. 4th 263, 287(2005) ("*Progressive*"). Even if Defendants could posit some motive or reason why they suddenly determined to launch BCH at inflated prices to the advantage of their insiders, that analysis would be fact intensive and not appropriate here. *Progressive* at 287. *See also Backus v. General Mills*, 122 F. Supp. 3d 909, 929-930 (N.D. Cal. 2015).

In addition to not moving against Plaintiffs' claims of material omissions, Defendants also limit their arguments regarding affirmative misrepresentations to a small subset of what is actually alleged.  For example, Plaintiffs allege that on the day of the Launch, Coinbase sent an email to all of its GDAX customers stating that it was opening trading in BCH, in accord with its Digital Asset Framework and that it would remain in "post-only" mode until there is sufficient liquidity for trading.  SAC ¶23.  Plaintiffs then allege that contrary to these representations, Coinbase was not able to launch BCH with reasonable liquidity, market capitalization and reasonable "trade velocity," and that, in fact, Coinbase knew that at the time of the Launch it had only purchase orders in its book which would cause a massive spike in the price and its systems were unable to handle the trading.  *Id.*  The contrived discussion of the SAC in Defendants' motion, however, fails to cite this paragraph or even address the alleged misrepresentations, (*see* Defts. Br. at 4-8), in the face of allegations by Plaintiff Crowe that he received and relied on this email when placing the trades that were bungled by Coinbase.  SAC ¶¶70-72.

Nor do Defendants convincingly argue that the alleged misrepresentations they do address could not be considered materially false and misleading when made.  Coinbase made a series of representations about its intent and timing with regard to the Launch and support of BCH.  SAC ¶¶136-140, 149-151, 158-159, 165-167.  Defendants argue that these statements were not knowingly false when made and that when Plaintiffs placed their orders, they knew that Coinbase was supporting BCH in mid-December, not January as stated.  Defts. Br. at 4-5.  Two of these representations were being published on Coinbase's website in December, however, well after it had told its employees that it was going to support trading in BCH.  SAC ¶¶158, 165-166.  As such, these statements were knowingly false at the time they were being published to the public. Moreover, Defendants simply disregard allegations regarding the impact that these representations were having on the market, by preventing BCH traders from adequately preparing for the Launch.  *E.g., id.* ¶160.  Reliance on these statements by Plaintiffs and others contributed to the lack of an orderly market, which in turn caused losses and failed trades.  Accordingly, the alleged false statements support claims under the fraudulent prong of

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS SECOND AMENDED CLASS ACTION
COMPLAINT - CASE NO. 3:18-cv-01364-VC

the UCL and the fraud claim, and are also part of the analysis of unfair conduct, negligence and
market manipulation in violation of the Commodities Exchange Act ("CEA").  Defendants'
attempt to sequester these representations in a box marked solely as affirmative
misrepresentations fails to address the entire course of conduct alleged in the complaint.

     Additionally, under the unfair prong, Defendants ignore the significance of their own
adoption and publication of regulatory requirements as a reason for trusting Coinbase.  For
example, Defendants' entire argument with regard to the New York state regulations is that the
UCL will not borrow regulations from another state under its unlawful prong.  Defts. Br. at 10-
11.  But that is not the only basis for applying the NY regulations in this case.  Coinbase
expressly stated in its Digital Asset Framework, which was incorporated into the email to all its
customers on December 19th, that before it would support an asset, it would determine that the
asset would not affect its ability "to meet compliance obligations, which included (1) Anti-
Money Laundering (AML) program and (2) obligation under government licenses in any
jurisdiction."  SAC ¶¶23, 107-111.[2]  Accordingly, the NY state regulations provide a fair means
of analyzing Defendants' unfair conduct in this case.

     In addition to prohibiting false and misleading statements, the regulations also prohibit
material omissions.  SAC ¶104.  For the reasons stated above, Defendants violated both the
prohibition on false and misleading statements, and the prohibition on material omissions.
Second, the regulations require actions to combat fraud, and prohibit engaging in fraudulent
activity.  *Id.* ¶110.  Defendants' only argument on this point is that it maintains a written policy.
Defts. Br. 11.  The rule is much broader than that, however, and Plaintiffs lay out both the
commission of fraud and the failure to prevent it, in the SAC.  Defendants then argue incorrectly
that Plaintiffs do not claim they were in the dark about the size of their transactions; at most
they complain about the amount paid per unit.  Defts. Br. at 11.  Plaintiffs complain about both.
Plaintiffs placed orders for specific amounts of BCH at the price shown, but the trades were
filled later at massively higher prices, which left them in the dark about the size of their
transactions and the amount paid per unit. SAC ¶¶52-90.  Moreover, the regulation requires

---

[2] See also, Decl. of Sean Arenson ISO Defendant's RJN, Exh. 6, p. 5 of 6.

