KEKER, VAN NEST & PETERS LLP
STEVEN P. RAGLAND - # 221076
sragland@keker.com
BENJAMIN BERKOWITZ - # 244441
bberkowitz@keker.com
ERIN E. MEYER - # 274244
emeyer@keker.com
NICHOLAS D. MARAIS - # 277846
nmarais@keker.com
SEAN M. ARENSON - # 310633
sarenson@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:     415 391 5400
Facsimile:     415 397 7188

Attorneys for Defendants
COINBASE, INC., BRIAN ARMSTRONG
and DAVID FARMER

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEFFREY BERK, WILLIAM CROWE, PREETHAM PERIASWAMI, NATHANIEL PYRON, SPENCER SOLTAU, MICHAEL SHRIBER, and NIKO YOUNTS, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>COINBASE, INC., a Delaware Corporation d/b/a Global Digital Asset Exchange ("GDAX"), Brian Armstrong and David Farmer,<br><br>Defendants. | Case No. 3:18-cv-01364-VC<br><br>**DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>Date:     April 25, 2019<br>Time:     10:00 a.m.<br>Dept:     Courtroom 4, 17th Floor<br><br>Judge:     Hon. Vince Chhabria<br><br>Date Filed: March 1, 2018<br><br>Trial Date:  None set |

# <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ..........................................................................................................1

II.     ARGUMENT ................................................................................................................2

        A.      Plaintiffs' UCL claims should be dismissed. ................................................2

                1.      Plaintiffs fail to state a claim under the UCL's "unfair" prong. ..................2

                2.      Plaintiffs fail to state a claim under the UCL's "unlawful" prong. ............5

        B.      Plaintiffs' negligence claims should be dismissed...................................................8

        C.      Plaintiffs fail to state a claim for fraud. ................................................................10

III.    CONCLUSION..........................................................................................................10

# **TABLE OF AUTHORITIES**

**Page(s)**

**Federal Cases**

*In re Aluminum Warehousing Antitrust Litig.*,
2014 WL 4743425 (S.D.N.Y. Sept. 15, 2014), aff'd, 833 F.3d 151 (2d Cir. 2016) ........................................................................................................................9

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................................................................................................4, 5

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....................................................................................................3, 5

*CFTC v. Kraft Foods Group, Inc.*,
153 F. Supp. 3d 996 (N.D. Ill. 2015) ............................................................................7

*CFTC v. My Big Coin Pay, Inc.*,
334 F. Supp. 3d 492 (D. Mass. 2018) ...........................................................................6

*CFTC v. My Big Coin Pay, Inc.*,
No. 1:18-cv-10077-RWZ (D. Mass. May 18, 2018), ECF No. 70 ..............................6

*CFTC v. Wilson*,
2018 WL 6322024 (S.D.N.Y. Nov. 30, 2018)..............................................................7

*In re Consol. Welfare Fund ERISA Litig.*,
856 F. Supp. 837 (S.D.N.Y. 1994)................................................................................9

*In re Crude Oil Commodity Litig.*,
2007 WL 1946553 (S.D.N.Y. June 28, 2007) ..............................................................6

*In re Facebook*,
986 F. Supp. 2d at 438–39 ............................................................................................9

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*,
986 F. Supp. 2d 428 (S.D.N.Y. 2013)...........................................................................9

*Hodsdon v. Mars, Inc.*,
891 F.3d 857 (9th Cir. 2018) ....................................................................................2, 3

*Kalitta Air, LLC v. Cent. Texas Airborne Sys., Inc.*,
2009 WL 1636036 (N.D. Cal. June 8, 2009) ................................................................9

*Morgan v. Apple Inc.*,
2018 WL 2234537 (N.D. Cal. May 16, 2018)............................................................8, 9

*In re Platinum & Palladium Antitrust Litigation*,
2017 WL 1169626 (S.D.N.Y. Mar. 28, 2017) ...........................................................................7

*In re Sony Gaming Networks and Customer Data Security Breach Litig.*,
996 F. Supp. 2d 942 (S.D. Cal. 2014) ......................................................................................8

**State Cases**

*J'Aire Corp. v. Gregory*,
24 Cal. 3d 799 (1979) ..........................................................................................................8, 9

*Ott v. Alfa-Laval Agri, Inc.*,
31 Cal. App. 4th 1439 (1995) ...................................................................................................8

