UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEFFREY BERK,<br><br>        Plaintiff,<br><br>    v.<br><br>COINBASE, INC., et al.,<br><br>        Defendants. | Case No. 18-cv-01364-VC<br><br>**ORDER DENYING MOTION TO COMPEL; GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS**<br><br>Re: Dkt. Nos. 54, 55 |

    1. Coinbase, Inc.'s renewed motion to compel arbitration is denied. Although the question is a close one, the Court's prior order explains why the arbitration agreement does not clearly and unmistakably delegate the question of arbitrability to the arbitrator. *See* Dkt. No. 48. Thus, the primary issue presented by this motion involves the scope of the arbitration provision, which extends to "dispute[s] arising under" the user agreement. *E.g.*, User Agreement pt. 1, ¶ 7.2, Dkt. No. 54-13. A provision that sweeps in only those disputes "arising under" the parties' agreement is interpreted narrowly, in contrast to provisions that also encompass disputes "relating to" the agreement. *See Cape Flattery Ltd. v. Titan Maritime, LLC*, 647 F.3d 914, 921-22 (9th Cir. 2011). In recognition of the parties' use of a narrow provision, Ninth Circuit precedent dictates that a court can compel arbitration only if the claims "refer to disputes or controversies relating to the interpretation and performance of the contract itself." *Mediterranean Enterprises, Inc. v. Ssangyong Corp.*, 708 F.2d 1458, 1464 (9th Cir. 1983).

    That standard plainly has not been met for the plaintiffs' claims premised on Coinbase's

alleged facilitation of insider trading or alleged market manipulation. True enough, Coinbase maintains a policy against insider trading and market manipulation. GDAX Trading Rules ¶¶ 3.12, 4.7, Dkt. No. 54-15. But Coinbase's adoption of this policy does not make these disputes arise under the user agreement, any more than a company's general policy against sexual harassment by its employees would subsume a Title VII claim into contract law. To the extent the negligence, fraud, and Unfair Competition Law (UCL) claims are based on insider trading and market manipulation, Coinbase's actions "would constitute an independent wrong from any breach" of the user agreement. *Tracer Research Corp. v. National Environmental Services Co.*, 42 F.3d 1292, 1295 (9th Cir. 1994).

The plaintiffs' other theory of liability – that Coinbase negligently launched a dysfunctional trading market for Bitcoin Cash – presents a closer question, but this claim too is collateral to the user agreement. Even if the plaintiffs could not access Coinbase's exchange without accepting the terms of the user agreement (and therefore could not have been injured but for the agreement), Coinbase's negligence is actionable separate and apart from any contractual remedies the plaintiffs may (or may not) have available. *See Mediterranean Enterprises*, 708 F.2d at 1464-65. And as will be explained in the context of the motion to dismiss, Coinbase bore a duty of reasonable care to its traders "originating outside of the agreement." *Rice v. Downs*, 248 Cal. App. 4th 175, 190-91 (2016). Accordingly, the negligence claim does not arise under the user agreement.[1]

2.  The motion to dismiss the negligence claims by the plaintiffs who bought Bitcoin

---

[1] Incidentally, the plaintiffs are wrong to argue that the arbitration agreement is unenforceable based on the fee-shifting provision. Bilateral fee-shifting provisions are not substantively unconscionable under California law. *Tompkins v. 23andMe, Inc.*, 840 F.3d 1016, 1025 (9th Cir. 2016); *see* 9 U.S.C. § 2.

Cash is denied, but the motion to dismiss the negligence claims by the plaintiffs who attempted to sell Bitcoin Cash is granted.

Negligence has four elements under California law: duty, breach, causation, and injury. *See Vasilenko v. Grace Family Church*, 3 Cal. 5th 1077, 1083 (2017). Coinbase contests most forcefully the existence of a duty, relying on the general rule that one does not possess a duty to exercise reasonable care against the economic loss of others. To be sure, "a duty to manage business affairs so as to prevent purely economic loss to third parties in their financial transactions is the exception, not the rule, in negligence law." *Quelimane Co. v. Stewart Title Guaranty Co.*, 19 Cal. 4th 26, 58 (1998). Yet California law recognizes exceptions to this general rule. The foundational case on this subject outlines six factors for establishing a duty to protect against economic loss: "[1] the extent to which the transaction was intended to affect the plaintiff, [2] the foreseeability of harm to him, [3] the degree of certainty that the plaintiff suffered injury, [4] the closeness of the connection between the defendant's conduct and the injury suffered, [5] the moral blame attached to the defendant's conduct, and [6] the policy of preventing future harm." *Biakanja v. Irving*, 49 Cal. 2d 647, 650 (1958).