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS SECOND AMENDED CLASS ACTION
COMPLAINT - CASE NO. 3:18-cv-01364-VC

written disclosures "prior to each transaction" of the terms and conditions of the transaction, including "the amount of the transaction." *Id.* ¶109. Here, the regulations require full disclosure of the terms prior to the trade, and Defendant did not provide either the total or the amount per unit. Then, it halted trading, so that when customers did find out the shocking amounts of their trades, they were unable to sell. *Id.* ¶¶66, 78-79.

### B.     Defendants Engaged in Unlawful Conduct Under the UCL

In arguing against Plaintiffs' claims of unlawful conduct in violation of the UCL, Defendants assert that in order for BCH to be covered under the Commodities Exchange Act ("CEA"), there had to be futures trading in BCH at the time of the alleged conduct. Defts. Br. at 8. This is an incorrect statement of the law. It is sufficient to allege that the asset in question is a virtual currency and that there is futures trading in virtual currencies, particularly Bitcoin. *CFTC v. My Big Coin Pay, Inc.,* 2018 U.S. Dist. LEXIS 164932 at *6-10 (D. Mass. Sept. 26, 2018)("My Big Coin is a virtual currency and it is undisputed that there is futures trading in virtual currencies (specifically involving Bitcoin)."), citing *CFTC v. McDonnell*, 287 F. Supp. 3d 213, 228 (E.D.N.Y. 2018)("Virtual currencies can be regulated by CFTC as a commodity.") The case cited by Defendants, *U.S. v. Brooks,* 681 F.3d 678, 694 (5th Cir. 2012), helps Plaintiffs, not Defendants. In *Brooks,* the Court held that all natural gas met the definition of a commodity, even though only the natural gas flowing through the "Henry Hub" was underlying the natural gas futures contracts traded on NYMEX. Here, Plaintiffs allege that BCH is a cryptocurrency formed from Bitcoin in which there is futures trading. SAC ¶¶24, 45. This satisfies the requirements for pleading applicability of the CEA.

Coinbase's conduct here constituted manipulation under CEA§ 6, and Regulations 180.1 and 180.2. Plaintiffs properly plead a claim for unlawful conduct under that prong of the UCL. Coinbase misstates the law applicable to claims alleging a violation of Rule 180.1 (17 C.F.R. §180.1), claiming that the Rule "requires 'a material misrepresentation (or omission).'" Defts. Br. at 8. While it is true that material misrepresentations or omissions violate the Rule, it is much broader, prohibiting (1) any "manipulative device, scheme or artifice to defraud," (2) material misrepresentations or omissions, or (3) any act, practice or course of business which

-9-

would operate as a fraud upon any person.  *Id., see also* SAC ¶226. For example, in the case

cited by Defendants, *CFTC v. Kraft Foods Group, Inc.,* 153 F.Supp. 3d 996 (N.D. Ill. 2006), the

court upheld a claim for violating Rule 180.1 where Kraft "acquired a massive futures position

in December 2011 wheat futures" without making any representations at all, because this was

manipulative conduct.  *Id.* at 1014.

      Here, Plaintiffs allege an entire course of conduct that included false and deceptive

statements (and material omissions) about when and the extent to which Coinbase would and

could support BCH; manipulation of the price of Bitcoin and BCH to draw investors away from

Bitcoin and to artificially inflate the price of BCH; and to aid a pump and dump scheme

perpetrated by insiders who were tipped by Coinbase as to when it planned to fully launch BCH.

SAC ¶¶2-5.  A part of that scheme was the surprise announcement that it was launching support

for BCH on December 19, 2017 and the entire course of the Launch through December 21,

2017. *Id.* ¶¶168-182.  By failing to address the entire course of conduct as alleged, or any of the

material omissions alleged, as discussed above, Defendants effectively concede that Plaintiffs

allege violations of Rule 180.1.  Defendants' limited arguments to the effect that their

statements about the timing and their ability to conduct an orderly market were true when made

do nothing to address the claim that those representations were part of a larger scheme to

defraud.