*Robinson Helicopter Co. v. Dana Corp.*,
34 Cal. 4th 979 (2004) ...........................................................................................................10

**Federal Statutes**

Commodity Exchange Act ...............................................................................................1, 5, 6, 9

**Rules**

Federal Rule of Civil Procedure 9(b) .......................................................................................6

**Other Authorities**

FinCEN "Know Your Customer" ..............................................................................................5

New York "Bitlicense" ................................................................................................................5

## I.    INTRODUCTION

One would expect that, with each iteration of the complaint, Plaintiffs' allegations and theories would become clearer and more defensible.  Instead, much like the Second Amended Complaint ("SAC"), Plaintiffs' opposition is a muddle of contradictions.  They accuse Coinbase of "bungl[ing]" the BCH launch, but also of carefully manipulating its rollout "to enable insiders" to make profits.  *See* Pls.' Opp'n to Defs.' Mot. to Dismiss Second Am. Class Action Compl. ("Opp'n") 1, 7, ECF No. 60.  They argue that Coinbase's systems "failed from the opening bell," but also that the launch was timed "perfectly" to allow its employees "to dump at artificially inflated prices."  When it comes to answering the Court's lingering question—"What should Coinbase have done differently?"—however, Plaintiffs tie themselves into knots misquoting a policy document that had yet to be written.  *Compare* Opp'n 12 *with* Defs.' Mot. to Dismiss Second Am. Class Action Compl. ("Mot.") 13 n.7, ECF No. 55.  Although almost a year has passed since Plaintiffs filed their complaint, they are still casting about for a legal hook.

Nothing in Plaintiffs' opposition cures the flaws in the SAC.  *First*, Plaintiffs have rejected the invitation to identify a statement—any statement—upon which they reasonably relied and which was knowingly false when made.  Instead, they now rest their case not on something Coinbase said, but on what it *didn't* say.  That fares no better.  *Second*, when it comes to Plaintiffs' "unlawful" UCL claim, they appear to have abandoned two of their three statutory hooks.  Their third, the Commodity Exchange Act ("CEA"), still fails absent allegations of a BCH futures market *and* actual market manipulation—neither of which exist here.  Ultimately, Plaintiffs' "unfair" UCL claim is an amorphous mix of each of their other causes of action and fails for the same reasons.  *Third*, when it comes to Plaintiffs' negligence theory, their chosen legal authority only underscores what Coinbase said in its motion: because there is no "special relationship" here (instead, the relationship is governed by the User Agreement), the economic loss rule prohibits them from seeking purely economic losses.  And, *fourth*, Plaintiffs' three-line defense of their fraud claims fails even to mention *scienter*—an essential but missing element.

Plaintiffs have failed to allege any unfair competition, negligence, or fraud, and this case

should be dismissed with prejudice.

## II.     ARGUMENT

### A.     Plaintiffs' UCL claims should be dismissed.

#### 1.     Plaintiffs fail to state a claim under the UCL's "unfair" prong.

##### a.     Plaintiffs have identified no material omissions.

Having built their "unfair" UCL claim on Coinbase's supposedly "false and deceptive statements," *see, e.g.*, SAC ¶ 2, Plaintiffs must—but still cannot—identify some such statement. *See* Mot. 4–7. Instead, Plaintiffs now assert that their UCL unfairness claim is based less on any particular statement than on an "entire course of conduct" that Coinbase has supposedly "fail[ed] to address." Opp'n 8. This "course of conduct" purportedly consists of "material omissions" and "manipulation of the price of Bitcoin and BCH … to aid a pump and dump scheme" by unnamed insiders. *Id.* at 10. But while Plaintiffs accuse Coinbase of ignoring these allegations, it is Plaintiffs who have ignored arguments in Defendants' motion that addressed each in turn.

First, the supposed "material omissions" are all, allegedly, failures "to correct … earlier statements." SAC ¶ 156. For instance, Plaintiffs argue that when Coinbase proceeded with the launch, "it omitted to disclose that [it] was not actually able to" do so "consistent with [its prior] representations." *Id.* ¶ 138. In other words, Plaintiffs' argument "is that *having made the statements it did* about the timing of the Launch and the factors that would have to be in place in order to conduct the Launch, Coinbase was *then* obligated to disclose that it had not met those requirements once it decided it would list BCH." Opp'n 6 (emphasis added). This does not suffice because that theory still requires a misleading affirmative representation, without which there was simply nothing to "correct."