Although California courts have not decided whether the exchange-trader relationship satisfies the *Biakanja* test, the best interpretation of California law – and the interpretation that the California Supreme Court would be most likely to adopt – is that Coinbase indeed had a duty to maintain a functional marketplace. First, Coinbase encouraged traders to enter the market following its launch of trading in Bitcoin Cash, so Coinbase's actions were aimed at the traders as a class. Second Amended Complaint (SAC) ¶¶ 168-72, Dkt. No. 51; *see J'Aire Corp. v. Gregory*, 24 Cal. 3d 799, 803 (1979) (explaining that the defendant can owe a duty of care "to a class of which the plaintiff is a member"). Second, the negligent launch of a digital currency

foreseeably impacts those who trade in the resulting dysfunctional market. Third, the buyers suffered an ascertainable pocketbook injury, and fourth, that injury is directly tied to the allegedly negligent launch. As to the fifth and sixth factors, California cases suggest that the defendant's conduct is morally blameworthy, and a policy of preventing future harm is warranted, when the defendant holds a position of trust, such as Coinbase's role in processing the transactions of traders on its exchange. *See, e.g.*, *Ott v. Alfa-Laval Agri, Inc.*, 31 Cal. App. 4th 1439, 1451 (1995).

*In re Facebook, Inc., IPO Securities and Derivative Litigation*, 986 F. Supp. 2d 428 (S.D.N.Y. 2013), is instructive. There, the district court held that NASDAQ owed investors a duty to properly process orders. *Id.* at 460-62. As Coinbase points out, that court applied New York law, but it nonetheless considered many of the same factors from *Biakanja*.

The complaint also lays out a plausible account that Coinbase breached its duty to maintain a functional market. For starters, the fact that Coinbase halted trading within three minutes of the launch is indicative of dysfunction. SAC ¶¶ 176-77. The buyers have also identified precautions Coinbase could have taken to avert the massive spike in the price of Bitcoin Cash on its exchange. Most prominently, Coinbase could have announced its launch of trading in Bitcoin Cash more than an hour in advance, which would have permitted more buyers and sellers to place limit orders. *Id.* ¶ 160. That way, Coinbase could have ensured the liquidity and market capitalization needed for an orderly market. *Id.* ¶ 22. Coinbase instead launched trading while only purchase orders were pending. *Id.* ¶ 169. And the buyers have alleged a plausible motive for Coinbase's seemingly rushed decision to launch under subpar conditions: The Chicago Mercantile Exchange opened trading in Bitcoin futures the day before the launch.

SAC ¶ 3.[2]

The complaint properly pleads that this alleged breach caused the buyers' injuries, since Coinbase's launch of Bitcoin Cash trading under these circumstances is a plausible reason why the buyers' market orders were filled by such high-priced limit orders. *Id.* ¶¶ 42, 162. In contrast, the sellers haven't shown causation. Assuming the sellers have stated a cognizable injury, that injury – the lost opportunity to sell at artificially high prices – was caused by Coinbase's decision to halt Bitcoin Cash trading, an action that wasn't itself negligent. *Id.* ¶¶ 66, 86. Indeed, Coinbase would have been exposed to claims from yet more buyers absent the halt in trading. And if Coinbase had taken the precautions that the plaintiffs identify, Coinbase either (a) would have allowed only withdrawals of Bitcoin Cash or (b) would have launched Bitcoin Cash trading under conditions more likely to produce an orderly market. In neither scenario would the sellers have been able to sell their Bitcoin Cash at the price that obtained on the exchange prior to the halt in trading.

The final issue relevant to negligence is Coinbase's defense of consent. Coinbase underscores that the buyers agreed to provisions that acknowledge the risk of slippage and contends that by doing so they relinquished any right to recover for the injury they suffered from the bungled launch. GDAX Trading Rules ¶ 1.12; User Agreement pt. 3, ¶ 2.1 (incorporating GDAX Trading Rules); *see* Cal. Civ. Code § 3515 ("He who consents to an act is not wronged by it."). But as explained in these provisions, "slippage" occurs when a market order is matched to a limit order with a buy or sell price that is different from the best limit order available when

---

[2] The basis for finding a breach draws further support from Coinbase's adoption of a new policy that remedies some of these alleged deficiencies. *Id.* ¶¶ 7-8, 233-35. It bears noting that this policy might be a "subsequent remedial measure" that is not admissible to prove negligence, although Coinbase did not argue that it should not be considered at the pleading stage. Fed. R. Evid. 407. In any event, even without considering adoption of the new policy, the buyers have stated a negligence claim for the reasons discussed in this ruling.

the market order was placed. In other words, slippage is the natural expression of supply and demand that exists in a functional exchange where people place market orders. The plaintiffs' claim for negligence is not that the plaintiffs suffered injury from the natural expression of supply and demand on the exchange; it is that Coinbase engaged in conduct that would ensure a dysfunctional market where there was no natural expression of supply and demand at all. Assuming the truth of the plaintiffs' allegations in this regard, the concept of slippage is not relevant to their claim or to any defense that Coinbase might assert.