      Moreover, at least from mid-November 2017, Coinbase knew but failed to disclose its

plan to launch BCH, including failing to update its then false "roadmap" on its own website.

The failure to disclose this information in light of its knowledge or to correct its prior

misleading statements out in the market is actionable and at least constitutes recklessness if not

outright fraud.  *In re Commodity Exch,. Inc.*, 213 F Supp. 3d 631, 670 (S.D.N.Y. 2016)

("*Commodity Exch.*")(recklessness alleged where facts taken as whole demonstrate defendants

failed to review or check information they had a duty to monitor, or ignored obvious signs of

fraud); *In re Amaranth Natural Gas Commodities Litig.*, 612 F. Supp. 2d 376, 383-84

(S.D.N.Y. 2009) (recklessness shown by defendants' knowledge of facts or access to

information contradicting their public statements.

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS SECOND AMENDED CLASS ACTION
COMPLAINT - CASE NO. 3:18-cv-01364-VC

Rule 180.2 makes it unlawful to manipulate or attempt to manipulate the price of any commodity. 17 C.F.R.§180.2. Defendants identify the four part test applied to claims under Rule 180.2 and focus their arguments on the first, second and fourth factors; whether Defendants had the ability to influence prices, whether an artificial price existed, and whether Defendants had the requisite intent to cause the artificial price. Defts. Br. at 8-9. But again, Defendants' arguments veer from the actual allegations in the SAC toward their own straw men which are easier to knock down. Defendants assert that the only facts in the complaint about their ability to affect price is that by supporting BCH, Coinbase increased demand. Defts. Br. at 9. But the SAC alleges that Defendants made a surprise announcement that it would support trading in BCH in one hour, at a time when they knew there had been insider trading, took orders for about an hour and then went live with only purchase orders on the book. SAC ¶¶23, 33-38, 168-177. That is how the price of BCH opened around $16,000 and traded around $8,000 to $9,000 on Coinbase platforms, while it was trading around $2,000 to $4,000 on other platforms, with the high sides of those trades influenced by the manipulated prices on the Coinbase platforms. *Id.* ¶33.

These allegations are sufficient to satisfy the requirement that Plaintiffs plead Defendants' ability to influence prices, the existence of an artificial price and the intent to cause the artificial price. *See, e.g., In re London Silver Fixing, Ltd.*, 213 F. Supp. 3d 530, 565 (S.D.N.Y. 2016)(explaining that the ability to influence a market is demonstrated by artificial prices); *Commodity Exch.*, at *668-69 (existence of artificial prices demonstrates ability to influence market). As stated in *In re Platinum and Palladium Antitrust Litig.,* 2017 U.S. Dist. LEXIS 46624, at *101 (S.D.N.Y. March 26, 2017), "artificial prices [are] 'those prices that do not reflect the forces of supply and demand in the market *or* do not otherwise comport with contemporaneous prices in comparable markets.'" (emphasis in original, citation omitted).

Defendants' reliance on *CFTC v. Wilson*, 2018 U.S. Dist. LEXIS 207376 (S.D.N.Y. November 30, 2018), is misplaced. First, *Wilson* is an opinion rendered after trial, where the defendant put in evidence of the nature of its trades and the CFTC failed to offer evidence of how those trades created an artificial price. *Id.* It was in the context of the trial evidence that

-11-

the Court concluded that the CFTC was conflating artificial prices with the intent to affect prices, as quoted by Defendants.  However, these same facts had been sufficient to defeat not only a motion to dismiss, but also a motion for summary judgment.  *See CFTC v. Wilson,* 27 F.Supp.3d 517 (S.D.N.Y. 2014) and *CFTC v. Wilson,* 2016 U.S. Dist. LEXIS 177705 (S.D.N.Y. Sept. 30, 2016).   In the motion to dismiss, the court rejected arguments similar to those made here, noting that the plaintiff alleged bids placed and withdrawn, at prices higher than the relevant prices, that did not result in the consummation of actual trades and that prices were not being determined through standard market forces.  *CFTC v. Wilson,* 27 F.Supp. 3d at 533-534.  Here, Defendants were opening trading and taking bids, some of which were executed and some not, all on their own schedule, and closed in violation of their own rules. SAC ¶¶55-90, 97, 177-180, 185-189.[3]