As the Ninth Circuit explained in *Hodsdon v. Mars, Inc.*, 891 F.3d 857 (9th Cir. 2018), which Plaintiffs rely on, an actionable omission "must be contrary to a representation actually made by the defendant, or an omission of a fact the defendant was obliged to disclose." *Id.* at 861 (quoting *Daugherty v. Am. Honda Motor Co.*, 144 Cal. App. 4th 824 (2006)) (emphasis omitted). Defendants addressed this theory at length in their motion to dismiss, and nothing in Plaintiffs' opposition resolves that challenge. None of the supposed omissions Plaintiffs allege was

"contrary to a representation actually made." *Id.*; *see* Mot. 4–7. For instance, Plaintiffs lean heavily on a claim that the ultimate launch, in December 2017, was inconsistent with a prior representation "that BCH would not be in more than withdrawal mode by January 1, 2018." SAC ¶ 151. But, as Defendants have shown, no such representation was ever "actually made by the defendant," *Hodsdon*, 891 F.3d at 861; *see* Mot. at 5.[1]

To the extent Plaintiffs purport to rely on some freestanding obligation to disclose, that does not save their claims: "omission cases must plead that the undisclosed information created a *safety hazard*." *Hodsdon*, 891 F.3d at 860 (citing *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136 (9th Cir. 2012)) (emphasis added). As the Ninth Circuit has explained, the authority Plaintiffs rely on stands, at most, for the proposition that absent a safety hazard, an actionable omission must concern a "*physical* defect." *Hodsdon,* 891 F. 3d at 860, 864. Even alleged omissions that are "*central* to the product's function" are not actionable absent a "physical defect." *Id.* at 864. Thus, as in *Hodsdon*, Plaintiffs' UCL claims are "foreclosed" because they are based on omissions "concerning no physical product defect" and "no safety defect." *Id.* at 865.

Finally, Plaintiffs fail to allege any *facts* to support their naked speculation about what Coinbase purportedly "knew" or "intended." To the contrary, Plaintiffs' allegations about the launch are either refuted by judicially noticeable facts or based solely on hindsight. *See* Mot. 6–7; *see also, e.g.*, Decl. of Sean M. Arenson in Supp. of Defs.' Req. for Judicial Not. ("Arenson Decl."), Exs. 3, 4 (refuting Plaintiffs' allegation that certain "representations were being published on Coinbase's website in December," Opp'n. 7). Plaintiffs' bare, conclusory assertions about Coinbase's knowledge and intent related to their supposed statements or omissions do not "raise a right to relief above the speculative level," and thus do not entitle them to proceed past a motion to dismiss. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

### b.    Plaintiffs have identified no unfair "conduct."

Plaintiffs' reliance on allegedly unfair *conduct* fares no better. First, Plaintiffs' conduct argument is really just a "material omissions" argument in disguise. For instance, Plaintiffs assert

---

[1] Plaintiffs do not object to Defendants' Request for Judicial Notice. Opp'n 3. Nor do they offer any substantive response to the fact that these documents plainly show that Coinbase never made the supposedly misleading statements that Plaintiffs now contend should have been corrected.

that Coinbase's conduct was "unfair" because of its "*radical departure from its own stated policies* of not launching until it was assured of a fair and orderly market." Opp'n 4 (emphasis added). But, as Coinbase explained in its motion, Plaintiffs have misquoted and misrepresented those policies—and they cannot now argue that Coinbase's conduct departed from statements the company never made. *See, e.g.*, Mot. 11–13. In addition, Coinbase's User Agreement expressly warned users that Coinbase reserved *sole discretion* over whether to support fork assets, undercutting Plaintiffs' suggestion that they relied on any alleged extrinsic statements. *See, e.g., id.* at 2. To the extent Plaintiffs allege *conduct*—separate from representations—Defendants have already addressed those allegations at length, *see id.* at 12–15, and Plaintiffs' opposition fails to counter those points. Plaintiffs argue in their opposition that it was unfair to launch BCH trading when "Coinbase knew that at the time of the Launch it had only purchase orders in its book … and its systems were unable to handle the trading." Opp'n 7. But Plaintiffs never actually allege, much less explain why, it would be unfair to launch a market with "only purchase orders in [the] book," *id.*, or why the rollout of a new asset with pent-up demand would have been any different if Coinbase had launched at some other time. *See* Mot. 13. Plaintiffs allude vaguely to purported "ulterior motives" of unidentified "insiders," Opp'n 4, but they do nothing to tie these theories to well-pleaded allegations (let alone facts), or to address Coinbase's arguments that those theories are internally inconsistent. *See* Mot. 5, 9–10. For example, to the extent they claim the anti-manipulation policy contained in Coinbase's Trading Rules was inadequate, SAC ¶ 97, they never explain *how* this policy was inadequate or in what way it should have been different. Nor do they explain why Defendants would have had any plausible interest in sabotaging a launch that they allegedly "advocate[d] for" and "favored," *id.* ¶¶ 30, 246. *See* Opp'n 7.