      3.  The motion to dismiss the fraud claims is granted. The plaintiffs have not particularly pleaded their reliance on Coinbase's allegedly fraudulent statements. *See* Fed. R. Civ. P. 9(b). Moreover, while the factual allegations paint a compelling picture of an incompetent launch by Coinbase, the complaint does not outline a coherent account of fraud by Coinbase, Armstrong, and Farmer. For instance, the plaintiffs tell us that Armstrong (the founder of Coinbase) trumpeted the virtues of Bitcoin Cash and sought to increase its popularity, all the while harboring a nefarious plan to let insiders sabotage his exchange's launch of trading in Bitcoin Cash. *Compare* SAC ¶¶ 5, 25 *with id.* ¶¶ 173-76. What's more, the complaint alleges that Armstrong "pumped" the value of Bitcoin Cash with his bullish public statements so that unnamed insiders could "dump" at inflated prices, yet also alleges Coinbase simultaneously intended to hoard Bitcoin Cash for itself in the aftermath of the dump. *Compare id.* ¶ 35 *with id.* ¶ 4. These shadowy inferences of scienter are implausible, especially when another explanation – incompetence born of haste – is far more applicable to these facts.

      4.  The motion to dismiss the UCL claim is granted. The UCL prohibits "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. For the reasons given for the fraud claims, the factual allegations do not plausibly describe a fraudulent business

act. And the complaint likewise falls short on pleading the unlawfulness or unfairness of Coinbase's actions.

The plaintiffs identify three potential laws for the "unlawful" prong: the Commodities Exchange Act, the FinCEN rules, and New York state regulations. Even assuming Bitcoin Cash is a commodity subject to the Commodities Exchange Act, the complaint does not sufficiently explain how the launch manipulated the market for Bitcoin Cash or for Bitcoin. Nor does it plausibly or coherently describe Coinbase and Armstrong's motive to manipulate the prices. *See United States v. Reliant Energy Services, Inc.*, 420 F. Supp. 2d 1043, 1056 (N.D. Cal. 2006) (listing elements of manipulation). Coinbase did not violate the FinCEN rules because the reporting obligation applies only to transactions on one's own exchange. 31 C.F.R. § 1022.320(a)(2). The alleged insiders who purchased Bitcoin Cash in advance of the launch must have traded on exchanges other than Coinbase's. And the lack of compliance with New York law does not render an action unlawful under the UCL. Admittedly, the UCL "borrows" violations of other California and federal laws, thereby rendering them actionable under the UCL. *Farmer Insurance Exchange v. Superior Court*, 2 Cal. 4th 377, 383 (1992). But the plaintiffs offer no support for borrowing laws from other states, an unmanageable approach that would subject California's businesses to the (often conflicting) laws of all 50 states.

The test for unfairness under the UCL is "currently in flux," but the plaintiffs have failed to state a claim under their preferred test, which balances "the utility of the defendant's conduct against the gravity of the harm to the alleged victim." *Lozano v. AT&T Wireless Services*, 504 F.3d 718, 735 (9th Cir. 2007); *see South Bay Chevrolet v. General Motors Acceptance Corp.*, 72 Cal. App. 4th. 861, 886-87 (1999). As stated above, the theories of misconduct grounded in insider trading and market manipulation are implausible. The plaintiffs also identify two types of

7

allegedly false and misleading statements: those concerning when Coinbase would launch trading, and those concerning whether Coinbase would launch a fair and orderly market. SAC ¶ 214. This aspect of the UCL claim sounds in fraud, thus triggering the pleading requirements of Rule 9(b). *See Pickles v. Kate Spade and Co.*, No. 15-cv-5329-VC, 2016 WL 3999531, at *1 (N.D. Cal. July 26, 2016). But the plaintiffs did not particularly plead reliance on Coinbase's statements; rather, they fall back on their general impression of Coinbase's reputation. *See Pirozzi v. Apple, Inc.*, 966 F. Supp. 2d 909, 919 (N.D. Cal. 2013).

\* \* \*

The plaintiffs' fraud and UCL claims (Counts I and III-VIII) and the negligence claim by the sellers (a component of Count II) are dismissed with prejudice. The plaintiffs have been unable to articulate how they could amend to adequately allege those claims, and the Court cannot independently conceive of a means for doing so. As always, dismissal of a subset of claims with prejudice does not preclude a plaintiff from seeking revival if discovery reveals a factual basis that justifies reconsideration of this order. *See* Fed. R. Civ. P. 54(b); *WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1059 (9th Cir. 2011), *abrogated on other grounds by Lorenzo v. SEC*, 139 S. Ct. 1094 (2019).

**IT IS SO ORDERED.**

Dated: August 6, 2019

VINCE CHHABRIA
United States District Judge