## C.   Plaintiffs have Sufficiently Pled Negligence

At the hearing on the first motion to dismiss the negligence claim, the Court asked Plaintiffs what Defendants could or should have done differently.  Plaintiffs' SAC answers that question with Coinbase's own policies.  *See* SAC ¶¶7-9.  Primary among those policies is the recognition of the need to pre-announce the listing of a new asset "far in advance," in order to allow for sufficient liquidity and an orderly boot up of the market.  *Id.* ¶7.  Defendants argue that these policies were put in place after the bungled debacle that was the Launch, so they cannot be held to have violated policies that were enacted after the fact.  The claim is not that they violated their later enacted policies, however.  The claim is that they failed to act with the reasonable care required of the situation in which they were listing a cryptocurrency for trading. They announced the listing an hour before it started, recorded only purchase orders, then began trading on five minutes notice, failed to complete trades at the prices indicated to customers, failed to maintain accurate information on their public facing trading systems, shut down after 2 ½ minutes, cancelled trades, executed trades at prices other than what customers had been told and generally failed to act with reasonable care.  It will take presentation of evidence at trial to

---

[3] Plaintiffs' allegations regarding NY State regulations and FinCen can be analyzed under both the unfair prong and the unlawful prong as discussed above.

determine whether their conduct of the Launch fell below the standard of care or not.  At this stage, it is sufficient that Plaintiffs allege the conduct that fell below the standard of care and include allegations of what Coinbase could have done differently.

Defendants argue that Plaintiffs have no adequately pled the element of duty.  A **duty** is an element of the tort of negligence.  *Melton v. Boustred*, 183 Cal. App. 4th 521, 529-30 (2010).  Defendants argue that business defendants do not have a responsibility for purely economic losses to parties in financial transactions.  Defts. Br. at 12.  In such circumstances, the existence of a duty and the scope of duty is determined by application of the *Biakanja* factors.[4]

Applying those factors supports the imposition of a duty here.  First, there is a clear and identifiable class—the class that is named in the Amended Complaint.  Liability may be imposed for negligent conduct where there is a duty of care owed to the plaintiff or the plaintiff class.  *Centinela*, at 1016.  Second, the harm from selling artificially inflated BCH, and launching its trading before the platform and Coinbase's systems were ready, was clearly foreseeable.  Third, those who purchased BCH at inflated prices, can demonstrate with certainty that the cause was due to the manipulation of the price.  Those who tried to sell on December 19th, and placed sell orders that were cancelled and who were unable obtain either their coins or money, can demonstrate with certainty their damage from the manipulation and Coinbase's inability to handle the Launch.  Fourth, there is a close connection between Coinbase and those who used its platform on December 19th.  Fifth, this action gives rise to moral blame against Coinbase.  It does have a duty to maintain the integrity of its system, and not to engage in commodities manipulation or unfair business practices under the CEA and the UCL.  This case is very similar to *In re Facebook, Inc. IPO and Sec. and Derivative Litig.*, 986 F. Supp. 2d 428 (S.D.N.Y. 2013) ("*Facebook IPO*"), in which the court upheld negligence claims by investors

---

[4] Under *Biakanja v. Irving*, 49 Cal. 2d 647 (1958)("*Biakanja*"), "[t]he determination whether in a specific case the defendant will be held liable to a third person not in privity  is a matter of policy and involves the balancing of various factors, among which are [1] the extent to which the transaction was intended to affect the plaintiff, [2] the foreseeability of harm to him, [3] the degree of certainty that the plaintiff suffered injury, [4] the closeness of the connection between the defendant's conduct and the injury suffered, [5] the moral blame attached to the defendant's conduct, and [6] the policy of preventing future harm." *Southern California Gas Leak*, 18 Cal. App. 5th 581, 587 (2017); *citing Centinela Freeman Emergency Medical Assoc. v. Health Net of California, Inc.*, 1 Cal. 5th 994, 1013-14 (2016) (" *Centinela*").

unable to obtain proper execution of trades when NASDAQ became overwhelmed during the Facebook IPO.  The duty arose not from contract, but from the nature of the services and its impact on the public interest.  *Facebook IPO*, at 460-63. The same is true here.