Plaintiffs' only response is to suggest, fancifully, that Coinbase launched BCH in December 2017 because that "turned out to be the perfect moment to pump the price of BCH, derail Bitcoin, and allow insiders to dump at artificially inflated prices." Opp'n 2. But Plaintiffs never plead any *facts* to support this conjecture. (To the contrary, they imply that *any* launch by Coinbase would have caused a spike. *See* Mot. 13, SAC ¶ 14.) These are the sorts of "bare assertions" that are "not entitled to be assumed true." *Ashcroft v. Iqbal*, 556 U.S. 662, 680–81

(2009).  Worse still, they defy "common sense," and for that reason also fail to "state[] a plausible claim for relief."  *Id.* at 679.  Simply put, Plaintiffs have not "nudged their claims across the line from conceivable to plausible."  *Twombly*, 550 U.S. at 570.

Finally, Plaintiffs argue that it was unfair for Coinbase to state that it would adhere to the New York "Bitlicense" regulations and the FinCEN "Know Your Customer" ("KYC") rules and then fail to do so.  But Plaintiffs' SAC did not allege facts regarding any purported violation of these regulations, *see* Mot. 10–11, and their opposition fares no better.  In fact, Plaintiffs offer no response at all on FinCEN, essentially abandoning that theory.  *See* Mot. 10.  And the argument they do make about the New York regulations is unpersuasive:  They have not shown that Coinbase made "false, misleading, or deceptive representations or omissions" or "engage[d] in fraudulent activity."  SAC ¶¶ 108, 110; *see supra* II.A.1.; *infra* II.C.; Mot. 4–7, 15.  They have never identified "reasonable steps" that Coinbase should have taken, but failed to take, "to detect and prevent fraud."  SAC ¶ 110.  To the extent Plaintiffs claim that these New York rules require "written disclosures 'prior to each transaction' of the terms and conditions of the transaction," the parties are all well aware that Coinbase discloses (and Plaintiffs agreed to) a User Agreement and Trading Rules that set out the "terms and conditions" governing "each transaction" on Coinbase's platform.  *See* Opp'n 8–9; Mot. 2, 13–14.  Finally, Plaintiffs argue that Coinbase failed to disclose "the amount of the transaction" in advance, a new allegation that is not only false, but also nowhere to be found in the SAC.  *See* Opp'n 9 (asserting without citation).  Plaintiffs also cite no authority supporting their interpretation of this requirement, and Defendants are aware of none.  In sum, even if these regulations *could* form the basis of an unfair competition claim, Plaintiffs have not alleged that Coinbase fell short of their requirements.

### 2.    Plaintiffs fail to state a claim under the UCL's "unlawful" prong.

In their SAC, Plaintiffs predicated their "unlawful" UCL claim on three statutory or regulatory schemes.  Now, they have abandoned two of them, offering no response at all to Defendants' arguments about the foreign "Bitlicense" regime and the FinCEN KYC rules.  *See* Mot. at 10–11.  Having conceded these points, Plaintiffs are back where they began—resting their "unlawful" case solely on a theory that Coinbase violated the CEA.  The Court has rejected that

argument once before, and Plaintiffs offer nothing new.