Moreover, the negligence claim is not barred by the economic loss rule. Where there is a special relationship giving rise to a duty under the *Biakanja* factors, as demonstrated above, an exception to the economic loss rule arises.  *J'Aire Corp. v. Gregory*, 24 Cal. 3d 799, 803 (1979)("*J'Aire*"), citing *Biakanja; see also Southern California Gas Leak*, at 588.

Defendants make the argument that Plaintiff cannot plead a special relationship here because the action is brought on behalf of a class.  The first *Biakanja* factor applies to either a plaintiff or an identifiable class of plaintiffs, as here. *See, e.g., Ott v. Alfa-Laval Agri., Inc.*, 31 Cal. App. 4th 1439, 1449 (1995)( explaining that "[t]he Supreme Court began its analysis by noting, 'Liability for negligent conduct may only be imposed where there is a duty of care owed by the defendant to the plaintiff or *to a class of which the plaintiff is a member*.'")(emphasis added). *See Kalitta Air, LLC v. Cen. Tex. Airborne Sys., Inc.*, 2009 U.S. Dist. LEXIS 51282 (N.D. Cal. June 8, 2009)("*Kalitta*"); *see also Facebook IPO*, at 461 (where court found duty on behalf of identified class that used exchange within certain time period).  Plaintiff satisfied the *Biakanja* factors, and similar to *Facebook IPO*, has sufficiently pled his negligence claims.

Defendants' arguments in support of the assertion that even if it had a duty to Plaintiffs, Coinbase did not breach it, are like putting lipstick on a pig.  But the breach of duty shows through Coinbase's arguments.  For example, Defendants discuss the fact that Coinbase shut down trading after 2 ½ minutes and explain that they did so "to protect customers."  Defts. Br. at 14.  That raises the question, protect customers from what?  The answer is that it was to protect customers from the damage being caused by Coinbase's negligent Launch when its systems were not sufficiently robust to handle the transactions.  Coinbase's order book was imbalanced in favor of purchase trades, its systems were unable to record and present accurate information to traders, and it shut down selling while filling buy orders at what it knew to be prices artificially inflated by a pump and dump orchestrated by insiders.  SAC ¶35-38. The impact on traders was far greater than the "slippage" discussed by Defendant.  For Plaintiff

-14-

Pyron, for example, he thought he was purchasing at $3,000, based on the information running on Coinbase's system, but got filled at $5,000, instead; and then when Coinbase stopped filling sell orders, apparently to protect the customers, Plaintiff Pyron was stuck with $595,000 of BCH and suffered a massive loss.  SAC ¶¶76-81.  Other Plaintiffs had similar experiences.

This failure by Coinbase mirrors the problems faced by the Facebook IPO investors where Plaintiffs asserted that given NASDAQ's statements touting its capability and reliability, it should have designed and tested its systems to ensure that they would be able to handle the predicted trading volume, including the ability of the systemes to execute and confirm the large number of trade orders and cancellations anticipated for execution.  *Facebook IPO* at 460.  The same failures occurred here and Defendants' attempt to deny that such failures occurred or caused any damage are disingenuous at best.

### D.    Plaintiffs have Sufficiently Pled Fraud

Defendants' motion to dismiss Plaintiffs' fraud claims is based solely on their analysis of the misrepresentations addressed above.  For the same reasons, particularly including Defendants' material omissions at the time of the Launch that are unchallenged in their motion, the motion should be denied.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff requests that the Court deny Defendants' motion to dismiss, and to the extent any part of the motion is granted, Plaintiff requests leave to amend.

DATED:  January 10, 2019                    **GREEN & NOBLIN, P.C.**

By:  ___/s/ Robert S. Green_____
          Robert S. Green

James Robert Noblin
2200 Larkspur Landing Circle, Suite 101
Larkspur, CA  94939
Telephone: (415) 477-6700
Facsimile: (415) 477-6710
Email:  gnecf@classcounsel.com

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS SECOND AMENDED CLASS ACTION
COMPLAINT - CASE NO. 3:18-cv-01364-VC

Lynda J. Grant, *admitted pro hac vice*
**THEGRANTLAWFIRM, PLLC**
521 Fifth Avenue, 17th Floor
New York, NY 10175
Telephone: (212) 292-4441
Facsimile: (212) 292-4442
Email:  lgrant@grantfirm.com

*Attorneys for Plaintiff*

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS SECOND AMENDED CLASS ACTION
COMPLAINT - CASE NO. 3:18-cv-01364-VC