Plaintiffs argue again that they need not show that a BCH futures market existed at the time of the alleged misconduct to establish that BCH is a "commodity" under the CEA.  Opp'n 9. Again, they are wrong.  They rely principally on a non-binding District of Massachusetts decision holding that the CFTC could regulate a virtual currency called "My Big Coin" because there was futures trading in another virtual currency (there, Bitcoin).  *CFTC v. My Big Coin Pay, Inc.*, 334 F. Supp. 3d 492, 498 (D. Mass. 2018).  *My Big Coin Pay*, however, should be read narrowly; it did not involve BCH and its reasoning should be limited to its specific facts.  Indeed, even the CFTC was careful to narrow its arguments in that case, arguing expressly that the court need not decide whether "*all* virtual currencies" are commodities—only how to treat the virtual currency at issue in that case, My Big Coin (or "MBC").  *See* Pl.'s Opp'n to Defs.' Mot. to Dismiss at 12, *CFTC v. My Big Coin Pay, Inc.*, No. 1:18-cv-10077-RWZ (D. Mass. May 18, 2018), ECF No. 70. There, the CFTC's complaint contained detailed allegations showing that MBC was "functionally similar" to Bitcoin.  *Id.* at 10–13.  Here, by contrast, Plaintiffs take the opposite tack, pleading allegations in the SAC that *distinguish* BCH from Bitcoin.  *See, e.g.*, SAC ¶¶ 24–29.[2]  In other words, Plaintiffs here have not alleged that Bitcoin and BCH are fungible (quite the opposite). Nor have they ever alleged any futures market in BCH.  That should be the end of the analysis under the CEA and the Court should decline the invitation to extend the holding of *My Big Coin Pay* broadly to include distinct, non-fungible virtual currencies like BCH for which there existed no futures market.

Significantly, even if the CEA applied to BCH, Plaintiffs have not identified any *facts* in support of their manipulation claim, much less with particularity, as they must under Rule 9(b). *See In re Crude Oil Commodity Litig.*, 2007 WL 1946553, at *5 (S.D.N.Y. June 28, 2007) (manipulation claims based in part on "false or misleading statements" are "subject to the heightened pleading standard for Rule 9(b)").  Plaintiffs rely on the same alleged misrepresentations and omissions and speculation about Defendants' motives that Coinbase has

---

[2] *My Big Coin Pay* is also quite different from this case in that it involved specific, demonstrably false statements—*e.g.,* that "My Big Coin was 'backed by gold'"—in stark contrast to Plaintiffs' speculative and inadequate claims here.

1316895

already debunked.  Opp'n 10.  The "surprise announcement that [Coinbase] was launching support for BCH," *id.*, bears no resemblance to the sort of conduct that courts find manipulative. For instance, in *CFTC v. Kraft*, Kraft was alleged to have taken "a huge wheat futures position" that it "intended … would signal Kraft's demand for wheat in the relevant time period … in a way that would mislead others in the market into thinking that Kraft would take delivery of its futures position and not buy cash wheat … which was intended to, and in fact did, cause cash wheat prices to decrease and the price for futures to increase."  *CFTC v. Kraft Foods Group, Inc.*, 153 F. Supp. 3d 996, 1014 (N.D. Ill. 2015).  In other words, Kraft's conduct was intended to, and did, send a "false signal" to the market about supply and demand for a commodity.  By contrast, Plaintiffs have still never explained how Coinbase's alleged "course of conduct" could have created an "artificial price" that "does not reflect basic forces of supply and demand"—much less demonstrated that such conduct *did* result in such an artificial price.  *CFTC v. Wilson*, 2018 WL 6322024, at *13 (S.D.N.Y. Nov. 30, 2018) (citation omitted).[3]

Unable to show actual manipulation, Plaintiffs turn to *In re Platinum & Palladium Antitrust Litigation*, 2017 WL 1169626, at *32 (S.D.N.Y. Mar. 28, 2017), to argue that they can allege artificiality based on prices that "do not otherwise comport with contemporaneous prices in comparable markets."  Opp'n 11.  But that does not save their claim, because Plaintiffs have long alleged that Coinbase is ***not*** comparable to other markets—that it is "one of the largest and most accessible exchanges for the trading, buying and selling of virtual or cryptocurrency in the world" and "one of the only cryptocurrency exchanges to accept fiat currency (typical government issued currency) … such that customers … can buy and sell cryptocurrency through the use of credit cards and their bank accounts."  SAC ¶¶ 11–12.  It stands to reason that, as demand spiked and prices increased, the "most accessible" and popular exchanges would be most affected.[4]

---

[3] If anything, Plaintiffs' SAC alleges that the market was functioning just as one would expect: pent-up market demand "caused a massive spike in the price."  *See, e.g.*, SAC ¶ 23.

[4] Plaintiffs also cannot show artificial prices because they have previously alleged that contemporaneous prices on other exchanges were similar to those on Coinbase.  Plaintiff Berk admitted that BCH was trading on another exchange, Binance, in the "unmanipulated" range of "a low of $2604 to a high of $5389," and claimed to have purchased BCH on Coinbase for "$4200.98 per BCH," notably within his own alleged range of "prices in other exchanges that reflected unmanipulated supply and demand for the currency."  *See* Am. Class Action Compl.

Plaintiffs' request that this Court *infer* manipulation should be rejected.

     **B.**     **Plaintiffs' negligence claims should be dismissed.**

Plaintiffs appear to concede that the economic loss rule prevents them from pursuing negligence claims for purely economic losses unless they enjoy some "special relationship" with the defendant.  See Opp'n 14.  And, yet, they go on to argue that they can somehow plead the requisite "special relationship" without regard or reference to any particular individual.  Unfortunately for Plaintiffs, the law is against them:

> Courts routinely reject negligence theories proceeding on the special relationship doctrine in situations such as this where a plaintiff fails to allege, nor could it, that the manufacturer marketed a product with the specific plaintiff in mind rather than the general public.

*Morgan v. Apple Inc.*, 2018 WL 2234537, at *9 (N.D. Cal. May 16, 2018) (dismissing plaintiffs' negligence claim with prejudice); *see also In re Sony Gaming Networks and Customer Data Security Breach Litig.*, 996 F. Supp. 2d 942, 969 (S.D. Cal. 2014) (plaintiffs "failed to allege a 'special relationship' with Sony beyond those envisioned in everyday consumer transactions, and therefore, negligence is the wrong legal theory on which to pursue recovery").

Plaintiffs rely on *Ott v. Alfa-Laval Agri, Inc.*, 31 Cal. App. 4th 1439, 1449 (1995), to argue that it might be possible to "plead a special relationship" with either a "plaintiff or … a class of which the plaintiff is a member."  *See* Opp'n 14.  That argument fails here because the "class" would still need to explain why they shared a "special relationship" with Coinbase and what, exactly, set them apart from the "general public."  Plaintiffs make no effort to do that, and their negligence claims fail for the same reasons as those of the *Ott* plaintiffs:

> [N]either the pleadings nor the evidence suggests the 1970 milking system was 'intended to affect' the plaintiffs *in any way particular to the plaintiffs*, as opposed to all potential purchasers of the equipment. *The absence of this foundation precludes a finding of "special relationship.…"*

*Ott*, 31 Cal. App. 4th at 1455–56 (emphases added).  Plaintiffs' other cited authority also supports dismissal.  In *J'Aire Corp. v. Gregory*, 24 Cal. 3d 799 (1979), the California Supreme Court made clear that its finding of a "special relationship" turned on the fact that the underlying contract was for the renovation of the *specific* premises "in which [J'Aire Corp.] maintained its business.  The

---

¶¶ 11–12, 26, ECF No. 33.

1316895

contract could not have been performed without impinging on that business." *Id.* at 804. Similarly, in *Kalitta Air*, Judge Wilken found a "special relationship" specifically because "the transactions were intended to affect Kalitta," because the parties "had substantial and ongoing interaction[s]," and because the "modifications" at issue "required particularized workmanship" for an individual, specific consumer. *Kalitta Air, LLC v. Cent. Texas Airborne Sys., Inc.*, 2009 WL 1636036, at *6–7 (N.D. Cal. June 8, 2009).

Here, Plaintiffs allege no special relationship. To the contrary, they claim nothing more than that they were members of the general consuming public. *See, e.g.*, SAC ¶¶ 196–97. There is no allegation, nor any argument in Plaintiffs' opposition, that Coinbase "marketed [its] product" with them—or with *any specific plaintiff*—"in mind rather than the general public." *Cf. Morgan*, 2018 WL 2234537, at *9. Thus, their relationship with Coinbase was governed not by the law of negligence, but by the law of contract and, specifically, the User Agreement between the parties. *See* Mot. 12. That is a deathknell for Plaintiffs' negligence claim: without a special relationship, California's economic loss rule bars their claims.

Having struck out under California law, Plaintiffs turn to New York law—to no avail. They argue that a district court in *In re Facebook* found a "special relationship" with a class of NASDAQ customers. Opp'n 14 (citing *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 428, 461 (S.D.N.Y. 2013)). There is plenty to distinguish that case from this one,[5] but most obviously, California and New York law are different on this point. In New York, it is "not … unusual or exceptional" for courts to "creat[e] a duty without a direct relationship or contractual allegation." *Id.* at 482. In California, the test—as both parties have acknowledged by adopting *Biakanja*—is more stringent.[6]

---

[5] NASDAQ is a securities exchange registered "under Section 6 of the Exchange Act," which means that the SEC must "determine … that [it] has a set of rules that are 'consistent with the requirements' of the Exchange Act. … In addition, the SEC enforces exchanges' compliance with the Exchange Act, the SEC's rules, and the exchanges' own rules." *In re Facebook*, 986 F. Supp. 2d at 438–39.

[6] When New York courts analyze negligence claims brought under *California* law, they turn to *Biakanja*, not to *In re Facebook*. *See, e.g.*, *In re Aluminum Warehousing Antitrust Litig.*, 2014 WL 4743425, at *5 (S.D.N.Y. Sept. 15, 2014), aff'd, 833 F.3d 151 (2d Cir. 2016); *In re Consol. Welfare Fund ERISA Litig.*, 856 F. Supp. 837, 841–42 (S.D.N.Y. 1994).

This result is neither counterintuitive nor unfair.  The economic loss rule is intended not only to "limit liability in commercial activities that negligently or inadvertently go awry," but also to prevent the "law of contract and the law of tort from dissolving one into the other." *Robinson Helicopter Co. v. Dana Corp.*, 34 Cal. 4th 979, 988, 991 n.7 (2004).  Plaintiffs' remedies for any wrongs must be pursued under contract law and the User Agreement, not the law of negligence. As Coinbase has explained, the User Agreement could not be clearer: "There is no guarantee that a Market Order will Fill at the price specified."  *See* Mot. at 13; Arenson Decl., Ex. 2 ¶¶ 1.10– 1.12, ECF No. 56-3.  Plaintiffs, of course, have *not* alleged any breach of contract—perhaps in an effort to avoid arbitration—and they cannot plead around it by dressing up a claim for economic damages as "negligence."[7]

### C.      Plaintiffs fail to state a claim for fraud.

Plaintiffs' entire response to Defendants' argument about their fraud claims is a three-line "ditto."  For "the same reasons" discussed elsewhere in their brief, they argue, Defendants' request for dismissal of their fraud counts should be denied.  Opp'n 15.  It is true, as Defendants argued in its motion, that Plaintiffs' "fraud" claims are premised on the same supposed misrepresentations that underpin their UCL claims, and that they should fail for the same reasons. But fraud claims *also* require a "plausible theory of *scienter*."  *See* Mot. 9–10, 15.  Plaintiffs' opposition never addresses that deficiency—indeed, it never mentions the word "*scienter*" once— and their fraud claims should be dismissed for that reason, too.

## III.    CONCLUSION

Defendants respectfully request that the Court dismiss plaintiffs' SAC with prejudice.

---

[7] As Defendants have already argued, even if Coinbase owed Plaintiffs a duty, it did not breach it. *See* Mot. 12–14.  All Plaintiffs agreed to the User Agreement and Trading Rules which clearly disclosed how trades would be executed, including the "Price-Time Priority" and the possibility of slippage, and Plaintiffs do not allege that Coinbase's execution of their trades violated these agreements.  *Id.*  Furthermore Plaintiffs' purported harm is entirely speculative.  *Id.* at 15. Plaintiffs' negligence claim also fails for these reasons.

Dated:  January 18, 2019                              KEKER, VAN NEST & PETERS LLP

                                          By:    /s/ Steven P. Ragland
                                                 STEVEN P. RAGLAND

                                                 Attorneys for Defendants
                                                 COINBASE, INC., BRIAN ARMSTRONG
                                                 and DAVID FARMER

DEFENDANTS' REPLY ISO MTD SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 3:18-cv-01364-VC

1316895